# EXHIBIT 1

Ilan D. Scharf
Jeffrey P. Nolan (Pro Hac Vice Pending)
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, New York 10017-2024
Telephone:  (212) 561-7700
Facsimile:  (212) 561-7777
ischarf@pszjlaw.com
jnolan@pszjlaw.com

*Counsel for the Plaintiff,*
*Howard M. Ehrenberg in his capacity*
*as Liquidating Trustee of Orion Healthcorp, Inc., et al.,*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| ORION HEALTHCORP, INC.[1] | : Case No. 18-71748 (AST) |
| | : |
| Debtors. | : (Jointly Administered) |
| | : |

------------------------------------------------------

| | |
|---|---|
| HOWARD M. EHRENBERG IN HIS CAPACITY AS LIQUIDATING TRUSTEE OF ORION HEALTHCORP, INC., ET AL., | : |
| | : Adv. Pro. No. 20-_____ (AST) |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| ELIZABETH KELLY; FIDELITY NATIONAL TITLE INSURANCE COMPANY, | : |
| | : |
| Defendants. | : |

------------------------------------------------------

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Orion Healthcorp, Inc. (7246); Constellation Healthcare Technologies, Inc. (0135); NEMS Acquisition, LLC (7378); Northeast Medical Solutions, LLC (2703); NEMS West Virginia, LLC (unknown); Physicians Practice Plus Holdings, LLC (6100); Physicians Practice Plus, LLC (4122); Medical Billing Services, Inc. (2971); Rand Medical Billing, Inc. (7887); RMI Physician Services Corporation (7239); Western Skies Practice Management, Inc. (1904); Integrated Physician Solutions, Inc. (0543); NYNM Acquisition, LLC (unknown) Northstar FHA, LLC (unknown); Northstar First Health, LLC (unknown); Vachette Business Services, Ltd. (4672); Phoenix Health, LLC (0856); MDRX Medical Billing, LLC (5410); VEGA Medical Professionals, LLC (1055); Allegiance Consulting Associates, LLC (7291); Allegiance Billing & Consulting, LLC (7141); New York Network Management, LLC (7168). The corporate headquarters and the mailing address for the Debtors listed above is 1715 Route 35 North, Suite 303, Middletown, NJ 07748.

DOCS_LA:328179.8 65004/003

**COMPLAINT FOR AVOIDANCE AND RECOVERY**
**OF: (1) FRAUDULENT TRANSFERS; (2) PREFERENTIAL TRANSFERS;**
**(3) RECOVERY OF AVOIDED TRANSFERS; (4) TURNOVER OF PROPERTY**
**OF THE ESTATE; (5) FOR RECOVERY OF PROPERTY; (6) OBJECTION TO CLAIM**
**NO. 10044; (7) SUBORDINATION OF CLAIM; AND (8) DECLARATORY RELIEF**
**PURSUANT TO 11 U.S.C. §§ 502, 542, 544, 547, 548 AND 550; AND**
**(9) BREACH OF FIDUCIARY DUTY**

Plaintiff, Howard M. Ehrenberg in his capacity as Liquidating Trustee of Orion

Healthcorp, Inc., et al., (the "Plaintiff" or the Liquidating Trustee"), for the estates of the

above-captioned debtors in the above-captioned cases pending under chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code"), by and through its undersigned counsel, as and for

its *Complaint For Avoidance And Recovery Of: (1) Fraudulent Transfers; (2) Preferential*

*Transfers; (3) Recovery Of Avoided Transfers; (4) Turnover Of Property Of The Estate; (5) For*

*Recovery Of Property (6) Objection To Claim No. 10044; (7) Subordination Of Claim; And (8)*

*Declaratory Relief Pursuant To 11 U.S.C. §§ 502, 542, 544, 547 548 And 550; And (9) Breach*

*Of Fiduciary Duty* (the "Complaint") against the above-captioned defendants (collectively, the

"Defendant"), alleges as follows:

## THE PARTIES

1.      Plaintiff is the Liquidating Trustee under that certain Liquidating Trust

Agreement by and among Orion HealthCorp, Inc., Constellation Healthcare Technologies, Inc.

and certain of their affiliates.

2.      Upon information and belief, Defendant Elizabeth Kelly ("Kelly") is an

individual currently residing in the State of New York.  Defendant Kelly is the former President,

and Chief Executive Officer, of the Debtor, New York Network Management, LLC from March

2017 to June 2018.  Upon information and belief, Defendant Fidelity National Title Insurance

Company ("Fidelity National") is a corporation formed under the laws of the State of Florida.

## STANDING

3.      On March 16, 2018, each of the Debtors except New York Network Management, LLC ("NYNM") filed a voluntary petition with the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") under chapter 11 of the Bankruptcy (Code and NYNM commenced its voluntary petition on July 5, 2018 (collectively, the "Debtors"). The Debtors' cases are jointly administered for administrative purposes only [Docket Nos. 34 and 381].

4.      On February 26, 2019, the Honorable Alan S. Trust, United States Bankruptcy Judge for the Eastern District of New York, entered an order (the "Confirmation Order") [Docket No. 701] confirming the Debtors' Third Amended Joint Plan Of Liquidation (the "Plan").

5.      The Plan provides, among other things, for the formation of the Liquidating Trust and the appointment of the Liquidating Trustee on the Effective Date (as that term is defined in the Plan) to oversee distributions to holders of Allowed Claims and Allowed Interests and to pursue retained Causes of Action of the Debtors' Estates. The Effective Date occurred on March 1, 2019.

6.      The Plan provides that the Liquidating Trustee shall have the authority and responsibility to, among other things, receive, manage, invest, supervise, and protect the Liquidating Trust Assets, including causes of action, of the Debtors.

## JURISDICTION AND VENUE

7.      The Bankruptcy Court has jurisdiction over this adversary proceeding under the Bankruptcy Code pursuant to 28 U.S.C. §§ 157(a) and 1334(a).

8.      This proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b) and the Bankruptcy Court may enter final orders for the matters contained herein.

9.    Pursuant to Local Bankruptcy Rule 7008-1, the Plaintiff affirms his consent to the entry of final orders or judgments by the Bankruptcy Court if it is determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

10.    Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## BASIS FOR RELIEF REQUESTED

11.    This adversary proceeding is initiated pursuant to Rules 7001(1), (2) and (9) and 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to avoid and recover, pursuant to sections 502, 542, 544, 547, 548, 550, and 551 of the Bankruptcy Code and sections 273, 274, 275 and 276 of the New York Debtor & Creditor Law (the "NY Debt & Cred L"), made applicable herein pursuant to section 544 of the Bankruptcy Code, certain avoidable transfers that were made by the Debtors to the Defendant prior to the Petition Date.

## FACTS

12.    The Debtors are a consolidated enterprise of several companies aggregated through a series of acquisitions, which operate the following businesses: (a) outsourced revenue cycle management for physician practices, (b) physician practice management, (c) group purchasing services for physician practices, and (d) an independent practice association business, which is organized and directed by physicians in private practice to negotiate contracts with insurance companies on their behalf while such physicians remain independent and which also provides other services to such physician practices.

13.    Parmjit Parmar a/k/a Paul Parmar ("Parmar"), was the former Chief Executive Officer of the Debtor, Constellation Healthcare Technologies, Inc. ("CHT"), Sotirios Zaharis, a/k/a Sam Zaharis ("Zaharis"), was the former Chief Financial Officer of CHT, and Ravi

Chivukula ("Chivukula") was the Controller and Secretary of CHT from approximately 2013 to 2017.  Parmar, Zaharis and Chivukula served on the board of directors of CHT.  Parmar, Zaharis and Chivukula, in combination with one another and with others, operating through various Debtors, moved money and established off-balance sheet accounts to redirect monies of the Debtors for their own personal use.  The Debtors, and the aforementioned associates, utilized a Wells Fargo IOLA account overseen by the law firm of Robinson, Brog, Leinwand, Greene, Genovese & Gluck, P.C. ("Robinson Brog").  Upon information and belief, Robinson Brog also represented Parmar, Zaharis and Chivukula personally in their business, litigation and private affairs.

14.     On or about 2018, Parmar, Zaharis and Chivukula were indicted by the United States Attorney's Office, District of New Jersey, for creating fictitious business entities, balance sheets, doctored bank statements, fabricating customers as well as generating fake income streams, and sham acquisitions in an effort to divert monies from the Debtors.  As alleged, Parmar, Zaharis and Chivukula diverted funds to enrich themselves, their friends, family and associates.

15.     In or about 2015 and earlier, Defendant Kelly was the majority owner, managing member, and Chief Executive Officer of New York Network Management, LLC prior to its acquisition by the Debtors.

16.     On or about March 10, 2017, the Debtors as represented by Robinson Brog, acquired NYNM from selling members owning NYNM, which included Defendant Kelly. Pursuant to the Membership Interests Purchase Agreement made and entered into as of March 10, 2017, the sum of $15,589,500 in cash was paid, including the right to subsequent payments and earn-outs over the course of the following years (the "NYNM Acquisition").

17.     The NYNM Acquisition was orchestrated through the network of entities arranged by Parmar such that funds could be diverted into off-balance sheet accounts.  The off-balance sheet accounts allowed funds to be transferred (a) to entities controlled by Parmar and his confederates, or (b) to commingle funds such that monies could be disbursed in a manner which best allowed Parmar to obfuscate his dealings and continue to maintain an illusion that the Debtors were solvent.

18.     From March 10, 2017 to June, 2018, Defendant Kelly operated NYNM as the President and CEO.  During the course of the ensuing six to eight months, monthly billing and revenue for NYNM diminished drastically, the stated growth rates from the NYNM Acquisition were never realized, and the business performed poorly until Defendant's abrupt resignation in June 2018.

(A)     **The Transfers:**

19.     During the one (1) year period prior to the commencement of the bankruptcy cases, the Debtors transferred property to or for the benefit of Defendant in an amount not less than $5,890,000, as identified in particular on Exhibit "A" which is incorporated herein by reference (collectively, the "Transfers").  Defendant was an officer of the Debtors at all pertinent times therein.

20.     On or about January 26, 2018, the Debtors transferred to Defendant, Fidelity National, for the benefit of Defendant Kelly, $1,795,000.00, as identified in particular in Exhibit "B", which is incorporated herein by reference.

**(B)**    **Amounts Allegedly Owed To Defendant And Defendant's Proofs Of Claim:**

21.    On or about July 2, 2018, Defendant filed a claim in the amount $49,659,099.00, which the claims agent appointed by the Court designated as claim no. 10044 (the "Filed Claim"), a copy of which is attached hereto as Exhibit "C".

22.    Defendant alleges in the Filed Claim that the Debtors failed to pay working capital adjustment and the earn-out fees in accordance with the NYNM Acquisition.

## FIRST CLAIM FOR RELIEF

### (For Avoidance and Recovery of Intentionally Fraudulent Transfers Under 11 U.S.C. § 548 and NY Debt & Cred L § 276 Against Defendant, Kelly)

23.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

24.    The Defendant received the Transfers from the Debtors some of which were through various means including the off-balance sheet bank accounts as identified in particular on Exhibit "A".

25.    The Transfers were made by the Debtors with actual intent to hinder or delay or defraud their creditors insofar as the Transfers were orchestrated through a scheme to divert and redirect monies of the Debtors for the personal benefit of Parmar, his friends and associates, or in a manner to obfuscate the misuse of the Debtors.

26.    The Transfers were made to or for the benefit of Defendant.

27.    Accordingly, the Transfers are avoidable, and should be avoided, as intentionally fraudulent transfers pursuant to § 548(a)(1)(A) and NY Debt & Cred L § 276, and may be recovered from Defendant pursuant to § 548 and the NY Debt & Cred L. Plaintiff is entitled to an order and judgment under 11 U.S.C. § 544 that the Transfers be avoided.

## SECOND CLAIM FOR RELIEF

**(To Avoid Constructively Fraudulent Transfers Under
11 U.S.C. §§ 544(b) and 548(a)(1)(B) and NY Debt & Cred L
§§ 273-275, *et seq.*, Against Defendant Kelly)**

28.     Plaintiff realleges and incorporates by reference each and every allegation in the above paragraphs, as though fully set forth herein.

29.     Plaintiff is informed and believes, and thereon asserts that at all relevant times, the Debtors:  (a) were insolvent, or became insolvent as a result of the Transfers; (b) were engaged in or was about to engage in a business or a transaction for which their remaining assets were unreasonably small in relation to the business or transaction; (c) intended to incur, or believed or reasonably should have believed that they would incur, debts beyond its ability to pay as they became due; or (d) made such Transfers to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

30.     Plaintiff is informed and believes, and thereon asserts, that Defendant did not give the Debtors, and the Debtors did not otherwise receive, reasonably equivalent value for obligations incurred for the Transfers. As a result, the Debtors paid and received in value nothing from Defendant and/or less than reasonably equivalent value.

31.     At all relevant times, the Transfers were avoidable pursuant to 11 U.S.C. § 548(a)(1)(B) and NY Debt & Cred L.  Plaintiff is entitled to an order and judgment that the Transfers are avoided.

## THIRD CLAIM FOR RELIEF

**(Avoidance Of Preferential Transfers Pursuant to 11 U.S.C. § 547(b)
Against Defendant Kelly)**

32.     Plaintiff realleges and incorporates by reference each and every allegation in the above paragraphs, as though fully set forth herein.

33.    During the One-Year Period, Defendant was a creditor and an insider of one or more of the Debtors.

34.    Each Transfer identified on Exhibit "A" hereto was made to or for the benefit of Defendant.

35.    Each Transfer was made for or on account of an antecedent debt or debts owed by one or more of the Debtors before such Preferential Transfers were made.

36.    Each Transfer was made during the One-Year Period in which Kelly was an insider of the Debtors.

37.    Each Transfer was made while the Debtors were insolvent.

38.    Each Transfer enabled Defendant to receive more than Defendant would have received if (i) the Debtors' chapter 11 cases were instead cases under chapter 7 of the Bankruptcy Code; (ii) the transfers and/or payments had not been made; and (iii) Defendant received payment on account of the debt paid by the Preferential Transfers to the extent provided by the Bankruptcy Code.

39.    Each Transfer constitutes an avoidable preference pursuant to Bankruptcy Code section 547(b).

**FOURTH CLAIM FOR RELIEF**

**(For Turnover of Property of the Estate Under 11 U.S.C. § 542
Against Defendant Fidelity National)**

40.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 39, inclusive, as though fully set forth herein.

41.    Upon the commencement of the Debtor's bankruptcy case, the estate succeeded to the rights to the property of the estate as defined in 11 U.S.C. § 541.

42.     Pursuant to 11 U.S.C. §542, Plaintiff is entitled to turnover of the funds transferred to Defendant, Fidelity National, or the proceeds thereof, as identified in particular on Exhibit "B".

## FIFTH CLAIM FOR RELIEF

### (For Recovery of Property Under 11 U.S.C. § 544(b), §550 and NY Debt & Cred L Against Defendants Kelly and Fidelity National)

43.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

44.     As the Defendant is the initial, immediate or mediate transferees of the Transfer, Plaintiff may recover for the benefit of the estate the property transferred or the value of such property from (a) the initial transferee of such transfer or the entity for whose benefit such transfer was made or (b) any immediate or mediate transferee of such initial transferee pursuant to pursuant to 11 U.S.C. § 550(a)

45.     As alleged above, Plaintiff is entitled to avoid the Transfers under 11 U.S.C. §§ 542, 547 and 548.  As Defendant is the initial, immediate or mediate transferee of the Transfers, Plaintiff is entitled to receive for the Estate the proceeds or value of the Transfers under 11 U.S.C. § 550 of the Bankruptcy Code and NY Debt & Cred L.

## SIXTH CLAIM FOR RELIEF

### (Objection To Claims against Defendant, Kelly)

46.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

47.     After a thorough review of the Debtors' Books and Records and Claim No. 10044, the Plaintiff has determined that Claim No. 10044 does not comply with the Bankruptcy Rules, is without evidentiary support, and is contradicted by the Debtors' books and records.

48.    As alleged above, each Preferential or Fraudulent Transfer constitutes an avoidable transfer pursuant to 11 U.S.C. § 547 and/or 548 of the Bankruptcy Code, which is recoverable pursuant to Bankruptcy Code section 550.

49.    As a result of the above, Plaintiff moves to strike the Claim or alternatively,  pursuant to Bankruptcy Code section 502(d), Claim No. 10044  must be disallowed unless and until Defendant pays to the Plaintiff an amount equal to each preferential or fraudulent Transfer that is avoided including pre- and post-judgment interest on the avoided amount.

50.    As a result of the above, Plaintiff moves to strike Claim No. 10044.

## SEVENTH CLAIM FOR RELIEF

### (Equitable Subordination of the Claims Pursuant to 11 U.S.C. §§ (510(b) & (c))

51.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

52.    The Filed Claim seeks damages arising from the purchase or acquisition of NYNM and shall be subordinated to all claims or interests that are senior to or equal the claim or interest.

53.    Defendant Kelly, in her capacity as a former officer, of the Debtors engaged in the inequitable conduct surrounding the Debtors' operations, projections for future revenue and earnings such that the NYNM Acquisition ultimately needed to be sold upon her and her colleagues abrupt resignation.

54.    Because Kelly, an insider of the Debtors, conducted herself in a manner that resulted in injury to the Debtors and their creditors, the Claims should be equitably subordinated and paid *pari passu* with the Debtors' equity interest holders.

## EIGHTH CLAIM FOR RELIEF

### (For Declaratory Relief Against Defendants Kelly and Fidelity National)

55.     Plaintiff realleges and incorporates by reference each and every allegation in the above paragraphs, as though fully set forth herein.

56.     By reason of the fact that the NYNM Acquisition and the subsequent shifting of funds as payments was either or both an avoidable fraudulent transfer and/or avoidable preferential transfer, and are avoidable, Plaintiff asserts an ownership right in the Transfer identified on Exhibit "B" superior to that of Defendant, Fidelity National and that such interest should be free and clear of all interests.

57.     Plaintiff is informed and believes and thereon asserts that others may assert an interest in these funds as a result of litigation in which Defendant Kelly is or was a party.

58.     By reason of the conflicting assertions by Plaintiff and the Defendants, a justiciable controversy exists between the parties such that the issuance of declaratory relief is appropriate and warranted.

59.     Plaintiff seeks a declaration that it is the true owner of the funds transferred by the Debtors and identified in particular on Exhibit "B", and the transfers to Defendants, should be avoided and/or property returned to the Plaintiff.

## NINTH CLAIM FOR RELIEF

### (For Breach of Fiduciary Duty Against Defendant Kelly)

60.     Plaintiff realleges and incorporates by reference each and every allegation in the above paragraphs, as though fully set forth herein.

61.     By virtue of her position as President and Chief Executive Officer of NYNM, Kelly owed fiduciary duties to NYNM and its investors.

62.     The fiduciary duties owed by Kelly included, but were not limited to, the duty of good faith and fidelity, the duty of loyalty, the duty of care, the duty of candor and the duty to act competently.

63.     As part of the duty of care and to act competently, Kelly had the duty to operate the NYNM with reasonable care, including running its operations, billing and revenues with reasonable diligence, hiring personnel and entities with appropriate experience in matters of business and finance, acting to prevent fraud and mismanagement such as the unreasonable incurrence of personal expenses paid for by the Debtor, conducting reasonable diligence into the reasons and causes of NYNM's poor performance, and taking reasonable steps to ensure that NYNM would perform as projected.

64.     Acting in her capacity as an officer of NYNM, Kelly breached the duties she owed to NYNM and its investors, by operating and managing NYNM in an unreasonable way and making decisions that had no viable business reasons that caused NYNM's monthly billing and revenue to diminish drastically between March 2017 and June 2018, with poor performance that failed to match the growth rates that were anticipated at the time of the NYNM Acquisition.

65.     Kelly knew, or should have known, that the failure to take reasonable care in managing NYNM, and to operate it with due diligence, would result in damage to NYNM. Insofar as NYNM had any legitimate value as an operating entity at the time of the NYNM Acquisition, that value was diminished as a result of Kelly's failure to take reasonable care in operating NYNM after the Acquisition.

66.     Kelly's conduct as set forth above was in direct conflict with the interests of NYNM, and her actions were taken without a viable business reason.

67.     Kelly's conduct as set forth above was a direct and proximate cause of, and a substantial factor in, NYNM being damaged in an amount of which will be determined by proof at trial.

**WHEREFORE**, Plaintiff prays for judgment as follows:

a.     For a determination that the Transfers are an avoidable fraudulent transfer under 11 U.S.C. §§ 544, and 548, of the Bankruptcy Code and Section 273-276 of NY Debt & Cred L, *et seq.*, as applicable, and that Plaintiff is entitled to recover the Transfers under 11 U.S.C. § 550 of the Bankruptcy Code;

b.     For a determination that the Transfers are avoidable transfers under 11 U.S.C. §§ 544 and 547, as applicable, and that Plaintiff is entitled to recover the Transfers under 11 U.S.C. 550 and 551 of the Bankruptcy Code;

c.     For Turnover of the Debtors' property as identified on Exhibit "B", pursuant to 11 U.S.C. § 542;

d.     On its Claim for Objection to the Filed Claim and for Subordination, that the Defendant recover nothing by way of the Filed Claim or if any amount, it be subordinated to the claims of all unsecured creditors;

e.     The Court enter an Order pursuant to 11 U.S.C. § 510(b) and (c) against the Defendant that the Claims are deemed to be subordinated to the claims of all other unsecured creditors of the Debtors together with such other relief as is determined by this Court to be fair and equitable;

f.     For a Declaration from this Court that property as identified on Exhibit "B" in the possession of Fidelity National, is avoided, property of the Debtors, and is to be immediately returned.

g.      For a determination that Kelly breached the fiduciary duties owed to NYNM, and that Plaintiff is entitled to recover damages caused by these breaches in an amount to be proven at trial;

h.      Awarding to the Plaintiff the costs of suit incurred herein, including pre- and post-judgment interest; and

i.      For such other and further relief as the Court may deem just and proper.

Dated: New York, New York
      March 13, 2020

                              _/s/ Ilan D. Scharf_
                              Ilan D. Scharf, Esquire
                              Jeffrey P. Nolan, Esquire
                              PACHULSKI STANG ZIEHL & JONES LLP
                              780 Third Avenue, 36th Floor
                              New York, New York 10017
                              Telephone:    (212) 561-7700
                              Facsimile:    (212) 561-7777

                              Counsel for the Plaintiff,
                              Howard M. Ehrenberg in his capacity
                              as Liquidating Trustee of Orion Healthcorp, Inc.,
                              et al.,

SERVICE LIST


ELIZABETH KELLY
125 ANNFIELD CT.
STATEN ISLAND, NY 10304

DOMINIC PICCA, Esq.
PAUL RICOTTA, Esq.
C/O ELIZABETH KELLY
MINTZ, LEVIN, COHN, FERRIS ET AL
666 THIRD AVENUE
NEW YORK, NY 10017

FIDELITY NATIONAL TITLE INSURANCE COMPANY
ATTN: RAYMOND R. QUIRK, CEO
601 RIVERSIDE
JACKSONVILLE, FL  32204

C T CORPORATION SYSTEM,
R/A FOR FIDELITY NATIONAL TITLE INSURANCE CO.
818 W. 7TH STREET, STE. 930
LOS ANGELES, CA  90017-3476

# EXHIBIT A

# EXHIBIT A

| PARTY RECEIVING TRANSFER | Date | AMOUNT | Bank Account |
|---|---|---|---|
| | | | |
| ELIZABETH KELLY | 3/20/2017 | $ 50,000.00 | CHASE OPERATING ACCOUNT |
| ELIZABETH KELLY | 3/20/2017 | $ 125,000.00 | CHASE OPERATING ACCOUNT |
| ELIZABETH KELLY | 3/20/2017 | $ 125,000.00 | CHASE OPERATING ACCOUNT |
| ELIZABETH KELLY | 10/12/2017 | $ 2,000,000.00 | WELLS FARGO-IOLA ACCOUNT |
| ELIZABETH KELLY | 1/16/2018 | $ 1,795,000.00 | WELLS FARGO-IOLA ACCOUNT |
| FIDELITY NATIONAL ON BEHALF OF ELIZABETH KELLY | 1/26/2018 | $ 1,795,000.00 | WELLS FARGO-IOLA ACCOUNT |
| Total | | $ 5,890,000.00 | |

# EXHIBIT B

# EXHIBIT B

11:28 AM
03/30/16
Accrual Basis

**Wells Fargo - IOLA (Non-Interest)**
**Account QuickReport**
**All Transactions**

| Type | Date | Num | Name | Memo | Split | Debit | Credit | Balance |
|------|------|-----|------|------|-------|-------|--------|---------|
| Check | 01/26/2016 | DM/wire | Fidelity National Title Ins. Co. | wire out/IOLA Payer | Wells Fargo-IOLA | 1,795,000.00 | | 0.00 |

# EXHIBIT C

| | |
|---|---|
| United States Bankruptcy Court for the Eastern District of New York | |
| **Name of Debtor:** Orion HealthCorp, Inc. | **For Court Use Only** |
| **Case Number:** 18-71748 | Claim Number: 0000010044 |
| | File Date: 07/02/2018 18:45:49 |

# Proof of Claim

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case.** With the exception of 503(b)(9), do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.
Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.
A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.
**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

04/16

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**
Name of the current creditor (the person or entity to be paid for this claim): Elizabeth Kelly

Other names the creditor used with the debtor: _____

**2. Has this claim been acquired from someone else?** ☑ No  ☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?** Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Name  Elizabeth Kelly | Name  _____ |
| Address  125 Annfield Court | Address  _____ |
| City  Staten Island | City  _____ |
| State  NY   ZIP Code  10304 | State  _____   ZIP Code  _____ |
| Country (if international): _____ | Country (if international): _____ |
| Phone:  718 667 1979 | Phone:  _____ |
| Email:  weehag@hotmail.com | Email:  _____ |

**4. Does this claim amend one already filed?**
☑ No
☐ Yes.
   Claim number on court claims register (if known) _____
   Filed on _____
        MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**
☑ No
☐ Yes.
   Who made the earlier filing? _____

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes.
Last 4 digits of the debtor's account or any number you use to identify the debtor:

_____ _____ _____ _____

**7. How much is the claim?**  $ 49,695,099.00

**Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information.

Other Basis _____

_____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* with this Proof of Claim.

☐ Motor vehicle

☐ Other. Describe:

Basis for perfection:

Attach redacted copies of documents, if any, that show evidence of perfection of security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:                          $ _____

Amount of the claim that is secured:    $ _____

Amount of the claim that is unsecured: $ _____
(The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:  $ _____

Annual Interest Rate (when case was filed) _____ %
                                    ☐ Fixed ☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of petition.

$ _____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property:

_____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

☑ No

☐ Yes. *Check one:*

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

☐ Other. Specify subsection of 11 U.S.C. § 507 (a) (_____) that applies.

* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

**Amount entitled to priority**

$ _____

$ _____

$ _____

$ _____

$ _____

$ _____

**13. Does this claim qualify as an Administrative Expense under 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes. Amount that qualifies as an Administrative Expense under 11 U.S.C. § 503(b)(9): $ _____

| Part 3: | Sign Below |
|---|---|

| The person completing this proof of claim must sign and date it. FRBP 9011(b).<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571. | *Check the appropriate box:*<br><br>☑ I am the creditor.<br>☐ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other co-debtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>*Elizabeth Kelly*             07/02/2018 18:45:49<br>Signature             Date<br><br>**Provide the name and contact information of the person completing and signing this claim:**<br><br>Name   Elizabeth Kelly<br>Address   125 Annfield Court<br><br>City   Staten Island<br>State   NY      Zip   10304<br>Country (in international)   United States<br>Phone   718 667 1979<br>Email   wcchag@hotmail.com |

**Addendum to Proof of Claim of Creditor, Elizabeth Kelly, Regarding**
*In re Orion HealthCorp., Inc., et al*, (Bankr. E.D.N.Y. Case No. 18-71748 (AST)

Creditor, Elizabeth Kelly ("Creditor"), hereby submits this Addendum to her Proof of Claim (together with this Addendum, the "Claim") against the Debtors in each of the proceedings that have been administratively consolidated and which are being jointly administered under *In re Orion HealthCorp., Inc., et al*, (Bankr. E.D.N.Y. Case No. 18-71748 (AST) (the "Bankruptcy Cases"). The Claim constitutes a separate and independent claim in each of the proceedings constituting the Bankruptcy Cases.

As more fully described herein, as of the date of the filing of the Bankruptcy Cases, the amount of the Claim is $49,695,099.[1] The documentation and backup detail supporting the Claim constitutes several thousand pages and is not reproduced here. Such backup and detail has previously been transmitted in electronic form to the Debtors. Any party in interest may request a copy of such documentation by contacting counsel to Creditor at the following address:

> Dominic Picca
> Paul Ricotta
> Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
> 666 Third Avenue
> New York, NY 10017
> 212-935-3000
> dpicca@mintz.com
> pricotta@mintz.com

Creditor reserves the right to supplement or amend any of the documentation heretofore provided to Debtors. The following represents a general description of the Claim and such backup documentation.

## GENERAL DESCRIPTION OF THE CLAIM

Creditor founded and was the majority owner of New York Network Management LLC ("NYNM LLC"), which operated an independent practice association ("IPA") business providing certain services to private physician practices ("Providers") and insurance companies ("Payors"). Among other things, NYNM LLC or its subsidiaries contracted with Payors to maintain a network of Providers who would provide healthcare services to enrollees of the Payors. Separately, NYNM LLC or its subsidiaries contracted with Providers to provide services to members of each Payor's healthcare network on a negotiated fee basis. CareCore National, LLC (known as "eviCore") provided "back office" services to NYNM LLC's business, including the submission of Provider claims to Payors and the processing of payments made by Payors which were owed to Providers. Each of the claims submitted to Payors constituted a current account receivable owed to NYNM LLC or its subsidiaries, and any overpayments to Providers which were subject to refund from

---

[1] In providing a specific, liquidated amount, Creditor hereby reserves all rights to increase or modify the Claim in the event that new or additional facts become known to Creditor.

Providers similarly constituted current accounts receivable owed to NYNM LLC or its subsidiaries.

In March 2017, debtor, Orion Healthcorp, Inc., through NYNM Acquisition LLC ("NYNM Acquisition"), purchased all of the membership interests in NYNM LLC and its subsidiaries from certain parties, including, primarily, Creditor, pursuant to that certain Membership Interests Purchase Agreement, dated as of March 10, 2017 (the "Purchase Agreement"), entered into by and among debtor, NYNM Acquisition, NYNM LLC, Creditor, Michaela Kircher and Cliona Sotiropoulos. A copy of the Purchase Agreement is attached hereto at **Exhibit 1**. The closing date under the Purchase Agreement was designated as March 1, 2017 (the "Closing Date").

The purchase price paid to Creditor included cash at closing and (i) the right to an additional cash payment in the event that the actual working capital of NYNM LLC, as of the Closing Date, was greater than $1, with such actual working capital to be later determined by the parties (the "Working Capital Adjustment"), and (ii) the right to further cash payments in the event that the revenue of NYNM LLC during the two years immediately following the Closing Date exceeded certain milestones (the "Earn-Out"). The Debtors have failed to pay the Working Capital Adjustment and the Earn-Out to Creditor.

## WORKING CAPITAL ADJUSTMENT

Pursuant to Section 1.5(a) of the Purchase Agreement, Creditor is entitled to an adjustment of the Purchase Price (as defined in the Purchase Agreement) in the event that the actual working capital of NYNM LLC, as of the Closing Date, is greater than $1. Since, as an accounting matter, the actual working capital of NYNM LLC is determined by calculating the excess of current assets over current liabilities and, in the ordinary course of business of NYNM LLC, current assets such as accounts receivables cannot be accurately determined until a number of later adjustments, disputes and other matters are resolved, the Purchase Agreement included a mechanism whereby the actual working capital of NYNM LLC would be calculated after the Closing Date. On or about June 8, 2017, Creditor delivered an initial Working Capital Adjustment calculation in the amount of $1,345,328 to which the Debtors did not object.

Pursuant to Section 1.5(f) of the Purchase Agreement, the Parties set forth in a schedule the outstanding accounts receivable as of the Closing Date, "which schedule [Creditor] may update from time to time during the period ending nine months after the date hereof (as amended, the "Closing Accounts Receivable"). Monies received by [NYNM LLC and its subsidiaries] subsequent to the Closing Date arising from the Closing Accounts Receivable shall be held by [NYNM LLC and its subsidiaries] for the benefit of the Selling Members."

2

A summary of the June 8, 2017 initial Working Capital Adjustment that was delivered to the Debtors is as follows:

| Current Assets | | |
|---|---|---|
| Cash | $1,226,526.92 | |
| Net accounts receivable | $2,053,457.35 | $3,279,984.27 |
| Less: Current Liabilities | | ($1,934,655.66) |
| Initial Working Capital Adjustment | | $1,345,328.61 |

Subsequent to the delivery of the initial Working Capital Adjustment, it was determined that additional accounts receivable existed as of the Closing Date that should have been included in the Working Capital Adjustment and the Closing Accounts Receivable. Those receivables were for dates of service prior to the Closing Date, and were collected by the Debtors after the Closing Date. The amount of such additional receivables to be included in the Working Capital Adjustment totals $87,149.

Wellcare Healthplans, Inc. is a Payor. Prior to the Closing Date, Wellcare erroneously informed NYNM LLC (through eviCore) that certain Providers were entitled to be paid an aggregate amount which was $453,090 more than such Providers were actually entitled to be paid. NYNM LLC made such excess payments to Providers in cash prior to the Closing Date. Although NYNM LLC attempted to recoup such overpayment from such Providers, it was only successful in recouping $265,766 as of the Closing Date, leaving a deficit of $187,691 which constituted a receivable owed by such Providers to NYNM LLC as of the Closing Date. These accounts receivable were not reflected in the initial Working Capital Adjustment or the Closing Accounts Receivable. Subsequent to the Closing Date, the $187,691 receivable was recouped by NYNM LLC in cash. Therefore, the amount of such receivable which should be included in the Working Capital Adjustment and the Closing Accounts Receivable totals $187,691.

Fidelis Care New York is a Payor. Prior to the Closing Date, Fidelis erroneously informed NYNM LLC (through eviCore) that certain Providers were entitled to be paid an aggregate amount which was $214,644 more than such Providers were actually entitled to be paid. NYNM LLC made such excess payments to Providers in cash prior to the Closing Date. Although NYNM LLC attempted to recoup such overpayment from such Providers, it was only successful in recouping $135,006 as of the Closing Date, leaving a deficit of $81,458 which constituted a receivable owed by such Providers to NYNM LLC as of the Closing Date. These accounts receivable were not reflected in the initial Working Capital Adjustment or the Closing Accounts Receivable. Subsequent to the Closing Date, the $81,458 receivable was recouped by NYNM LLC in cash. Therefore, the amount of such receivable which should be included in the Working Capital Adjustment and the Closing Accounts Receivable totals $81,458.

At the time of the closing, two current expense items were overstated in the original calculation of Working Capital pursuant to the Purchase Agreement. As of the Closing Date, the current liability for the New York City Unincorporated Business Tax was originally estimated at $52,800. Subsequent to the Closing Date, the actual amount was determined to be $38,613, a difference of $14,187. As of the Closing Date, the current liability for claims processing fees owed to eviCore and to Change Healthcare were erroneously allocated to Creditor for services to be rendered in March and April, 2017 (*i.e.*, for periods after the Closing Date). Therefore, in total, Working Capital was understated by $173,036 because current liabilities were overstated by such amount, and the amount of the Working Capital Adjustment should increase by $173,036.

## EARN-OUT

Section 1.3 of the Purchase Agreement provides that Creditor is entitled to "Earn-Out Payments," to be paid in accordance with the formula set forth therein for the two years immediately following the Closing Date. Section 1.3(f) of the Purchase Agreement further provides, in part, that,

> [T]he Buyer acknowledges that the ability of [Creditor] to earn the Earn-Out Payments is a material inducement to enter into this Agreement and consummate the transactions contemplated hereby, and the Buyer and its Affiliates, as applicable, hereby agree to use commercially reasonable efforts to try to achieve results that would result in the making of an Earn-Out Payment. In furtherance of the foregoing, Buyer agrees that at any time prior to the expiration of all deadlines to earn the related Earn-Out Payment (i) it will not knowingly take any action or fail to take any action with the intent to frustrate the achievement of an Earn-Out Payment, (ii) it will carry on the Company Group and the Business as a going concern and with a view to profit . . . If Buyer is in breach of any of these provisions and [Creditor] has not consented in writing to such breach, then the Net Revenue for the relevant Earn-Out Year shall be adjusted as if the breach has not occurred for the purposes of ascertaining the Earn-Out Payments.

Creditor is entitled to a claim based on actual results of NYNM LLC for Year 1[2] and projected results of NYNM LLC for Year 2[3] calculated as if the breach of Section 1.3 of the Purchase Agreement had not occurred. The actual results of NYNM LLC for Year 1 and the projected results of NYNM LLC for Year 2 are set forth below. The projected results for Year 2 are based upon, among other things, the average growth rate of the revenues of NYNM LLC as well as the known growth opportunities of NYNM LLC which the company failed to pursue due to the fraud perpetrated upon Creditor and others by the Debtors.

---

[2] Year 1 is defined in the Purchase Agreement as the period between March 2017 and February 2018.
[3] Year 2 is defined in the Purchase Agreement as the period between March 2018 and February 2019.

4

|                                                              | Year 1         | Year 2         |
| ------------------------------------------------------------ | -------------- | -------------- |
| Revenue                                                      | $11,998,439    | $28,773,914    |
| Less:  Floor Amount (from Earn-Out formula)                  | (10,900,000)   | (11,998,439)   |
| Excess of Revenue over Floor                                 | $1,098,439     | $16,775,475    |
| Multiplied by Multiple (from Earn-Out formula)               | x  3.8         | x  3.8         |
|                                                              | $4,174,069     | $63,746,805    |
| Multiplied by Factor (from Earn-Out formula)                 | x  50%         | x  50%         |
| Earn-Out on Excess Amount                                    | $2,087,034     | $31,873,403    |
| Plus, Earn-Out on Floor Amount                               | 6,930,000      | 6,930,000      |
| TOTAL EARN-OUT                                               | $9,017,034     | $38,803,403    |

## SUMMARY

A summary of the components of the Claim is as follows:

| **Component of Claim** | **Amount** |
| --- | --- |
| Initial Working Capital Adjustment | $1,345,328 |
| Additional accounts receivable omitted from Initial Working Capital Adjustment and Closing Accounts Receivable | $87,149 |
| Additional account receivable due because of Wellcare overpayment | $187,691 |
| Additional account receivable due because of Fidelis overpayment | $81,458 |
| Overstatement and Misallocation of Current Liabilities in Calculation of Working Capital | $173,036 |
| Earn-Out | $47,820,437 |
| TOTAL CLAIM | $49,695,099 |

5

## RESERVATION OF RIGHTS

Creditor expressly reserves her right to file any separate or additional proof of claim with respect to the Claim or otherwise (which proof of claim, if so filed, unless otherwise indicated thereon, shall not be deemed to supersede the Claim), to amend or supplement the Claim in any respect, including with respect to the filing of an additional or amended claim for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional claims or for any other reason.

Creditor expressly reserves all rights accruing to her and the execution and filing of the Claim is not and shall not be deemed: (a) an election of remedy; (b) a waiver of any rights or remedies of the Creditor under any agreement or applicable law; (c) a waiver of any right to assert that all or any portion of the Claim constitutes an administrative expense claim, an unsecured claim, a secured claim, or a priority claim in this bankruptcy case; (d) a waiver or release of the Creditor's claims or rights against any other entity, person, or property liable for all or any part of the Claim or any matters related to the Claim; (e) a consent by the Creditor to the jurisdiction of the Bankruptcy Court with respect to any proceeding commenced in this bankruptcy case against or otherwise involving the Creditor or a waiver by the Creditor of any immunity; (f) a waiver of the right to withdraw the reference, or otherwise to challenge the jurisdiction of the Bankruptcy Court with respect to the subject matter of the Claim, any objection or other proceedings commenced with respect thereto, or any other proceedings commenced in this bankruptcy case against or otherwise involving the Creditor; (g) a waiver or release by the Creditor of her right to trial by jury, a consent by the Creditor to a trial by jury in the Bankruptcy Court or any other court, an admission that any matter is a core matter or is a matter as to which the Bankruptcy Court can enter a final judgment, a right to have final orders entered in non-core matters only after a *de novo* review by the district court, or a consent to the entry by the Bankruptcy Court of a final judgment with respect to the Claim or any other matter; (h) a waiver of any claim or right against any other creditor, arising under the bankruptcy case or otherwise; and/or (i) a waiver of any right related to any plan of reorganization proposed in the bankruptcy case. Creditor reserves all rights of setoff and recoupment that she may have. Creditor specifically reserves all of her defenses and rights, procedural and substantive, including, without limitation, her rights with respect to any claim that may be asserted against Creditor by the Debtors or any other party.

# Exhibit 1 to the Addendum

## Purchase Agreement

78566771v.3

MEMBERSHIP INTERESTS PURCHASE AGREEMENT

made and entered into as of

March 10, 2017

by and among

NYNM ACQUISITION, LLC,

NEW YORK NETWORK MANAGEMENT, L.L.C.,

ELIZABETH KELLY,

MICHAELA KIRCHER,

AND

CLIONA SOTIROPOULOS

{00829079.DOCX;12 }

MEMBERSHIP INTERESTS PURCHASE AGREEMENT, dated as of March 10, 2017 (the "**Effective Date**") (herein, together with the Schedules and Exhibits attached hereto, referred to as this "**Agreement**"), is by and among Elizabeth Kelly, an individual residing at 12 Annfield Court, Staten Island, NY 10304 ("**Kelly**"), Michaela Kircher, an individual residing at 432 Temple Ave, Woodbury Heights, NJ 08097 ("**Kircher**"), and Cliona Sotiropoulos, an individual residing at 5203 Sandstone Court, Suffolk, VA 23435 ("**Sotiropoulos**;" each of Kelly, Kircher, and Sotiropoulos, are sometimes referred to individually as a "**Selling Member**" and collectively as the "**Selling Members**"), New York Network Management, L.L.C., a New York limited liabilitycompany (" **Company**") (each of the Selling Members and the Company are sometimes referred to individually as a "**Selling Party**" and collectively as the "**Selling Parties**"), Kelly, as the representative for the Selling Members (the "**Selling Member Representative**"), and NYNM Acquisition, LLC ("**Buyer;**" each of Buyer, the Company, the Selling Members, and the Selling Member Representative is sometimes referred to individually as a "**Party**" and collective as the "**Parties**"). Capitalized terms used in this Agreement without definition shall have the meanings ascribed to such terms in **Section 8.1**.

WITNESSETH:

WHEREAS, the Selling Members own all of the issued and outstanding membership interest of the Company (the "**Interests**"); and

WHEREAS, the Selling Members wish to sell, and Buyer wishes to purchase, the Interests upon the terms of this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations and warranties herein contained, and upon the terms and subject to the conditions hereinafter set forth, the Parties hereto hereby agree as follows:

ARTICLE 1

SALE AND PURCHASE OF INTERESTS

Section 1.1    Sale of Interests; Purchase Price.    On the Closing Date and subject to the terms and conditions set forth in this Agreement, the Selling Members will sell, assign, and transfer to Buyer, and Buyer will purchase and acquire, all of the Interests, free and clear of all Liens, for and in consideration of (A) (1) the sum of those amounts actually paid to one or more of the Selling Parties and Selling Member Representative (i) as Closing Payment, (ii) from the Escrow Fund, (iii) from the Second Escrow Fund, (iv) any Earn-Out payments, and (v) in respect of the adjustment of the Company Group's working capital in accordance with **Section 1.5**. plus (2) any amounts released from the Third Escrow Fund plus (3) any amounts released from the Second Escrow Fund to Persons other than the Selling Parties and the Selling Member Representative less (B) any Required Repayments paid in accordance with **Section 1.6** (collectively, the "**Purchase Price**").

Section 1.2    Closing Payment.    The Closing Payment shall be paid as follows:

{00829079.DOCX;12 }

1

(a)    Initial Determination of Closing Payment. The Closing Payment shall be $22,000,000.00 (the "**Closing Payment**").

(b)    Payment of Closing Payment. The Closing Payment is payable at the Closing as follows: (i) $3,590,000 (the "**Escrow Payment**") will be placed in escrow with Robinson Brog Leinwand et al. (the "**Escrow Agent**") to be held and released pursuant to an escrow agreement (the "**Escrow Agreement**") to be entered into at the Closing among Buyer, the Selling Member Representative and the Escrow Agent (the monies held from time to time by the Escrow Agent pursuant to the Escrow Agreement are referred to as the "**Escrow Fund**"), substantially in the form annexed hereto as **Exhibit 1.2(a)**, (ii) such amount required to be placed in escrow (the "**Second Escrow Payment**") pursuant to the order issued by the Supreme Court of the State of New York in the Matter of New York Network Management LLC against Kevin Kelly and Auciello Law Group, LC (such order, as it may be amended, the "**Order**") will be placed in escrow with Holland & Knight LLP (the "**Second Escrow Agent**") to be held and released pursuant to an escrow agreement (the "**Second Escrow Agreement**") to be entered into at the Closing among the Selling Member Representative and the Second Escrow Agent (the monies held from time to time by the Second Escrow Agent pursuant to the Second Escrow Agreement are referred to as the "**Second Escrow Fund**"), substantially in the form annexed hereto as **Exhibit 1.2(b)**, (iii) $2,000,000 (the "**Third Escrow Payment**") will be placed in escrow with the Escrow Agent to be held and released pursuant to an escrow agreement (the "**Third Escrow Agreement**") to be entered into at the Closing among the Selling Member Representative and the Escrow Agent (the monies held from time to time by the Escrow Agent pursuant to the Third Escrow Agreement are referred to as the "**Third Escrow Fund**"), substantially in the form annexed hereto as **Exhibit 1.2(c)**, and (iv) the remaining amount of the Closing Payment (the "**Non-Escrowed Closing Payment**") will be paid to the Selling Members in immediately available funds by wire transfer to accounts designated by the Selling Member Representative in writing to Buyer no later than three (3) Business Days before the Closing Date.

(c)    Release of the Escrow Funds. The Escrow Fund shall be disbursed as follows: (i) an amount equal to fifty percent (50%) of the Escrow Payment less the aggregate amount of indemnity and offset payments made to Buyer pursuant to the terms hereof and any other bona fide claims of Buyer to indemnity or offset hereunder (to the extent such claims, if any, remain unresolved) will be paid to the Selling Member Representative on the nine (9) month anniversary of the Closing Date in accordance with the Escrow Agreement; and (ii) the remainder of the Escrow Payment less the aggregate amount of indemnity and offset payments made to Buyer pursuant to the terms hereof and any other bona fide claims of Buyer to indemnity or offset hereunder (to the extent such claims, if any, remain unresolved) will be paid to the Selling Member Representative on the first anniversary of the Closing Date in accordance with the Escrow Agreement. The Second Escrow Fund shall be disbursed in accordance with the Second Escrow Agreement. The Third Escrow Fund shall be disbursed in accordance with the Third Escrow Agreement.

Section 1.3    Earn-Out Payments.

(a)    Year 1 Earn-Out. In addition to the Closing Payment, the Selling Members shall receive an additional payment (a "**Year 1 Earn-Out Payment**") equal to (i) the

Year 1 Earn-Out Formula (determined in an accordance with the following formula) less (ii) the Replacement Costs in Year 1:

| Year 1 Revenue | Year 1 Earn-Out Formula |
|---|---|
| more than $10,900,000 | (A) $6,930,000 plus (B) 50% of (i) 3.8 multiplied by (ii) amount by which Year 1 Revenue exceeds $10,900,000 |
| $10,900,000 | $6,930,000 |
| Less than $10,900,00 but more than $6,700,000 | 50% of (i) 2.8 multiplied by (ii) amount by which the Year 1 Revenue exceeds $6,700,000 |
| $6,700,000 or less | $0 |

        (b)     Year 2 Earn-Out. In addition to the Closing Payment the Selling Members shall receive an additional payment (a "**Year 2 Earn-Out Payment**") equal to (i) the Year 2 Earn-Out Formula (determined in an accordance with the following formula) less (ii) the Replacement Costs in Year 2:

| Year 2 Revenue | Year 2 Earn-Out Formula |
|---|---|
| more than New Baseline | (A) $6,930,000 plus (B) 50% of (i) 3.8 multiplied by (ii) amount by which Year 2 Revenue exceeds New Baseline |
| more than $10,900,000 but not more than New Baseline | $6,930,000 |
| $10,900,000 | $6,930,000 |
| Less than $10,900,000 but more than $6,700,000 | 50% of (i) 2.8 multiplied by (ii) amount by which the Year 2 Revenue exceeds $6,700,000 |
| $6,700,000 or less | $0 |

By way of an example, if the Year 1 Revenues and the Year 2 Revenues are both $10,900,000, then the Selling Members will receive the following:

        (i)     a Year 1 Earn-Out Payment of $6,930,000

        (ii)     a Year 2 Earn-Out Payment of $6,930,000

                 total Earn-Out Payments of   $13,860,000

                 total payments of         $35,860,000

{00829079.DOCX;12 }

Byway of an example, if the Year 1 Revenues were $14,000,000 and the Year 2 Revenues were $18,000,000, then the Selling Members will receive the following:

    (i)    a Year 1 Earn-Out Payment of $12,820,000

    (ii)    a Year 2 Earn-Out Payment of $14,530,000

    total Earn-Out Payments of  $27,530,000

    total payments of    $49,530,000

Byway of an example, if the Year 1 Revenues were $10,000,000 and the Year 2 Revenues were $8,000,000, then the Selling Members will receive the following:

    (iii)    a Year 1 Earn-Out Payment of $4,620,000

    (iv)    a Year 2 Earn-Out Payment of $1,820,000

    total Earn-Out Payments of  $6,440,000

    total payments of    $28,440,000

Byway of an example, if the Year 1 Revenues were $9,000,000 and the Year 2 Revenues were $15,000,000, then the Selling Members will receive the following:

    (i)    a Year 1 Earn-Out Payment of $3,220,000

    (ii)    a Year 2 Earn-Out Payment of $14,720,000

    total Earn-Out Payments of  $17,940,000

    total payments of    $39,940,000

    (c)    No later than seventy five (75) days following the end of Year 1 the Buyer will prepare and deliver to the Selling Member Representative a copy of the Company Group's consolidated income statement for Year 1, together with a calculation of the Year 1 Revenue, the New Baseline, the Year 1 Earn-Out Formula, the Replacement Costs in Year 1, and the Year 1 Earn-Out Payment (the "**Year 1 Earn-Out Calculation**"). No later than seventy five (75) days following the end of Year 2, the Buyer will prepare and deliver to the Selling Member Representative a copy of the Company Group's consolidated income statement for Year 2, together with a calculation of the Year 2 Revenue, the Year 2 Earn-Out Formula, the Replacement Costs in Year 2, and the Year 2 Earn-Out Payment (the "**Year 2 Earn-Out Calculation**"). In each case, the Buyer will make available to the Selling Member Representative at the Buyer's offices, or via electronic means, if possible, and upon reasonable notice, all of the relevant books and records maintained by the Company relating to the Company Group's business in order for the Selling Member Representative to review and confirm the Year 1 Earn-Out Calculation and the Year 2 Earn-Out Calculation.

{00829079.DOCX;12 }

4

       (d)      <u>Dispute Resolution</u>.  In the event that the Selling Member Representative does not agree with the Year 1 Earn-Out Calculation or the Year 2 Earn-Out Calculation, the Selling Member Representative and the Buyer shall resolve their disputes in accordance with the procedures set forth in **Section 1.5(c)-(e)**, including the applicable time frames for notices, with appropriate adjustments to reflect the fact that the subject of the dispute is the subject of **Section 1.3(a)-(c)** and not **Section 1.5(a)-(b)**.

       (e)      <u>Payment of Earn-Out Payments</u>.  No later than three (3) Business Days following the determination of the final Year 1 Earn-Out Payment or Year 2 Earn-Out Payment, as applicable (whether because Selling Member Representative does not provide a timely Objection Notice or because of the final determination by the  Independent Auditor), the Buyer and CHT shall deliver to the Selling Member Representative, or designee or assignee thereof, in immediately available funds by wire transfer to an account designated by the Selling Member Representative, or designee or assignee thereof, in writing to Buyer no later than three (3) Business Days before the date of such payment, the applicable Earn-Out Payment pursuant to the terms of this Agreement, and the Selling Member Representative shall distribute such payment amounts to the Selling Members in amounts as determined by the Selling Members; provided, however that if the shares of common stock of CHT ("**Shares**") are at such time traded on a national securities exchange, then, if the Selling Member Representative notifies Buyer at least three (3) Business Days before the date of such payment, Buyer shall pay up to 15% of such payment with Shares, with the Shares valued for such payment at the average closing price of such Shares during the ten trading days immediately prior to Buyer's receipt of such notice.

       (f)      The Selling Members and the Selling Member Representative acknowledge and agree that after the Closing the Buyer shall be entitled to operate the Company Group in any manner that it determines, in its sole discretion, to be appropriate, subject only to its obligation of good faith. Notwithstanding the foregoing, the Buyer acknowledges that the ability of the Selling Members to earn the Earn-Out Payments is a material inducement to enter into this Agreement and consummate the transactions contemplated hereby and the Buyer and its Affiliates, as applicable, hereby agree to use commercially reasonable efforts to try to achieve results that would result in the making of an Earn-Out Payment. In furtherance of the foregoing, the Buyer agrees that at any time prior to the expiration of all deadlines to earn the related Earn-Out Payments (i) it will not knowingly take any action or fail to take any action with the intent to frustrate the achievement of an Earn-Out Payment, (ii) it will carry on the Company Group and the Business as a going concern and with a view to profit and shall not cause or permit the Company Group to (a) carry out any act or make any omission where the primary purpose is or would be to reduce or defer income or profits of the Company Group; or (b) enter into any agreement or arrangement other than on arms' length terms, (iii) it will not present a petition for or pass any resolution for the winding-up of the Company or any of its Subsidiaries, or (iv) appoint a receiver, administrative receiver or administrator over the whole or any part of the assets of the Company or any of its Subsidiaries. If the Buyer is in breach of any of these provisions and the Selling Member Representative has not consented in writing to such breach, then the Net Revenue for the relevant Earn-Out Year shall be adjusted as if the breach had not occurred for the purposes of ascertaining the Earn-Out Payments.

       Section 1.4    <u>Discharge of Debt and Liabilities; Maintenance of Working Capital</u>.

{00829079.DOCX;12 }

(a)     <u>Discharge of Debt and Liabilities</u>.  At or before the Closing, the Company Group shall pay and discharge all debts, liabilities and obligations of the Company Group (including, without limitation, any liabilities in respect of anyI ndebtedness, Payables (except any Qualified Accounts Payable included in the calculation of Closing Working Capital) and Transaction Expenses then due and payable. "**Qualified Accounts Payable**" means accounts payable and accrued expenses that have been incurred in the Ordinary Course of Business; provided, however, that no account payable shall be a Qualified Accounts Payable if such account payable is due on or before the Closing, or if on the Closing Date such account payable is more than twenty nine (29) days old, or if such account payable if paid in the Ordinary Course of Business would have been paid prior to Closing, or if such account payable is for professional fees or for charges of vendors, or if the terms of such account payable provides that payment shall be made within less than thirty (30) days from the date of its issuance or if the terms of such account payable provides that payment shall be made within less than thirty (30) days from the date of its receipt.  For the avoidance of doubt, all accounts payable including payroll and liabilities incurred prior to Effective Date shall be the Selling Parties' responsibility; provided that the Selling Parties shall (i) cause all accounts receivable for services rendered prior to Effective Date to be utilized prior to the Effective Date to satisfy such payables and (ii) cause any surplus to be distributed prior to the Effective Date to the Selling Members.

(b)     <u>Release of All Liens</u>.  At or before the Closing, the Company Group shall cause all security interests, encumbrances and other Liens (other than Permitted Liens) on or relating to any of the properties, assets and rights of the Company Group, at the Selling Members' sole cost and expense, to be released, extinguished and discharged in full, and shall deliver to Buyer instruments and Uniform Commercial Code ("**UCC**") termination statements, releasing, extinguishing and discharging all such security interests, encumbrances, mortgages and other Liens (other than Permitted Liens), all in form and substance satisfactoryto Buyer. In the event Buyer elects to proceed with the Closing prior to its receipt of all such documentation, instruments and UCC termination statements, the Selling Members shall nevertheless obtain and deliver to Buyer all instruments and UCC termination statements, and obtain the release, extinguishment and discharge of all Liens contemplated to be released bythis **Section 1.4(b)** promptly after the Closing.

(c)     <u>Maintenance of Minimum Working Capital</u>.  The Selling Members shall cause the Company Group to take all necessary action to ensure that at the time of the Closing, and after the discharge of all debts, liabilities and obligations of the CompanyGroup pursuant to **Section 1.4(a)** and the payment of any and all distributions to the Selling Members, the Company Group shall have Closing Working Capital in an amount of not less than One Dollar ($1.00) (the "**Minimum Working Capital**").

Section 1.5   <u>Post-Closing Working Capital Adjustment; Accounts Receivable</u>.

(a)     <u>Post-Closing Working Capital Adjustment</u>.  If the Closing Working Capital is less than the Minimum Working Capital, the Selling Members shall make, in accordance with **Section 7.3**, a payment equal to the amount by which the Closing Working Capital is less than the Minimum Working Capital within three (3) Business Days of the final determination of the Closing Working Capital by wire transfer of immediatelya vailable funds of the Selling Members to an account designated by Buyer.  If the Minimum Working Capital is

less than the Closing Working Capital, then Buyer shall pay to the Selling Members an additional amount equal to the amount by which the Minimum Working Capital is less than the Closing Working Capital, which shall be paid to the Selling Member Representative by Buyer within three (3) Business Days of the final determination thereof by wire transfer of immediately available funds of the CompanyGroup to an account designated by the Selling Member Representative, or designee or assignee thereof; provided, however, if the Company Group is unable to make such payments in full, Buyer shall fund the Company Group for such purpose, or shall make any shortfall payments directly to the Selling Member Representative, all of which shall be done within the aforesaid three (3) Business Days. "**Closing Working Capital**" shall mean, as of the Closing Date, and on a consolidated basis, the sum of cash and cash equivalents (including marketable securities and short term investments, but excluding accounts receivables of the Company Group set forth on **Schedule 1.5(f)**), expenses pre-paid by the CompanyGroup (including, but not limited to insurance premiums and rents), amounts the CompanyGroup deposited with suppliers, vendors and landlords, and unbilled fees for work completed (i) which is not set forth on **Schedule 1.5(f)** and (ii) that can be reasonably expected to be converted into cash within one year, less the sum of Payables, checks issued by the Company Group that have not been debited from the Company Group's bank account, amounts pre-paid to the Company Group, and amounts deposited with the Company Group, each as of the Closing, Payables received after the Closing for the period prior to the Closing and all outstanding Reimbursable Expenses that were incurred prior to the Closing regardless of whether they were submitted to the Company Group prior to the Closing.

(b)    Delivery of Closing Balance Sheet and Closing Date Calculation. No later than the sixtieth (60th) day following the Closing, Buyer shall prepare and deliver to the Selling Member Representative, (i) a consolidated balance sheet of the Company Group as of the Effective Date, prepared in a manner consistent with the Financial Statements (the "**Closing Balance Sheet**"), and (ii) a written calculation of the Closing Working Capital (the "**Closing Date Calculation**"), as determined by reference to the relevant provisions of this Agreement and, as applicable, the Closing Balance Sheet.

(c)    Objection Notices.  On or prior to the 60th day after the Selling Member Representative's receipt of the Closing Date Calculation and the Closing Balance Sheet, the Selling Member Representative may give Buyer a written notice stating in reasonable detail the Selling Member Representative's objections (an "**Objection Notice**") to the Closing Date Calculation and/or the Closing Balance Sheet.  Buyer shall permit the Selling Member Representative and its representatives to have reasonable access to the books, records and other documents (including work papers) pertaining to or used in connection with preparation of the Closing Date Calculation and the Closing Balance Sheet.  Any determination expressly set forth in the Closing Date Calculation or on the Closing Balance Sheet which is not objected to in an Objection Notice shall be deemed final and binding upon the Selling Member Representative upon delivery of such Objection Notice, unless same is affected by a disputed portion of such determination.  Except to the extent the Selling Member Representative makes an objection to a determination set forth in the Closing Date Calculation or on the Closing Balance Sheet pursuant to an Objection Notice delivered to Buyer within such 60-dayperiod,  the Closing Date Calculation and Closing Balance Sheet will be deemed conclusive and binding upon the Parties.

{00829079.DOCX;12 }

(d)     Disputed Items. If the Selling Member Representative gives a timely Objection Notice as described in **Section 1.5(c)** above, then Buyer and the Selling Member Representative will negotiate in good faith to resolve their disputes regarding the Closing Date Calculation and the Closing Balance Sheet on or prior to the 30th day after the delivery of the Objection Notice (or such longer period as Buyer and the Selling Member Representative shall agree) (such period of time being hereinafter referred to as the "**Resolution Period**"). If, at or before the end of the Resolution Period, the Selling Member Representative and Buyer resolve such disputes and objections, then the calculations so agreed to by the Selling Member Representative and Buyer shall be deemed to be utilized in any Closing Date Calculation and the Closing Balance Sheet, as applicable. If, at the end of the Resolution Period, the Selling Member Representative and Buyer have not resolved their disputes regarding the calculations set forth in a Closing Date Calculation or the Closing Balance Sheet, then such disputes (each a "**Disputed Item**", and collectively, the "**Disputed Items**") shall, within five (5) Business Days after the expiration of the Resolution Period, be submitted to the Independent Auditor for final determination. The Independent Auditor shall only have the authority to resolve matters expressly submitted to it for resolution. In resolving any Disputed Item, the Independent Auditor may not assign a value to any Disputed Item greater than the greatest value for such Disputed Item claimed by either party or less than the smallest value for such Disputed Item claimed by either party. The Independent Auditor's resolution of any disputes hereunder shall be made within sixty (60) calendar days of the submission of such disputes thereto, or as soon as reasonably practicable thereafter, and shall be set forth in a written statement delivered to the Selling Member Representative and Buyer. The Closing Date Calculation and the Closing Balance Sheet as determined by the Independent Auditor will be conclusive and binding upon the Parties and will constitute the Closing Date Calculation and the Closing Balance Sheet for all purposes of this **Section 1.5**.

(e)     Responsibility for costs and expenses. If all disputes regarding the disputed calculations are resolved in favor of the Selling Members, then Buyer shall pay the costs and expenses of the Independent Auditor. If all disputes regarding the disputed calculations are resolved in favor of Buyer, then Selling Members jointly and severally shall pay the costs and expenses of the Independent Auditor. If the disputes regarding the disputed calculations are resolved in part in favor of the Selling Members and in part in favor of Buyer, then the costs and expenses of the Independent Auditor shall be shared by the Selling Member Representative and Buyer equally.

(f)     Closing Accounts Receivable. **Schedule 1.5(f)** sets forth outstanding accounts receivable, as of a date specified thereon, arising from the Selling Members' ownership and operation of the Company Group prior to the Effective Date or otherwise resulting from services rendered or goods sold by the Company Group prior to the Effective Date, which schedule the Selling Member Representative may update from time to time during the period ending nine months after the date hereof (as amended, the "**Closing Accounts Receivable**"). Monies received by the Company Group subsequent to the Closing Date arising from the Closing Accounts Receivable shall be held by the Company Group for the benefit of the Selling Members. The Buyer shall cause the Company Group to use good faith bona fide efforts to collect such Closing Accounts Receivable, including, upon request by the Selling Member Representative, litigation; provided, however, that the Selling Members shall be responsible for the fees and expenses of such litigation; and provided, further however that that

the Selling Member Representative and Buyer shall mutually agree on how to handle the Closing Accounts Receivables of current clients and no litigation shall be commenced with respect to such Closing Accounts Receivables without such mutual agreement.  On or before the fifteenth 15th day following each of the first three quarterly anniversaries of the Closing Date (or the first Business Day thereafter), the Buyer shall cause the Company Group to submit a report to the Selling Member Representative outlining all of the monies received by the Company Group related to the Closing Accounts Receivable in such immediately preceding quarterly period, together with all statements and supporting documentation related thereto.  Selling Member Representative shall promptlyr eview such report and notify the Buyer if it is in agreement and if Selling Member Representative is in agreement, Buyer shall pay, in immediately available funds by wire transfer to an account designated by the Selling Member Representative such monies set forth in the report.  Any time during which Kelly is an employee of the Company Group, Kelly shall be responsible for preparing the report on behalf of the Company Group and deliver it to the Buyer for its review (in which case Buyer shall promptlyrevie w such report and notifythe Selling Member Representative if it is in agreement and if Buyer is in agreement, Buyer shall pay, in immediately available funds by wire transfer to an account designated by the Selling Member Representative such monies set forth in the report).  In the event the Selling Member Representative or the Buyer, as applicable, disputes the amounts and calculations set forth in the Company Group's report(s), the Selling Member Representative and the Buyer shall resolve their disputes in good faith promptly and in any case within thirty (30) days from the Buyer's receipt or the Selling Member Representative's receipt, as applicable, of the report in accordance with the procedures set forth in **Section 1.5(c)-(e)** (with appropriate adjustments to reflect the fact that the subject of the dispute is the subject of **Section 1.5(f)** and not **Section 1.5(a)-(b)**) and jointly determine the amount of the monies that were received in such quarterly period related to the Closing Accounts Receivable and thereafter Buyer shall pay such amount in immediately available funds by wire transfer to such account.  .

(i)     Buyer shall cause the Company Group to, and the Company Group shall, use commercially reasonable good faith efforts to collect the Closing Accounts Receivable.

Section 1.6     <u>Required Repayments</u>.

(a)     <u>General</u>.  If any medical provider with whom any member of the Company Group has entered into a Contract (a "**Provider**") made false or incorrect reports to any member of the Company Group during the period prior to the Closing (each, a "**False Report**") in connection with which a member of the Company Group submitted a claim for payment to a Commercial Healthcare Plan on behalf of such Provider (an "**Inaccurate Submission**"), then if such Provider received a payment on account of such Inaccurate Submission (the "**Excessive Payment to a Provider**") and such Provider is obligated to refund any monies or grant a credit to such Commercial Healthcare Plan because of the Excessive Payment to a Provider, the amount the Provider is obligated to refund or for which Provider is obligated to grant a credit, in each case to the applicable Commercial Healthcare Plan, is referred to in this Agreement as a "**Refundable Payment by a Provider**" and the amount that the Commercial Healthcare Plan paid to the Company Group (and not paid or transferred to a Provider) in connection with the Inaccurate Submission that has resulted in a Refundable Payment by a Provider which the Company Group has refunded to the Commercial Healthcare

Plan is referred to in this Agreement as the "**Excluded Earnings**." The parties agree that Kelly shall be permitted a period of 90 days following receipt of written notice from a Commercial Healthcare Plan ("**Notice of Refund Request**") that Excluded Earnings should be refunded by a member of the Company Group to such Commercial Healthcare Plan, to negotiate with such Commercial Healthcare Plan with regards to such request, and three additional 30 dayperiods following a notice of extension request to Buyer accompanied by a written explanation of the Notice of Refund Request and Kelly's efforts with respect to such Notice of Refund Request, for a maximum total period of 180 days following the initial receipt of the Notice of Refund Request (such period, the "**Negotiation Period**"), before the Buyer may require the Company Group to pay such refund to such Commercial Healthcare Plan; provided, however, that in the event that the Commercial Healthcare Plan files a lawsuit against the Company Group in connection with the Excluded Earnings covered by such Notice of Refund Request, the Buyer may require the Company Group to pay such refund to such Commercial Healthcare Plan prior to the end of the Negotiation Period. For avoidance of doubt, the Excluded Earnings will include only the charge received by and paid to a member of the Company Group for administrative or similar services rendered by such member of the Company Group in connection with its Contract with the Commercial Healthcare Plan and will not include the amount paid by the Commercial Healthcare Plan to a Provider in connection with the Inaccurate Submission for the provision or purported provision of medical services. Buyer shall be entitled to a repayment (the "**Required Repayment**") of an amount equal to the sum of (i) the Excluded Earnings that were included as Net Revenue for purposes of determining the EBITDA used in determining the Closing Payment plus (ii) to the extent such Excluded Earnings are greater than $500,000 an amount equal to the product of (a) the amount of Excluded Earnings that were included as Net Revenue for purposes of determining the EBITDA used in determining the Closing Payment that is in excess of $500,000 and (b) two.

(b)     Request for a Required Repayment. If at any time after the Closing, either any member of the Company Group or Buyer is aware of a False Report, Inaccurate Submission, Excessive Payment to a Provider or a Refundable Payment bya Provider, it shall notify the other. Buyer shall then determine the amount of the Excluded Earnings and calculate the Required Repayment. Thereafter, Buyer shall submit to the Selling Member Representative (i) reasonable evidence of the Excluded Earning and (ii) its calculation of the Required Repayment.

(c)     Dispute Resolution. In the event that the Selling Member Representative does not agree with the determination of the amount of the Excluded Earnings or the calculation of the Required Repayment, the Selling Member Representative and the Buyer shall resolve their disputes in accordance with the procedures set forth in **Section 1.5(c)-(e)**, including the applicable time frames for notices with appropriate adjustments to reflect the fact that the subject of the dispute is the subject of **Section 1.6(a)-(b)** and not **Section 1.5(a)-(b)**.

(d)     Payment of Required Repayments. No later than three (3) Business Days following the determination of any Required Repayment in accordance with **Section 1.6(b)-(c)**, the Selling Members shall, in accordance with **Section 7.3**, pay the Required Repayment to the Buyer by wire transfer to an account provided byBuyer to the Selling Member Representative no later than one Business Day following the day of the determination of the Required Repayment.

{00829079.DOCX;12 }

ARTICLE 2

CLOSING

Section 2.1    <u>Closing.</u>  The closing of the transactions provided for herein (the
"**Closing**") will take place on the date hereof at the offices of the Buyer's counsel at the address
set forth in **Section 9.2** hereof (the "**Closing Date**") and be effective as of the March 1, 2017.
Except as otherwise provided herein, all proceedings to be taken and all documents to be
executed and delivered by the Parties at the Closing shall be deemed to have been taken,
executed and delivered simultaneously and no proceedings shall be deemed taken nor any
documents executed or delivered until all have been taken, executed and delivered.  Closing
shall be deemed effective as of 12:01 A.M. on the Effective Date.  Notwithstanding the
foregoing (i) the Selling Parties may deliver any or all of the Seller Documents required
hereunder to Buyer's counsel on or before the Closing Date (to hold and deliver in escrow
according to the Selling Member Representative's written instructions), and (ii) Buyer may
deliver any or all of the Buyer Documents required hereunder to the Company's counsel on or
before the Closing Date (to hold and deliver in escrow according to the Buyer's written
instructions).

Section 2.2    <u>Closing Deliverables.</u>

(a)    At the Closing, the Selling Parties will deliver to Buyer:

(i)    Employment Agreement, duly executed by Kelly in the
form attached hereto as **Exhibit 2.2(a)(i)** and the Consulting Agreement, duly executed by Kelly
in the form attached hereto as **Exhibit 2.2(a)(i)(1)** (collectively, the "**Kelly Employment
Agreement**");

(ii)    a certificate of good standing of each of the members of the
Company Group certified as of a then recent date by the New York Secretary of State and each
other jurisdiction where the operation of the Business requires such member of the Company
Group to be qualified to do business the failure of which would have a Material Adverse Effect;

(iii)    pay-off letter(s) in form and substance reasonably
satisfactory to Buyer evidencing the amount required to discharge at Closing all Indebtedness
and accomplish the release of all Liens related thereto;

(iv)    a general release releasing each member of the Company
Group executed by the Selling Members in form and substance as **Exhibit 2.2.(a)(iv)**;

(v)    the limited liabilitycompany  or corporate records of each
member of the Company Group regarding member, manager, shareholder or director meetings, if
any;

(vi)    a list of all checks issued byan y member of the Company
Group that have not been debited from the Company Group's bank accounts prior to the Closing;

(vii)    accountant compiled consolidated financial statements of the Company Group for the years ended December 31, 2015, and December 31, 2016, for and for the periods ended January 31, 2017 and February 28, 2017, provided, however that the financial statements for the period ended February 28, 2017 shall be provided to Buyer no later than March 20, 2017;

(viii)    the Escrow Agreement duly executed by the Selling Member Representative and the Escrow Agent;

(ix)    the Second Escrow Agreement duly executed by the Selling Member Representative and the Second Escrow Agent;

(x)    the Third Escrow Agreement duly executed by the Selling Member Representative and the Escrow Agent;

(xi)    copies of the resolutions duly adopted by the manager of the Company authorizing the execution, delivery and performance of this Agreement and each of the other Seller Documents executed by the Company and the consummation of all transactions described in this Agreement and thereby;

(xii)    a certificate of the secretary or other appropriate officer of the Company certifying as to the incumbency of the officer(s) of the Company executing this Agreement and the other Seller Documents, including specimen signatures, the Company's operating agreement and charter document;

(xiii)    copies of UCC-3 termination statements extinguishing all Liens, other than permitted liens;

(xiv)    resignations of all managers or managing members or directors of members of the Company Group; and

(xv)    such other instruments and documents of any Selling Party, in form and substance reasonably acceptable to Buyer, as Buyer and its counsel may reasonably request.

(b)    At the Closing, Buyer will:

(i)    deliver to each Selling Member in accordance with **Section 1.2** the amount of the Non-Escrowed Closing Payment payable to such Selling Member as provided in **Section 1.2**;

(ii)    deliver the Escrow Amount to the Escrow Agent;

(iii)    deliver the Second Escrow Amount to the Second Escrow Agent;

(iv)    deliver the Third Escrow Amount to the Escrow Agent;

{00829079.DOCX;12 }

(v)    deliver to the Selling Member Representative the Escrow Agreement duly executed by Buyer;

(vi)    deliver a copy of the Kelly Employment Agreement signed by the Company to Kelly;

(vii)    deliver to the Selling Member Representative such other instruments and documents, in form and substance reasonably acceptable to the Selling Member Representative, as the Selling Member Representative and its counsel may reasonably request;

(viii)    deliver to the Selling Member Representative a certificate of good standing of Buyer certified as of a then recent date by the Secretary of State of the jurisdiction of such entity's formation;

(ix)    deliver to the Selling Member Representative copies of the resolutions duly adopted by the manager of the Buyer authorizing the execution, delivery and performance of this Agreement and each of the other Buyer Documents executed by the Buyer and the consummation of all transactions described in this Agreement and thereby; and

(x)    deliver to the Selling Member Representative a certificate of the secretary or other appropriate officer of the Buyer certifying as to the incumbency of the officer(s) of the Buyer executing this Agreement and the other Buyer Documents, including specimen signatures.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANY GROUP

Each Selling Member hereby represents and warrants to the Buyer as follows.

Section 3.1    <u>Organization; Authority; Due Execution.</u>

(a)    The Company is a limited liability company duly organized, subsisting and in good standing under the laws of the State of New York and has all requisite limited liability company power and authority to own, lease and operate its properties and assets, and to carry on the Business as presently conducted as and in the places such properties are now owned, leased or operated and is qualified to do business and is in good standing as a foreign limited liability company in each jurisdiction where the ownership or operation of its properties or conduct of its business requires such qualification except where the failure to be so qualified or in good standing would not have a Material Adverse Effect. Selling Member Representative has provided, or caused to be provided, to Buyer a true and correct copy of its articles of organization and operating agreement as amended to date. Such articles of organization and operating agreement so delivered are in full force and effect. **Schedule 3.1(a)** hereto contains a true and correct list of each jurisdiction where the Company is qualified or licensed to do business. Selling Member Representative has provided, or caused to be provided, to Buyer true and correct copies of the minutes, if any, of all meetings of the members of the Company, the manager(s) of the Company and the committees thereof. The Books and Records contain true and correct, in all material respects, summaries of all actions taken at any member meetings,

{00825079.DOCX;12 }

13

manager meetings, and include all written consents executed in lieu of the holding of any such meeting. **Schedule 3.1(a)** hereto lists all the officers and managers of the Company.

Section 3.2    Subsidiaries and EquityInvestment s. **Schedule 3.2** hereto lists the Company's Subsidiaries. Except as set forth on **Schedule 3.2** hereto, the Company does not have any interest, direct or indirect, or any commitment to purchase any interest, direct or indirect, in, or the power to vote the equity interest of, any other corporation, limited liability company, partnership, joint venture or other business enterprise or entity (other than with respect to any marketable securities included in current assets). Except as set forth on **Schedule 3.2** hereto, none of the Business has been conducted through any direct or indirect Subsidiary or any direct or indirect Affiliate of the Company or the Selling Parties. Each Subsidiary of the Company is an entity duly formed, organized, or incorporated and subsisting and in good standing under the laws of the state of its formation, organization or incorporation, as applicable, and has all requisite limited liabilitycompan y or corporate, as applicable, power and authority to own, lease and operate its properties and assets, and to carry on the Business as presently conducted as and in the places such properties are now owned, leased or operated and is qualified to do business and is in good standing as a foreign limited liability companyor corporation, as applicable, in each jurisdiction where the ownership or operation of its properties or conduct of its business requires such qualification except where the failure to be so qualified or in good standing would not have a Material Adverse Effect. Selling Member Representative has provided, or caused to be provided, to Buyer a true and correct copy of each such Subsidiary's articles of organization and operating agreement or certificate of incorporation and bylaws, as the case may be, as amended to date. Such articles of organization and operating agreement or certificate of incorporation and bylaws, as the case may be, so delivered are in full force and effect. **Schedule 3.2** hereto contains a true and correct list of each jurisdiction where anySubsidiary of the Company is qualified or licensed to do business. Selling Member Representative has provided, or caused to be provided, to Buyer true and correct copies of the minutes, if any, of all meetings of the members or shareholders of each Subsidiary of the Company, the manager(s) or director(s) of each Subsidiary of the Company and the committees thereof. The Books and Records contain true and correct, in all material respects, summaries of all actions taken at any member meetings, manager meetings, shareholder meetings or directors and include all written consents executed in lieu of the holding of any such meeting. **Schedule 3.2** hereto lists all the officers and managers or directors of the Subsidiaries of the Company.

Section 3.3    Consents; No Violation.

(a)    Except as set forth on **Schedule 3.3(a)** hereto, no notices, reports or other filings are required to be made with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by, any member of the Company Group from any Governmental Entity or Person (i) in connection with the execution and delivery of this Agreement or any of the other Seller Documents by any Selling Party and the consummation by the Selling Parties of the transactions described in this Agreement and thereby, or (ii) the absence of which would prevent, delay or impair the ability of the Selling Members to consummate the transactions described in this Agreement or any other Seller Document, or impair in anymaterial respect the ability of Buyer following consummation of the transactions described in this Agreement to conduct the Business in the Ordinary Course of the Business.

{00829079.DOCX;12 }

14

Case 8-20-08048-ast    Doc 13-1    Filed 06/30/20    Entered 06/30/20 12:24:23

Case 8-20-08048-ast    Doc 1-3 .  Filed 03/13/20    Entered 03/13/20 23:52:19 .

(b)      Assuming all Consents listed on **Schedule 3.3(a)** are obtained, except as set forth on **Schedule 3.3(b)** hereto, the execution, delivery and performance of this Agreement and the other Seller Documents by any Selling Party does not, and the consummation of the transactions described in this Agreement and thereby will not, constitute or result in (i) with or without the giving of notice or the passage of time, or both, a breach or violation of, or a default under, the certificate of incorporation, bylaws, articles of organization or operating agreement or other governing documents of any member of the Company Group, (ii) with or without the giving of notice or the passage of time, or both, a breach of, or violation of or a conflict with, or a default under, or the termination of, or the acceleration under, any Material Contract, debt, obligation, governmental or non-governmental permit or license to which one or more members of the Company Group is a party to or to or by which any member of the Company Group or any of the Business is subject or bound, the result of which will have a Material Adverse Effect, (iii) the creation or imposition of anyL ien upon the Business, one or more members of the Company Group or any of the Interests that will not be discharged at the Closing, or (iv) the violation of any Law, order, judgment, decree or award of any court, Governmental Entity or arbitrator to or by which a Selling Party or the Business is subject or bound the result of which will have a Material Adverse Effect.

Section 3.4    Indebtedness.  Except as set forth on **Schedule 3.4**, no member of the Company Group has any outstanding Indebtedness or is a party to any Material Contract providing for the creation, incurrence or assumption thereof.

Section 3.5    Capitalization.

(a)      As of the date hereof the Company has not issued any units and, except as set forth on **Schedule 3.5**, all of the membership interests in the Company are owned byKelly , Kircher, and Sotiropoulos, which interests are set forth on **Schedule 3.5**. As of the date hereof all of the equity interests in the Company's Subsidiaries are owned by the Company.

(b)      No member of the Company Group has any (i) issued or outstanding subscription, warrant, option, convertible security or other right (contingent or otherwise) to purchase or acquire any interest, (ii) obligation (contingent or otherwise) to issue anysubscription,  warrant, option, convertible security or other such right, or to issue or distribute to holders of any equity interest of such member of the Company Group any evidences of indebtedness or assets of such member of the Company Group, or (iii) obligation (contingent or otherwise) to purchase, redeem or otherwise acquire any equity interest or to payany distribution or to make any other distribution in respect thereof.

(c)      There is no agreement, written or oral, between or among any member of the Company Group and any holder(s) of securities of such member of the Company Group, relating to the sale or transfer (including agreements relating to rights of first refusal, co-sale rights or "drag along" rights), registration under the Securities Act of 1933, as amended, or voting of the interests of such member of the CompanyGroup.

Section 3.6    Litigation.  The Order in the form annexed hereto on Schedule 3.6 has not been amended or modified.  Except as set forth in **Schedule 3.6** hereto, there is no pending civil, criminal or administrative suit, action, proceeding, or to the Selling Parties'

{00829079.DOCX;12 }

Knowledge, investigation, review or inquiry, and, to the Selling Parties' Knowledge, there is no civil, criminal or administrative suit, action, proceeding, investigation, review or inquiry threatened, against any member of the Company Group or any of its properties or rights, nor is there any judgment, decree, injunction, rule or order of any Governmental Entity or arbitrator outstanding against any member of the Company Group or any of its properties or rights (the foregoing collectively referred to as "**Proceedings**"). To Selling Parties' Knowledge, none of the Proceedings is reasonablylikel y, either individually or in the aggregate, to have a Material Adverse Effect or to prevent, impair or materially delay the ability of any member of the Company Group to consummate the transactions contemplated by this Agreement and the other Seller Documents. To Selling Parties' Knowledge, there is no meritorious basis for any such civil, criminal, or administrative suit, action or other Proceeding.

Section 3.7   Personal Property.

(a)     Set forth on **Schedule 3.7(a)** hereto is a true and correct list of all tangible personal property owned or leased or licensed byany  member of the CompanyGroup (the "**Personal Property**"), except for items having a value of less than $5,000, which do not, in the aggregate, have a total market value of more than $25,000, and sets forth with respect to all such listed items, all leases and licenses related thereto. Members of the Company Group have good and marketable title to, or hold by valid and existing lease or license, all of the Personal Property, except with respect to assets disposed of in the Ordinary Course of Business, free and clear of all Liens.

(b)     The Personal Property together with anyC ompanyL eased Property has been used in the Ordinary Course of the Business. Except as set forth on **Schedule 3.7(b)** hereto, to the Selling Parties' Knowledge, each item of Personal Property is free from material defects and is in reasonably good operating condition and repair (subject to normal wear and tear and regular maintenance). To the Selling Parties' Knowledge, the Personal Property has been maintained by members of the Company Group in all material respects in accordance with normal industrypractic e and has been reasonably suitable for use in the Ordinary Course of the Business.

Section 3.8   Real Property.  No member of the Company Group owns, and none has at any time owned, any real property. **Schedule 3.8** hereto sets forth a complete and correct list, in all material respects of all real property leased, subleased, licensed, operated or occupied by any member of the Company Group (collectively the "**Company Leased Property**"), the location thereof, and the leases, licenses or other agreements pursuant to which any member of the Company Group leases, subleases, licenses, operates or occupies the CompanyL eased Property(collectively, the "**Company Leases**"). Except as set forth in **Schedule 3.8** hereto, neither any member of the Company Group, nor, to the Selling Parties' Knowledge, any other party is in default under any of the CompanyL eases (nor, to the Selling Parties' Knowledge, does there exist any condition which, upon the passage of time or the giving of notice or both, would cause a default thereunder). Except as set forth in **Schedule 3.8** hereto, no CompanyL eased Property is occupied by a party other than members of the CompanyGroup, and, to the Selling Parties' Knowledge, no party has a right to occupy such property other than members of the Company Group. No member of the Company Group has assigned, leased, subleased or granted to any Person any rights in anyCompany L ease. Other than the Company

Leases, there are no other agreements or arrangements whatsoever relating to the use or occupancyby an y member of the Company Group of any of the Company Leased Property. No member of the Company Group has transferred, mortgaged or assigned any interest in any of the CompanyL eases. To the Selling Parties' Knowledge, (i) there is no pending or threatened condemnation or similar Proceeding affecting any CompanyL eased Property or any portion thereof, (ii) each CompanyL eased Property is supplied with utilities and other services sufficient to operate the Business conducted at such CompanyL eased Property, and (iii) no member of the Company Group has received written notice from any Governmental Entity that the operations of any member of the Company Group or the Business on the CompanyL eased Property, or the CompanyL eased Property, violate in any material manner anya pplicable building code, zoning requirement, or classification or statute relating to the particular property or such operations. The CompanyL eased Property is, to the Selling Parties' Knowledge, in reasonably good operating condition and repair and has been used in the Ordinary Course of the Business at the Company Leased Property.

Section 3.9    <u>Customer List.</u>  No member of the Company Group and no other Person (other than Charles "Chuck" Scott and Kevin Kelly), has sold, assigned, leased or licensed or transferred to any Person any list of past, present or prospective customers, suppliers or licensees of the Business. No Person (other than members of the Company Group) is entitled to use any such list.

Section 3.10  <u>Tax Matters.</u>

(a)    Each member of the Company Group has timely filed all Tax Returns required to be filed by such member of the Company Group in the manner provided by Law. All such Tax Returns are true, correct and complete in all material respects. Each member of the Company Group has timely paid all Taxes due, whether or not shown as being due on any Tax Returns. All Taxes that any member of the Company Group is or was required by Law to collect or withhold have been duly withheld or collected, and, to the extent required by Law, paid to the proper Tax authority. Except as has been disclosed on **Schedule 3.10(a)** hereto:

(i)    No claim for unpaid Taxes has become a Lien of anykind against the property of any member of the Company Group or is being asserted against any member of the Company Group, except for Liens for Taxes not yet due.

(ii)    No audit, examination, investigation, deficiency or refund litigation or other Proceeding in respect of Taxes of any member of the Company Group is pending (or to the Selling Parties' Knowledge, threatened or being conducted by a Tax authority), and neither any member of the Company Group nor any Selling Member has received written notice of the commencement of any audit, examination, deficiency litigation or other Proceeding with respect to any such Taxes.

(iii)    No material issues have been raised in any written notice received by any member of the Company Group or any Selling Member from any Tax authority in connection with the examination of any of the Tax Returns filed by any member of the Company Group after January 1, 2011.

{00829079.DOCX;12 }

(iv)     No extension or waiver of the statute of limitations on the assessment of any Taxes has been granted to any member of the Company Group and is currently in effect.

(v)     No member of the Company Group (A) has been a member of an affiliated group within the meaning of Code Section 1504(a) or any similar group under state, local or foreign law filing a consolidated federal income Tax Return; (B) has any liability for the Taxes of any Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract (other than contracts entered into in the ordinary course of business, the primary purposes of which were not the sharing of Taxes), or otherwise; and (C) is a party to, bound by, or has any obligation under, or potential liability with regards to, any Tax sharing arrangement, Tax indemnification agreement or similar contract or arrangement.

(vi)     No member of the Company Group has ever entered into or been a party to (A) a transaction subject to registration pursuant to Code Section 6111 as a "reportable transaction" within the meaning of Code Section 6111(b)(2) or as a "tax shelter" as defined in former Code Sections 6111(c) or (d), (B) a transaction subject to the list requirements of Code Section 6112, (C) a tax shelter within the meaning of Code Section 6662(d), or (D) a "listed transaction" as set forth in written guidance or a written notice issued by the Internal Revenue Service (the "**IRS**"). No Tax Returns of any member of the Company Group contained or was required to contain a disclosure statement under Sections 6011 or 6662 of the Code (or any predecessor statute) or any similar provision of state, local or foreign Law.

(vii)     No power of attorney has been granted by or with respect to any member of the Company Group which remains in effect with respect to any matter relating to Taxes.

(viii)     No member of the Company Group is a party to any agreement, plan, contract or arrangement that would result, separately or in the aggregate, in the payment of any "excess parachute payments" within the meaning of Section 280G of the Code.

(ix)     No member of the Company Group has any deferred intercompany gain or loss arising as a result of a deferred intercompany transaction within the meaning of Treasury Regulation Section 1.1502-13 (or similar provision under state, local or foreign law) or any excess loss accounts within the meaning of Treasury Regulation Section 1.1502-19.

(x)     No member of the Company Group is or has ever been a United States real property holding corporation (as that term is defined in Section 897(c)(2) of the Code) during the applicable period specified in Section 897(c)(1)(ii) of the Code.

(xi)     No member of the Company Group is or has ever been subject to a Tax ruling that has continuing effect.

(xii)     No member of the Company Group will be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending on or after the Effective Date as a result of any:(A)

{00829079.DOCX;12 }

adjustment under either Section 481(a) or 482 of the Code (or an analogous provision of state, local or foreign law) by reason of a change in accounting method or otherwise for any period ending on or prior to the Effective Date; (B) "closing agreement" as described in Code section 7121 (or any corresponding or similar provision of state, local or foreign income Tax law) executed on or prior to the Effective Date; (C) intercompany transaction or excess loss account described in Treasury Regulations under Code Section 1502 (or any corresponding or similar provision of state, local or foreign income Tax law) existing on or prior to the Closing Date; (D) installment sale or open transaction disposition made on or prior to the Effective Date; or (E) prepaid amount received on or prior to the Effective Date.

(xiii)    Other than as a result of the transactions contemplated by this Agreement, the net operating losses, if any, of the members of the Company Group are not limited under Section 382 of the Code and any excess credits, net capital losses, and foreign tax credits of the members of the Company Group are not limited under Section 383 of the Code.

(xiv)    No claim has ever been made by an authority in a jurisdiction where a member of the Company Group does not file Tax Returns that such member of the Company Group is or may be subject to taxation by that jurisdiction.

(xv)    All "non-qualified deferred compensation plans" (as such term is defined under section 409A(d)(1) of the Code and the guidance issued thereunder) of a member of the Company Group under which such member of the Company Group makes, is obligated to make or promises to make any payments or other awards (each, a "**409A Plan**") (A) meet and have met the requirements of Code Sections 409A(a)(2), (3), and (4) of the Code, and (B) are, and at all times were, operated in accordance with such requirements, are operated in good faith compliance with the transitional relief and all guidance and regulations provided by the Internal Revenue Service under section 409A of the Code, and (C) no 409A Plan has been funded by an off-shore arrangement described in Section 409A(b)(1) of the Code.

(xvi)    No member of the Company Group owns any interest in anyentity that is treated as a "disregarded entity" for federal tax purposes.

(xvii)    No member of the Company Group has distributed stock of another entity, or had its equity distributed by another entity, in a transaction that was purported or intended to be governed, in whole or in part, by Section 355 or 361 of the Code.

(xviii)    The Selling Parties have delivered or made available to Buyer true and correct copies of all income and other material Tax Returns including the K-1 statements which any member of the Company Group has distributed to its Members, examination reports, and statements of deficiencies filed by, assessed against, or agreed to by anymembe r of the Company Group since January 1, 2015.

(xix)    The Company is currently taxed as a "partnership" for federal income tax purposes. The Company has never elected to be treated as an association taxable as a corporation pursuant to Treasury Regulation Section 301.7701-3(c) or otherwise.

{00829079.DOCX;12 }

     (b)     The representations and warranties in this **Section 3.10** (other than those in **Sections 3.10(a)(ix), (xi), (xii) and (xvii)**) shall only be construed and interpreted as applying to Taxes and associated liabilities occurring in Pre-Closing Tax Periods.

     Section 3.11   Employees.  **Schedule 3.11** hereto sets forth the name, current annual compensation rate (including bonus and commissions), title, current base salaryrate, accrued but unpaid bonus and commissions, accrued sick leave, accrued vacation benefits and accrued severance pay of each Employee of each member of the Company Group other than those who ceased to be employees or consultants prior to December 31, 2016. **Schedule 3.11** hereto further lists all such Employees, as well as agents and independent contractors, covered by an employment non-competition, non-solicitation, consulting or severance agreement with any member of the Company Group, and the Company has provided to Buyer current and complete copies of each such agreement, as well as copies of any confidentiality or other agreement covering any proprietaryI ntellectual Property applicable to any such Person. **Schedule 3.11** hereto further lists the policies and practices of each member of the Company Group concerning Reimbursable Expenses, and the amounts of Reimbursable Expenses that have been submitted to each member of the Company Group but have not been reimbursed as of the Closing Date.  No member of the Company Group is a party to or otherwise bound by any collective bargaining agreement, contract or other agreement or understanding with a labor union or labor organization, nor is any member of the Company Group the subject of any Proceeding asserting that it has committed an unfair labor practice or seeking to compel any member of the Company Group to bargain with any labor union or labor organization, nor is there pending or, to the Selling Parties' Knowledge, threatened, any labor strike, dispute, walkout, work stoppage, slowdown or lockout involving any member of the Company Group. To the Selling Parties' Knowledge, each member of the Company Group is in compliance in all material respects with all applicable Laws respecting employment and employment practices, independent contractor arrangements, terms and conditions of employment and wages and hours and occupational safety and health. Except as disclosed in **Schedule 3.11** hereto, there is no action, suit or legal, administrative, arbitration, grievance or other Proceeding pending or, to the Selling Parties' Knowledge, threatened and, to Selling Parties' Knowledge, there is no investigation pending or threatened against any member of the Company Group relating to the employment practices of any member of the Company Group or any of the applicable Laws described in this **Section 3.11**. Except as set forth on **Schedule 3.11,** the Selling Parties have not received any written notice, and, to the Selling Parties' Knowledge, no Employee of any member of the CompanyGroup (other than those who ceased to be employees or consultants prior to December 31, 2016) intends or is considering terminating his or her employment with any member of the CompanyGroup before the Closing or does not intend to accept employment with Buyer on the Closing Date or if he intends to accept employment with Buyer is considering terminating his/her employment with Buyer thereafter.

     Section 3.12   Employee Benefits.

     (a)     A copy of each bonus, deferred compensation, pension, retirement, profit-sharing, thrift, savings, employee membership ownership, membership bonus, membership purchase, membership option, employment, retention, deal-sharing, termination,

severance, exit, change of control, compensation, medical, health or other welfare plan, agreement, policy or arrangement that covers or covered employees, directors, managers, former employees, former directors or former managers of any member of the Company Group (the "**Compensation and Benefit Plans**") has been provided to Buyer prior to the Closing Date. For each Compensation and Benefit Plan, copies of the following documents (to the extent applicable) have also been provided to Buyer prior to the Closing Date: (i) anyamendments since the last restatement of such plan; (ii) any trust agreement or other funding agreement; (iii) the most recent Form 5500 annual report, including all attachments; (iv) the most recent annual actuarial valuation report; and (v) the most recent IRS determination letter, and any outstanding request for such a letter. The Compensation and Benefit Plans existing as of the Effective Date are listed on **Schedule 3.12(a)** hereto.

(b)    All of the Compensation and Benefit Plans are in compliance in all material respects with all applicable Laws including but not limited to the Code, the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), the Health Insurance Portability and Accountability Act of 1996, as amended by P.L. 111-5 Division A ("**HIPAA**"), and the Family and Medical Leave Act. Each Compensation and Benefit Plan that is an "employee pension benefit plan" within the meaning of Section 3(2) of ERISA (a "**Pension Plan**"), that is intended to be qualified under Section 401(a) of the Code and is not a standardized prototype plan has received a favorable determination letter from the IRS, has applied for such letter in a timely fashion, or has a remaining period of time within which to apply for such a letter, and no member of the Company Group is aware of anycircumstances likely to result in revocation of any such favorable determination letter, the refusal to issue such a favorable determination letter or any material costs under the IRS's Employee Plans Compliance Resolution System. There are no pending or, to the Selling Parties' Knowledge, threatened claims or litigation relating to any of the Compensation and Benefit Plans. No member of the Company Group has engaged in a transaction with respect to anyCompensation and Benefit Plan that, assuming the taxable period of such transaction expired as of the Closing Date, would subject it to fiduciaryliability pay ment of additional benefits or a material tax or penalty imposed pursuant to either Section 4975 of the Code or Section 502 of ERISA.

(c)    As of the Closing Date, except as set forth on **Schedule 3.12(c)** hereto, no member of the Company Group maintains or contributes to an employee pension benefit plan subject to Title IV of ERISA or Section 412 of the Code.

(d)    Except as set forth on **Schedule 3.12(d)** hereto, no member of the Company Group has any obligations for retiree health and life benefits under any Compensation and Benefit Plan. Each member of the Company Group may amend or terminate any such plan under the terms of such plan at any time without incurring any material liabilitythereunder. Except as set forth on **Schedule 3.12(d)** hereto, no member of the Company Group has any obligation to provide group continuation coverage to former employees or their dependents as required by Section 600 et seq. of ERISA and Section 4980B of the Code.

(e)    Except as set forth on **Schedule 3.12(e)** hereto, neither the execution of this Agreement by the Company or the Selling Members nor the consummation of the transactions contemplated by this Agreement will (i) entitle any employees of any member of the Company Group to severance pay, (ii) accelerate the time of payment or vesting or trigger

{00829079.DOCX;12 }

anypay ment of compensation or benefits or forgiveness of indebtedness under, increase the amount payable or trigger any other material obligation pursuant to, any of the Compensation and Benefit Plans, or (iii) result in any breach or violation of, or a default under, any of the Compensation and Benefit Plans.

(f)     Except as set forth on **Schedule 3.12(f)** hereto, all annual reports required to be filed under anyL aws applicable to the Compensation and Benefits Plans have been timely filed with the respective Governmental Entity with which such reports are required to be filed, including, without limitation Form 5500 and Form 11-K.

(g)     To the Selling Parties' Knowledge, all Compensation and Benefit Plans covering current or former non-U.S. employees or former employees of any member of the CompanyGroup  comply in all material respects with applicable Laws. No member of the Company Group has any material unfunded liabilities with respect to any Compensation and Benefit Plan that covers such employees.

(h)     Except as set forth on **Schedule 3.12(h)**, no member of the Company Group (x) participates, maintains or contributes to, or has any liability or obligation under or with respect to, any single or multi-employer Compensation and Benefit Plan governed by or subject to Title IV of ERISA (whether by reason of being a member of an affiliated group of companies, one of which maintains such a plan, or otherwise), and (y) has participated, maintained, contributed or incurred any liability or obligation with respect to any such plan.

Section 3.13  Intellectual Property.

(a)     **Schedule 3.13(a)** hereto sets forth all of the Intellectual Property owned, in whole or in part, including jointly with others, byany  member of the CompanyGroup (collectively, the "**Owned Intellectual Property**") including, without limitation a complete and accurate list of all United States and foreign (i) patents and patent applications; (ii) Trademark registrations and applications and material unregistered Trademarks; and (iii) copyright registrations and applications, indicating for each, the applicable jurisdiction, registration number (or application number) and date issued (or date filed). **Schedule 3.13(a)** hereto lists all actions that must be taken byBuy er within one hundred eighty (180) days from the Effective Date, including the payment of any registration, maintenance, renewal fees, annuity fees and taxes or the filing of any documents, applications or certificates for the purposes of maintaining, perfecting or preserving or renewing any Intellectual Property of any member of the Company Group. **Schedule 3.13(a)** separately lists all Owned Intellectual Property that is owned in part or jointly owned with any other Person.

(b)     License Agreements.

(i)     **Schedule 3.13(b)(i)** hereto sets forth a complete and accurate list of all license, service or similar agreements (written or oral) granting to any member of the Company Group any material right to use or practice any rights under anyI ntellectual Property (other than off-the-shelf software that is subject to "shrink-wrap" or similar license and is commercially available and is not a material component of any product or service marketed, distributed or commercially exploited byan y member of the Company Group) (collectively, the "**License Agreements**").

{00829079.DOCX;12 }

        (ii)     No member of the Company Group has licensed Software or granted other rights in to use or practice any rights under any Owned Intellectual Property.

        (iii)     No Person has received from any member of the Company Group, or has the right to use, any Owned Intellectual Property.

        (iv)     Except as set forth on **Schedule 3.13(b)(iv)** hereto, there is no outstanding or, to the Selling Parties' Knowledge, threatened dispute or disagreement with respect to any License Agreement. Except as set forth in **Schedule 3.13(b)(iv)** hereto, no member of the Company Group is in breach of, or has failed to perform under, any of the License Agreements.

        (c)     Ownership; Sufficiency of Intellectual Property Assets. Members of the Company Group own or possess adequate licenses or other rights to use and practice, free and clear of all Liens (other than Permitted Liens), rights, claims, conditions, restrictions, limitations and interests of any Governmental Entity, orders and arbitration awards, and without payment of any kind to any Person, all of the Owned Intellectual Property. No member of the Company Group is engaged in the wrongful use of any confidential information or trade secrets or patentable inventions of any current or former employee or consultant of any member of the Company Group or any other person, firm or entity and to Selling Parties' Knowledge no such employee, consultant, person, firm or entity, has alleged that any member of the CompanyGroup is engaged in such wrongful use or that members of the Company do not own the Owned Intellectual Property. Except as set forth in **Schedule 3.13(c)** hereto, the Owned Intellectual Property identified in **Schedule 3.13(a)** hereto, together with the unregistered copyrights of members of the Company Group, if any, and rights under the licenses granted to members of the Company Group under the License Agreements, if any, constitute all the material Intellectual Property rights used in the operation of the Business, other than "shrink wrap" software licenses, and, to the Selling Parties' Knowledge, are all the Intellectual Property rights necessaryto operate the Business after the Effective Date in the same manner as the Business has been operated by the members of the Company Group.

        (d)     No Infringement. To Selling Parties' Knowledge, none of the products or services manufactured, distributed, marketed, sold, licensed or performed by any member of the Company Group, nor any of the Owned Intellectual Property used in the conduct of the Business, infringe upon, violate or constitute the unauthorized use of any rights owned or controlled byany Person, including any Intellectual Property or proprietary rights (including, without limitation, patents, design patents, Trademarks, common law marks, domain names, trade dress, industrial property and copyrights) of anyPerson.

        (e)     No Pending or Threatened Infringement Claims. Except as set forth on **Schedule 3.13(e)** hereto, there is no pending litigation and no written notice or other claim has been received byan y member of the Company Group (i) alleging that any member of the Company Group has engaged in any activity or conduct that infringes upon, violates or constitutes the unauthorized use of any of the Intellectual Property or proprietary rights of any Person, or (ii) challenging the ownership, use, validity or enforceability of anyOwned Intellectual Property, or the Intellectual Property exclusively licensed by or to any member of the Company Group. No member of the Company Group has received any writing requesting,

{00829079.DOCX;12 }

23

inquiring or demanding the licensing of any other Person's Intellectual Property or proprietary rights.

(f)    <u>No Infringement by Third Parties</u>. To Selling Parties' Knowledge, no third party is misappropriating, infringing, diluting, or violating any Owned Intellectual Property or Intellectual Property exclusively licensed to one or more members of the Company Group, and no such claims have been brought against any Person by an y member of the CompanyGroup.

(g)    **Schedule 3.13(g)** hereto sets forth a list of all websites of the Business or of, or maintained by, one or more members of the Company Group (the "**Websites**"). With respect to such Websites, except as set forth on **Schedule 3.13(g)** hereto, members of the Company Group (i) themselves or through contractors, operate and manage each Website, (ii) have the right to modify each Website, and to make links and hyperlinks therefrom to other internet sites, and (iii) own or possess the perpetual, world-wide, royalty-free, fully assignable right to operate each Website as presently conducted, including, without limitation, the fully assignable right to operate such Website with its current host on its current server as presently operated and to use, enhance, and create derivative works of or from and maintain all source code and other Intellectual Property and proprietary rights necessary to operate, develop, modify, make derivative works of or from, support and maintain each website. Without limiting the foregoing, except as set forth on **Schedule 3.13(g)** hereto, members of the CompanyGroup own or possess the perpetual, world-wide royalty free, fully assignable right to use, display, perform, publish, disseminate, transmit and distribute the content and other information displayed, published, performed, disseminated, transmitted or distributed on or through each Website, and to disseminate, transmit, distribute, market, sell or license the information, products, and services disseminated, transmitted, marketed, sold or licensed on or through each Website.

Section 3.14  <u>Financial Statements ; Accounts Receivable</u>

(a)    Annexed hereto as **Schedule 3.14(a)** are the (i) compiled consolidated financial statements of the Companyan d its Subsidiaries as at and for the twelve month periods ended December 31, 2016, 2015, and 2014, together with a report thereon by Company's accountants (collectively, the "**Annual Financial Statements**"), (ii) unaudited internal interim consolidated financial statements of the Company and its Subsidiaries as at and for the one-month period ended January 31, 2017 (the "**Interim Financial Statement**"), and (iii) unaudited internal interim consolidated financial statements of the Company and its Subsidiaries as at and for the one-month period ended February 28, 2017 (the "**Additional Interim Financial Statement**"), provided, however that the Additional Interim Financial Statement shall be provided to Buyer no later than March 20, 2017, including in each of clauses (i), (ii) and (iii), balance sheets and a statement of income and retained earnings (the Annual Financial Statements, the Interim Financial Statement and the Additional Interim Financial Statement, collectively the "**Financial Statements**"). Except as set forth therein or in **Schedule 3.14(a)** hereto, the Annual Financial Statements have been prepared on an accrual basis using consistent accounting practices for periods and dates presented, in all material respects in accordance with the Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants throughout the periods indicated. The Financial

{00829079.DOCX;12 }

Statements present fairly the consolidated financial position of the Company and its Subsidiaries as of the dates indicated and present fairly, in all material respects, the consolidated financial condition of the Company and its Subsidiaries for the periods then ended. The Interim Financial Statement and the Additional Interim Financial Statement have been prepared in all material respects on a basis consistent with the Annual Financial Statements, except that the Interim Financial Statement and the Additional Interim Financial Statement do not contain notes and other presentation items required by GAAP, may be subject to normal audit or year-end adjustments and have not been audited, reviewed, compiled, or otherwise tested by the Company's independent auditor. The balance sheet included in the Interim Financial Statement and the Additional Interim Financial Statement presents fairly, in all material respects, the financial condition of the Business as at the end of the one-month period ended January 31, 2017 and the one-month period ended February 28, 2017, respectively. The statement of income and retained earnings included in the Interim Financial Statement and the Additional Interim Financial Statement present fairly in all material respects the results of operations of the Business for the one-month period ended January 31, 2017 and the one-month period ended February 28, 2017.

      (b)     Accounts Receivable. Except as indicated on **Schedule 3.14(b)**, all accounts receivable of the members of the Company Group are reflected properly on the Books and Records, represent bona fide, current and valid obligations arising from sales actually made or services actually performed in the Ordinary Course of Business. Such accounts receivable are not subject to any material setoffs or counterclaims, are current and collectible within nine (9) months from the invoice relating to the applicable account receivable, and will be collected within such period in accordance with their terms at their recorded amounts, subject only to the allowance for doubtful accounts set forth in the Balance Sheet included in the most recent Interim Financial Statement as adjusted for the passage of time through the Closing Date consistent with the past custom and practice of the members of the Company Group. Except as set forth therein or in **Schedule 3.14(b)** hereto, no member of the Company Group has received written notice from any obligor of any material accounts receivable that such obligor is refusing to pay or contesting payment of which has not been resolved prior to the Closing Date, other than in the Ordinary Course of Business under any Contract with any obligor of any accounts receivable.

     Section 3.15    Absence of Certain Changes.

      (a)     Except as set forth on **Schedule 3.15(a)** hereto, since January 1, 2017, (x) each member of the Company Group has conducted the Business only in, and has not engaged in any transaction other than according to, the Ordinary Course of Business, (y) no member of the Company Group has entered into any Contracts that are materially less favorable to any member of the Company Group than Contracts entered into in the Ordinary Course of Business, and (z) there has not occurred:

          (i)     any Material Adverse Effect;

          (ii)     any damage, destruction or other casualty loss with respect to any material asset or property owned, leased or otherwise used by any member of the Company Group, whether or not covered by insurance;

{00829079.DOCX;12 }

25

(iii)    any declaration, setting aside or payment of any dividend, or other distribution (whether in cash, membership interest or property) in respect of the equity interest, or any repurchase, redemption or other reacquisition of any equity interest or other securities of any member of the CompanyGroup;

(iv)    any change in the accounting principles, practices or methods of any member of the Company Group;

(v)    any change in any material Tax election or any settlement or compromise of any material Tax claim or liability; or

(vi)    any agreement or commitment to take any of the actions referred to in clauses (iii) through (v) above.

(b)    Without limiting the foregoing provisions of **Section 3.15(a)**, since the date of the most recent Annual Financial Statement, except as set forth in **Schedule 3.15(b)** hereto, no member of the CompanyGroup:

(i)    incurred any obligation or liability, absolute, accrued, contingent or otherwise, whether due or to become due, except current liabilities for trade or business obligations incurred in the Ordinary Course of Business, none of which are, individually or in the aggregate, material;

(ii)    mortgaged, pledged or subjected to any Lien (other than Permitted Liens), any of the rights, assets or property, tangible or intangible of any member of the CompanyGroup;

(iii)    sold, transferred, leased to others or otherwise disposed of any assets, properties or rights of any member of the Company Group, except for inventorysold, supplies consumed, and minor amounts of obsolete equipment replaced, in each case in the Ordinary Course of Business;

(iv)    to Selling Parties' Knowledge, been subject to or encountered any labor union organizing activity, had any actual or, to Selling Parties' Knowledge, threatened employee strike, work stoppage, slow down or lockout, or, to Selling Parties' Knowledge, had any material adverse change in its relations with its employees, consultants, customers, distributors or suppliers or any governmental regulatory authority or self-regulatoryauthorit y;

(v)    transferred or granted any rights under, or entered into any settlement regarding the breach or infringement of, any license, copyright, Trademark, patent, or other Intellectual Property of any member of the Company Group, or modified anyexisting rights with respect thereto;

(vi)    made any change in excess of 2% in the rate of compensation, commission, bonus or other direct or indirect remuneration payable, or paid or agreed or orally promised to pay, conditionally or otherwise, any bonus, extra compensation,

pension or severance or vacation pay, to any employee, consultant, salesman, representative or agent of any member of the Company Group;

(vii)    instituted, settled or agreed to settle any litigation, action or Proceeding before any Governmental Entity;

(viii)    received any written notice or other information from any member, distributor, salesman, representative, vendor, supplier, customer or group of customers, that it (they) intend(s) to cease doing business with one or more members of the Company Group, including, without limitation, any written notices of material change in revenues, costs or method of distribution;

(ix)    made any purchase commitments materially in excess of the normal, ordinary and usual requirements of the Business or at any price materially in excess of the current market price or upon terms and conditions more onerous than those that are usual and customary in the trade or made any change in its selling, pricing, advertising or personnel practices inconsistent with its prior or prudent business practices;

(x)    taken any action to accelerate any payment of or taken any action to adversely change the terms of, any accounts receivable of any member of the Company Group nor delay the payment of, or taken any action to adversely change the terms of the accounts payable of any member of the CompanyGroup;

(xi)    entered into any transaction, contract or commitment other than in the Ordinary Course of Business, or paid or agreed to payan y brokerage, finder's fee, or other compensation in connection with, or incurred any severance pay obligation by reason of, this Agreement or the transactions contemplated hereby;

(xii)    amended any Compensation and Benefit Plans; or

(xiii)    entered into any agreement or made any commitment to take any of the types of actions described in any of clauses (i) through (xii) of this **Section 3.15(b)**.

Section 3.16    Bank Accounts.  **Schedule 3.16** hereto sets forth a list of all bank and savings accounts, securities accounts, certificates of deposit and safe deposit boxes of the members of the Company Group and those persons authorized to sign thereon as of the date of this Agreement.

Section 3.17    Compliance with Law.

(a)    Except as set forth in **Schedule 3.17(a)** hereto, since January1, 2013, the Business has not been, and is not being, conducted in violation of any law, ordinance, regulation, treaty, judgment, order (whether temporary, preliminary or permanent), decree, arbitration award, license or permit of any Governmental Entity (each a "**Law**" and collectively, "**Laws**"), except for violations or possible violations that, individually or in the aggregate, are not material or are not reasonablylikel y to prevent, materially delay, materially burden or materially impair the Selling Parties' ability to consummate the transactions described in this

{00829079.DOCX;12 }

Agreement or materially impair the ability of Buyer, following the Closing, to conduct the Business in the manner in any jurisdiction in which it is now being conducted. No action or demand or, to the Selling Parties' Knowledge, review, by any Governmental Entity with respect to any member of the Company Group or affecting any of its properties or assets is pending or, to the Selling Parties' Knowledge, threatened, nor has any Governmental Entity provided written notice to any member of the Company Group of an intention to conduct the same or that an investigation of any member of the Company Group is being conducted. To the Selling Parties' Knowledge, no material change is required in the processes, properties or procedures of any member of the Company Group in connection with any such Laws, and no member of the Company Group has received any written notice of any material noncompliance with any such Laws that has not been cured as of the Closing Date.

(b)    Except as set forth on **Schedule 3.17(b)** hereto, each member of the CompanyGroup has in full force and effect all material approvals, authorizations, certificates, filings, franchises, licenses, and permits of or with all Governmental Entities (collectively, "**Permits**") necessary to own, lease or operate the properties and other assets of the members of the Company Group and to carry on, the Business. All such Permits are set forth on **Schedule 3.17(b)** hereto. There is no continuing default under, or violation of, any such Permit, and each such Permit is in full force and effect. The execution, delivery, and performance of this Agreement, and the consummation of the transactions described in this Agreement will not result in a violation of or default under and will not cause the revocation or cancellation of any such Permit. No member of the Company Group has received any written notice that, and there are no facts which have, or reasonably should have, led it or the Selling Members to believe that anyof the Permits are not currently in good standing.

(c)    Each member of the Company Group has kept in all material respects all required records and has filed in all material respects with Governmental Entities all required notices, supplemental applications and annual or other reports required for the operation of the Business and in all material respects in accordance with applicable Law. To the Selling Parties' Knowledge, neither the ownership nor use of the assets or properties of the members of the Company Group, nor the conduct, production or operations of the Business, conflicts with the rights of any Person. Neither the ownership nor use of the assets or properties of the members of the Company Group, nor the conduct, production or operations of the Business violates, or, with the giving of notice or the passage of time, or both, will violate, conflict with or result in a default, right to accelerate or loss of rights under, any terms or provisions of (a) the certificate of incorporation, bylaws, articles of organization or operating agreement or other governing documents of any member of the Company Group, or (b) any Permit held byan y member of the Company Group, or any Material Contract or material commitment to which  any member of the Company Group is a party, that is material to the Ordinary Course of the Business.

Section 3.18    Environmental Matters.  Except as disclosed in **Schedule 3.18** hereto: (i) each member of the Company Group has complied in all material respects with all applicable Environmental Laws; (ii) no member of the Company Group has any material liability under any Environmental Law for any Hazardous Substance disposal or contamination on the properties currently owned or operated by the Company; (iii) no member of the CompanyGroup has any material liability under any Environmental Law for any Hazardous Substance disposal or contamination on the properties formerly owned or operated by the Company; (iv) no member of

{00829079.DOCX;12 }

the Company Group has anyliabilit y under any Environmental Law for any Hazardous Substance disposal or contamination on anyproperty owned or operated byany other Person; (v) no member of the Company Group is in violation of or has anyliability under any Environmental Law for any release or threat of release of any Hazardous Substance; (vi) no member of the Company Group has received any written notice, demand, letter, claim or request for information alleging that it may be in violation of or liable under any Environmental Law; (vii) no member of the Company Group is subject to any orders, decrees, injunctions or other arrangements with any Governmental Entity or an indemnitor of any third party indemnitee for any liability under any Environmental Law or relating to Hazardous Substances; (viii) to the Selling Parties' Knowledge, there are no circumstances or conditions involving any member of the Company Group that could reasonably be expected to result in any material claims, liability, investigations, costs or restrictions on the ownership, use, or transfer of any of its property pursuant to any Environmental Law; (ix) to the Selling Parties' Knowledge, none of the Company Leased Properties contains any underground storage tanks, asbestos-containing material, lead-based paint, or polychlorinated biphenyls in violation of any Environmental Law or that would reasonably be expected to result in liability to any member of the Company Group under any Environmental Law; and (x) no member of the Company Group has engaged in anyactivities involving the generation, use, handling or disposal of any Hazardous Substances in violation of any Environmental Law or that would reasonablybe expected to result in any material liability under any Environmental Law. Except as disclosed in **Schedule 3.18** hereto, there have been no environmental investigations, studies, audits, tests, reviews or other analyses conducted by or for one or more members of the Company Group, or, to the Selling Parties' Knowledge, bysomeone other than members of the Company Group, relating to any property or facility now or previously owned or leased by one or more members of the Company Group that have not been delivered to Buyer.

Section 3.19    Contracts and Commitments.

(a)    **Schedule 3.19(a)** hereto contains a true and correct list of all of the following current Contracts and documents to which any member of the Company Group is bound or which pertain to any of the Business (together with all other Contracts required to be listed on a Schedule to this Agreement and/or delivered or made available to Buyer, the "**Material Contracts**"):

(i)    service, management, consulting or similar types of Contracts involving receipts byan y member of the Company Group in excess of $25,000 in any 12-month period during term of any such Contract;

(ii)    sale, maintenance, supply, purchase, distribution, dealer, and distributor Contracts involving receipts in excess of $25,000 in any 12-month period during term of any such Contract;

(iii)    sale, maintenance, supply, purchase, distribution, dealer, and distributor Contracts involving payments in excess of $25,000 in any 12-month period during term of any such Contract;

{00829079.DOCX;12 }

29

(iv)     Government Contracts and Government Bids (as used herein, "**Government Contract**" means any Contract that (x) is between any member of the Company Group and a U.S. or other Governmental Entity or (y) is entered into by any member of the Company Group as a subcontractor (at any tier) in connection with a Contract between another Person and a U.S. or other Governmental Entity, and, "**Government Bid**" means any offer by any member of the Company Group to sell goods or to provide services prior to the Closing Date which, if accepted, would result in a Government Contract);

(v)     covenants not to compete or other covenants (x) limiting or restricting the development, manufacture, marketing, distribution or sale of any of the products or services of any member of the Company Group or any future line extension of such products or services into other forms, or (y) limiting or restricting the ability of any member of the Company Group to enter into any market or line of business or to compete with any other Person, or any other covenant restricting or prohibiting any member of the Company Group from transacting business or dealing in any manner with any other Person;

(vi)     Contracts with any Affiliate of any member of the Company Group or with any director, officer, shareholder, manager or employee of any member of the Company Group or any Affiliate of any member of the Company Group;

(vii)     advertising Contracts requiring expenditures or fees in excess of $20,000 in any twelve-month period after the Closing Date;

(viii)     management, employment, service, consulting, retention, severance or other similar type of Contract whereby any member of the Company Group is provided with services;

(ix)     Contracts relating in whole or in part to the Intellectual Property of any member of the Company Group (including any Contract under which any member of the Company Group is the licensee or licensor of any such Intellectual Property, but excluding any Contracts related to "shrink wrapped" Software) that are material to the Business;

(x)     internet or website related agreements relating to the Business (including, without limitation, all interactive service, portal, web site management, hosting, server, content licensing, advertising, branding, and link or hyperlink agreements) and development agreements, except for click through or similar type agreements;

(xi)     leases, subleases or licenses under which any member of the Company Group holds any leasehold or other interest or right to the use of any real property, or pursuant to which any member of the Company Group has assigned, leased, subleased or granted to any Person any rights therein;

(xii)     mortgage, pledge, security agreement, deed of trust, loan agreement, credit agreement, indenture, conditional sale or title retention agreement, equipment financing obligation or other instrument or agreement granting a Lien (other than a Permitted Lien) upon any of the properties or assets of any member of the Company Group;

(xiii)   Contracts regarding the release, transportation or disposal of Hazardous Substances, or the clean-up, abatement or other action relating to Hazardous Substances or Environmental Laws;

(xiv)   Contracts establishing or creating any partnership, joint venture, limited liabilitycompany , limited liability partnership or similar entity;

(xv)   Contracts to make any capital expenditures or capital additions or improvements with commitments in excess of $10,000 in anytwelve -month period after the Closing Date or in excess of $50,000 in the aggregate over the term of anysuch Contract;

(xvi)   Contracts relating to the storage or warehousing of any inventory or products of any member of the Company Group, or relating to the charter or purchase of transportation or shipping services;

(xvii)   guarantees or other Contracts in respect of any Indebtedness of any Person other than with respect to the deposit of third party checks;

(xviii)   Contracts providing for the indemnification by a member of the Company Group of any current or former director, officer or employee of any member of the Company Group (other than such provisions as are set forth in the Certificate of Incorporation, Articles of Organization, operating agreement or similar charter documents of a member of the CompanyGroup);

(xix)   any agreements, arrangements or commitments byor relating to any member of the Company Group under which any member of the CompanyGroup indemnifies any other Person or is required to carry insurance for the benefit of any other Person (other than credit agreements, leases, supply agreements and other Contracts otherwise scheduled as Material Contracts);

(xx)   all other Contracts, commitments and purchase orders (other than short-term purchase orders for supplies and services and sales orders of inventory, for cash), in each case: other than those (A) made in the Ordinary Course of Business on customary terms and conditions and consistent with past practices, and (B) involving payments or receipts by members of the Company Group of less than $25,000 in any single case or series of related orders; and

(xxi)   any other Contracts to which any member of the Company Group is a party or by which it or any of the Business is bound that is material to the Business or the Company and the Subsidiaries.

(b)   Each Material Contract is a valid and binding obligation of one or more members of the Company Group, in full force and effect and enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general principles of equity.

{00829079.DOCX;12 }

(c)     Except as set forth on **Schedule 3.19(c),** no member of the Company Group is and, to the Selling Parties' Knowledge, no other party to anyMaterial Contract, is in violation of or in default under any Material Contract, nor, to the Selling Parties' Knowledge, has any event occurred, or circumstance or condition exist, that (with or without notice or lapse of time or both) would reasonably be expected to (i) result in a violation of, or default under, any Material Contract, (ii) give any party the right to cancel or terminate or modifyan y Material Contract, or (iii) give anyparty to any Material Contract the right to seek material damages or other remedies. Except as set forth in **Schedule 3.19(c)** hereto, there have been no oral or written modifications of, or amendments or waivers with respect to, any of the terms of any of the Material Contracts. To the Selling Parties' Knowledge, except for any consents required thereunder which are properly so indicated on **Schedule 3.19(a)** hereto, (x) each Material Contract will be unaffected by the sale of or other transfer of the Interests and the transactions described in this Agreement and the other Seller Documents, and (y) following the Closing, the members of the Company Group will be entitled to the full benefits thereof, provided the members of the Company Group continue to abide by the terms thereof.

(d)     No member of the Company Group has been required to refund or grant a credit to a Commercial Healthcare Plan with respect to the amount paid to a member of the Company Group for services rendered by such member of the Company Group in connection with its Contract with its Commercial Healthcare Plan on account of an Inaccurate Submission.

Section 3.20    Insurance. **Schedule 3.20** hereto sets forth: (a) the policies of insurance presently in force covering members of the Company Group specifying with respect to each such policy, the name of the insurer, type of coverage, term of policy, limits of liabilityand annual premium; (b) the losses of each member of the Company Group, byy ear, byt ype of coverage, since January 1, 2015 based on information received from the insurance carrier(s) of the members of the Company Group; (c) all outstanding insurance claims byan y members of the Company Group for damage to or loss of property or income which have been referred to insurers or which any member of the Company Group believes to be covered by commercial insurance and (d) general comprehensive liability policies carried by any member of the Company Group since January 1, 2015, including excess liability policies, if any. The Company has heretofore delivered or made available to Buyer true and correct copies of the policies and agreements set forth on **Schedule 3.20** hereto. No member of the Company Group has received any written notice regarding termination of insurance policies set forth on **Schedule 3.20** and the invoiced premiums with respect thereto covering all periods up to and including the date of the Closing have been or will be paid prior to Closing. Such policies have been maintained in the Ordinary Course of Business, such insurance policies are, to Selling Parties' Knowledge, valid, outstanding and enforceable policies, provide (in the Selling Parties' opinion) adequate insurance coverage for the assets and operations of the Business, will remain in full force and effect through the respective dates set forth on **Schedule 3.20** hereto without the payment of additional premiums, and will not in anyway be affected by, or terminate or lapse by reason of, the transactions described in this Agreement.  Affiliate Transactions.

(a)     Except as set forth in **Schedule 3.21(a)** hereto, no member of the Company Group has purchased goods or services from, or sold goods or services to, or otherwise engaged in any transaction with, any Person (i) that is an Affiliate of any member of the Company Group, or (ii) with respect to which any Affiliate of any member of the Company

{00829079.DOCX;12 }

Group, or any member of the immediate family of any such Affiliate, owns more than 10% of the voting equity of such Person. All such transactions were entered into in the Ordinary Course of Business and on terms and conditions that are no less favorable to the members of the Company Group than would be obtained in a comparable arm's length transaction with a Person that is not an Affiliate of any member of the CompanyGroup.

(b)     Except as set forth in **Schedule 3.21(b)** hereto, no member, employee, officer, director or agent of any member of the Company Group has any interest in anypropert y, real or personal, tangible or intangible, used in or pertaining to the Business.

Section 3.22    Distributors, Suppliers and Customers.

(a)     Set forth in **Schedule 3.22(a)** hereto is a list of names and addresses of the ten (10) largest suppliers (measured by dollar volume of purchases) of the members of the Company Group and the percentage of the business which each such supplier represented during the twelve (12) month periods ended December 31, 2015 and December 31, 2016. Set forth in **Schedule 3.22(a)** hereto is a list of names and addresses of the ten (10) largest customers (measured by dollar volume of purchases) and all other customers that accounted for more than $50,000 in revenue of one or more members of the Company Group and the percentage of the business which each such customer represented during the twelve (12) month periods ended December 31, 2015 and December 31, 2016. Except as set forth on **Schedule 3.22 (a),** no Selling Party and no Subsidiary of the Company has received any written notice, and to the Selling Parties' Knowledge, there is no reason to believe that (u) any customer has expressed any concern about the performance byany member of the Company Group of its services or the cost of such services, (v) any customer has ceased, or will cease (either before or after the Closing), to use the products or services of the members of the Company Group, (w) any customer has materially reduced or will materially reduce (either before or after the Closing) the use of products or services of members of the Company Group, (x) any customer intends or is considering reevaluating the use of the products or services of members of the CompanyGroup, either before or after the Closing, (y) any member of the Company Group is at risk of any of its customers not renewing its agreement or arrangement with such member of the CompanyGroup, or reducing the services or products it obtains from members of the Company Group, on account of performance, prices or otherwise or (z) any member of the Company Group is not performing all of its contractual obligations to each of its customers as required and in accordance with such the applicable Contract. To the Selling Parties' Knowledge, no unfilled customer order or commitment obligating any member of the Company Group to perform services will result in a loss to any member of the Company Group upon completion of performance.

(b)     To Selling Parties' Knowledge, the relationships of the members of the Company Group with their distributors, suppliers, customers, and licensors or sublicensors of rights with respect to Intellectual Property are reasonably good commercial working relationships.

Section 3.23    Products Liability and Warranty Liability.    Except as set forth in **Schedule 3.23** hereto, no member of the Company Group provides any product warranties with respect to the products or services sold by any member of the Company Group. Except as set forth in **Schedule 3.23** hereto, no member of the Company Group has received anywritten

{00829079.DOCX;12 }

33

complaints of any damages to any Person relating to the products or services of any member of the Company Group with respect to which any member of the Company Group has any liability. The Selling Parties do not know of any facts that indicate any member of the Company Group has any material liability for warranty claims or returns with respect to any of its products or services. **Schedule 3.23** hereto sets forth a description of all product or service warranty claims in excess of $10,000 per such warranty claim, with respect to products and services of any member of the Company Group since January 1, 2011.

Section 3.24    <u>Absence of Certain Business Practices.</u>    Neither any member of the Company Group nor any officer, or employee of any member of the Company Group, nor any other agent, person or entity acting on its behalf, has, directly or indirectly, given or agreed to give any gift or similar benefit to any client, customer, governmental employee or other person or entity who is or may be in a position to help or hinder the business of any member of the Company Group (or assist any member of the Company Group in connection with any actual or proposed transaction) which (a) subjects any member of the Company Group to any damage or penalty in any civil, criminal or governmental litigation or Proceeding, (b) if not given in the past, would have had an adverse effect on the assets, properties, business or operations of any member of the Company Group, or (c) if not continued in the future, adversely affects the assets, or operations of any member of the Company or which subjects any member of the Company Group to suit or penalty in any private or governmental litigation or Proceeding. There are no situations with respect to any member of the Company Group which involved or involves (i) the use of any corporate funds for unlawful contributions, gifts, or other unlawful expenses related to political activity, (ii) the making of any direct or indirect unlawful payments to government officials or others from corporate funds or the establishment or maintenance of any unlawful or unrecorded funds, (iii) the receipt of any illegal discounts or rebates or any other violation of antitrust laws or (iv) to the Selling Parties' Knowledge, any investigation by any Government Entity.

Section 3.25    <u>Records.</u>    The Books and Records are, and at all times were, prepared in the Ordinary Course of Business and appropriately reflect the operations and transactions of the members of the Company Group in all material respects.

Section 3.26    <u>Health Care Compliance</u>.

(a)    Except as set forth on **Schedule 3.26(a)**, each member of the Company Group is in compliance in all material respects with all Healthcare Laws, including, but not limited to, (i) the Anti-Kickback Statute, the Stark Law, the Civil Monetary Penalty Law, and the Exclusion Statute; (ii) all Laws pertaining to Medicaid, Medicare and TRICARE, (iii) HIPAA and other federal and state privacy Laws; (iv) all state Laws relating to fee splitting or kickbacks; (v) all federal and state Laws regulating the disposal of Medical Waste and radioactive waste; and (v) all laws regulating the corporate practice of medicine.

(b)    Except as set forth on **Schedule 3.26(b)**, no member of the Company Group is directly (i) a supplier or provider under an agreement with CMS, (ii) a party to an agreement with a state Medicaid agency; or (iii) a party to an agreement with a Medicare Advantage plan.

{00829079.DOCX;12 }                34

(c)     Except as set forth on **Schedule 3.26(c)**, to the Selling Parties' Knowledge, each member of the Company Group has in all material respects, to the extent applicable, billed and filed claims on behalf of customers in accordance with the terms of the applicable agreements with Healthcare Programs, including, where applicable, billing and collection of all deductibles and co-payments.  All claims that have been filed byany  member of the Company Group, to the extent coded by a member of the Company Group were properly coded, were filed in compliance with all Healthcare Program requirements and, to the Selling Parties' Knowledge, are for services actually rendered.  To the extent that any member of the Company Group provides coding for health care providers, such member of the CompanyGroup engages coders who are properly trained, conducts on-going supervision of coders to ensure that coding is accurate, and requires retraining or dismissal of coders who do not meet accuracy requirements.

(d)     Except, as set forth on **Schedule 3.26(d)** except for routine audits in the Ordinary Course of Business consistent with past practices, no audit or, to the Selling Parties' Knowledge, investigation relating to claims submission and collection provided byany member of the Company Group has been conducted byan y Governmental Entity with respect to any member of the Company Group in connection with anyGov ernment Healthcare Program, including, but not limited to, the DOJ, OIG, any MAC, RAC, ZPIC, or byany Commercial Healthcare Program and, to the Selling Parties' Knowledge, no such audit or, to the Selling Parties' Knowledge, investigation is scheduled, pending or threatened against or affecting any member of the Company Group.

(e)     In each case where any member of the Company Group pays a commission for sales, successful marketing or similar activities, the individual who receives the commission is a bona fide W-2 employee of such member of the Company Group.

(f)     No member of the Company Group is a party to an individual integrity agreement, corporate integrity agreement, deferred prosecution agreement, settlement agreement, or other formal or informal agreement with any Governmental Entityconcerning compliance with Healthcare Laws.

(g)     No member of the Company Group: (i) has been charged with or convicted of any criminal offense relating to the delivery of an item or service in connection with any Healthcare Program; (ii) is or ever was excluded from participation in anyGovernment Healthcare Program and, to the Selling Parties' Knowledge, no member of the CompanyGroup is threatened with exclusion; (iii) has had a civil monetarypenalty  assessed against it under the Civil MonetaryPenalt y Law or its regulations; or (iv) is currently listed on the General Services Administration System for Award Management as ineligible, restricted, excluded or debarred from federal procurement programs and non-procurement programs.

(h)     At no time has any member of the Company Group engaged in any activity that is in violation of, or is cause for civil penalties or mandatory or permissive exclusion under, any Healthcare Laws, including without limitation:  (i) knowingly and willfully making or causing to be made a false statement or representation of a material fact in any application for any benefit or payment; (ii) knowingly and willfully making or causing to be made a false statement or representation of a material fact for use in determining rights to any benefit or

{00829079.DOCX;12 }

35

payment; (iii) knowingly and willfully soliciting or receiving any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or kind (A) in return for referring an individual to a Person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under anyHealthcare Program, or (B) in return for purchasing, leasing, or ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service or item for which payment maybe made in whole or in part under any Healthcare Program; (iv) knowingly and willfully offering or paying any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind, to any Person to induce such Person (A) to refer an individual to a Person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Healthcare Program, or (B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service or item for which payment may be made in whole or in part under a Healthcare Program; or (v) any other activity that violates any Healthcare Law relating to prohibiting fraudulent, abusive or unlawful practices connected in any way with the provision of health care items or services or the billing for such items or services provided to a beneficiary of any Healthcare Program.

(i)    Except as set forth on **Schedule 3.26(i)**, since January 1, 2013, no member of the Company Group has received any subpoena, civil investigative demand or similar process from the DOJ, the OIG, any state attorney general, Medicaid fraud unit or other Governmental Entity  To the Selling Parties' Knowledge,  no member of the Company Group is a defendant in a suit under the False Claims Act.

(j)    The members of the Company Group maintain in full force and effect a corporate compliance program to ensure compliance with Healthcare Laws.

(k)    Except as set forth on **Schedule 3.26(k)**, to the extent that any member of the Company Group under HIPAA is a "covered entity" or "business associate" as each is defined in 45 C.F.R. § 160.103, it is in compliance in all material respects with HIPAA, including, without limitation (i) it has developed, implemented, and maintains in full force and effect both in the United States and in all foreign offices a HIPAA compliance plan, including, without limitation, policies and procedures as required byHIPAA to protect the privacyand security of Protected Health Information, to provide proper notification in the event of a "breach" (as defined in 45 C.F.R. § 164.402) of Protected Health Information, and to engage in electronic transactions in compliance with HIPAA; and (ii) it has in effect a "business associate contract" (as defined under HIPAA) with each Person for which a business associate contract is required, that complies with HIPAA as currently in effect (including, but not limited to, revisions that were required by the regulations promulgated by OCR on January 25, 2013) and such member of the Company Group is in compliance in all material respects with such business associate contract.  Except as set forth on **Schedule 3.26(k)**, no member of the CompanyGroup experienced a breach of Protected Health Information pertaining to five hundred (500) or more individuals.  No member of the Company Group has been the subject of an audit by the OCR.

(l)    To the extent that one or more members of the Company Group is a Group Purchasing Organization ("**GPO**"), it complies with the GPO safe harbor to the Anti-Kickback Statute set forth in 42 C.F.R. §1001.952(j).  Each member of the Company Group has

required each of its divisions to comply with the requirements in the discount safe harbor to the Anti-Kickback Statute set forth in 42 C.F.R. §1001.952(h).

Section 3.27    Brokers and Finders.    Except for the fees set forth on **Schedule 3.27**, which are the sole responsibility of the Selling Parties, none of the Selling Parties nor any of their respective officers, directors, trustees or employees has employed any broker or finder or incurred any liability for any brokerage fees, commissions or finders' fees in connection with the transactions described in this Agreement.

Section 3.28    Inventory.    Except as listed on **Schedule 3.28** no member of the Company Group maintains any inventory .

Section 3.29    Privacy.    No member of the Company Group is in breach of any contractual or regulatory obligation to secure or otherwise safeguard Personal Data it receives in connection with the operation of its business and the Websites. Each member of the Company Group has at all times taken commercially reasonable measures to ensure that all Personal Data is protected against loss and unauthorized access, use, modification, disclosure or other misuse, and, except as set forth in **Schedule 3.29**, to Selling Parties' Knowledge, there has been no unauthorized access to or other misuse of such data. Each member of the Company Group has made all notifications to customers or individuals required to be made by such member of the Company Group by any Privacy and SecurityL aws arising out of or relating to any event of access to or acquisition of any Personal Data by an unauthorized Person, including third parties and employees of any member of the Company Group acting outside of the scope of their authority or authorization in a manner which is otherwise unlawful. True and correct copies of all applicable current internal and customer or user-facing privacypolic ies of each member of the Company Group ("**Company Privacy Policies**") have been provided or made available to Buyer. Each member of the Company Group has complied in all material respects with all Privacy and SecurityL aws in connection with the operation of the Business of the members of the Company Group and the Websites. No Personal Data disclosures, representations or covenants made to any customer, or contained in any Company PrivacyPolicy , have been inaccurate or in violation of any Privacy and SecurityL aws. There is no complaint to, or audit of, or Proceeding, or written claim or, to the Selling Parties' Knowledge, investigation currently pending against, any member of the Company Group by (i) any Person, or (ii) any Governmental Entity, with respect to the collection, use or disclosure of Personal Data. The negotiation, execution and consummation of the transactions described in this Agreement, and anydisclosure and/or transfer of information in connection therewith, will not breach or otherwise cause any violation of anyPrivacy Policy or Privacy and SecurityL aws. To the Selling Parties' Knowledge, no member of the Company Group has received any complaints or other notices from any source of any failures to meet the requirements of the Privacy and SecurityRegulations or Transaction Regulations.

Section 3.30    Full Disclosure.    No representation or warranty by the Company in this Agreement and no statement contained in the schedules hereto or any certificate or other document furnished or to be furnished to the Company pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading. Except as set forth on **Schedule 3.30** the contents of the data room in which the

{00829079.DOCX;12 }

Selling Parties were providing information to the Buyer and its representatives are true, complete and accurate; provided, however, that the Company and the Selling Members make no representations and warranties with respect to (i) information or documents containing any projections, forward looking statements, budgets, or pro forma information and (ii) documents in the data room that have been redacted or provided in limited form.

ARTICLE 4
REPRESENTATIONS AND WARRANTIES OF THE SELLING MEMBERS

Section 4.1    Ownership of Interest.  Such Selling Member is the legal and beneficial owner of the Interests set forth by its name on **Schedule 3.5**, and at the Closing such Interests shall be free and clear of all Liens. Upon the delivery of such Interests, Buyer will acquire the beneficial and legal, valid and marketable title to such Interests.

Section 4.2    Authority.  Such Selling Member has the legal power, right and authority to enter into and perform this Agreement and each other Seller Document to which it is a party, and to perform each of its obligations hereunder and thereunder. This Agreement and the other Seller Documents to which such Selling Member is a party have been duly executed and delivered by such Selling Member, and such Agreement and such Seller Documents constitute a valid and binding obligation of such Selling Member, enforceable in accordance with their terms subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general principles of equity. The execution, delivery and performance of this Agreement and such Seller Documents by such Selling Member (a) except as set forth on **Schedule 3.3(b)** hereof, require no action by or in respect of, or filing with, or consent of, any Governmental Entity or anyother Person and (b) do not contravene, or constitute a default under, any provision of applicable Law or of any agreement, judgment, injunction, order, decree or any other instrument binding upon such Selling Member.

Section 4.3    Litigation.  There is no Proceeding pending against such Selling Member, or, to its actual knowledge, threatened against or affecting such Selling Member or any of its properties or rights, nor is there any judgment, decree, injunction, rule or order of any Governmental Entity or arbitrator outstanding against or affecting either such Selling Member or any of its properties or rights, except such that are not, individually or in the aggregate, reasonably likely to prevent, materially delay or materially impair (a) its ability to consummate the transactions described in this Agreement, (b) Buyer's ability to acquire ownership of the Interests, free and clear of all Liens, or (c) the ability of Buyer, following the Closing, to conduct the Business.

Section 4.4    Brokers and Finders.  Except for the fees set forth on **Schedule 3.27**, which are the sole responsibility of the Selling Parties, such Selling Member has not employed any broker or finder or incurred any liability for any brokerage fees, commissions or finders' fees in connection with the transactions described in this Agreement.

ARTICLE 5

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to the Selling Members that:

Section 5.1    Organization; Authority; Due Execution.

(a)    Buyer is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and has all requisite corporate power and authority to own and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of its properties or conduct of its business requires such qualification, except where the failure to be so qualified or in good standing, when taken together with all other such failures, will not prevent, materiallydelay or materially impair Buyer's ability to consummate the transactions described in this Agreement.

(b)    Buyer has all requisite corporate power and authority to enter into this Agreement and each agreement, document and instrument to be executed or delivered byit in connection with this Agreement (collectively, the "**Buyer Documents**"), to perform its obligations hereunder and thereunder, and to consummate the transactions described in this Agreement and thereby. The execution, delivery and performance of this Agreement and the other Buyer Documents to be executed by Buyer as the case may be and the consummation by Buyer as the case may be of the transactions described in this Agreement and thereby have been duly and validly authorized and no other corporate proceedings on the part of Buyer or their respective members are necessary with respect to any such matter. This Agreement and the other Buyer Documents to be executed by Buyer as the case may be have been duly executed and delivered by Buyer as applicable and constitute the valid, binding and enforceable obligations of to be executed Buyer as the case may be, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general principles of equity.

Section 5.2    Consents; No Violation.

(a)    No notices, reports or other filings are required to be made with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained byBuy er from any Governmental Entity or any other Person in connection with the execution and delivery of this Agreement or the other Buyer Documents to be executed byBuy er and the consummation byBuy er of the transactions described in this Agreement and thereby except those that the failure to make or obtain will not, individually or in the aggregate, prevent, materiallydelay or materially impair Buyer's ability to consummate the transactions described in this Agreement.

(b)    The execution, delivery and performance of this Agreement and the other Buyer Documents do not, and the consummation of the transactions described in this Agreement and thereby will not, constitute or result in: (i) (with or without notice, lapse of time or both) a breach or violation of, or a default under, Buyer's certificate of incorporation or bylaws or other governing documents, or (ii) (with or without notice, lapse of time or both) a

{00829079.DOCX;12 }

39

breach or violation or a conflict with, or a default under, or the termination of, or the acceleration under, any Contract, debt, obligation, governmental or non-governmental permit or license to which Buyer is a party or to or by which it is subject or bound; except, in the case of clause (ii) of this **Section 5.1(b)**, for any violation, default or acceleration, that, individually or in the aggregate, will not prevent, materiallydelay or materially impair Buyer's ability to consummate the transactions described in this Agreement.

Section 5.3    <u>Litigation</u>.  There is no civil, criminal or administrative suit, action, proceeding, investigation, review or inquiry pending or, Buyer's knowledge, threatened against or affecting Buyer or any of its respective properties or rights, nor is there any judgment, decree, injunction, rule or order of any Governmental Entity or arbitrator outstanding against or affecting Buyer or any of its respective properties or rights such that will not, individually or in the aggregate, prevent, materiallydelay or materially impair Buyer's ability to consummate the transactions described in this Agreement.

Section 5.4    <u>Compliance with Law</u>.  Buyer is not in violation of any Law, except for violations or possible violations that, individually or in the aggregate, will not prevent, materiallydelay or materially impair Buyer's ability to consummate the transactions described in this Agreement.

Section 5.5    <u>Brokers and Finders</u>.  None of the Buyer and its respective officers, directors, trustees or employees has employed any broker or finder or incurred any liability for any brokerage fees, commissions or finders' fees in connection with the transactions contemplated by this Agreement.

Section 5.6    <u>Availability of Funds</u>.  Buyer has sufficient cash and/or available credit facilities to pay the Purchase Price, all post-Closing payments that mayreasonabl y be expected to be due and payable after the Closing pursuant to the terms of this Agreement, and any other amounts payable pursuant to this Agreement and to consummate the transactions contemplated by this Agreement.

Section 5.7    <u>Independent Investigation</u>.  The Buyer has conducted its own independent investigation, review and analysis of the Company Group and the Interests.  The Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, it has relied solely upon its own investigation, the contents of the data room in which the Selling Parties were providing information to the Buyer and its representatives (except for (i) information or documents containing any projections, forward looking statements, budgets, or pro forma information and (ii) documents in the data room that have been redacted or provided in limited form) and the express representations and warranties (including the schedules associated therewith) of the Selling Members and the Company set forth in this Agreement, and in anydocuments, certificates or other items delivered by the Selling Members or the Company in connection with the Closing; and (b) neither the Company, the Selling Members nor any other Person has made any representation or warranty as to the Company or the Interests, except as expressly set forth in this Agreement, and in any documents, certificates or other items delivered byth e Selling Members or the Company in connection with the Closing.

ARTICLE 6

CERTAIN COVENANTS AND AGREEMENTS OF THE SELLING MEMBERS AND
BUYER

Section 6.1    Expenses and Finder's Fees. Except as provided in **Sections 3.27
and 5.5** concerning brokers and finders' fees and in **Article 7** and except for the Transaction
Expenses, whether or not the Closing is consummated, all costs and expenses incurred in
connection with this Agreement and the transactions contemplated by this Agreement shall be
paid by the Party incurring such expense; provided, however, any legal or other professional fees
incurred by any member of the Company Group related to or arising from the transactions
contemplated by this Agreement, including the negotiation and drafting of this Agreement, that
remain outstanding as of the Closing Date shall be the responsibility of the Selling Members; and
provided, further, however that all fees and expenses of the Escrow Agent and the Second
Escrow Agent shall be the responsibility of the Selling Members.

Section 6.2    Public Announcements. The Parties agree that no public release,
announcement or any other disclosure to the public concerning any of the transactions
contemplated hereby shall be made or issued by any Party without the prior written consent of
Buyer and the Selling Member Representative (which consent of either party shall not be
unreasonably withheld, conditioned or delayed), except to the extent such release, announcement
or disclosure may be required by applicable law or regulation (including the regulations relating
to exchanges upon which the shares of Buyer or its Affiliates are listed or traded), in which case
the Party required to make the release, announcement or disclosure shall allow Buyer or the
Selling Member Representative, as the case may be, reasonable time to comment on such
release, announcement or disclosure in advance of such issuance or disclosure.

Section 6.3    Tax Matters. The following provisions shall govern certain Tax
matters:

(a)    Straddle Period. In the case of any Tax period that includes (but
does not end on) the Closing Date (a "**Straddle Period**"), the amount of any Taxes based on or
measured by income, receipts, sales or payroll of any member of the Company Group which
relate to the Pre-Closing Tax Period shall be determined based on an interim closing of the books
as of the close of business on the Closing Date (and for such purpose, the taxable period of any
partnership or other pass-through entity in which any member of the Company Group holds a
beneficial interest shall be deemed to terminate at such time); provided, however, that any Taxes
attributable to transactions outside the ordinary course of business after the Closing on the
Closing Date shall relate to the portion of the Straddle Period beginning after the Closing Date
and the amount of Taxes of a member of the Company Group not based on or measured by
income, receipts, sales or payroll of such member of the Company Group for a Straddle Period
which relate to the Pre-Closing Tax Period shall be deemed to be the amount of such Tax for the
entire taxable period multiplied by a fraction, the numerator of which is the number of days in
the taxable period ending on the Closing Date and the denominator of which is the number of
days in such Straddle Period.

{00829079.DOCX;12 }

(b)    <u>Certain Taxes and Fees</u>. All transfer, documentary, sales, use, stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with consummation of the transactions contemplated by this Agreement shall be paid by the Selling Members when due, and each Selling Member will, at its own expense, file all necessaryTax Returns and other documentation with respect to all such Taxes, fees and charges, and, if required by applicable law, Buyer will, and will cause the members of Company Group and its Affiliates to join in the execution of any such Tax Returns or other documentation.

(c)    <u>Cooperation on Tax Matters</u>. Buyer, the members of the Company Group, and the Selling Members shall cooperate fully, as and to the extent reasonably requested byan y other Party, in connection with the filing of Tax Returns and any audit, litigation, refund claim or other Proceeding with respect to Taxes. Such cooperation shall include the retention and (upon any other Party's request) the provision of records and information which are reasonably relevant to any such filing, audit, litigation, refund claim or other Proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. The members of the Company Group and the Selling Members agree to retain all books and records with respect to Tax matters pertinent to the Company Group relating to any taxable period beginning before the Effective Date until the expiration of the statute of limitation (and, to the extent notified byBuy er or the Selling Members, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any Tax authority.

(d)    <u>Pre-Closing Tax Periods</u>. The Selling Member Representative shall prepare or cause to be prepared and timely file or cause to be timely filed all Tax Returns for each member of the Company Group for all periods ending on or prior to the Effective Date that are filed after the Closing Date. All such returns shall be correct and complete in all material respects and prepared in accordance with applicable Law. The Selling Member Representative shall permit Buyer to review and comment on each such Tax Return at least thirty (30) days prior to filing. The Selling Member Representative shall make such revisions to such Tax Returns as are reasonably requested by the Buyer. To the extent permitted by applicable Law, each Selling Member shall include any income, gain, loss, deduction or other tax items for such period on its Tax Returns in a manner consistent with the Schedule K-Is prepared or caused to be prepared by the Selling Member Representative for such periods. Buyer shall prepare (or cause to be prepared) and file (or cause to be filed) each other Tax Return required to be filed by each member of the Company Group after the Closing Date for a taxable period beginning on or before the Closing Date (each a "**Buyer Prepared Return**"). Each Buyer Prepared Return (A) shall be prepared in a manner consistent with the prior practice of the applicable member of the Company Group unless otherwise required by applicable Law, (B) shall be provided to the Selling Member Representative for review and comment at least thirty (30) days before the due date for filing such Buyer Prepared Return, and (C) the Selling Member Representative shall have the right to review and comment on each such Buyer Prepared Return before filing. Buyer shall make such revisions to any Buyer Prepared Returns as are reasonably requested by the Selling Member Representative.

(e)    Accrual Basis. The Sellers shall use their reasonable best efforts to cause the Tax Returns for all taxable periods commencing on or after January 1, 2016 to be prepared on an accrual basis and not on a cash basis.

(f)    Tax Contests. The Company shall promptly notify the Selling Member Representative in writing upon receipt by any member of the Company Group or any of its Affiliates of a written notice of any pending or threatened action with respect to Taxes for which any of the Selling Members may have liability pursuant to this Agreement or otherwise, provided, however, that no failure or delay by the Company to provide such notice shall reduce or otherwise affect the obligation of the Selling Members hereunder, except to the extent that they are actually prejudiced thereby. After the Closing Date, except as set forth in this **Section 6.3(f)**, the Company Group shall control the conduct, through counsel of its own choosing, of any audit, claim for refund, or administrative or judicial proceeding involving any asserted Tax liability or refund with respect to any member of the Company Group (each a "**Tax Contest**"). In the case of a Tax Contest after the Closing Date that relates solely to Pre-Closing Tax Periods, the Selling Member Representative may elect to control the conduct of such Tax Contest, but members of the Company Group shall have the right to participate in such Tax Contest at its own expense and the Selling Member Representative shall not settle or otherwise resolve such Tax Contest without the prior written permission of the Buyer, which consent shall not be unreasonably withheld, delayed, or conditioned; provided that, if the Selling Member Representative fails to assume control of the conduct of any such Tax Contest within thirty (30) days following the receipt by the Selling Member Representative of notice of such Tax Contest from the Company, then any member of the Company Group shall have the right to assume control of such Tax Contest. In the case of any Tax Contest relating to any Pre-Closing Tax Period that is not controlled by the Selling Member Representative pursuant to this **Section 6.3(f)**, (i) the Selling Member Representative shall have the right to participate in such Tax Contest at its own expense and (ii) the Company Group shall not settle or otherwise resolve such Tax Contest without the prior written permission of the Selling Member Representative, which consent shall not be unreasonably withheld, delayed, or conditioned. The provisions of this **Section 6.3(f)**, rather than those of **Section 7.1(e)**, shall apply in the case of any Tax Contest.

(g)    Buyer Tax Acts. Following the Closing Date, neither Buyer, nor the Company Group nor any Affiliate thereof may (i) file, amend or modify a Tax Return of any member of the Company Group for any taxable period ending on or before the Closing Date , except in accordance with **Section 6.3(d)**, (ii) take any action that would extend the applicable statute of limitations for any Taxes or Tax Return of any member of the Company Group for any taxable periods ending on or before the Closing Date, (iii) file, amend or revoke any Tax election on behalf of any member the Company Group for any taxable periods ending on or before the Closing Date, (iv) surrender any right to claim a refund of Taxes relating to any member of the Company Group relating to any taxable periods ending on or before the Closing Date, or (v) make a voluntary disclosure to a Governmental Entity with respect to any Tax or Tax Returns of any member of the Company Group for any taxable periods ending on or before the Closing Date, in each case, without the prior written consent of the Selling Member Representative.

(h)    Tax Refunds. All refunds of Taxes of any member of the Company Group for any Pre-Closing Tax Period (including any portion of a Straddle Period ending on the Closing Date as determined in accordance with the same principles provided for in

{00829079.DOCX;12 }

43

**Section 6.3(a)**), whether in the form of cash received or a credit against Taxes otherwise payable, shall be the property of the Selling Members and all other refunds shall be the property of the Buyer. To the extent that Buyer, any member of the Company Group, or any of their Affiliates receives a refund after the Closing Date that is the property of the Selling Members, Buyer shall pay to the Selling Member Representative for distribution to the Selling Members the amount of such refund (and any interest received from the Governmental Entity with respect to such refund). The amount due to the Selling Members shall be payable twenty (20) days after receipt of the refund from the applicable Governmental Entity (or, if the refund is in the form of direct credit, twenty (20) days after the filing of the Tax Return claiming the benefit of such credit). Buyer shall, and shall cause its Affiliates, to take all actions necessary, or reasonably requested by the Selling Member Representative, to timely claim any refunds that will give rise to a payment under this **Section 6.3(h)**.

(i) Allocation of Purchase Price. The Parties agree to treat for U.S. federal, state and local income tax purposes the purchase and sale of the Interests pursuant to this Agreement in a manner consistent with Revenue Ruling 99-6, situation #2. For purposes of determining (i) Buyer's initial Tax basis in the assets of the members of the CompanyGroup immediately following the Closing and (ii) the portion of the gain or loss recognized bythe Selling Members upon the sale of the Interests pursuant to this Agreement that is attributable to the members of the Company Group's "unrealized receivables" and "inventory items" (as such terms are defined in Section 751 of the Code), Buyer and each of the Selling Members agree to file all Tax Returns in accordance with the Purchase Price Allocation (as hereinafter defined). Any adjustments to the Purchase Price pursuant to this Agreement shall result in an adjustment to the Purchase Price Allocation to reflect the proportionate change amongst those classes of assets (or assets that correspond to the liabilities), including goodwill, that caused the adjustment to the Purchase Price. The Parties shall cooperate in the preparation of a schedule allocating the Purchase Price (along with any liabilities of the members of the Company Group that are not corporations) to the assets of the members of the Company Group that are not corporations (the **"Purchase Price Allocation"**). Buyer shall file, in accordance with Section 1060 of the Code, a Form 8594 reflecting the Purchase Price Allocation. The Parties shall report, act and file Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with the Purchase Price Allocation. The Parties shall, as applicable, timelyand properly prepare, execute, file and deliver all such documents, forms and other information as the other Parties mayreasonably request to prepare in connection with the Purchase Price Allocation. If, however, the Parties are unable to complete such Purchase Price Allocation within one hundred twenty (120) days following the Closing Date, or such later date as agreed to by the Parties, then Buyer shall file IRS Form(s) 8594 and the Parties shall each file anyother federal, state and local income Tax Returns, allocating the Purchase Price (and any liabilities of the members of the Company Group that are not corporations) in the manner each believes is appropriate. The Parties shall promptly advise one another of the existence of any Tax audit, controversy or litigation related to any allocation hereunder. None of the Parties shall take any position (whether on any Tax Returns, in any Tax Contest or Proceeding or otherwise) that is inconsistent with this **Section 6.3(i)** unless required to do so byL aw. Notwithstanding the foregoing, the Parties agree that (i) the amount allocated to any assets of any member of the Company Group that is not a corporation that were subject to depreciation or amortization by such member of the Company Group for income Tax purposes shall be equal to such member of the Company Group's adjusted tax basis in such assets for federal income tax purposes as of the

{00829079.DOCX;12 }

44

Closing Date, and (ii) the amount allocable to the Company Group's accounts receivable shall equal the amount paid to the Selling Member Representative with respect thereto pursuant to **Section 1.5(f)**.

      (j)    Transaction Tax Items. The Parties agree that, to the fullest extent allowable by applicable Laws, all Transaction Tax Items shall be treated (but solely for Tax purposes) as liabilities of the Selling Members that are being assumed by Buyer and, accordingly, any federal, state or local income Tax deductions arising from anypay ment of such Transaction Tax Items, including any deductions relating to unamortized deferred financing fees relating to any Indebtedness, shall be claimed by the Selling Members, rather than by Buyer. Neither Buyer, nor the members of the Company Group (for any period following the Closing Date) nor any Affiliates thereof shall claim any income Tax deduction for any payments made in connection with any Transaction Tax Items on any Tax Return or take any position on anyTax Return or otherwise that is inconsistent with the Selling Members claiming all available income Tax deductions with respect to the payment of any Transaction Tax Items in computing their federal, state and local income Tax liabilities.

      Section 6.4    Non-Competition, Non-Solicitation and Non-Disclosure.

      (a)    Non-Competition, Non-Solicitation. Subject to the last paragraph of Section 5 of any applicable Employment Agreements, each Selling Member agrees that it shall not, and it shall take all commercially reasonable efforts to cause its Affiliates to not, whether or not for compensation, directly or indirectly, individually or as an officer, director, shareholder, member, manager, trustee, employee, consultant, advisor, partner, proprietor or otherwise, for a period commencing on the Effective Date and ending thirty-six (36) months after the Effective Date (the "**Restricted Period**"): (i) other than with respect to employment or other similar arrangement with members of the Company Group, participate or engage in or provide any services to, or have any direct or indirect interest in, any business whose operations, in whole or in part, are the same as, similar to or are in competition with any of the business operations carried on by members of the CompanyGro up during her employment bythe Company Group or that the Company Group contemplated (and which such Selling Member should have known that the Company Group was contemplating) carrying on at the time of the termination of her employment by the Company Group in New York, New Jersey, Pennsylvania, or Connecticut; provided, however, that nothing in this Agreement shall preclude such Selling Member from purchasing or owning up to five percent (5%) of the outstanding capital stock of anycompany which has a class of securities registered under Section 12 of the Securities Act of 1934, as amended, or trading on a national securities exchange or quoted in an over-the-counter market; (ii) encourage, solicit, or induce, or in any manner attempt to encourage, solicit, or induce, any person or entityemploy ed by, or providing consulting services to, any member of the Company Group, the Buyer and/or the Buyer's parent and subsidiaries' keyemploy ees or key consultants , to terminate such person's or entity's employment or services (or in the case of a consultant, materially reduce such services) with one or more members of the CompanyGroup, the Buyer and/or the Buyer's parent and subsidiaries; (iii) hire any person or entity who was employed by any member of the Company Group, the Buyer and/or the Buyer's parent and subsidiaries' key employees or key consultants within the six (6) month period prior to the date on which such Selling Member ceases to be an employee of any member of the Company Group; or (iv) encourage, solicit or induce, or in any manner attempt to encourage, solicit or induce, any

client, account, customer or licensee of any member of the Company Group and/or the Buyer or any other Person with whom any member of the Company Group and/or the Buyer has a business relationship to cease doing business with or reduce the amount of business conducted with the members of the Company Group and/or the Buyer, or in any way interfere with the relationship between any such client, account, customer, licensee or business relation with the members of Company Group and/or the Buyer. Notwithstanding anything to the contrary in this Agreement, the foregoing shall not prohibit or restrict Sotiropoulos from owning, managing, operating, controlling or other becoming involved in, whether as an officer, director, employee, investor, partner, shareholder, trustee, consultant, agent, representative, broker, promoter or otherwise, Provider Assistance, LLC. For the avoidance of doubt a keyemploy ee or key consultant is any person or company who is compensated more than $100,000 a year or who has a title of Vice President or above or, if a consultant, is providing similar services to a person who has a title of Vice President or above. The Selling Members shall be entitled to rely on the representations of any person or entity with respect to their title and compensation and whether or not they worked for the Buyer's parent or subsidiaries.

(b)    Non-Disclosure. Except in connection with Kelly's employment by the members of Company Group, the Buyer or any of their Affiliates, each Selling Member agrees that it shall not, and it shall take all efforts to cause its Affiliates to not, use for itself or others, or publish, disclose or otherwise reveal or divulge, any Confidential Information (as such term is defined below); provided, that subsequent to the fifth anniversary of the Effective Date, such restriction shall applyonl y if such use or disclosure is materially adverse to one or more members of the Company Group. Each Selling Member shall, and shall take all commercially reasonable efforts to cause its Affiliates to, (1) maintain all Confidential Information in the strictest confidence and keep the same secret using at least the same degree of care as it uses for its own confidential information, (2) retain all Confidential Information in trust in a fiduciary capacity for the sole and absolute benefit of the members of the Company Group, and (3) refrain from using or allowing to be used any Confidential Information for its own benefit or for the benefit of any third party, provided, however, that in the event disclosure of Confidential Information is requested of a Selling Member (i) by a Governmental Authority under color of law or applicable regulation, (ii) pursuant to subpoena or other compulsory process, or (iii) otherwise as may be required by law, such Selling Member to the extent lawfully possible will give the Company prompt prior written notice, which, to the extent possible, shall be at least five (5) days, before its disclosure and will provide the Company with copies of anyresponsive materials. For purposes of this Agreement, "**Confidential Information**" shall mean non-public information concerning the financial data, strategic business plans, product development (or other proprietary product data), customer lists, customer information, costs, pricing, materials, supplies, vendors, products, services, information relating to governmental relations, discoveries, practices, processes, methods, marketing plans, Intellectual Property and other material non-public, proprietary and confidential information of one or more members of the CompanyGroup or relating to the Business, that, in any case, is not otherwise generally available to the public and has not been disclosed by any member of the Company Group to others not subject to confidentiality agreements. Confidential information does not include information that (i) becomes known to a Selling Member from a source other than a member of the CompanyGroup or Affiliate thereof; provided, that, such source has not entered into a confidentialityagreement with a member of the Company Group or Affiliate thereof with respect to such information or obtained the information from an entity or person who is a party to a confidentiality agreement

{00829079.DOCX;12 }

46

with a member of the Company Group with respect to such information, (ii) is proven by competent evidence by a Selling Member that it was independently conceived or discovered by such Selling Member without reference to or use of the Confidential Information, or (iii) has become publicly known and made generally available through no wrongful act of a Selling Member.

      (c)    Enforcement. If any Selling Member commits a breach, or threatens to commit a breach, of any of the provisions of **Section 6.4(a)-(b),** (such person committing or threatening to commit a breach, the **"Breaching Party"**), then the members of the Company Group shall have the right and remedy to have such provisions of this Section specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to the members of the Company Group and that money damages will not provide an adequate remedy at law; and in connection therewith the right to seek, without notice to such Breaching Party and without the need to post any bond, a temporary restraining order, an injunction and any other equitable relief. Such right of injunctive relief shall be cumulative only in addition to the right of the members of the Company Group to recover from such Breaching Party the liquidated damages as set forth in **Section 6.4(d)** below.

      (d)    Specific Liquidated Damages. Kelly agrees that in addition to the equitable remedies available to the Buyer under **Section 6.4(c)**, if, following written notice by the Buyer to Kelly of a breach her of obligations set out in **Section 6.4** throughout Year 1 and, then, following a 15 day cure period for curable breaches, Kelly is still not in compliance with her obligations set out in **Section 6.4** throughout Year 1, then Kelly shall, within ten days of the Buyer obtaining a final, non-appealable judgement against Kelly for breach of her obligations set out in **Section 6.4** throughout Year 1, pay the Buyer $10,000,000 as full and complete liquidated damages for such breach; *provided, however,* that if Kelly contests her obligations pursuant to this sentence or does not pay such amount within such ten day period, Kelly shall be obligated to pay the Buyer $30,000,000 as full and complete liquidated damages for such breach. Kelly agrees that in addition to the equitable remedies available to the Buyer under **Section 6.4(c)**, if Kelly was in compliance with her obligations set out in **Section 6.4** throughout Year 1, and if following written notice by the Buyer to Kelly of a breach her of obligations set out in **Section 6.4** throughout Year 2 and, then, following a 15 day cure period for curable breaches, Kelly is still not in compliance with her obligations set out in **Section 6.4** throughout Year 2, then Kelly shall, within ten days of the Buyer obtaining a final, non-appealable judgement against Kelly for breach of her obligations set out in **Section 6.4** throughout Year 2, pay the Buyer $5,000,000 as full and complete liquidated damages for such breach; *provided, however,* that if Kelly contests her obligations pursuant to this sentence or does not pay such amount within such ten day period, Kelly shall be obligated to pay the Buyer $15,000,000 as full and complete liquidated damages for such breach.

      (e)    Severability. The provisions of this **Section** are severable, and if any provision or any part of any provision of this **Section** is found to be invalid or unenforceable, the balance of that provision and the other provisions hereof shall be given full force and effect and remain fully valid and enforceable.

{00829079.DOCX:12 }

47

(f)     Blue-Penciling. If any one, or any part, of the covenants contained in this **Section 6.4** is held to be unenforceable because of the duration of such provision or the area covered thereby, the parties agree that the court making such determination shall have the power to reduce the duration and/or area of such provision and, in its reduced form, said provision shall then be enforceable.

(g)     Venue. The parties hereto intend to and hereby confer jurisdiction to enforce the covenants contained in this **Section 6.4** upon the courts of any state or other jurisdiction within the geographical scope of such covenants. In the event that the courts of any one or more of such states or other jurisdictions shall hold such covenants whollyunenforceable by reason of the breadth of such scope or otherwise, it is the intention of the parties hereto that such determination not bar or in any way affect in the courts of any other states or other jurisdictions within the geographical scope of such covenants the right of the members of the Company Group or the right of the Selling Members, as applicable, to the relief for breaches of such covenants in such other states, the above covenants as theyrelate.

Section 6.5    Expense Accounts. Except as expressly consented to byBuy er in writing, the members of the Company Group shall cause all of their managers, directors, officers, employees and consultants to submit all claims for Reimbursable Expenses incurred prior to the Closing to be submitted to the applicable members of the Company Group prior to the Closing and shall cause all travel, entertainment and other Reimbursable Expenses incurred by their managers, directors, officers, employees and consultants that members of the Company Group are obligated to reimburse or that members of the Company Group have in the past typically reimbursed to be reimbursed prior to the Closing.

Section 6.6    Method of Accounting. During the period of time following the Closing in which the Selling Members may be entitled to receive certain post-Closing payments, including the Earn-Out Payments, Buyer shall cause the Company Group to prepare the Financial Statements in accordance with generally accepted accounting principles for purposes of calculating such post-Closing payments.

Section 6.7    Proceedings. The Selling Members shall be responsible for the fees and expenses of all Proceedings set forth on **Schedule 3.6** and the Selling Members shall be entitled to any and all recoveries from all such Proceedings.

Section 6.8    KeyEmploy ment Agreements. The Selling Members shall uses its good faith efforts to deliver Employment Agreements duly executed by a key employee of the Company Group who has an annual compensation package of over $100,000 per year, in a mutually agreed upon form (together with the KellyEmploy ment Agreement, the "Employment Agreements").

Section 6.9    Schedule Updates. The disclosures in any Schedule to the representations and warranties in Article 3 shall qualify the other representations and warranties in Article 3 to the extent it is readily apparent from a reading of the disclosure that such disclosure is applicable to such other representations and warranties in Article 3. At any time during the thirty (30) day period from and after March 10, 2017, the Selling Member Representative shall have the right to deliver to Buyer a supplement or amendment to any

{00829079.DOCX;12 }

Schedule to the representations and warranties in Article 3 (each, a "Schedule Supplement"), and such Schedule Supplement shall be deemed to be the final Schedules to the representations and warranties in Article 3; *provided, however*, that no Schedule Supplement shall be deemed to update any original Schedule to the representations and warranties in Article 3 if such Schedule Supplement sets forth any event or the existence of any fact or condition which would result in (a) a reduction of the Company Group's EBITDA, taken as a whole, for the twelve month period ending February 28, 2017, by more than $500,000 or (b) Losses to the Company Group of more than $500,000.

Section 6.10    CHT Shares.   Buyer shall use its best efforts to cause an Affiliate that directly or indirectly owns common stock of CHT to offer to Kelly $2 million worth of such Affiliate's equity (the "**Equity**") on mutually agreeable terms, including those to be set forth in a shareholders' agreement or operating agreement with respect thereto (the "**Shareholders' Agreement**"); provided, however that if by April 10, 2017 such Affiliate has not issued the Equity to Kelly and the parties have not entered into the Shareholders' Agreement, then the Equity will not be issued and the parties shall not enter into the Shareholders' Agreement.

Section 6.11    Business Plan.  The Selling Member Representative shall deliver to the Buyer a detailed business plan (including line items for all material categories of expenditures and projections of revenues) for the Company Group for the period ending on the last day of Year 2 no later than forty five (45) days following the Closing Date (provided, however that the deadline for such deliverymay be extended for additional one week periods upon notification to the Buyer by the Selling Member Representative), and thereafter the Selling Member Representative and Buyer shall in good faith promptly finalize such business plan.

ARTICLE 7

INDEMNIFICATION

Section 7.1    Indemnification.

(a)    Indemnification by the Selling Members. Subject to the limits set forth in this **Article 7**, from and after the Closing, the Selling Members agree, jointlyand severally, to indemnify, defend and hold Buyer and its Affiliates (including, after the Closing, the members of the Company Group) and their respective officers, directors, managers, members, shareholders, employees, agents and representatives (the "**Buyer Indemnified Persons**") harmless (except with respect to claims for indemnification arising from breaches of representations and warranties set forth in **Article 4** or claims for breaches of covenants contained in this Agreement made by a Selling Member, in which case, such Selling Member shall severally indemnify the Buyer Indemnified Parties with respect to such Selling Member's breaches) from and in respect of Losses that they incur or suffer arising out or by reason of, in connection with or due to (i) any breach of any representation or warranty of any of the members of the Company Group or any Selling Member contained in this Agreement or any other Seller Document, (ii) any breach of any covenant or agreement of any of the members of the Company Group or any Selling Member contained in this Agreement or any other Seller Document, (iii) any of the Excluded Liabilities, (iv) any and all claims of third parties with whom the Company or its agents have had discussions with respect to the disposition of the Company or its Business

{00829079.DOCX;12 }
49

in connection with or arising out of such discussions, (v) any and all claims relating to the matters set forth on **Schedule 3.6** or any other civil, criminal or administrative suit, action, proceeding, investigation, violation or other Proceeding to the extent based upon or arising from any act, transaction, circumstance, sale or providing of works, material, product or services, state of facts or other condition which occurred or existed, before the Closing Date, whether or not then known, due or payable, or with respect to the operation of the Business prior to Closing, the employment of the Employees prior to Closing or the ownership (or leasing of), operation or use of the assets of the Business prior to the Closing (each to the extent in excess of the amounts covered by the Company's insurance policies), (vi) any and all claims relating to the Owned Intellectual Property, including, without limitation, that such Owned Intellectual Property infringes upon, violates or constitutes the unauthorized use of anyof the Intellectual Property or proprietary rights of any Person with respect to the period prior to the closing, (vii) any and all Taxes of any Selling Member whether or not relating to or arising out of the Business; (viii) any and all Taxes of any of the members of the Company Group for anyPre -Closing Tax Periods (including the portion of any Straddle Period relating to the Pre-Closing Tax Period, as determined under **Section 6.3(a)**), (ix) any and all Benefit Liabilities of Company relating to the period prior to the Closing; (x) any liabilities with respect to environmental matters (including Losses relating to any remediation for environmental matters disclosed in **Schedule 3.18** with respect to the period prior to the Closing) incurred by the Company); (xi) with respect to services provided by Company before the Closing (A) any claim based on a warranty with respect to services rendered before the Closing and (B) any warranties issued before Closing relating to such services (whether expressed or implied by operation of Law); (xii) the operation of the Company prior to the Closing; (xiii) the Company having failed to dulyqualify or obtain a license to do business in all of the jurisdictions in which the nature of the Company's activities required such qualification or licensing with respect to the period prior to the Closing; and (xiv) anyL osses or other amounts (including with respect to disability and unemployment) with respect to Employees of the Company (other than to the extent arising out of their employment byBuy er) with respect to the period prior to the Closing.

(b)    Subject to the limits set forth in this **Article 7**, from and after the Closing, Buyer and the members of the Company Group, jointly and severally, agree to indemnify, defend and hold the Selling Members, and their respective agents and representatives (the "**Seller Indemnified Persons**") harmless from and in respect of any and all Losses that they incur or suffer arising out of or by reason of or in connection with or due to (i) any breach of any representation or warranty of Buyer set forth in this Agreement or any other Buyer Document, (ii) the failure to perform any of the covenants or agreements of Buyer set forth in this Agreement or any other Buyer Document, and (iii) the operation of the members of the Company Group following the Closing Date.

(c)    Certain Limitations. Anything in this **Article 7** to the contrary notwithstanding:

(i)    neither the Buyer Indemnified Persons, on the one hand, nor Seller Indemnified Persons, on the other hand, shall be entitled to recover pursuant to **Section 7.1(a) or 7.1(b)**, as the case may be, in respect of breaches of representations and warranties (other than the representations and warranties set forth in **Sections 3.1 (Organization; Authority; Due Execution), 3.5 (Capitalization) , 3.10 (Tax Matters), 3.17(b)**

{00829079.DOCX;12 }

**Permits, 4.1 (Ownership of Interest) and 4.2 (Authority)**, and Buyer's representations and warranties set forth in **Section 5.1(b) (Authority)** (all such representations and warranties being herein called "**Specified Representations**")) from the respective other Party hereunder for any Losses, except to the extent that the aggregate amount of any such Losses indemnifiable hereunder exceeds $75,000 (the "**Basket**"), at which point, either the Buyer Indemnified Persons or the Seller Indemnified Persons, as the case may be, will be obligated to indemnify the Party seeking indemnification for all such Losses in excess of the Basket, subject to the other clauses of this **Section 7.1(c)**;

(ii)       (a) neither the Buyer Indemnified Persons, on the one hand, nor Seller Indemnified Persons, on the other hand, shall be entitled to recover for Losses (other than for Losses on account of breaches of the Specified Representations) in an aggregate amount in excess of the Cap and (b) neither the Buyer Indemnified Persons, on the one hand, nor Seller Indemnified Persons, on the other hand, shall be entitled to recover for Losses, including Losses on account of breaches of the Specified Representations, in an aggregate amount in excess of twice the Cap.

(iii)       none of the foregoing limitations on indemnification in clauses (i) and (ii) of this **Section 7.1(c)** shall apply to any claim based on fraud or intentional misrepresentation or willful ignorance;

(iv)       solely for purposes of calculating the amount of Losses incurred arising out of or relating to any breach of a representation, warranty, covenant or agreement (and not for purposes of determining whether or not such a breach has occurred) any reference to "Material Adverse Effect" or any other materiality qualifications in such representation, warranty, covenant or agreement shall be disregarded; and

(v)       the amount which an Indemnifying Party is required to pay to, for or on behalf of any Indemnified Party pursuant to this **Article 7** shall be adjusted (including, retroactively) by an y insurance proceeds and any indemnity, contribution, or other similar payment actually recovered by or on behalf of such Indemnified Party in reduction of the related indemnifiable loss (the "**Indemnifiable Loss**"). Amounts required to be paid, as so reduced, are hereinafter sometimes called an "**Indemnity Payment**." If an Indemnifying Party shall have received or shall have had paid on its behalf an Indemnity Payment in respect of an Indemnifiable Loss and shall subsequently receive insurance proceeds or other payment in respect of such Indemnifiable Loss, then the Indemnified Party shall pay to the Indemnifying Party the amount of such insurance proceeds or other payment or, if lesser, the amount of the Indemnity Pay ment. To the extent that any I ndemnified Party is entitled to indemnification pursuant to this **Article 7**, the Indemnifying Party shall have rights of subrogation respecting, any rights and remedies (including rights of indemnity, rights of contribution and other rights of recovery) that any Indemnified Party may have to insurance policies or similar contracts with respect to which such Indemnified Party is a beneficiary.

(vi)       Buyer may set off any amount to which it may be entitled from the Selling Members under this Article against amounts payable to the Selling Members pursuant to **Sections 1.3 and 1.4** (provided, however that neither the exercise of, nor the failure

{00829079.DOCX;12 }

to exercise such right to setoff will constitute an election of remedies or limit Buyer in any manner in the enforcement of any other remedies that may be available to it).

(vii)    The Buyer Indemnified Persons and the Seller Indemnified Persons shall in good faith use commercially reasonable efforts to mitigate Losses in connection with any claim under **Section 7.1(a)** and **Section 7.1(b)**, respectively.

(viii)    Any Losses for which any Indemnified Party is entitled to indemnification under this **Article 7** shall be determined without duplication of recovery to the extent such Indemnified Party has been indemnified or reimbursed for such Loss under any other provision of this Agreement; and

(d)    Survival.

(i)    The representations, warranties and covenants of the Parties contained in this Agreement, any other Seller Document or Buyer Document, as the case maybe, or in any instrument delivered pursuant hereto or thereto will survive the Closing and will remain in full force and effect thereafter, except that the representations and warranties of the Parties shall expire twelve (12) months following the Closing; provided, that: (i) such representations and warranties shall survive beyond such period with respect to any breach thereof if written notice thereof shall have been duly given within such period, (ii) the representations and warranties set forth in **Sections 3.10 (Tax Matters) and 3.12 (Employee Benefits)** shall survive the Closing until one (1) month following the lapse of the applicable statute of limitations, and (iii) the representations and warranties set forth in **Sections 3.1 (Organization; Authority; Due Execution), 3.5 (Capitalization), 4.1 (Ownership of Interest), 4.2 (Authority) and 5.1(b) (Authority)** shall survive indefinitely. None of the foregoing limitations on survival shall apply in the case of fraud, intentional misconduct or intentional misrepresentation.

(ii)    Subject to **Section 7.1(d)(i)** above, all other claims for indemnification with respect to Losses incurred by the Buyer Indemnified Parties pursuant to **Section 7.1(a)** shall be asserted within a period of three (3) years following the Closing (and if not asserted within such period shall lapse); provided, however, (1) any claims for indemnification with respect to Losses incurred by the Buyer Indemnified Parties pursuant to **Sections 7.1(a)(vii) or (viii)** may be asserted indefinitely and (2) any claims for indemnification with respect to Losses incurred by the Buyer Indemnified Parties pursuant to **Section 7.1(a)(v)** shall be asserted within a period of four (4) years following the Closing (and if not asserted within such period shall lapse).

(e)    Notice and Opportunity to Defend. The following shall apply:

(i)    If there occurs an event (a "**Covered Proceeding**") which a Party asserts is an indemnifiable event pursuant to **Section 7.1(a) or 7.1(b)**, the Party or Parties seeking indemnification (the "**Indemnified Party**") shall notify the other Party or Parties obligated to provide indemnification (the "**Indemnifying Party**") promptly. If such event involves any claim or the commencement of any action or proceeding by a third person, the Indemnified Party shall give such Indemnifying Party prompt written notice of such claim or the commencement of such action or proceeding; provided, however, that the failure to provide prompt notice as provided herein will relieve the Indemnifying Party of its obligations hereunder

{00829079.DOCX;12 }

only to the extent that such failure prejudices the Indemnifying Party hereunder. In case any such action shall be brought against any Indemnified Party and after such Indemnified Party has notified the Indemnifying Party of the commencement thereof, the Indemnifying Party shall be entitled to assume the defense thereof, with counsel reasonably selected by the Indemnifying Party and reasonably approved by the Indemnified Party after notice from the Indemnifying Party to the Indemnified Party. The Indemnifying Party and the Indemnified Party agree to cooperate fully with each other and their respective counsel in connection with the defense, negotiation or settlement of any such action or asserted liability.

(ii)    If the Indemnifying Party agrees to assume the defense of a Covered Proceeding, the Indemnified Party shall have the right to participate at its own expense in the defense of such action or asserted liability. If the Indemnifying Party is otherwise entitled to control the settlement of a Covered Proceeding (subject to the requirements and limitations of this **Section 7.1**), the Indemnifying Party will be entitled to control such settlement only if (A) the terms of such settlement require no more than the payment of money (for example, such settlement does not require the Indemnified Party to admit any wrongdoing or take or refrain from taking any action), (B) the full amount of such monetary settlement is fully paid by the Indemnifying Party, and (C) the Indemnified Party receives as part of such settlement a legally binding and enforceable unconditional satisfaction and release of all claimed liabilities or obligations in form and substance reasonably satisfactory to the Indemnified Party.

Section 7.2    Exclusive Remedy. From and after the Closing, Buyer Indemnified Persons and Seller Indemnified Persons' sole and exclusive remedy, whether in any individual, corporate or any other capacity, with respect to any and all Losses arising under this Agreement or the transactions contemplated hereby, regardless of the legal theory under which such liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise, shall be pursuant to the provisions of this **Article 7**.

Section 7.3    Payments.  Any amounts owed to the Buyer by the Selling Members (or any one or more of the Selling Members) pursuant to the terms of this Agreement, including but not limited to, **Section 1.2, Section 1.5, Section 1.6, Article 7**, shall be paid to the Buyer as follows: (i) first, as a disbursement from the Escrow Fund, (ii) second, as a set off against amounts then due, if any, to the Selling Members pursuant to **Sections 1.2 and 1.3**, and (iii) finally, as a payment by the Selling Members in cash or available funds to an account designated by the Buyer within five (5) Business Days of the final determination of such payment.


# ARTICLE 8

# DEFINITIONS

Section 8.1    Definitions.  For purposes of this Agreement, the following terms used in this Agreement shall have the meanings ascribed to them below:

"**409A Plan**" has the meaning ascribed to such term in **Section 3.10(a)(xv)**.

"**Additional Interim Financial Statement**" has the meaning ascribed to such term in **Section 3.14(a)**.

"**Affiliate**" of any Person means another Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person.

"**Agreement**" has the meaning ascribed to such term in the Preamble.

"**Annual Financial Statements**" has the meaning ascribed to such term in **Section 3.14(a).**

"**Anti-Kickback Statute**" has the meaning ascribed to such term in the definition of "**Healthcare Laws**".

"**Basket**" has the meaning ascribed to such term in **7.1(c)(i).**

"**Books and Records**" means all operating data and records of the members of the Company Group which are necessary to and used in the operation of the Business or that are located at the Company's primary offices, in each case including all books of account, ledgers, general, financial, accounting, tax, warranty, shipping records, invoices, management letters from accountants, purchase and sales records and information, customers' records, records pertaining to customer requirements, equipment maintenance and warranty informatio n, customer and prospect lists, correspondence, catalogues, promotion materials, customer contacts, customer invoices, customer returns and vendor product information, credit and collection records, and all other files, records, literature and other documents of the members of the Company Group, whether in written, electronic or other form.

"**Breaching Party**" has the meaning ascribed to such term in **Section 6.4(c)**.

"**Business**" means the business activities, operations and affairs of the members of the Company Group currently conducted.

"**Business Day**" means any day  other than a Saturday, a Sunday or a day on which commercial banking institutions in New York, New York are authorized or obligated by law or executive order to be closed.

"**Buyer**" has the meaning ascribed to such term in the Preamble.

"**Buyer Documents**" has the meaning ascribed to such term in **Section 5.1(b)**.

"**Buyer Indemnified Persons**" has the meaning ascribed to such term in **Section 7.1(a).**

"**Buyer Prepared Return**" has the meaning ascribed to such term in **Section 6.3(d).**

"**Cap**" means fifty percent of an amount equal to (i) all amounts paid byBuy er pursuant to **Article 1** less (ii) all amounts paid to Buyer by the Selling Members pursuant to **Article 1.**

"**CHT**" means Constellation Healthcare Technologies, Inc., a Delaware corporation.

"**Civil Monetary Penalty Law**" has the meaning ascribed to such term in the definition of "**Healthcare Laws**".

"**Closing**" has the meaning ascribed to such term in **Section 2.1.**

"**Closing Accounts Receivable**" has the meaning ascribed to such term in **Section 1.5(f)**.

"**Closing Balance Sheet**" has the meaning ascribed to such term in **Section 1.5(a).**

"**Closing Date**" has the meaning ascribed to such term in **Section 2.1.**

"**Closing Date Calculation**" has the meaning ascribed to such term in **Section 1.5(a).**

"**Closing Payment**" has the meaning ascribed to such term in **Section 1.2(a)**

"**Closing Payment Multiplier**" is 3.0.

"**Closing Working Capital**" has the meaning ascribed to such term in **Section 1.5(a).**

"**CMS**" means the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services.

"**Code**" means the Internal Revenue Code of 1986, as amended. All citations to the Code or to the regulations promulgated thereunder shall include any amendments or any substitute or successor provisions thereto.

"**Commercial Healthcare Plan**" means any plan or program established by a non-governmental third-party ayor that pays for health care provided to individuals, including, without limitation, indemnity lans, health maintenance organizations, preferred provider organizations, and plans established under ERISA.

"**Company**" has the meaning ascribed to such term in the Preamble.

"**Company Group**" means the Company together with all of its Subsidiaries; each of the Company and its Subsidiaries is a member of the Company Group.

"**Company Leased Property**" has the meaning ascribed to such term in **Section 3.8.**

{00829079.DOCX;12 }

55

"**Company Leases**" has the meaning ascribed to such term in **Section 3.8**.

"**Company Privacy Policies**" has the meaning ascribed to such term in **Section 3.29**.

"**Compensation and Benefits Plans**" has the meaning ascribed to such term in **Section 3.12(a)**.

"**Confidential Information**" has the meaning ascribed to such term in **Section 6.4(b)**.

"**Consent**" means any consent, approval, authorization, waiver, permit, grant, franchise, concession, agreement, license, exemption or order of, registration, certificate, declaration or filing with, or report or notice to, any Person, including but not limited to any Governmental Entity.

"**Contracts**" or "**Contract**" means all contracts, agreements, leases, licenses, franchises, purchase orders, sale, license or service orders, instruments, commitments, arrangements and understandings (in each case, whether written or oral and including all amendments thereto) to which any member of the Company Group is a party or by which any member of the Company Group is bound or under which any member of the Company Group or the Business has any rights or is entitled to any benefits but excluding therefrom any licenses for "shrink-wrapped-off-the-shelf software".

"**Covered Proceeding**" has the meaning ascribed to such term in **Section 7.1(e)**.

"**Disputed Item**" and "**Disputed Items**" has the meaning ascribed to such term in **Section 1.5(d)**.

"**DOJ**" means the United States Department of Justice.

"**Earn-Out Payment(s)**" means either or both of the Year 1 Earn-Out Payment and the Year 2 Earn-Out Payment, as applicable and to the extent earned hereunder.

"**EBITDA**" means earnings before interest, taxes, depreciation and amortization; provided, however that the calculation of EBITDA shall not include any corporate or administrative overhead costs of Buyer or its affiliates that is allocated to any member of the CompanyGroup.

"**Effective Date**" has the meaning ascribed to such term in the Preamble.

"**Employees**" mean current and former employees and consultants of the members of the Company Group, including leased and temporary employees, involved in whole or in part in the Business.

"**Employment Agreements**" has the meaning ascribed to such term in **Section 6.8**.

"**Environmental Law**" means any Law, permit, authorization, policy, opinion, common law or agency requirement applicable to one or more members of the CompanyGroup relating to: (i) the protection, investigation or restoration of the environment, health and safety, or natural resources or exposure to any harmful or hazardous material, (ii) the handling, use, presence, disposal, release or threatened release of any chemical substance or waste water, or (iii) noise, odor, wetlands, pollution, contamination or any injury or threat of injury to persons or property, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, the Resource Conservation and Recovery Act, the Occupational and Safety and Health Act (solely to the extent related to Hazardous Substances), Clean Water Act and the Oil Pollution Act.

"**ERISA**" has the meaning ascribed to such term in **Section 3.12(b)**.

"**Escrow Agent**" has the meaning ascribed to such term in **Section 1.2(a)**.

"**Escrow Agreement**" has the meaning ascribed to such term in **Section 1.2(a)**.

"**Escrow Fund**" has the meaning ascribed to such term in **Section 1.2(b)**.

"**Escrow Payment**" has the meaning ascribed to such term in **Section 1.2(b)**.

"**Excessive Payment to a Client**" has the meaning ascribed to such term in **Section 1.6(a)**.

"**Excluded Earnings**" has the meaning ascribed to such term in **Section 1.6(a)**.

"**Excluded Liabilities**" means any and all of the debts, liabilities, claims and obligations of one or more members of the Company Group, whether fixed, contingent or otherwise, in each case to the extent existing or accrued or required to be accrued at or as of the Closing, or made, asserted or arising after the Closing but based upon or arising from any act, transaction, circumstance, sale or providing of goods or services, state of facts or other condition which occurred or existed on or prior to the Closing, whether or not then known, due or payable, including, without limitation, the following (but excluding the Qualified Accounts Payable):

      (i)     any claims, liabilities or obligations against or of one or more members of the Company Group under or arising out of any actual or claimed equity option, equity purchase, equity-based incentive, profit-sharing or similar plan(s), program(s), agreement(s) or arrangement(s) and/or under any and all qualified or non-qualified equity options, grants or awards and/or any other agreement, arrangement or understanding to make a payment to any manager, officer or employee in connection with the sale of the Interests or any transaction described in this Agreement;

      (ii)     any and all claims, liabilities and obligations against or of one or more members of the Company Group by, of or to any of its present or former direct or indirect shareholders, including any arising out of any action by one or more members of the Company Group in connection with any of the transactions described in this Agreement;

(iii)    any and all claims, liabilities and obligations in respect of brokerage or finder's fees payable by one or more members of the Company Group and all investment banking, legal, accounting and other consulting or similar costs and expenses incurred by one or more members of the Company Group in connection with the negotiation, execution and/or consummation of this Agreement and/or any of the transactions described in this Agreement;

(iv)    any and all Transaction Expenses, Indebtedness of one or more members of the Company Group and Payables (other than Qualified Accounts Payable) and any and all other liabilities and obligations of one or more members of the CompanyGroup to the Selling Member or any Affiliate(s) of the Selling Member (whether current or long-term);

(v)    any and all claims, liabilities and obligations against or of any member of the Company Group as a guarantor, co-obligor or surety of or with anyother Person, (other than another member of the Company Group), or arising by reason of one or more members of the Company Group being an Affiliate of a Selling Member or against or of any Affiliate of a Selling Member;

(vi)    any and all claims, liabilities and obligations for or in respect of any and all foreign, federal, state and local Taxes of or imposed on one or more members of the Company Group for anyPre -Closing Tax Period);

(vii)    any and all claims, liabilities and obligations against or of one or more members of the Company Group on account of Proceedings;

(viii)    any and all claims, liabilities and obligations against or of one or more members of the Company Group with respect to any Compensation and Benefits Plans arising out of any events occurring, or circumstances or state of facts existing, prior to the Closing Date, it being agreed and understood that the members of the Company Group or the Buyer, and not the Selling Member, shall be responsible for all Compensation and Benefits Plans arising out of any events occurring, or circumstances or state of facts existing, after the Closing Date so long as such event is not triggered by the Closing; or

(ix)    any and all claims, liabilities and obligations against or of one or more members of the Company Group based on or arising from the presence of any Hazardous Substance on any of the CompanyL eased Property in violation of applicable Environmental Law, or any Hazardous Discharge on or prior to the Closing Date in violation of applicable Environmental Law, and/or the failure to obtain any license or permit required in connection with any Hazardous Substance or Hazardous Discharge in order to comply with applicable Environmental Law or the retention, disposal, treatment or use thereof, and/or arising out of any, in each case, based on or arising from any act, transaction, state of facts or other condition which occurred or existed before the Closing Date in violation of applicable Environmental Law, on, from, involving or by any of the Company Leased Property, or one or more members of the Company Group, or any of its Affiliates, and/or any demand of any government agency or authority or other Person prior to, on or after the Closing Date which is based upon or in any way related to any discharge of any Hazardous Substance, the presence, use, disposal or treatment of a Hazardous Substance in violation of applicable Environmental

Law prior to the Closing Date, on, from, involving or by any of the Company Leased Property, one or more members of the Company Group or any of its Affiliates.

"**Exclusions Statute**" has the meaning ascribed to such term in the definition of "**Healthcare Laws**".

"**False Claims Act**" has the meaning ascribed to such term in the definition of "**Healthcare Laws**".

"**False Report**" has the meaning ascribed to such term in **Section 1.6(a)**.

"**Financial Statements**" has the meaning ascribed to such term in **Section 3.14(a)**.

"**GAAP**" means U.S. generally accepted accounting principles, consistently applied.

"**Governing Plan**" has the meaning ascribed to such term in **Section 1.3(f)**.

"**Government Bid**" has the meaning ascribed to such term in **Section 3.19(a)(iv)**.

"**Government Contract**" has the meaning ascribed to such term in **Section 3.19(a)(iv)**.

"**Government Healthcare Program**" means Medicare, Medicaid, TRICARE and any other program for the provision of health care established by the U.S. federal government or a state government.

"**Government Healthcare Program Contractor**" means a non-governmental entity that acts on behalf of a Government Healthcare Program to administer a Government Healthcare Program, process and audit claims, make eligibility determinations, enroll and dis-enroll providers and suppliers, or audit providers and suppliers, including, for example, any Medicare Administrative Contractor ("**MAC**"), Recovery Audit Contractor ("**RAC**"), Zone Program Integrity Contractor ("**ZPIC**").

"**Governmental Entity**" means (a) any supranational, federal, state, local, municipal, foreign or other government; (b) any governmental or quasi-governmental entity of any nature (including any governmental agency, branch, department, official or entity and any court or other tribunal); or (c) any body, authority or agency exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority, including any arbitral tribunal.

"**GPO**" has the meaning set forth in **Section 3.26(l)**.

"**Hazardous Discharge**" means the use, management, handling, transport, treatment, generation, storage, spill, escape, seepage, leakage, spillage, emission, release,

discharge, remediation or clean-up of any Hazardous Substance on or about any of the Company Leased Property or caused by one or more members of the CompanyGroup.

"**Hazardous Substance**" means any substance that is: (a) listed, classified or regulated in any concentration pursuant to any Environmental Law, (b) any petroleum product or by-product, asbestos-containing material, lead-containing paint or plumbing, polychlorinated biphenyls, radioactive materials or radon, or (c) any other substance which may be the subject of regulatory action byany Governmental Entity pursuant to any Environmental Law.

"**Healthcare Laws**" means all federal and state laws pertaining to regulation, licensing, claims submission, payment, or provision of health care including, without limitation: (i) all federal and state fraud and abuse laws including, without limitation, 42 U.S.C. § 1320a-7b(b) ("**Anti-Kickback Statute**"), the other provisions of 42 U.S.C. §1320a-7b, 42 U.S.C. § 1395nn ("**Stark Law**"), 31 U.S.C. § 3729 *et seq.* ("**False Claims Act**"), 42 U.S.C. § 1320a-7 ("**Exclusion Statute**"), 42 U.S.C. § 1320a-7a ("**Civil Monetary Penalty Law**"), 18 U.S.C. § 1347 and the regulations promulgated pursuant to such statutes; (ii) Laws pertaining to mail fraud and wire fraud; (iii) Laws and regulations pertaining to medical records; (iv) Laws and regulations pertaining to billing and claims filing and collection; (v) all federal and state statutes, regulations and manuals pertaining to Medicare or Medicaid; (vi) all statutes and regulations applicable to Government Healthcare Programs established under Titles V, XX, and XXI of the Social Security Act of 1935, as amended; (vii) all statutes and regulations pertaining to TRICARE; (viii) HIPAA and other federal and state privacy laws and regulations, (ix) all state laws relating to fee splitting, kickbacks and self-referral; (x) all statutes, regulations and cases pertaining to corporate practice of medicine; (xi) all federal and state laws regulating disposal of Medical Waste and radioactive waste; (xii) all statutes and regulations pertaining to the federal Drug Enforcement Administration; (xiii) all statutes and regulations pertaining to the federal Food and Drug Administration; (xiv) all applicable statutes and regulations regarding the regulation of imaging equipment; and (xv) any other federal or state laws and regulations pertaining to the delivery or payment for health care services applicable to the Acquired Corporations.

"**Healthcare Programs**" means a collective reference to Government Healthcare Programs and any Commercial Healthcare Plan.

"**HIPAA**" has the meaning ascribed to such term in **Section 3.12(b)**.

"**Inaccurate Submission**" has the meaning ascribed to such term in **Section 1.6(a)**.

"**Indebtedness**" means, without duplication, and in each case whether fixed, contingent or otherwise, and to the extent existing or accrued or required to be accrued at or as of the Closing, (a) any indebtedness for borrowed money or issued in substitution for or exchange of indebtedness for borrowed money, (b) any indebtedness evidenced byany note, bond, debenture or other debt security, including "overdraft", (c) all indebtedness for the deferred purchase price of property or a business represented by a note, or earn-out or contingent purchase payment obligation, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired (even though the rights and remedies

{00829079.DOCX;12 }

60

of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all indebtedness secured by a purchase money mortgage or other Lien to secure all or part of the purchase price of the property subject to such mortgage or Lien, (f) all obligations under leases which shall have been or must be, in accordance with GAAP, recorded as capital leases, (g) any credit extended in the nature of banker's acceptances or letters of credit, (h) any obligations (including, but not limited to, interest, fees, penalties and other expenses) under any interest rate swap agreements or instruments, (i) all interest, fees and other expenses owed with respect to the indebtedness referred to above, and (j) all indebtedness and liabilities referred to above which is directly or indirectly guaranteed, and, with respect to (a) to (j) above, all premiums, penalties, charges, fees, expenses and other amounts that are or would be due (including with respect to early termination) in connection with the payment and satisfaction in full of such obligations.

"**Indemnifiable Loss**" has the meaning ascribed to such term in **Section 7.1(e)(vi)**.

"**Indemnified Party**" has the meaning ascribed to such term in **Section 7.1(e)(i)**.

"**Indemnifying Party**" has the meaning ascribed to such term in **Section 7.1(e)(i)**.

"**Indemnity Payment**" has the meaning ascribed to such term in **Section 7.1(e)(v)**.

"**Independent Auditor**" means a mutuallyagreeable independent nationally recognized accounting firm who has not then provided services to any Party in the previous two (2) years (a "**Neutral Firm**") that will agree to act as Independent Auditor. If: (i) Buyer and the Selling Member Representative are unable to agree on the selection of an Independent Auditor within fifteen (15) days of the conclusion of the period described above, then each of Buyer, on the one hand, and the Selling Member Representative, on the other hand, shall select one Neutral Firm and those two Neutral Firms together shall appoint a Neutral Firm as Independent Auditor hereunder, and such appointment shall be conclusive and binding on all of the Parties; or (ii) if anyParty does not select a Neutral Firm within ten (10) days of written demand therefor bythe other Party, then the Neutral Firm selected by the other Party shall act as the Independent Auditor.

"**Intellectual Property**" means any know-how, proprietary rights or other intellectual property, including without limitation, trade secrets, inventions, formulae, processes, patents (including all reissues, divisions, continuations and extensions thereof), patent applications, Trademarks, Trademark registrations, Trademark applications, service marks, service mark registrations, service mark applications, copyrights, copyright registrations, copyright applications, web sites and home pages, uniform resource locators, domain names, all rights to, and all intellectual property used or necessary to, create, publish, modify or maintain, any website or home page, customer and vendor information, lists and data bases, customer files, customer lists, mailing and subscription lists, supplier lists, information not known to the general public, literary works, whether or not copyrightable, ideas, concepts, designs, drawings, discoveries, product and service developments, inventions, improvements, processes, logos,

software, source codes and materials, object codes and materials, algorithms, techniques, technology, technical information, research material, prototypes and models.

"**Interests**" has the meaning ascribed to such term in the Preamble.

"**Interim Financial Statement**" has the meaning ascribed to such term in **Section 3.14(a)**.

"**IRS**" has the meaning ascribed to such term in **Section 3.10(a)(vi)**.

"**Kelly**" has the meaning ascribed to such term in the Preamble.

"**Kelly Employment Agreement**" has the meaning ascribed to such term in **Section 2.2(a)(i)**.

"**Kircher**" has the meaning ascribed to such term in the Preamble.

"**Law**" or "**Laws**" has the meaning ascribed to such term in **Section 3.17(a)**.

"**License Agreements**" has the meaning ascribed to such term in **Section 3.13(b)(i)**.

"**Liens**" means, with respect to any property or asset, all liens, mortgages, pledges, security interests, conditional sales agreements, purchase options, rights of first refusal or other encumbrance of like nature in respect of such property or asset.

"**Losses**" means any and all losses, damages, costs, deficiencies and reasonable expenses (including reasonable fees and expenses of counsel incident to any of the foregoing, or incurred in investigating or attempting to avoid the same or to oppose the imposition thereof, or in enforcing any of the obligations of any Indemnifying Party), excluding punitive damages.

"**MAC**" has the meaning ascribed to such term in the definition of "**Government Healthcare Program Contractor**".

"**Material Adverse Effect**" means any change or effect (or any development that is reasonably likely to result in any change or effect) that (a) is materially adverse to the assets, Business, financial condition, or results of operations of the members of the Company Group, or (b) would materially and adversely impair the ability of the Selling Members to consummate the transactions described in this Agreement; provided however, that "Material Adverse Effect" does not include material adverse changes or effects on the assets, Business, financial condition or results of operations of the members of the Company Group caused by events, conditions or circumstances that generally affect the economy or the industry in which members of the Company Group operate and do not affect members of the Company Group disproportionately.

"**Material Contracts**" has the meaning ascribed to such term in **Section 3.19(a)**.

"**Medicaid**" means the need-based health care program established under Title XIX of the Social Security Act.

{00829079.DOCX;12 }

"**Medical Waste**" means any solid or liquid waste that is generated in the diagnosis, treatment, or immunization of human beings or animals, in research pertaining thereto, or in the production or testing of biologicals, including, without limitation, blood soaked bandages; culture dishes and other glassware; discarded surgical gloves; discarded surgical instruments; discarded syringes and needles used to give shots or draw blood; blood and blood products; cultures, stocks, swabs used to inoculate cultures; removed body organs or other body tissue; human body waste; and discarded lancets.

"**Medicare**" means the health care program for individuals sixty five (65) years of age and over, certain disabled individuals, and certain individuals with end-stage renal disease established under Title XVIII of the Social Security Act.

"**Medicare Advantage**" means the health insurance program for certain individuals sixty five (65) years of age and over established under Part C of Title XVIII of the Social Security Act usually in the form of a coordinated care program and generally administered by non -governmental entities.

"**Minimum Working Capital**" has the meaning ascribed to such term in **Section 1.4(c)**.

"**Net Revenue**" means, for any particular period, the sum of (i) the gross revenues generated by the members of the Company Group and their Subsidiaries for services rendered or products sold less (ii) amounts paid byt he members of the CompanyG roup and their Subsidiaries to physicians and other medical professionals and practices in connection with services that resulted in payments to the members of the CompanyG roup and their Subsidiaries less (iii) amounts that the members of the CompanyG roup and their Subsidiaries paid to any Person for payments of commissions and sharing of administrative fees in connection with services that resulted in payments to the members of the Company Group and their Subsidiaries.

"**Neutral Firm**" has the meaning ascribed to such term in the definition of "**Independent Auditor**".

"**New Baseline**" means the greater of $10,900,000 and the Year 1 Revenue.

"**Non-Escrowed Closing Payment**" has the meaning ascribed to such term in **Section 1.2(a)**.

"**Objection Notice**" has the meaning ascribed to such term in **Section 1.5(c)**.

"**OCR**" means the Office for Civil Rights of the United States Department of Health and Human Services.

"**OIG**" means the Office of the Inspector General of the United States Department of Health and Human Services.

"**Ordinary Course of Business**" means the ordinary course of business of the members of the Company Group consistent with past custom and practice (including with respect to frequency and amount).

"**Owned Intellectual Property**" has the meaning ascribed to such term in **Section 3.13(a)**.

"**Party**" or "**Parties**" has the meaning ascribed to such term in the Preamble.

"**Payables**" means all accounts payable, accrued expenses and other amounts payable of the members of the Company Group, in each case whether fixed, contingent or otherwise, whether invoiced or not, and to the extent existing or accrued or required to be accrued at or as of the Closing Date, determined in accordance with GAAP or consistent with the members of the Company Group's existing method of accounting and income tax reporting.

"**Pension Plan**" has the meaning ascribed to such term in **Section 3.12(b)**.

"**Permits**" has the meaning ascribed to such term in **Section 3.17(b)**.

"**Permitted Liens**" means: (a) inchoate Liens for current taxes not yet due and payable and (b) minor Liens that have arisen in the Ordinary Course of Business (including mechanics', workers', landlords', warehousemen's, bailees', licensor's and other statutory liens (or other liens arising by operation of law) incurred in the Ordinary Course of Business for amounts not in default or being contested in good faith, and deposits or pledges to secure obligations under workmen's compensation or similar laws), which in each case and in the aggregate, are not substantial in amount, do not materially detract from the value of the assets subject thereto or materially impair the operations of the Business.

"**Person**" means an individual, corporation, partnership, limited liability company, trust or unincorporated organization or a Governmental Entity, or any other entity.

"**Personal Data**" means Protected Health Information, as defined in HIPAA.

"**Personal Property**" has the meaning ascribed to such term in **Section 3.7(a)**.

"**Pre-Closing Tax Period**" means any taxable period or portion thereof ending on or prior to the Closing Date.

"**Privacy and Security Laws**" shall mean Laws regarding collecting, accessing, using, disclosing, electronically transmitting, securing, sharing, transferring and storing Personal Data including federal, state or foreign laws or regulations regarding (a) data privacy and information security, (b) data breach notification (as applicable), (c) unfair or deceptive practices relating to data privacy and security and (d) trespass, computer crime and other Laws governing unauthorized access to or use of electronic data.

"**Privacy and Security Regulations**" means HIPAA, Title XIII HITECH, and the related regulations contained in 45 C.F.R. Parts 160 and 164.

"**Proceedings**" has the meaning ascribed to such term in **Section 3.6**.

"**Protected Health Information**" has the meaning set forth in 45 C.F.R. § 160.103.

{00829079.DOCX;12 }

"**Purchase Price**" has the meaning ascribed to such term in **Section 1.1**.

"**Purchase Price Allocation**" has the meaning ascribed to such term in **Section 6.3(i)**.

"**Qualified Accounts Payable**" has the meaning ascribed to such term in **Section 1.4(a)**.

"**RAC**" has the meaning ascribed to such term in the definition of "**Government Healthcare Program Contractor**".

"**Refundable Payment by a Client**" has the meaning ascribed to such term in **Section 1.6(a)**.

"**Reimbursable Expenses**" mean any and all expenses, including those related to automobiles, telephones, memberships, travel and entertainment, of managers, directors, officers, employees and consultants of one or more members of the Company Group that one or more members of the Company Group is obligated to reimburse or are of the type that members of the Company Group have generally reimbursed.

"**Replacement Costs**" means an amount equal to (i) the total compensation, including salary, bonus and benefits, attributable to Replacement Personnel for such applicable period, less (ii) an amount equal to the total compensation, including salary, bonus and benefits, that would have been attributable to Kelly had she been employed during such applicable period using the actual amounts attributable to Kelly for the last full month immediately prior to Kelly's termination of employment with the Company Group byKelly  without Good Reason or bythe Company Group for Cause or upon death or disability (each as defined in the Kelly Employment Agreement).

"**Replacement Personnel**" mean any and all persons engaged by the Company Group upon the termination of Kelly's employment with the Company Group byKelly without Good Reason or by the Company Group for Cause (each as defined in the KellyEmployment Agreement) to fulfill some or all of the functions provided by Kelly to the CompanyGroup immediately prior to the Closing; provided, however that if the Buyer wishes to engage Replacement Personnel, the Buyer shall provide Kelly with prior written notice and, in the case of the first two candidates, Buyer shall not engage their services without Kelly's prior written consent, which consent may be denied for any reason or no reason at all (provided, however, that Kelly shall be deemed to have consented if she does not respond in writing within seven (7) days from her receipt of the notice).

"**Required Payment**" has the meaning ascribed to such term in **Section 1.6(a)**.

"**Resolution Period**" has the meaning ascribed to such term in **Section 1.5(d)**.

"**Restricted Period**" has the meaning ascribed to such term in **Section 6.4(a)**.

"**Second Escrow Agent**" has the meaning ascribed to such term in **Section 1.2(a)**.

{00829079.DOCX;12 }

65

"**Second Escrow Agreement**" has the meaning ascribed to such term in **Section 1.2(a)**.

"**Second Escrow Fund**" has the meaning ascribed to such term in **Section 1.2(b)**.

"**Second Escrow Payment**" has the meaning ascribed to such term in **Section 1.2(b)**.

"**Seller Documents**" means this Agreement and each other agreement, document or instrument to be executed or delivered by any member of the Company Group, any Selling Member, or the Selling Member Representative pursuant to this Agreement, including the Kelly Employment Agreement.

"**Seller Indemnified Persons**" has the meaning ascribed to such term in **Section 7.1(b)**.

"**Selling Member**" or "**Selling Members**" has the meaning ascribed to such term in the Preamble.

"**Selling Member Representative**" has the meaning assigned to it in the Preamble.

"**Selling Party**" or "**Selling Parties**" has the meaning ascribed to such term in the Preamble.

"**Selling Parties' Knowledge**" means the actual knowledge of the Selling Members, after due inquiry with the appropriate personnel of the Company Group.

"**Software**" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, testing scripts, schematics, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, and (iv) all documentation, including user manuals, training materials and functional specifications or similar documentation included as part of any License Agreement, relating to any of the foregoing.

"**Sotiropoulos**" has the meaning ascribed to such term in the Preamble.

"**Specified Representations**" has the meaning ascribed to such term in **Section 7.1(c)(i)**.

"**Stark Law**" has the meaning ascribed to such term in the definition of "**Healthcare Laws**".

"**Straddle Period**" has the meaning ascribed to such term in **Section 6.3(a)**.

{00829079.DOCX;12 }

66

"**Subsidiary**" or "**Subsidiaries**" of any Person means another Person, an amount of the voting securities, other voting rights or voting membership or partnership interests of which is sufficient to elect at least a majority of its board of directors or other governing body (or, if there are no such voting interests, fifty percent (50%) or more of any class or series of capital stock or other partnership, joint venture, membership or other equity interest of which) is owned directly or indirectlyby such first Person.

"**Tax**" or "**Taxes**" means all taxes, including (i) all federal, state, local, provincial or foreign income or franchise taxes; (ii) all gross receipts, ad valorem, value-added, goods and services, excise, real property, personal property, sales, use, transfer, withholding, employment, unemployment, insurance, social security, business license, business organization, environmental (including Taxes under Code section 59A), workers compensation, profits, license, lease, service, service use, severance, stamp, occupation, windfall profits, customs, duties, franchise, net worth, commercial profits and other taxes imposed byany Governmental Entity; (iii) any interest, penalties, assessments or additions to tax resulting from, attributable to or incurred in connection with any items listed in clauses (i) or (ii) of this paragraph; and (iv) any liability in respect of any items described in clauses (i), (ii) and/or (iii) payable by reason of contract, assumption, transferee liability, operation of law or Treasury Regulations section 1.1502-6(a) (or any predecessor or successor thereof or any similar provision under law or otherwise).

"**Tax Benefit**" means any actual reduction in Taxes payable for any year (or period) or increase in Tax refunds received for anyy ear (or other period).

"**Tax Contest**" has the meaning ascribed to such term in **Section 6.3(f)**.

"**Tax Return**" means any return, declaration, report, statement or information return required to be filed with any Governmental Entity with respect to Taxes, including all required Schedules and other attachments thereto, and any amendments thereof.

"**Trademarks**" means all trademarks and service marks (whether registered or unregistered), trade names and designs, together with all goodwill related to the foregoing owned by or licensed to one or more members of the CompanyGroup.

"**Transaction Expenses**" means the sum of the fees and expenses of third parties (such as accountants, lawyers, consultants or other outside advisors) incurred by one or more members of the Company Group arising or resulting from the transactions described in this Agreement, which remain outstanding as of the Closing Date.

"**Transaction Regulations**" means 45 C.F.R. Parts 160 and 162.

"**Transaction Tax Items**" means any payments relating to (i) the repayment of Indebtedness, (ii) any Transaction Expenses, (iii) any Payables and (iv) any indemnification payments made by the Selling Members under this Agreement.

"**TRICARE**" means the health care program established by the Department of Defense under Title 10, Subtitle A, Part II, Chapter 55 (10 U.S.C. §1071 *et seq.*) for members of the military, military retirees, and their dependents.

{00829079.DOCX;12 }

67

"**UCC**" has the meaning ascribed to such term in **Section 1.4(b)**.

"**Websites**" has the meaning ascribed to such term in **Section 3.13(g)**.

"**Year 1**" means that first twelve calendar months commencing on or after the Closing Date.

"**Year 2 Earn-Out Calculation**" has the meaning ascribed to such term in **Section 1.3(c)**.

"**Year 1 Earn-Out Payment**" has the meaning ascribed to such term in **Section 1.3(a)**.

"**Year 1 Revenue**" means the Net Revenue of the Company and its Subsidiaries on a consolidated basis for Year 1 determined by the Company's external accountants in accordance with GAAP.

"**Year 2**" means that twelve months period commencing immediately after the end of Year 1.

"**Year 2 Earn-Out Calculation**" has the meaning ascribed to such term in **Section 1.3(c)**.

"**Year 2 Earn-Out Payment**" has the meaning ascribed to such term in **Section 1.3(b)**.

"**Year 2 Revenue**" means the Net Revenue of the Company and its Subsidiaries on a consolidated basis for Year 2 determined by the Company's external accountants in accordance with GAAP.

"**ZPIC**" has the meaning ascribed to such term in the definition of "**Government Healthcare Program Contractor**".

ARTICLE 9

MISCELLANEOUS

Section 9.1    Waiver. Any failure of any of the Selling Parties to comply with any of their obligations or agreements herein contained may be waived only in writing by Buyer. Any failure of Buyer to comply with any of its obligations or agreements herein contained may be waived only in writing by the Selling Member Representative. No waiver granted hereunder shall be deemed a waiver of any subsequent breach or default of the same or similar nature.

Section 9.2    Notices. All notices, requests, demands and other communications provided for hereunder shall be in writing and directed to each applicable party at the address set

{00829079.DOCX;12 }

forth hereafter or at such other address as to which such party may inform the other parties in writing in compliance with the terms of this Section:

| | |
|---|---|
| If to Selling Parties, then to: | Elizabeth Kelly<br>12 Annfield Court<br>Staten Island, NY 10304<br>Cliona Sotiropoulos<br>5203 Sandstone Court<br>Suffolk, VA 23435<br><br>Michaela Kircher<br>432 Temple Ave.<br>Woodbury Heights, NJ 08097 |
| with a copy (which shall not constitute notice) to: | Holland and Knight LLP<br>701 Brickell Avenue<br>Suite 3300<br>Miami, FL 33131<br>Attention: Alberto Hernandez, Esq. |
| (a)   If to Buyer, then to: | NYNM Acquisition, LLC<br>c/o Robinson Brog Leinwand et al.<br>875 Third Avenue<br>9th Floor<br>New York, New York 10022 |
| with a copy (which shall not constitute notice) to: | Robinson Brog Leinwand et al.<br>875 Third Avenue<br>9th Floor<br>New York, New York 10022<br>Attention: A. Mitchell Greene, Esq. |

Notices shall be deemed properly delivered and received (i) if personally delivered, upon receipt thereof, (ii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iii) if sent by a commercial overnight courier for delivery on the next Business Day, on the first Business Day after deposit with such courier for delivery. In this Section, "notice" includes any demand or request permitted or required under this Agreement.

{00829079.DOCX;12 }

69

Section 9.3    <u>Appointment of Selling Member Representative.</u>

Kelly is hereby appointed, authorized and empowered to act as a representative, for the benefit of the Selling Members (the "**Selling Member Representative**"), as the exclusive agent and attorney-in-fact to act on behalf of each Selling Member, in connection with and to facilitate the consummation of the transactions contemplated hereby, which shall include the power and authority:

(a)    to interpret the terms and provisions of this Agreement;

(b)    to execute and deliver such waivers and consents in connection with this Agreement and the consummation of the transactions contemplated hereby as the Selling Member Representative, in her sole discretion, may deem necessary or desirable;

(c)    to enforce and protect the rights and interests of the Selling Members arising out of or under or in any manner relating to this Agreement, and each other agreement, document, instrument or certificate referred to herein or therein or the transactions provided for herein or therein (including, payments following the Closing, if any, pursuant to **Sections 1.3, 1.4 1.5, and 1.6** and in connection with any and all claims for indemnification brought under **Article 7** hereof) and to take any and all actions which the Selling Member Representative believes are necessary or appropriate under this Agreement for and on behalf of the Selling Members;

(d)    to negotiate and compromise any dispute that may arise under this Agreement or the related agreements, including the Escrow Agreement and the Second Escrow Agreement, authorizing the disbursement from the Escrow Fund and the Second Escrow Fund, and to sign any releases or other documents with respect to any such dispute; and

(e)    to make, execute, acknowledge, deliver and receive all such other agreements, guarantees, orders, receipts, endorsements, notices, requests, instructions, certificates, stock powers, letters and other writings, and, in general, to do any and all things and to take any and all action that the Selling Member Representative, in its sole and absolute discretion, may consider necessary or proper or convenient in connection with or to carry out the transactions contemplated by this Agreement and all other agreements, documents or instruments referred to herein or therein or executed in connection herewith and therewith.

Buyer shall have the right to rely upon all actions taken or omitted to be taken by the Selling Member Representative pursuant to this Agreement, all of which actions or omissions shall be legally binding upon the Selling Members.  The grant of authority provided for herein (i) is coupled with an interest and shall be irrevocable and survive the bankruptcy or liquidation of any Selling Member; and (ii) shall survive the consummation of the transactions contemplated by this Agreement.  All decisions and actions by the Selling Member Representative, including without limitation any agreement between the Selling Member Representative and the Buyer relating to indemnification obligations of the parties under this Agreement, including the defense or settlement of any claims and the making of payments with respect hereto, shall be binding upon all of the Selling Members, and no Selling Member shall have the right to object, dissent, protest or otherwise contest the same.  The Selling Members shall indemnify the Selling Member Representative with respect to any action taken or suffered by the Selling Member

{00829079.DOCX;12 }

Representative in reliance upon any notice, direction, instruction, consent, statement or other documents believed by it to be genuinely and duly authorized, nor for any other action or inaction with respect to the indemnification obligations of the parties under this Agreement, including the defense or settlement of any claims and the making of payments with respect thereto, except to the extent resulting from the Selling Member Representative's own willful misconduct or gross negligence. The Selling Member Representative may, in all questions arising under this Agreement and the Exhibits, rely on the advice of counsel, and for anything done, omitted or suffered in good faith by the Selling Member Representative, the Selling Member Representative shall not be liable to the Selling Members.

Section 9.4    Governing Law; Consent to Jurisdiction and Waiver of Jury Trial.

(a)    This Agreement shall be governed by and construed in accordance with the internal substantive laws, and not the choice of law rules, of the State of New York.

(b)    Each of the Parties irrevocably submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York located in New York County, State of New York, or if such court does not have jurisdiction, the state courts of the State of New York located in New York County for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby. Each of the Parties hereto irrevocably and fully waives the defense of an inconvenient forum to the maintenance of such suit, action or proceeding. Each of the Parties further agrees that service of any process, summons, notice or document to such Party's respective address listed above in one of the manners set forth in **Section 9.2** hereof shall be deemed in every respect effective service of process in any such suit, action or proceeding; provided that with respect to this **Section 9.4(b)** only, any such notice solely sent in accordance with **Section 9.2** shall be deemed given only if and when actually received by the other Party. Nothing herein shall affect the right of any Person to serve process in any other manner permitted byL aw. Each of the Parties hereto irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in either of the courts named in this subsection and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. The Parties hereto herebyirrevocabl y and unconditionally waive trial byjury in any legal action or proceeding relating to this Agreement or any other agreement entered into in connection therewith and for any counterclaim with respect thereto. Notwithstanding the preceding, the Parties maysubsequently agree in writing that any such proceeding may be brought and maintained in any other court sitting in the United States that has jurisdiction.

(c)    The Parties further agree that should any dispute arise between the parties pursuant to this Agreement, the losing party in any action shall be responsible for paying the winning party's reasonable attorneyfees.

Section 9.5    Counterparts.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Execution and delivery of this Agreement bydelivery of a facsimile or electronically recorded copy in .pdf file or similar format bearing a copy of the

{00829079.DOCX;12 }

Case 8-20-08048-ast Doc 1-3 Filed 03/13/20 Entered 03/13/20 23:52:19

signature of a Party shall constitute a valid and binding execution and delivery of this Agreement by such Party. Such copies shall constitute enforceable original documents.

Section 9.6 Headings. The section headings contained in this Agreement are for reference purposes only and shall not affect in anyway the meaning or interpretation of this Agreement.

Section 9.7 Entire Agreement. This Agreement, including the Exhibits and Schedules hereto and the documents referred to herein, embodies the entire agreement and understanding of the Parties in respect of the subject matter contained herein other than the Confidentiality Agreement. This Agreement supersedes all prior agreements and understandings between the Parties with respect to the subject matter hereof other than the Confidentiality Agreement.

Section 9.8 Amendment and Modification. This Agreement may be amended or modified onlyby written agreement of the Selling Member Representative and Buyer.

Section 9.9 Binding Effect; Benefits. This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns; nothing in this Agreement, express or implied, is intended to confer on any Person other than the Parties and their respective successors and permitted assigns (and, to the extent provided in **Section 7.1**, the other Buyer Indemnified Parties and Seller Indemnified Parties) any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 9.10 Joint Drafting. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointlyby the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 9.11 Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement so long as the economic or legal substance of the transactions described in in this Agreement is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modifythis Agreement so as to effect the original intent of the Parties as closely as possible to the fullest extent permitted by applicable Law in an acceptable manner to the end that the transactions described in this Agreement are fulfilled to the extent possible.

Section 9.12 Interpretation. When a reference is made in this Agreement to an Article, Section, Schedule, or Exhibit, such reference will be to an Article or Section of, or a Schedule or Exhibit to, this Agreement unless otherwise indicated. Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." The words "hereof," "herein" and "hereunder" and

words of similar import when used in this Agreement will refer to this Agreement as a whole and not to any particular provision of this Agreement. All terms used herein with initial capital letters have the meanings ascribed to them herein and all terms defined in this Agreement will have such defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Unless otherwise indicated, any agreement, instrument or statute defined or referred to herein, or in any agreement or instrument that is referred to herein, means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. References to a Person are also to its successors and permitted assigns.

Section 9.13    <u>Assignability</u>.  This Agreement shall not be assignable by an y Party hereto without the prior written consent of the other Parties; provided that Buyer (a) may grant a security interest in its rights under this Agreement to its lenders as security for Buyer's obligations to such lenders (and such lenders may exercise their rights and remedies with respect to such security interest), (b) may assign its rights under the Agreement to any Affiliate of Buyer and (c) may assign its rights to indemnity, in whole or in part, to any Person that acquires an interest in Buyer or a material portion of its assets or the Business. Notwithstanding any assignment by Buyer described in clauses (b) and (c) of the proviso in the previous sentence of this Section, Buyer shall remain liable under this Agreement jointly and severally with the assignee.  No such assignment shall be a novation of Buyer's obligations under this Agreement.

Section 9.14    <u>Attorneys' Fees</u>.  If any Party hereto defaults in the performance of any of its obligations under this Agreement or if any dispute arises between Parties hereto concerning the meaning or interpretation of any provision of this Agreement, then the defaulting Party or the Party not prevailing in such dispute, as the case may be, shall pay any and all costs and expenses incurred by the other Party or Parties on account of such default and/or in enforcing or establishing its rights hereunder, including, without limitation, court costs (including costs of any trial or appeal therefrom), and reasonable attorneys' fees and disbursements.

Section 9.15    <u>Specific Performance.</u>  The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that each Party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement (without any obligation of such Party to post any bond or other surety in connection therewith) and to enforce specifically the terms and provisions of this Agreement in addition to any other remedy to which such Party may be entitled at law or in equity.

Section 9.16    <u>Continuing Counsel.</u>  The Buyer hereby acknowledges that Holland & Knight LLP has acted as counsel to the Company Group with respect to this Agreement and the transactions contemplated hereby.  The following provisions apply to the attorney-client relationship between Holland & Knight LLP and the Company Group following the Closing.  The Buyer hereby agrees that (a) it will not seek to disqualify Holland & Knight

{00829079.DOCX;12 }

LLP from acting and continuing to act as counsel to the Selling Members or the Selling Member Representative either in the event of a dispute hereunder or in the course of the defense or prosecution of any claim relating to this Agreement or the transactions contemplated hereby, and (b) the Company Group has a reasonable expectation of privacy with respect to their communications (including any communications using the Company's computer and email systems and servers) with Holland & Knight LLP prior to the Closing to the extent that such communications relate to this Agreement or the transactions contemplated hereby. The Buyer agrees that it will respect the confidentiality and privileged nature of all such communications between Holland & Knight LLP and the Company Group, and the Buyer agrees that it will not seek discovery of any such communications or otherwise claim any right of access or use to any such communications to the extent so privileged. The Selling Parties hereby acknowledge that Robinson Brog Leinwand Greene Genovese & Gluck PC has acted as counsel to the Buyer with respect to this Agreement and the transactions contemplated hereby. The Selling Parties hereby agree that they will not seek to disqualify Robinson Brog Leinwand Greene Genovese & Gluck PC from acting and continuing to act as counsel to the Buyer or the Company Group either in the event of a dispute hereunder or in the course of the defense or prosecution of any claim relating to this Agreement or the transactions contemplated hereby.

*[Remainder of Page Intentionally Left Blank; Signature pages Follow]*

IN WITNESS WHEREOF, the parties hereto have duly executed this Membership Interests Purchase Agreement as of the date first above written.

NYNM ACQUISITION, LLC

By: _____
Name: Paul Parmar
Title:   Manager

NEW YORK NETWORK MANAGEMENT, L.L.C.,

By: _____
Name:
Title:


_____
ELIZABETH KELLY


_____
MICHAELA KIRCHER


_____
CLIONA SOTIROPOULOS


[Signature Page to MIPA]

IN WITNESS WHEREOF, the parties hereto have duly executed this Membership Interests Purchase Agreement as of the date first above written.

NYNM ACQUISITION, LLC

By: _____
    Name:  Paul Parmar
    Title:   Manager

NEW YORK NETWORK MANAGEMENT, L.L.C.,

By: _____
    Name:
    Title:


_____
ELIZABETH KELLY


_____
MICHAELA KIRCHER

_____
CLIONA SOTIROPOULOS


[Signature Page to MIPA]

IN WITNESS WHEREOF, the parties hereto have duly executed this Membership Interests Purchase Agreement as of the date first above written.

NYNM ACQUISITION, LLC

By: _____
     Name: Paul Parmar
     Title:  Manager

NEW YORK NETWORK MANAGEMENT, L.L.C.,

By: _____
     Name:
     Title:

_____
ELIZABETH KELLY

_____
MICHAELA KIRCHER

_____
CLIONA SOTIROPOULOS

[Signature Page to MIPA]

## BUYER'S GUARANTY

Constellation Healthcare Technologies, Inc., a Delaware corporation, hereby irrevocably and unconditionally guarantees payment to the Selling Members of any and all obligations of the Buyer under this Agreement and each of the documents contemplated thereunder, subject to any and all rights and defenses that the Buyer has or may have hereafter under the terms of this Agreement. Constellation Healthcare Technologies, Inc., a Delaware corporation, hereby irrevocably and unconditionally guarantees Buyer's obligations in Section 6.10 of this Agreement.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC.

By: _Paul Parmar_

Name:

Title:

[Signature Page to Buyer's Guaranty to MIPA]

## ASSIGNMENT OF MEMBERSHIP INTEREST

FOR VALUE RECEIVED, the undersigned ("Assignor") hereby sells, assigns, transfers, grants and conveys unto NYNM ACQUISITION, LLC, all of Assignor's right, title and interest in NEW YORK NETWORK MANAGEMENT, L.L.C., a New York limited liability company (the "Company"), standing in her name on the books said Company, together with all of her rights, powers and obligations arising thereunder and does hereby irrevocably constitute and appoint the Secretary of the Company as attorney-in-fact to transfer said interest on the books of the Company with full power and substitution in the premises.

IN WITNESS WHEREOF, the undersigned has executed this instrument as of the 10th, day of March, 2017.

ELIZABETH KELLY

### ASSIGNMENT OF MEMBERSHIP INTEREST

FOR VALUE RECEIVED, the undersigned ("Assignor") hereby sells, assigns, transfers, grants and conveys unto NYNM ACQUISITION, LLC, all of Assignor's right, title and interest in NEW YORK NETWORK MANAGEMENT, L.L.C., a New York limited liability company (the "Company"), standing in her name on the books said Company, together with all of her rights, powers and obligations arising thereunder and does hereby irrevocably constitute and appoint the Secretary of the Company as attorney-in-fact to transfer said interest on the books of the Company with full power and substitution in the premises.

IN WITNESS WHEREOF, the undersigned has executed this instrument as of the 10th, day of March, 2017.

MICHAELA KIRCHER

## ASSIGNMENT OF MEMBERSHIP INTEREST

FOR VALUE RECEIVED, the undersigned ("Assignor") hereby sells, assigns, transfers, grants and conveys unto NYNM ACQUISITION, LLC, all of Assignor's right, title and interest in NEW YORK NETWORK MANAGEMENT, L.L.C., a New York limited liability company (the "Company"), standing in her name on the books said Company, together with all of her rights, powers and obligations arising thereunder and does hereby irrevocably constitute and appoint the Secretary of the Company as attorney-in-fact to transfer said interest on the books of the Company with full power and substitution in the premises.

IN WITNESS WHEREOF, the undersigned has executed this instrument as of the 10th, day of March, 2017.

CLIONA SOTIROPOULOS