# EXHIBIT 2

MEMBERSHIP INTERESTS PURCHASE AGREEMENT, dated as of March 10, 2017 (the "**Effective Date**") (herein, together with the Schedules and Exhibits attached hereto, referred to as this "**Agreement**"), is by and among Elizabeth Kelly, an individual residing at 12 Annfield Court, Staten Island, NY 10304 ("**Kelly**"), Michaela Kircher, an individual residing at 432 Temple Ave, Woodbury Heights, NJ 08097 ("**Kircher**"), and Cliona Sotiropoulos, an individual residing at 5203 Sandstone Court, Suffolk, VA 23435 ("**Sotiropoulos**;" each of Kelly, Kircher, and Sotiropoulos, are sometimes referred to individually as a "**Selling Member**" and collectively as the "**Selling Members**"), New York Network Management, L.L.C., a New York limited liability company ("**Company**") (each of the Selling Members and the Company are sometimes referred to individually as a "**Selling Party**" and collectively as the "**Selling Parties**"), Kelly, as the representative for the Selling Members (the "**Selling Member Representative**"), and NYNM Acquisition, LLC ("**Buyer;**" each of Buyer, the Company, the Selling Members, and the Selling Member Representative is sometimes referred to individually as a "**Party**" and collective as the "**Parties**"). Capitalized terms used in this Agreement without definition shall have the meanings ascribed to such terms in **Section 8.1**.

WITNESSETH:

WHEREAS, the Selling Members own all of the issued and outstanding membership interest of the Company (the "**Interests**"); and

WHEREAS, the Selling Members wish to sell, and Buyer wishes to purchase, the Interests upon the terms of this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations and warranties herein contained, and upon the terms and subject to the conditions hereinafter set forth, the Parties hereto hereby agree as follows:

ARTICLE 1

SALE AND PURCHASE OF INTERESTS

Section 1.1    Sale of Interests; Purchase Price.    On the Closing Date and subject to the terms and conditions set forth in this Agreement, the Selling Members will sell, assign, and transfer to Buyer, and Buyer will purchase and acquire, all of the Interests, free and clear of all Liens, for and in consideration of (A) (1) the sum of those amounts actually paid to one or more of the Selling Parties and Selling Member Representative (i) as Closing Payment, (ii) from the Escrow Fund, (iii) from the Second Escrow Fund, (iv) any Earn-Out payments, and (v) in respect of the adjustment of the Company Group's working capital in accordance with **Section 1.5**. plus (2) any amounts released from the Third Escrow Fund plus (3) any amounts released from the Second Escrow Fund to Persons other than the Selling Parties and the Selling Member Representative less (B) any Required Repayments paid in accordance with **Section 1.6** (collectively, the "**Purchase Price**").

Section 1.2    Closing Payment.    The Closing Payment shall be paid as follows:

Year 1 Earn-Out Formula (determined in an accordance with the following formula) less (ii) the Replacement Costs in Year 1:

| Year 1 Revenue | Year 1 Earn-Out Formula |
|---|---|
| more than $10,900,000 | (A) $6,930,000 plus (B) 50% of (i) 3.8 multiplied by (ii) amount by which Year 1 Revenue exceeds $10,900,000 |
| $10,900,000 | $6,930,000 |
| Less than $10,900,00 but more than $6,700,000 | 50% of (i) 2.8 multiplied by (ii) amount by which the Year 1 Revenue exceeds $6,700,000 |
| $6,700,000 or less | $0 |

   (b) <u>Year 2 Earn-Out</u>.  In addition to the Closing Payment the Selling Members shall receive an additional payment (a "**Year 2 Earn-Out Payment**") equal to (i) the Year 2 Earn-Out Formula (determined in an accordance with the following formula) less (ii) the Replacement Costs in Year 2:

| Year 2 Revenue | Year 2 Earn-Out Formula |
|---|---|
| more than New Baseline | (A) $6,930,000 plus (B) 50% of (i) 3.8 multiplied by (ii) amount by which Year 2 Revenue exceeds New Baseline |
| more than $10,900,000 but not more than New Baseline | $6,930,000 |
| $10,900,000 | $6,930,000 |
| Less than $10,900,000 but more than $6,700,000 | 50% of (i) 2.8 multiplied by (ii) amount by which the Year 2 Revenue exceeds $6,700,000 |
| $6,700,000 or less | $0 |

By way of an example, if the Year 1 Revenues and the Year 2 Revenues are both $10,900,000, then the Selling Members will receive the following:

   (i) a Year 1 Earn-Out Payment of $6,930,000

   (ii) a Year 2 Earn-Out Payment of <u>$6,930,000</u>

    total Earn-Out Payments of <u>$13,860,000</u>

    total payments of  $35,860,000

{00829079.DOCX;12 }

3

(d)    <u>Dispute Resolution</u>. In the event that the Selling Member Representative does not agree with the Year 1 Earn-Out Calculation or the Year 2 Earn-Out Calculation, the Selling Member Representative and the Buyer shall resolve their disputes in accordance with the procedures set forth in **Section 1.5(c)-(e)**, including the applicable time frames for notices, with appropriate adjustments to reflect the fact that the subject of the dispute is the subject of **Section 1.3(a)-(c)** and not **Section 1.5(a)-(b)**.

(e)    <u>Payment of Earn-Out Payments</u>. No later than three (3) Business Days following the determination of the final Year 1 Earn-Out Payment or Year 2 Earn-Out Payment, as applicable (whether because Selling Member Representative does not provide a timely Objection Notice or because of the final determination by the Independent Auditor), the Buyer and CHT shall deliver to the Selling Member Representative, or designee or assignee thereof, in immediately available funds by wire transfer to an account designated by the Selling Member Representative, or designee or assignee thereof, in writing to Buyer no later than three (3) Business Days before the date of such payment, the applicable Earn-Out Payment pursuant to the terms of this Agreement, and the Selling Member Representative shall distribute such payment amounts to the Selling Members in amounts as determined by the Selling Members; provided, however that if the shares of common stock of CHT ("**Shares**") are at such time traded on a national securities exchange, then, if the Selling Member Representative notifies Buyer at least three (3) Business Days before the date of such payment, Buyer shall pay up to 15% of such payment with Shares, with the Shares valued for such payment at the average closing price of such Shares during the ten trading days immediately prior to Buyer's receipt of such notice.

(f)    The Selling Members and the Selling Member Representative acknowledge and agree that after the Closing the Buyer shall be entitled to operate the Company Group in any manner that it determines, in its sole discretion, to be appropriate, subject only to its obligation of good faith. Notwithstanding the foregoing, the Buyer acknowledges that the ability of the Selling Members to earn the Earn-Out Payments is a material inducement to enter into this Agreement and consummate the transactions contemplated hereby and the Buyer and its Affiliates, as applicable, hereby agree to use commercially reasonable efforts to try to achieve results that would result in the making of an Earn-Out Payment. In furtherance of the foregoing, the Buyer agrees that at any time prior to the expiration of all deadlines to earn the related Earn-Out Payments (i) it will not knowingly take any action or fail to take any action with the intent to frustrate the achievement of an Earn-Out Payment, (ii) it will carry on the Company Group and the Business as a going concern and with a view to profit and shall not cause or permit the Company Group to (a) carry out any act or make any omission where the primary purpose is or would be to reduce or defer income or profits of the Company Group; or (b) enter into any agreement or arrangement other than on arms' length terms, (iii) it will not present a petition for or pass any resolution for the winding-up of the Company or any of its Subsidiaries, or (iv) appoint a receiver, administrative receiver or administrator over the whole or any part of the assets of the Company or any of its Subsidiaries. If the Buyer is in breach of any of these provisions and the Selling Member Representative has not consented in writing to such breach, then the Net Revenue for the relevant Earn-Out Year shall be adjusted as if the breach had not occurred for the purposes of ascertaining the Earn-Out Payments.

Section 1.4    Discharge of Debt and Liabilities; Maintenance of Working Capital.

{00829079.DOCX;12 }

5

less than the Closing Working Capital, then Buyer shall pay to the Selling Members an additional amount equal to the amount by which the Minimum Working Capital is less than the Closing Working Capital, which shall be paid to the Selling Member Representative by Buyer within three (3) Business Days of the final determination thereof by wire transfer of immediately available funds of the Company Group to an account designated by the Selling Member Representative, or designee or assignee thereof; provided, however, if the Company Group is unable to make such payments in full, Buyer shall fund the Company Group for such purpose, or shall make any shortfall payments directly to the Selling Member Representative, all of which shall be done within the aforesaid three (3) Business Days. "**Closing Working Capital**" shall mean, as of the Closing Date, and on a consolidated basis, the sum of cash and cash equivalents (including marketable securities and short term investments, but excluding accounts receivables of the Company Group set forth on **Schedule 1.5(f)**), expenses pre-paid by the Company Group (including, but not limited to insurance premiums and rents), amounts the Company Group deposited with suppliers, vendors and landlords, and unbilled fees for work completed (i) which is not set forth on **Schedule 1.5(f)** and (ii) that can be reasonably expected to be converted into cash within one year, less the sum of Payables, checks issued by the Company Group that have not been debited from the Company Group's bank account, amounts pre-paid to the Company Group, and amounts deposited with the Company Group, each as of the Closing, Payables received after the Closing for the period prior to the Closing and all outstanding Reimbursable Expenses that were incurred prior to the Closing regardless of whether they were submitted to the Company Group prior to the Closing.

(b)    <u>Delivery of Closing Balance Sheet and Closing Date Calculation</u>. No later than the sixtieth (60th) day following the Closing, Buyer shall prepare and deliver to the Selling Member Representative, (i) a consolidated balance sheet of the Company Group as of the Effective Date, prepared in a manner consistent with the Financial Statements (the "**Closing Balance Sheet**"), and (ii) a written calculation of the Closing Working Capital (the "**Closing Date Calculation**"), as determined by reference to the relevant provisions of this Agreement and, as applicable, the Closing Balance Sheet.

(c)    <u>Objection Notices</u>. On or prior to the 60th day after the Selling Member Representative's receipt of the Closing Date Calculation and the Closing Balance Sheet, the Selling Member Representative may give Buyer a written notice stating in reasonable detail the Selling Member Representative's objections (an "**Objection Notice**") to the Closing Date Calculation and/or the Closing Balance Sheet. Buyer shall permit the Selling Member Representative and its representatives to have reasonable access to the books, records and other documents (including work papers) pertaining to or used in connection with preparation of the Closing Date Calculation and the Closing Balance Sheet. Any determination expressly set forth in the Closing Date Calculation or on the Closing Balance Sheet which is not objected to in an Objection Notice shall be deemed final and binding upon the Selling Member Representative upon delivery of such Objection Notice, unless same is affected by a disputed portion of such determination. Except to the extent the Selling Member Representative makes an objection to a determination set forth in the Closing Date Calculation or on the Closing Balance Sheet pursuant to an Objection Notice delivered to Buyer within such 60-day period, the Closing Date Calculation and Closing Balance Sheet will be deemed conclusive and binding upon the Parties.

the Selling Member Representative and Buyer shall mutually agree on how to handle the Closing Accounts Receivables of current clients and no litigation shall be commenced with respect to such Closing Accounts Receivables without such mutual agreement. On or before the fifteenth 15th day following each of the first three quarterly anniversaries of the Closing Date (or the first Business Day thereafter), the Buyer shall cause the Company Group to submit a report to the Selling Member Representative outlining all of the monies received by the Company Group related to the Closing Accounts Receivable in such immediately preceding quarterly period, together with all statements and supporting documentation related thereto. Selling Member Representative shall promptly review such report and notify the Buyer if it is in agreement and if Selling Member Representative is in agreement, Buyer shall pay, in immediately available funds by wire transfer to an account designated by the Selling Member Representative such monies set forth in the report. Any time during which Kelly is an employee of the Company Group, Kelly shall be responsible for preparing the report on behalf of the Company Group and deliver it to the Buyer for its review (in which case Buyer shall promptly review such report and notify the Selling Member Representative if it is in agreement and if Buyer is in agreement, Buyer shall pay, in immediately available funds by wire transfer to an account designated by the Selling Member Representative such monies set forth in the report). In the event the Selling Member Representative or the Buyer, as applicable, disputes the amounts and calculations set forth in the Company Group's report(s), the Selling Member Representative and the Buyer shall resolve their disputes in good faith promptly and in any case within thirty (30) days from the Buyer's receipt or the Selling Member Representative's receipt, as applicable, of the report in accordance with the procedures set forth in **Section 1.5(c)-(e)** (with appropriate adjustments to reflect the fact that the subject of the dispute is the subject of **Section 1.5(f)** and not **Section 1.5(a)-(b)**) and jointly determine the amount of the monies that were received in such quarterly period related to the Closing Accounts Receivable and thereafter Buyer shall pay such amount in immediately available funds by wire transfer to such account. .

(i)     Buyer shall cause the Company Group to, and the Company Group shall, use commercially reasonable good faith efforts to collect the Closing Accounts Receivable.

Section 1.6    Required Repayments.

(a)    General. If any medical provider with whom any member of the Company Group has entered into a Contract (a "**Provider**") made false or incorrect reports to any member of the Company Group during the period prior to the Closing (each, a "**False Report**") in connection with which a member of the Company Group submitted a claim for payment to a Commercial Healthcare Plan on behalf of such Provider (an "**Inaccurate Submission**"), then if such Provider received a payment on account of such Inaccurate Submission (the "**Excessive Payment to a Provider**") and such Provider is obligated to refund any monies or grant a credit to such Commercial Healthcare Plan because of the Excessive Payment to a Provider, the amount the Provider is obligated to refund or for which Provider is obligated to grant a credit, in each case to the applicable Commercial Healthcare Plan, is referred to in this Agreement as a "**Refundable Payment by a Provider**" and the amount that the Commercial Healthcare Plan paid to the Company Group (and not paid or transferred to a Provider) in connection with the Inaccurate Submission that has resulted in a Refundable Payment by a Provider which the Company Group has refunded to the Commercial Healthcare

ARTICLE 2

CLOSING

Section 2.1    <u>Closing.</u>  The closing of the transactions provided for herein (the "**Closing**") will take place on the date hereof at the offices of the Buyer's counsel at the address set forth in **Section 9.2** hereof (the "**Closing Date**") and be effective as of the March 1, 2017. Except as otherwise provided herein, all proceedings to be taken and all documents to be executed and delivered by the Parties at the Closing shall be deemed to have been taken, executed and delivered simultaneously and no proceedings shall be deemed taken nor any documents executed or delivered until all all have been taken, executed and delivered.  Closing shall be deemed effective as of 12:01 A.M. on the Effective Date.  Notwithstanding the foregoing (i) the Selling Parties may deliver any or all of the Seller Documents required hereunder to Buyer's counsel on or before the Closing Date (to hold and deliver in escrow according to the Selling Member Representative's written instructions), and (ii) Buyer may deliver any or all of the Buyer Documents required hereunder to the Company's counsel on or before the Closing Date (to hold and deliver in escrow according to the Buyer's written instructions).

Section 2.2    <u>Closing Deliverables.</u>

(a)    At the Closing, the Selling Parties will deliver to Buyer:

(i)    Employment Agreement, duly executed by Kelly in the form attached hereto as **Exhibit 2.2(a)(i)** and the Consulting Agreement, duly executed by Kelly in the form attached hereto as **Exhibit 2.2(a)(i)(1)** (collectively, the "**Kelly Employment Agreement**");

(ii)    a certificate of good standing of each of the members of the Company Group certified as of a then recent date by the New York Secretary of State and each other jurisdiction where the operation of the Business requires such member of the Company Group to be qualified to do business the failure of which would have a Material Adverse Effect;

(iii)    pay-off letter(s) in form and substance reasonably satisfactory to Buyer evidencing the amount required to discharge at Closing all Indebtedness and accomplish the release of all Liens related thereto;

(iv)    a general release releasing each member of the Company Group executed by the Selling Members in form and substance as **Exhibit 2.2.(a)(iv)**;

(v)    the limited liability company or corporate records of each member of the Company Group regarding member, manager, shareholder or director meetings, if any;

(vi)    a list of all checks issued by any member of the Company Group that have not been debited from the Company Group's bank accounts prior to the Closing;

(v)    deliver to the Selling Member Representative the Escrow Agreement duly executed by Buyer;

(vi)    deliver a copy of the Kelly Employment Agreement signed by the Company to Kelly;

(vii)    deliver to the Selling Member Representative such other instruments and documents, in form and substance reasonably acceptable to the Selling Member Representative, as the Selling Member Representative and its counsel may reasonably request;

(viii)    deliver to the Selling Member Representative a certificate of good standing of Buyer certified as of a then recent date by the Secretary of State of the jurisdiction of such entity's formation;

(ix)    deliver to the Selling Member Representative copies of the resolutions duly adopted by the manager of the Buyer authorizing the execution, delivery and performance of this Agreement and each of the other Buyer Documents executed by the Buyer and the consummation of all transactions described in this Agreement and thereby; and

(x)    deliver to the Selling Member Representative a certificate of the secretary or other appropriate officer of the Buyer certifying as to the incumbency of the officer(s) of the Buyer executing this Agreement and the other Buyer Documents, including specimen signatures.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANY GROUP

Each Selling Member hereby represents and warrants to the Buyer as follows.

Section 3.1    Organization; Authority; Due Execution.

(a)    The Company is a limited liability company duly organized, subsisting and in good standing under the laws of the State of New York and has all requisite limited liability company power and authority to own, lease and operate its properties and assets, and to carry on the Business as presently conducted as and in the places such properties are now owned, leased or operated and is qualified to do business and is in good standing as a foreign limited liability company in each jurisdiction where the ownership or operation of its properties or conduct of its business requires such qualification except where the failure to be so qualified or in good standing would not have a Material Adverse Effect. Selling Member Representative has provided, or caused to be provided, to Buyer a true and correct copy of its articles of organization and operating agreement as amended to date. Such articles of organization and operating agreement so delivered are in full force and effect. **Schedule 3.1(a)** hereto contains a true and correct list of each jurisdiction where the Company is qualified or licensed to do business. Selling Member Representative has provided, or caused to be provided, to Buyer true and correct copies of the minutes, if any, of all meetings of the members of the Company, the manager(s) of the Company and the committees thereof. The Books and Records contain true and correct, in all material respects, summaries of all actions taken at any member meetings,

{00829079.DOCX;12 }

13

(b)     Assuming all Consents listed on **Schedule 3.3(a)** are obtained, except as set forth on **Schedule 3.3(b)** hereto, the execution, delivery and performance of this Agreement and the other Seller Documents by any Selling Party does not, and the consummation of the transactions described in this Agreement and thereby will not, constitute or result in (i) with or without the giving of notice or the passage of time, or both, a breach or violation of, or a default under, the certificate of incorporation, bylaws, articles of organization or operating agreement or other governing documents of any member of the Company Group, (ii) with or without the giving of notice or the passage of time, or both, a breach of, or violation of or a conflict with, or a default under, or the termination of, or the acceleration under, any Material Contract, debt, obligation, governmental or non-governmental permit or license to which one or more members of the Company Group is a party or to or by which any member of the Company Group or any of the Business is subject or bound, the result of which will have a Material Adverse Effect, (iii) the creation or imposition of any Lien upon the Business, one or more members of the Company Group or any of the Interests that will not be discharged at the Closing, or (iv) the violation of any Law, order, judgment, decree or award of any court, Governmental Entity or arbitrator to or by which a Selling Party or the Business is subject or bound the result of which will have a Material Adverse Effect.

Section 3.4    Indebtedness.  Except as set forth on **Schedule 3.4**, no member of the Company Group has any outstanding Indebtedness or is a party to any Material Contract providing for the creation, incurrence or assumption thereof.

Section 3.5    Capitalization.

(a)     As of the date hereof the Company has not issued any units and, except as set forth on **Schedule 3.5**, all of the membership interests in the Company are owned by Kelly, Kircher, and Sotiropoulos, which interests are set forth on **Schedule 3.5**. As of the date hereof all of the equity interests in the Company's Subsidiaries are owned by the Company.

(b)     No member of the Company Group has any (i) issued or outstanding subscription, warrant, option, convertible security or other right (contingent or otherwise) to purchase or acquire any interest, (ii) obligation (contingent or otherwise) to issue any subscription, warrant, option, convertible security or other such right, or to issue or distribute to holders of any equity interest of such member of the Company Group any evidences of indebtedness or assets of such member of the Company Group, or (iii) obligation (contingent or otherwise) to purchase, redeem or otherwise acquire any equity interest or to pay any distribution or to make any other distribution in respect thereof.

(c)     There is no agreement, written or oral, between or among any member of the Company Group and any holder(s) of securities of such member of the Company Group, relating to the sale or transfer (including agreements relating to rights of first refusal, co-sale rights or "drag along" rights), registration under the Securities Act of 1933, as amended, or voting of the interests of such member of the Company Group.

Section 3.6    Litigation.  The Order in the form annexed hereto on Schedule 3.6 has not been amended or modified.  Except as set forth in **Schedule 3.6** hereto, there is no pending civil, criminal or administrative suit, action, proceeding, or to the Selling Parties'

Leases, there are no other agreements or arrangements whatsoever relating to the use or occupancy by any member of the Company Group of any of the Company Leased Property. No member of the Company Group has transferred, mortgaged or assigned any interest in any of the Company Leases. To the Selling Parties' Knowledge, (i) there is no pending or threatened condemnation or similar Proceeding affecting any Company Leased Property or any portion thereof, (ii) each Company Leased Property is supplied with utilities and other services sufficient to operate the Business conducted at such Company Leased Property, and (iii) no member of the Company Group has received written notice from any Governmental Entity that the operations of any member of the Company Group or the Business on the Company Leased Property, or the Company Leased Property, violate in any material manner any applicable building code, zoning requirement, or classification or statute relating to the particular property or such operations. The Company Leased Property is, to the Selling Parties' Knowledge, in reasonably good operating condition and repair and has been used in the Ordinary Course of the Business at the Company Leased Property.

Section 3.9    Customer List.    No member of the Company Group and no other Person (other than Charles "Chuck" Scott and Kevin Kelly), has sold, assigned, leased or licensed or transferred to any Person any list of past, present or prospective customers, suppliers or licensees of the Business. No Person (other than members of the Company Group) is entitled to use any such list.

Section 3.10    Tax Matters.

(a)    Each member of the Company Group has timely filed all Tax Returns required to be filed by such member of the Company Group in the manner provided by Law.  All such Tax Returns are true; correct and complete in all material respects. Each member of the Company Group has timely paid all Taxes due, whether or not shown as being due on any Tax Returns.  All Taxes that any member of the Company Group is or was required by Law to collect or withhold have been duly withheld or collected, and, to the extent required by Law, paid to the proper Tax authority. Except as has been disclosed on **Schedule 3.10(a)** hereto:

(i)    No claim for unpaid Taxes has become a Lien of any kind against the property of any member of the Company Group or is being asserted against any member of the Company Group, except for Liens for Taxes not yet due.

(ii)    No audit, examination, investigation, deficiency or refund litigation or other Proceeding in respect of Taxes of any member of the Company Group is pending (or to the Selling Parties' Knowledge, threatened or being conducted by a Tax authority), and neither any member of the Company Group nor any Selling Member has received written notice of the commencement of any audit, examination, deficiency litigation or other Proceeding with respect to any such Taxes.

(iii)    No material issues have been raised in any written notice received by any member of the Company Group or any Selling Member from any Tax authority in connection with the examination of any of the Tax Returns filed by any member of the Company Group after January 1, 2011.

{00829079.DOCX;12 }

adjustment under either Section 481(a) or 482 of the Code (or an analogous provision of state, local or foreign law) by reason of a change in accounting method or otherwise for any period ending on or prior to the Effective Date; (B) "closing agreement" as described in Code section 7121 (or any corresponding or similar provision of state, local or foreign income Tax law) executed on or prior to the Effective Date; (C) intercompany transaction or excess loss account described in Treasury Regulations under Code Section 1502 (or any corresponding or similar provision of state, local or foreign income Tax law) existing on or prior to the Closing Date; (D) installment sale or open transaction disposition made on or prior to the Effective Date; or (E) prepaid amount received on or prior to the Effective Date.

(xiii)    Other than as a result of the transactions contemplated by this Agreement, the net operating losses, if any, of the members of the Company Group are not limited under Section 382 of the Code and any excess credits, net capital losses, and foreign tax credits of the members of the Company Group are not limited under Section 383 of the Code.

(xiv)    No claim has ever been made by an authority in a jurisdiction where a member of the Company Group does not file Tax Returns that such member of the Company Group is or may be subject to taxation by that jurisdiction.

(xv)    All "non-qualified deferred compensation plans" (as such term is defined under section 409A(d)(1) of the Code and the guidance issued thereunder) of a member of the Company Group under which such member of the Company Group makes, is obligated to make or promises to make any payments or other awards (each, a "**409A Plan**") (A) meet and have met the requirements of Code Sections 409A(a)(2), (3), and (4) of the Code, and (B) are, and at all times were, operated in accordance with such requirements, are operated in good faith compliance with the transitional relief and all guidance and regulations provided by the Internal Revenue Service under section 409A of the Code, and (C) no 409A Plan has been funded by an off-shore arrangement described in Section 409A(b)(1) of the Code.

(xvi)    No member of the Company Group owns any interest in any entity that is treated as a "disregarded entity" for federal tax purposes.

(xvii)    No member of the Company Group has distributed stock of another entity, or had its equity distributed by another entity, in a transaction that was purported or intended to be governed, in whole or in part, by Section 355 or 361 of the Code.

(xviii)    The Selling Parties have delivered or made available to Buyer true and correct copies of all income and other material Tax Returns including the K-1 statements which any member of the Company Group has distributed to its Members, examination reports, and statements of deficiencies filed by, assessed against, or agreed to by any member of the Company Group since January 1, 2015.

(xix)    The Company is currently taxed as a "partnership" for federal income tax purposes.  The Company has never elected to be treated as an association taxable as a corporation pursuant to Treasury Regulation Section 301.7701-3(c) or otherwise.

severance, exit, change of control, compensation, medical, health or other welfare plan, agreement, policy or arrangement that covers or covered employees, directors, managers, former employees, former directors or former managers of any member of the Company Group (the "**Compensation and Benefit Plans**") has been provided to Buyer prior to the Closing Date. For each Compensation and Benefit Plan, copies of the following documents (to the extent applicable) have also been provided to Buyer prior to the Closing Date: (i) any amendments since the last restatement of such plan; (ii) any trust agreement or other funding agreement; (iii) the most recent Form 5500 annual report, including all attachments; (iv) the most recent annual actuarial valuation report; and (v) the most recent IRS determination letter, and any outstanding request for such a letter. The Compensation and Benefit Plans existing as of the Effective Date are listed on **Schedule 3.12(a)** hereto.

(b)    All of the Compensation and Benefit Plans are in compliance in all material respects with all applicable Laws including but not limited to the Code, the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), the Health Insurance Portability and Accountability Act of 1996, as amended by P.L. 111-5 Division A ("**HIPAA**"), and the Family and Medical Leave Act. Each Compensation and Benefit Plan that is an "employee pension benefit plan" within the meaning of Section 3(2) of ERISA (a "**Pension Plan**"), that is intended to be qualified under Section 401(a) of the Code and is not a standardized prototype plan has received a favorable determination letter from the IRS, has applied for such letter in a timely fashion, or has a remaining period of time within which to apply for such a letter, and no member of the Company Group is aware of any circumstances likely to result in revocation of any such favorable determination letter, the refusal to issue such a favorable determination letter or any material costs under the IRS's Employee Plans Compliance Resolution System. There are no pending or, to the Selling Parties' Knowledge, threatened claims or litigation relating to any of the Compensation and Benefit Plans. No member of the Company Group has engaged in a transaction with respect to any Compensation and Benefit Plan that, assuming the taxable period of such transaction expired as of the Closing Date, would subject it to fiduciary liability payment of additional benefits or a material tax or penalty imposed pursuant to either Section 4975 of the Code or Section 502 of ERISA.

(c)    As of the Closing Date, except as set forth on **Schedule 3.12(c)** hereto, no member of the Company Group maintains or contributes to an employee pension benefit plan subject to Title IV of ERISA or Section 412 of the Code.

(d)    Except as set forth on **Schedule 3.12(d)** hereto, no member of the Company Group has any obligations for retiree health and life benefits under any Compensation and Benefit Plan. Each member of the Company Group may amend or terminate any such plan under the terms of such plan at any time without incurring any material liability thereunder. Except as set forth on **Schedule 3.12(d)** hereto, no member of the Company Group has any obligation to provide group continuation coverage to former employees or their dependents as required by Section 600 et seq. of ERISA and Section 4980B of the Code.

(e)    Except as set forth on **Schedule 3.12(e)** hereto, neither the execution of this Agreement by the Company or the Selling Members nor the consummation of the transactions contemplated by this Agreement will (i) entitle any employees of any member of the Company Group to severance pay, (ii) accelerate the time of payment or vesting or trigger

{00829079.DOCX;12 }

(ii)    No member of the Company Group has licensed Software or granted other rights in to use or practice any rights under any Owned Intellectual Property.

(iii)    No Person has received from any member of the Company Group, or has the right to use, any Owned Intellectual Property.

(iv)    Except as set forth on **Schedule 3.13(b)(iv)** hereto, there is no outstanding or, to the Selling Parties' Knowledge, threatened dispute or disagreement with respect to any License Agreement. Except as set forth in **Schedule 3.13(b)(iv)** hereto, no member of the Company Group is in breach of, or has failed to perform under, any of the License Agreements.

(c)    Ownership; Sufficiency of Intellectual Property Assets.  Members of the Company Group own or possess adequate licenses or other rights to use and practice, free and clear of all Liens (other than Permitted Liens), rights, claims, conditions, restrictions, limitations and interests of any Governmental Entity, orders and arbitration awards, and without payment of any kind to any Person, all of the Owned Intellectual Property.  No member of the Company Group is engaged in the wrongful use of any confidential information or trade secrets or patentable inventions of any current or former employee or consultant of any member of the Company Group or any other person, firm or entity and to Selling Parties' Knowledge no such employee, consultant, person, firm or entity, has alleged that any member of the Company Group is engaged in such wrongful use or that members of the Company do not own the Owned Intellectual Property.  Except as set forth in **Schedule 3.13(c)** hereto, the Owned Intellectual Property identified in **Schedule 3.13(a)** hereto, together with the unregistered copyrights of members of the Company Group, if any, and rights under the licenses granted to members of the Company Group under the License Agreements, if any, constitute all the material Intellectual Property rights used in the operation of the Business, other than "shrink wrap" software licenses, and, to the Selling Parties' Knowledge, are all the Intellectual Property rights necessary to operate the Business after the Effective Date in the same manner as the Business has been operated by the members of the Company Group.

(d)    No Infringement. To Selling Parties' Knowledge, none of the products or services manufactured, distributed, marketed, sold, licensed or performed by any member of the Company Group, nor any of the Owned Intellectual Property used in the conduct of the Business, infringe upon, violate or constitute the unauthorized use of any rights owned or controlled by any Person, including any Intellectual Property or proprietary rights (including, without limitation, patents, design patents, Trademarks, common law marks, domain names, trade dress, industrial property and copyrights) of any Person.

(e)    No Pending or Threatened Infringement Claims. Except as set forth on **Schedule 3.13(e)** hereto, there is no pending litigation and no written notice or other claim has been received by any member of the Company Group (i) alleging that any member of the Company Group has engaged in any activity or conduct that infringes upon, violates or constitutes the unauthorized use of any of the Intellectual Property or proprietary rights of any Person, or (ii) challenging the ownership, use, validity or enforceability of any Owned Intellectual Property, or the Intellectual Property exclusively licensed by or to any member of the Company Group. No member of the Company Group has received any writing requesting,

Statements present fairly the consolidated financial position of the Company and its Subsidiaries as of the dates indicated and present fairly, in all material respects, the consolidated financial condition of the Company and its Subsidiaries for the periods then ended.  The Interim Financial Statement and the Additional Interim Financial Statement have been prepared in all material respects on a basis consistent with the Annual Financial Statements, except that the Interim Financial Statement and the Additional Interim Financial Statement do not contain notes and other presentation items required by GAAP, may be subject to normal audit or year-end adjustments and have not been audited, reviewed, compiled, or otherwise tested by the Company's independent auditor.  The balance sheet included in the Interim Financial Statement and the Additional Interim Financial Statement presents fairly, in all material respects, the financial condition of the Business as at the end of the one-month period ended January 31, 2017 and the one-month period ended February 28, 2017, respectively.  The statement of income and retained earnings included in the Interim Financial Statement and the Additional Interim Financial Statement present fairly in all material respects the results of operations of the Business for the one-month period ended January 31, 2017 and the one-month period ended February 28, 2017.

(b)     Accounts Receivable. Except as indicated on **Schedule 3.14(b)**, all accounts receivable of the members of the Company Group are reflected properly on the Books and Records, represent bona fide, current and valid obligations arising from sales actually made or services actually performed in the Ordinary Course of Business. Such accounts receivable are not subject to any material setoffs or counterclaims, are current and collectible within nine (9) months from the invoice relating to the applicable account receivable, and will be collected within such period in accordance with their terms at their recorded amounts, subject only to the allowance for doubtful accounts set forth in the Balance Sheet included in the most recent Interim Financial Statement as adjusted for the passage of time through the Closing Date consistent with the past custom and practice of the members of the Company Group.  Except as set forth therein or in **Schedule 3.14(b)** hereto, no member of the Company Group has received written notice from any obligor of any material accounts receivable that such obligor is refusing to pay or contesting payment of which has not been resolved prior to the Closing Date, other than in the Ordinary Course of Business under any Contract with any obligor of any accounts receivable.

Section 3.15    Absence of Certain Changes.

(a)     Except as set forth on **Schedule 3.15(a)** hereto, since January 1, 2017, (x) each member of the Company Group has conducted the Business only in, and has not engaged in any transaction other than according to, the Ordinary Course of Business, (y) no member of the Company Group has entered into any Contracts that are materially less favorable to any member of the Company Group than Contracts entered into in the Ordinary Course of Business, and (z) there has not occurred:

(i)     any Material Adverse Effect;

(ii)    any damage, destruction or other casualty loss with respect to any material asset or property owned, leased or otherwise used by any member of the Company Group, whether or not covered by insurance;

pension or severance or vacation pay, to any employee, consultant, salesman, representative or agent of any member of the Company Group;

        (vii)    instituted, settled or agreed to settle any litigation, action or Proceeding before any Governmental Entity;

        (viii)    received any written notice or other information from any member, distributor, salesman, representative, vendor, supplier, customer or group of customers, that it (they) intend(s) to cease doing business with one or more members of the Company Group, including, without limitation, any written notices of material change in revenues, costs or method of distribution;

        (ix)    made any purchase commitments materially in excess of the normal, ordinary and usual requirements of the Business or at any price materially in excess of the current market price or upon terms and conditions more onerous than those that are usual and customary in the trade or made any change in its selling, pricing, advertising or personnel practices inconsistent with its prior or prudent business practices;

        (x)    taken any action to accelerate any payment of or taken any action to adversely change the terms of, any accounts receivable of any member of the Company Group nor delay the payment of, or taken any action to adversely change the terms of the accounts payable of any member of the Company Group;

        (xi)    entered into any transaction, contract or commitment other than in the Ordinary Course of Business, or paid or agreed to pay any brokerage, finder's fee, or other compensation in connection with, or incurred any severance pay obligation by reason of, this Agreement or the transactions contemplated hereby;

        (xii)    amended any Compensation and Benefit Plans; or

        (xiii)    entered into any agreement or made any commitment to take any of the types of actions described in any of clauses (i) through (xii) of this **Section 3.15(b)**.

        Section 3.16    <u>Bank Accounts.</u>  **Schedule 3.16** hereto sets forth a list of all bank and savings accounts, securities accounts, certificates of deposit and safe deposit boxes of the members of the Company Group and those persons authorized to sign thereon as of the date of this Agreement.

        Section 3.17    <u>Compliance with Law.</u>

        (a)    Except as set forth in **Schedule 3.17(a)** hereto, since January 1, 2013, the Business has not been, and is not being, conducted in violation of any law, ordinance, regulation, treaty, judgment, order (whether temporary, preliminary or permanent), decree, arbitration award, license or permit of any Governmental Entity (each a "**Law**" and collectively, "**Laws**"), except for violations or possible violations that, individually or in the aggregate, are not material or are not reasonably likely to prevent, materially delay, materially burden or materially impair the Selling Parties' ability to consummate the transactions described in this

{00829079.DOCX;12 }

the Company Group has any liability under any Environmental Law for any Hazardous Substance disposal or contamination on any property owned or operated by any other Person; (v) no member of the Company Group is in violation of or has any liability under any Environmental Law for any release or threat of release of any Hazardous Substance; (vi) no member of the Company Group has received any written notice, demand, letter, claim or request for information alleging that it may be in violation of or liable under any Environmental Law; (vii) no member of the Company Group is subject to any orders, decrees, injunctions or other arrangements with any Governmental Entity or an indemnitor of any third party indemnitee for any liability under any Environmental Law or relating to Hazardous Substances; (viii) to the Selling Parties' Knowledge, there are no circumstances or conditions involving any member of the Company Group that could reasonably be expected to result in any material claims, liability, investigations, costs or restrictions on the ownership, use, or transfer of any of its property pursuant to any Environmental Law; (ix) to the Selling Parties' Knowledge, none of the Company Leased Properties contains any underground storage tanks, asbestos-containing material, lead-based paint, or polychlorinated biphenyls in violation of any Environmental Law or that would reasonably be expected to result in liability to any member of the Company Group under any Environmental Law; and (x) no member of the Company Group has engaged in any activities involving the generation, use, handling or disposal of any Hazardous Substances in violation of any Environmental Law or that would reasonably be expected to result in any material liability under any Environmental Law. Except as disclosed in **Schedule 3.18** hereto, there have been no environmental investigations, studies, audits, tests, reviews or other analyses conducted by or for one or more members of the Company Group, or, to the Selling Parties' Knowledge, by someone other than members of the Company Group, relating to any property or facility now or previously owned or leased by one or more members of the Company Group that have not been delivered to Buyer.

Section 3.19    Contracts and Commitments.

(a)    **Schedule 3.19(a)** hereto contains a true and correct list of all of the following current Contracts and documents to which any member of the Company Group is bound or which pertain to any of the Business (together with all other Contracts required to be listed on a Schedule to this Agreement and/or delivered or made available to Buyer, the "**Material Contracts**"):

(i)    service, management, consulting or similar types of Contracts involving receipts by any member of the Company Group in excess of $25,000 in any 12-month period during term of any such Contract;

(ii)    sale, maintenance, supply, purchase, distribution, dealer, and distributor Contracts involving receipts in excess of $25,000 in any 12-month period during term of any such Contract;

(iii)    sale, maintenance, supply, purchase, distribution, dealer, and distributor Contracts involving payments in excess of $25,000 in any 12-month period during term of any such Contract;

(xiii)    Contracts regarding the release, transportation or disposal of Hazardous Substances, or the clean-up, abatement or other action relating to Hazardous Substances or Environmental Laws;

(xiv)    Contracts establishing or creating any partnership, joint venture, limited liability company, limited liability partnership or similar entity;

(xv)    Contracts to make any capital expenditures or capital additions or improvements with commitments in excess of $10,000 in any twelve-month period after the Closing Date or in excess of $50,000 in the aggregate over the term of any such Contract;

(xvi)    Contracts relating to the storage or warehousing of any inventory or products of any member of the Company Group, or relating to the charter or purchase of transportation or shipping services;

(xvii)   guarantees or other Contracts in respect of any Indebtedness of any Person other than with respect to the deposit of third party checks;

(xviii) Contracts providing for the indemnification by a member of the Company Group of any current or former director, officer or employee of any member of the Company Group (other than such provisions as are set forth in the Certificate of Incorporation, Articles of Organization, operating agreement or similar charter documents of a member of the Company Group);

(xix)   any agreements, arrangements or commitments by or relating to any member of the Company Group under which any member of the Company Group indemnifies any other Person or is required to carry insurance for the benefit of any other Person (other than credit agreements, leases, supply agreements and other Contracts otherwise scheduled as Material Contracts);

(xx)    all other Contracts, commitments and purchase orders (other than short-term purchase orders for supplies and services and sales orders of inventory, for cash), in each case: other than those (A) made in the Ordinary Course of Business on customary terms and conditions and consistent with past practices, and (B) involving payments or receipts by members of the Company Group of less than $25,000 in any single case or series of related orders; and

(xxi)   any other Contracts to which any member of the Company Group is a party or by which it or any of the Business is bound that is material to the Business or the Company and the Subsidiaries.

(b)    Each Material Contract is a valid and binding obligation of one or more members of the Company Group, in full force and effect and enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general principles of equity.

{00829079.DOCX;12 }

Group, or any member of the immediate family of any such Affiliate, owns more than 10% of the voting equity of such Person. All such transactions were entered into in the Ordinary Course of Business and on terms and conditions that are no less favorable to the members of the Company Group than would be obtained in a comparable arm's length transaction with a Person that is not an Affiliate of any member of the Company Group.

(b)     Except as set forth in **Schedule 3.21(b)** hereto, no member, employee, officer, director or agent of any member of the Company Group has any interest in any property, real or personal, tangible or intangible, used in or pertaining to the Business.

Section 3.22    Distributors, Suppliers and Customers.

(a)     Set forth in **Schedule 3.22(a)** hereto is a list of names and addresses of the ten (10) largest suppliers (measured by dollar volume of purchases) of the members of the Company Group and the percentage of the business which each such supplier represented during the twelve (12) month periods ended December 31, 2015 and December 31, 2016. Set forth in **Schedule 3.22(a)** hereto is a list of names and addresses of the ten (10) largest customers (measured by dollar volume of purchases) and all other customers that accounted for more than $50,000 in revenue of one or more members of the Company Group and the percentage of the business which each such customer represented during the twelve (12) month periods ended December 31, 2015 and December 31, 2016. Except as set forth on **Schedule 3.22 (a),** no Selling Party and no Subsidiary of the Company has received any written notice, and to the Selling Parties' Knowledge, there is no reason to believe that (u) any customer has expressed any concern about the  performance by any member of the Company Group of its services or the cost of such services, (v) any customer has ceased, or will cease (either before or after the Closing), to use the products or services of the members of the Company Group, (w) any customer has materially reduced or will materially reduce (either before or after the Closing) the use of products or services of members of the Company Group, (x) any customer intends or is considering reevaluating the use of the products or services of members of the Company Group, either before or after the Closing, (y) any member of the Company Group is at risk of any of its customers not renewing its agreement or arrangement with such member of the Company Group, or reducing the services or products it obtains from members of the Company Group, on account of performance, prices or otherwise or (z) any member of the Company Group is not performing all of its contractual obligations to each of its customers as required and in accordance with such the applicable Contract.  To the Selling Parties' Knowledge, no unfilled customer order or commitment obligating any member of the Company Group to perform services will result in a loss to any member of the Company Group upon completion of performance.

(b)     To Selling Parties' Knowledge, the relationships of the members of the Company Group with their distributors, suppliers, customers, and licensors or sublicensors of rights with respect to Intellectual Property are reasonably good commercial working relationships.

Section 3.23    Products Liability and Warranty Liability.  Except as set forth in **Schedule 3.23** hereto, no member of the Company Group provides any product warranties with respect to the products or services sold by any member of the Company Group. Except as set forth in **Schedule 3.23** hereto, no member of the Company Group has received any written

{00829079.DOCX;12 }

33

(c)     Except as set forth on **Schedule 3.26(c)**, to the Selling Parties' Knowledge, each member of the Company Group has in all material respects, to the extent applicable, billed and filed claims on behalf of customers in accordance with the terms of the applicable agreements with Healthcare Programs, including, where applicable, billing and collection of all deductibles and co-payments. All claims that have been filed by any member of the Company Group, to the extent coded by a member of the Company Group were properly coded, were filed in compliance with all Healthcare Program requirements and, to the Selling Parties' Knowledge, are for services actually rendered. To the extent that any member of the Company Group provides coding for health care providers, such member of the Company Group engages coders who are properly trained, conducts on-going supervision of coders to ensure that coding is accurate, and requires retraining or dismissal of coders who do not meet accuracy requirements.

(d)     Except, as set forth on **Schedule 3.26(d)** except for routine audits in the Ordinary Course of Business consistent with past practices, no audit or, to the Selling Parties' Knowledge, investigation relating to claims submission and collection provided by any member of the Company Group has been conducted by any Governmental Entity with respect to any member of the Company Group in connection with any Government Healthcare Program, including, but not limited to, the DOJ, OIG, any MAC, RAC, ZPIC, or by any Commercial Healthcare Program and, to the Selling Parties' Knowledge, no such audit or, to the Selling Parties' Knowledge, investigation is scheduled, pending or threatened against or affecting any member of the Company Group.

(e)     In each case where any member of the Company Group pays a commission for sales, successful marketing or similar activities, the individual who receives the commission is a bona fide W-2 employee of such member of the Company Group.

(f)     No member of the Company Group is a party to an individual integrity agreement, corporate integrity agreement, deferred prosecution agreement, settlement agreement, or other formal or informal agreement with any Governmental Entity concerning compliance with Healthcare Laws.

(g)     No member of the Company Group: (i) has been charged with or convicted of any criminal offense relating to the delivery of an item or service in connection with any Healthcare Program; (ii) is or ever was excluded from participation in any Government Healthcare Program and, to the Selling Parties' Knowledge, no member of the Company Group is threatened with exclusion; (iii) has had a civil monetary penalty assessed against it under the Civil Monetary Penalty Law or its regulations; or (iv) is currently listed on the General Services Administration System for Award Management as ineligible, restricted, excluded or debarred from federal procurement programs and non-procurement programs.

(h)     At no time has any member of the Company Group engaged in any activity that is in violation of, or is cause for civil penalties or mandatory or permissive exclusion under, any Healthcare Laws, including without limitation: (i) knowingly and willfully making or causing to be made a false statement or representation of a material fact in any application for any benefit or payment; (ii) knowingly and willfully making or causing to be made a false statement or representation of a material fact for use in determining rights to any benefit or

required each of its divisions to comply with the requirements in the discount safe harbor to the Anti-Kickback Statute set forth in 42 C.F.R. §1001.952(h).

Section 3.27    Brokers and Finders. Except for the fees set forth on **Schedule 3.27**, which are the sole responsibility of the Selling Parties, none of the Selling Parties nor any of their respective officers, directors, trustees or employees has employed any broker or finder or incurred any liability for any brokerage fees, commissions or finders' fees in connection with the transactions described in this Agreement.

Section 3.28    Inventory. Except as listed on **Schedule 3.28** no member of the Company Group maintains any inventory.

Section 3.29    Privacy. No member of the Company Group is in breach of any contractual or regulatory obligation to secure or otherwise safeguard Personal Data it receives in connection with the operation of its business and the Websites. Each member of the Company Group has at all times taken commercially reasonable measures to ensure that all Personal Data is protected against loss and unauthorized access, use, modification, disclosure or other misuse, and, except as set forth in **Schedule 3.29**, to Selling Parties' Knowledge, there has been no unauthorized access to or other misuse of such data. Each member of the Company Group has made all notifications to customers or individuals required to be made by such member of the Company Group by any Privacy and Security Laws arising out of or relating to any event of access to or acquisition of any Personal Data by an unauthorized Person, including third parties and employees of any member of the Company Group acting outside of the scope of their authority or authorization in a manner which is otherwise unlawful. True and correct copies of all applicable current internal and customer or user-facing privacy policies of each member of the Company Group ("**Company Privacy Policies**") have been provided or made available to Buyer. Each member of the Company Group has complied in all material respects with all Privacy and Security Laws in connection with the operation of the Business of the members of the Company Group and the Websites. No Personal Data disclosures, representations or covenants made to any customer, or contained in any Company Privacy Policy, have been inaccurate or in violation of any Privacy and Security Laws. There is no complaint to, or audit of, or Proceeding, or written claim or, to the Selling Parties' Knowledge, investigation currently pending against, any member of the Company Group by (i) any Person, or (ii) any Governmental Entity, with respect to the collection, use or disclosure of Personal Data. The negotiation, execution and consummation of the transactions described in this Agreement, and any disclosure and/or transfer of information in connection therewith, will not breach or otherwise cause any violation of any Privacy Policy or Privacy and Security Laws. To the Selling Parties' Knowledge, no member of the Company Group has received any complaints or other notices from any source of any failures to meet the requirements of the Privacy and Security Regulations or Transaction Regulations.

Section 3.30    Full Disclosure. No representation or warranty by the Company in this Agreement and no statement contained in the schedules hereto or any certificate or other document furnished or to be furnished to the Company pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading. Except as set forth on **Schedule 3.30** the contents of the data room in which the

{00829079.DOCX;12 }

ARTICLE 5

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to the Selling Members that:

Section 5.1    Organization; Authority; Due Execution.

(a)    Buyer is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and has all requisite corporate power and authority to own and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of its properties or conduct of its business requires such qualification, except where the failure to be so qualified or in good standing, when taken together with all other such failures, will not prevent, materially delay or materially impair Buyer's ability to consummate the transactions described in this Agreement.

(b)    Buyer has all requisite corporate power and authority to enter into this Agreement and each agreement, document and instrument to be executed or delivered by it in connection with this Agreement (collectively, the "**Buyer Documents**"), to perform its obligations hereunder and thereunder, and to consummate the transactions described in this Agreement and thereby. The execution, delivery and performance of this Agreement and the other Buyer Documents to be executed by Buyer as the case may be and the consummation by Buyer as the case may be of the transactions described in this Agreement and thereby have been duly and validly authorized and no other corporate proceedings on the part of Buyer or their respective members are necessary with respect to any such matter. This Agreement and the other Buyer Documents to be executed by Buyer as the case may be have been duly executed and delivered by Buyer as applicable and constitute the valid, binding and enforceable obligations of to be executed Buyer as the case may be, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general principles of equity.

Section 5.2    Consents; No Violation.

(a)    No notices, reports or other filings are required to be made with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by Buyer from any Governmental Entity or any other Person in connection with the execution and delivery of this Agreement or the other Buyer Documents to be executed by Buyer and the consummation by Buyer of the transactions described in this Agreement and thereby except those that the failure to make or obtain will not, individually or in the aggregate, prevent, materially delay or materially impair Buyer's ability to consummate the transactions described in this Agreement.

(b)    The execution, delivery and performance of this Agreement and the other Buyer Documents do not, and the consummation of the transactions described in this Agreement and thereby will not, constitute or result in: (i) (with or without notice, lapse of time or both) a breach or violation of, or a default under, Buyer's certificate of incorporation or bylaws or other governing documents, or (ii) (with or without notice, lapse of time or both) a

{00829079.DOCX;12 }

ARTICLE 6

CERTAIN COVENANTS AND AGREEMENTS OF THE, SELLING MEMBERS AND BUYER

Section 6.1    Expenses and Finder's Fees.    Except as provided in **Sections 3.27 and 5.5** concerning brokers and finders' fees and in **Article 7** and except for the Transaction Expenses, whether or not the Closing is consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement shall be paid by the Party incurring such expense; provided, however, any legal or other professional fees incurred by any member of the Company Group related to or arising from the transactions contemplated by this Agreement, including the negotiation and drafting of this Agreement, that remain outstanding as of the Closing Date shall be the responsibility of the Selling Members; and provided, further, however that all fees and expenses of the Escrow Agent and the Second Escrow Agent shall be the responsibility of the Selling Members.

Section 6.2    Public Announcements.    The Parties agree that no public release, announcement or any other disclosure to the public concerning any of the transactions contemplated hereby shall be made or issued by any Party without the prior written consent of Buyer and the Selling Member Representative (which consent of either party shall not be unreasonably withheld, conditioned or delayed), except to the extent such release, announcement or disclosure may be required by applicable law or regulation (including the regulations relating to exchanges upon which the shares of Buyer or its Affiliates are listed or traded), in which case the Party required to make the release, announcement or disclosure shall allow Buyer or the Selling Member Representative, as the case may be, reasonable time to comment on such release, announcement or disclosure in advance of such issuance or disclosure.

Section 6.3    Tax Matters.    The following provisions shall govern certain Tax matters:

(a)    Straddle Period. In the case of any Tax period that includes (but does not end on) the Closing Date (a "**Straddle Period**"), the amount of any Taxes based on or measured by income, receipts, sales or payroll of any member of the Company Group which relate to the Pre-Closing Tax Period shall be determined based on an interim closing of the books as of the close of business on the Closing Date (and for such purpose, the taxable period of any partnership or other pass-through entity in which any member of the Company Group holds a beneficial interest shall be deemed to terminate at such time); provided, however, that any Taxes attributable to transactions outside the ordinary course of business after the Closing on the Closing Date shall relate to the portion of the Straddle Period beginning after the Closing Date and the amount of Taxes of a member of the Company Group not based on or measured by income, receipts, sales or payroll of such member of the Company Group for a Straddle Period which relate to the Pre-Closing Tax Period shall be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period.

{00829079.DOCX;12 }

41

(e)    Accrual Basis. The Sellers shall use their reasonable best efforts to cause the Tax Returns for all taxable periods commencing on or after January 1, 2016 to be prepared on an accrual basis and not on a cash basis.

(f)    Tax Contests. The Company shall promptly notify the Selling Member Representative in writing upon receipt by any member of the Company Group or any of its Affiliates of a written notice of any pending or threatened action with respect to Taxes for which any of the Selling Members may have liability pursuant to this Agreement or otherwise, provided, however, that no failure or delay by the Company to provide such notice shall reduce or otherwise affect the obligation of the Selling Members hereunder, except to the extent that they are actually prejudiced thereby. After the Closing Date, except as set forth in this **Section 6.3(f),** the Company Group shall control the conduct, through counsel of its own choosing, of any audit, claim for refund, or administrative or judicial proceeding involving any asserted Tax liability or refund with respect to any member of the Company Group (each a "**Tax Contest**"). In the case of a Tax Contest after the Closing Date that relates solely to Pre-Closing Tax Periods, the Selling Member Representative may elect to control the conduct of such Tax Contest, but members of the Company Group shall have the right to participate in such Tax Contest at its own expense and the Selling Member Representative shall not settle or otherwise resolve such Tax Contest without the prior written permission of the Buyer, which consent shall not be unreasonably withheld, delayed, or conditioned; provided that, if the Selling Member Representative fails to assume control of the conduct of any such Tax Contest within thirty (30) days following the receipt by the Selling Member Representative of notice of such Tax Contest from the Company, then any member of the Company Group shall have the right to assume control of such Tax Contest. In the case of any Tax Contest relating to any Pre-Closing Tax Period that is not controlled by the Selling Member Representative pursuant to this **Section 6.3(f)**, (i) the Selling Member Representative shall have the right to participate in such Tax Contest at its own expense and (ii) the Company Group shall not settle or otherwise resolve such Tax Contest without the prior written permission of the Selling Member Representative, which consent shall not be unreasonably withheld, delayed, or conditioned. The provisions of this **Section 6.3(f)**, rather than those of **Section 7.1(e)**, shall apply in the case of any Tax Contest.

(g)    Buyer Tax Acts. Following the Closing Date, neither Buyer, nor the Company Group nor any Affiliate thereof may (i) file, amend or modify a Tax Return of any member of the Company Group for any taxable period ending on or before the Closing Date ,except in accordance with **Section 6.3(d)**, (ii) take any action that would extend the applicable statute of limitations for any Taxes or Tax Return of any member of the Company Group for any taxable periods ending on or before the Closing Date, (iii) file, amend or revoke any Tax election on behalf of any member the Company Group for any taxable periods ending on or before the Closing Date, (iv) surrender any right to claim a refund of Taxes relating to any member of the Company Group relating to any taxable periods ending on or before the Closing Date, or (v) make a voluntary disclosure to a Governmental Entity with respect to any Tax or Tax Returns of any member of the Company Group for any taxable periods ending on or before the Closing Date, in each case, without the prior written consent of the Selling Member Representative.

(h)    Tax Refunds. All refunds of Taxes of any member of the Company Group for any Pre-Closing Tax Period (including any portion of a Straddle Period ending on the Closing Date as determined in accordance with the same principles provided for in

{00829079.DOCX;12 }

Closing Date, and (ii) the amount allocable to the Company Group's accounts receivable shall equal the amount paid to the Selling Member Representative with respect thereto pursuant to **Section 1.5(f)**.

(j)    Transaction Tax Items. The Parties agree that, to the fullest extent allowable by applicable Laws, all Transaction Tax Items shall be treated (but solely for Tax purposes) as liabilities of the Selling Members that are being assumed by Buyer and, accordingly, any federal, state or local income Tax deductions arising from any payment of such Transaction Tax Items, including any deductions relating to unamortized deferred financing fees relating to any Indebtedness, shall be claimed by the Selling Members, rather than by Buyer. Neither Buyer, nor the members of the Company Group (for any period following the Closing Date) nor any Affiliates thereof shall claim any income Tax deduction for any payments made in connection with any Transaction Tax Items on any Tax Return or take any position on any Tax Return or otherwise that is inconsistent with the Selling Members claiming all available income Tax deductions with respect to the payment of any Transaction Tax Items in computing their federal, state and local income Tax liabilities.

Section 6.4    Non-Competition, Non-Solicitation and Non-Disclosure.

(a)    Non-Competition, Non-Solicitation. Subject to the last paragraph of Section 5 of any applicable Employment Agreements, each Selling Member agrees that it shall not, and it shall take all commercially reasonable efforts to cause its Affiliates to not, whether or not for compensation, directly or indirectly, individually or as an officer, director, shareholder, member, manager, trustee, employee, consultant, advisor, partner, proprietor or otherwise, for a period commencing on the Effective Date and ending thirty-six (36) months after the Effective Date (the "**Restricted Period**"): (i) other than with respect to employment or other similar arrangement with members of the Company Group, participate or engage in or provide any services to, or have any direct or indirect interest in, any business whose operations, in whole or in part, are the same as, similar to or are in competition with any of the business operations carried on by members of the Company Group during her employment by the Company Group or that the Company Group contemplated (and which such Selling Member should have known that the Company Group was contemplating) carrying on at the time of the termination of her employment by the Company Group in New York, New Jersey, Pennsylvania, or Connecticut; provided, however, that nothing in this Agreement shall preclude such Selling Member from purchasing or owning up to five percent (5%) of the outstanding capital stock of any company which has a class of securities registered under Section 12 of the Securities Act of 1934, as amended, or trading on a national securities exchange or quoted in an over-the-counter market; (ii) encourage, solicit, or induce, or in any manner attempt to encourage, solicit, or induce, any person or entity employed by, or providing consulting services to, any member of the Company Group, the Buyer and/or the Buyer's parent and subsidiaries' key employees or key consultants , to terminate such person's or entity's employment or services (or in the case of a consultant, materially reduce such services) with one or more members of the Company Group, the Buyer and/or the Buyer's parent and subsidiaries; (iii) hire any person or entity who was employed by any member of the Company Group, the Buyer and/or the Buyer's parent and subsidiaries' key employees or key consultants within the six (6) month period prior to the date on which such Selling Member ceases to be an employee of any member of the Company Group; or (iv) encourage, solicit or induce, or in any manner attempt to encourage, solicit or induce, any

{00829079.DOCX;12 }

with a member of the Company Group with respect to such information, (ii) is proven by competent evidence by a Selling Member that it was independently conceived or discovered by such Selling Member without reference to or use of the Confidential Information, or (iii) has become publicly known and made generally available through no wrongful act of a Selling Member.

(c)    Enforcement. If any Selling Member commits a breach, or threatens to commit a breach, of any of the provisions of **Section 6.4(a)-(b),** (such person committing or threatening to commit a breach, the **"Breaching Party"**), then the members of the Company Group shall have the right and remedy to have such provisions of this Section specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to the members of the Company Group and that money damages will not provide an adequate remedy at law; and in connection therewith the right to seek, without notice to such Breaching Party and without the need to post any bond, a temporary restraining order, an injunction and any other equitable relief. Such right of injunctive relief shall be cumulative only in addition to the right of the members of the Company Group to recover from such Breaching Party the liquidated damages as set forth in **Section 6.4(d)** below.

(d)    Specific Liquidated Damages. Kelly agrees that in addition to the equitable remedies available to the Buyer under **Section 6.4(c),** if, following written notice by the Buyer to Kelly of a breach her of obligations set out in **Section 6.4** throughout Year 1 and, then, following a 15 day cure period for curable breaches, Kelly is still not in compliance with her obligations set out in **Section 6.4** throughout Year 1, then Kelly shall, within ten days of the Buyer obtaining a final, non-appealable judgement against Kelly for breach of her obligations set out in **Section 6.4** throughout Year 1, pay the Buyer $10,000,000 as full and complete liquidated damages for such breach; *provided, however,* that if Kelly contests her obligations pursuant to this sentence or does not pay such amount within such ten day period, Kelly shall be obligated to pay the Buyer $30,000,000 as full and complete liquidated damages for such breach. Kelly agrees that agrees that in addition to the equitable remedies available to the Buyer under **Section 6.4(c)**, if Kelly was in compliance with her obligations set out in **Section 6.4** throughout Year 1, and if following written notice by the Buyer to Kelly of a breach her of obligations set out in **Section 6.4** throughout Year 2 and, then, following a 15 day cure period for curable breaches, Kelly is still not in compliance with her obligations set out in Section 6.4 throughout Year 2, then Kelly shall, within ten days of the Buyer obtaining a final, non-appealable judgement against Kelly for breach of her obligations set out in **Section 6.4** throughout Year 2, pay the Buyer $5,000,000 as full and complete liquidated damages for such breach; *provided, however,* that if Kelly contests her obligations pursuant to this sentence or does not pay such amount within such ten day period, Kelly shall be obligated to pay the Buyer $15,000,000 as full and complete liquidated damages for such breach.

(e)    Severability. The provisions of this **Section** are severable, and if any provision or any part of any provision of this **Section** is found to be invalid or unenforceable, the balance of that provision and the other provisions hereof shall be given full force and effect and remain fully valid and enforceable.

Schedule to the representations and warranties in Article 3 (each, a "Schedule Supplement"), and such Schedule Supplement shall be deemed to be the final Schedules to the representations and warranties in Article 3; *provided, however*, that no Schedule Supplement shall be deemed to update any original Schedule to the representations and warranties in Article 3 if such Schedule Supplement sets forth any event or the existence of any fact or condition which would result in (a) a reduction of the Company Group's EBITDA, taken as a whole, for the twelve month period ending February 28, 2017, by more than $500,000 or (b) Losses to the Company Group of more than $500,000.

Section 6.10    CHT Shares.  Buyer shall use its best efforts to cause an Affiliate that directly or indirectly owns common stock of CHT to offer to Kelly $2 million worth of such Affiliate's equity (the "**Equity**") on mutually agreeable terms, including those to be set forth in a shareholders' agreement or operating agreement with respect thereto (the "**Shareholders' Agreement**"); provided, however that if by April 10, 2017 such Affiliate has not issued the Equity to Kelly and the parties have not entered into the Shareholders' Agreement, then the Equity will not be issued and the parties shall not enter into the Shareholders' Agreement.

Section 6.11    Business Plan.  The Selling Member Representative shall deliver to the Buyer a detailed business plan (including line items for all material categories of expenditures and projections of revenues) for the Company Group for the period ending on the last day of Year 2 no later than forty five (45) days following the Closing Date (provided, however that the deadline for such delivery may be extended for additional one week periods upon notification to the Buyer by the Selling Member Representative), and thereafter the Selling Member Representative and Buyer shall in good faith promptly finalize such business plan.

ARTICLE 7

INDEMNIFICATION

Section 7.1    Indemnification.

(a)    Indemnification by the Selling Members.  Subject to the limits set forth in this **Article 7**, from and after the Closing, the Selling Members agree, jointly and severally, to indemnify, defend and hold Buyer and its Affiliates (including, after the Closing, the members of the Company Group) and their respective officers, directors, managers, members, shareholders, employees, agents and representatives (the "**Buyer Indemnified Persons**") harmless (except with respect to claims for indemnification arising from breaches of representations and warranties set forth in **Article 4** or claims for breaches of covenants contained in this Agreement made by a Selling Member, in which case, such Selling Member shall severally indemnify the Buyer Indemnified Parties with respect to such Selling Member's breaches) from and in respect of Losses that they incur or suffer arising out or by reason of, in connection with or due to (i) any breach of any representation or warranty of any of the members of the Company Group or any Selling Member contained in this Agreement or any other Seller Document, (ii) any breach of any covenant or agreement of any of the members of the Company Group or any Selling Member contained in this Agreement or any other Seller Document, (iii) any of the Excluded Liabilities, (iv) any and all claims of third parties with whom the Company or its agents have had discussions with respect to the disposition of the Company or its Business

**Permits, 4.1 (Ownership of Interest) and 4.2 (Authority)**, and Buyer's representations and warranties set forth in **Section 5.1(b) (Authority)** (all such representations and warranties being herein called "**Specified Representations**")) from the respective other Party hereunder for any Losses, except to the extent that the aggregate amount of any such Losses indemnifiable hereunder exceeds $75,000 (the "**Basket**"), at which point, either the Buyer Indemnified Persons or the Seller Indemnified Persons, as the case may be, will be obligated to indemnify the Party seeking indemnification for all such Losses in excess of the Basket, subject to the other clauses of this **Section 7.1(c)**;

(ii)    (a) neither the Buyer Indemnified Persons, on the one hand, nor Seller Indemnified Persons, on the other hand, shall be entitled to recover for Losses (other than for Losses on account of breaches of the Specified Representations) in an aggregate amount in excess of the Cap and (b) neither the Buyer Indemnified Persons, on the one hand, nor Seller Indemnified Persons, on the other hand, shall be entitled to recover for Losses, including Losses on account of breaches of the Specified Representations, in an aggregate amount in excess of twice the Cap.

(iii)    none of the foregoing limitations on indemnification in clauses (i) and (ii) of this **Section 7.1(c)** shall apply to any claim based on fraud or intentional misrepresentation or willful ignorance;

(iv)    solely for purposes of calculating the amount of Losses incurred arising out of or relating to any breach of a representation, warranty, covenant or agreement (and not for purposes of determining whether or not such a breach has occurred) any reference to "Material Adverse Effect" or any other materiality qualifications in such representation, warranty, covenant or agreement shall be disregarded; and

(v)    the amount which an Indemnifying Party is required to pay to, for or on behalf of any Indemnified Party pursuant to this **Article 7** shall be adjusted (including, retroactively) by any insurance proceeds and any indemnity, contribution, or other similar payment actually recovered by or on behalf of such Indemnified Party in reduction of the related indemnifiable loss (the "**Indemnifiable Loss**"). Amounts required to be paid, as so reduced, are hereinafter sometimes called an "**Indemnity Payment**." If an Indemnified Party shall have received or shall have had paid on its behalf an Indemnity Payment in respect of an Indemnifiable Loss and shall subsequently receive insurance proceeds or other payment in respect of such Indemnifiable Loss, then the Indemnified Party shall pay to the Indemnifying Party the amount of such insurance proceeds or other payment or, if lesser, the amount of the Indemnity Payment. To the extent that any Indemnified Party is entitled to indemnification pursuant to this **Article 7**, the Indemnifying Party shall have rights of subrogation respecting, any rights and remedies (including rights of indemnity, rights of contribution and other rights of recovery) that any Indemnified Party may have to insurance policies or similar contracts with respect to which such Indemnified Party is a beneficiary.

(vi)    Buyer may set off any amount to which it may be entitled from the Selling Members under this Article against amounts payable to the Selling Members pursuant to **Sections 1.3 and 1.4** (provided, however that neither the exercise of, nor the failure

{00829079.DOCX;12 }

51

only to the extent that such failure prejudices the Indemnifying Party hereunder. In case any such action shall be brought against any Indemnified Party and after such Indemnified Party has notified the Indemnifying Party of the commencement thereof, the Indemnifying Party shall be entitled to assume the defense thereof, with counsel reasonably selected by the Indemnifying Party and reasonably approved by the Indemnified Party after notice from the Indemnifying Party to the Indemnified Party. The Indemnifying Party and the Indemnified Party agree to cooperate fully with each other and their respective counsel in connection with the defense, negotiation or settlement of any such action or asserted liability.

(ii)    If the Indemnifying Party agrees to assume the defense of a Covered Proceeding, the Indemnified Party shall have the right to participate at its own expense in the defense of such action or asserted liability. If the Indemnifying Party is otherwise entitled to control the settlement of a Covered Proceeding (subject to the requirements and limitations of this **Section 7.1**), the Indemnifying Party will be entitled to control such settlement only if (A) the terms of such settlement require no more than the payment of money (for example, such settlement does not require the Indemnified Party to admit any wrongdoing or take or refrain from taking any action), (B) the full amount of such monetary settlement is fully paid by the Indemnifying Party, and (C) the Indemnified Party receives as part of such settlement a legally binding and enforceable unconditional satisfaction and release of all claimed liabilities or obligations in form and substance reasonably satisfactory to the Indemnified Party.

Section 7.2    Exclusive Remedy. From and after the Closing, Buyer Indemnified Persons and Seller Indemnified Persons' sole and exclusive remedy, whether in any individual, corporate or any other capacity, with respect to any and all Losses arising under this Agreement or the transactions contemplated hereby, regardless of the legal theory under which such liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise, shall be pursuant to the provisions of this **Article 7**.

Section 7.3    Payments.  Any amounts owed to the Buyer by the Selling Members (or any one or more of the Selling Members) pursuant to the terms of this Agreement, including but not limited to, **Section 1.2, Section 1.5, Section 1.6, Article 7**, shall be paid to the Buyer as follows: (i) first, as a disbursement from the Escrow Fund, (ii) second, as a set off against amounts then due, if any, to the Selling Members pursuant to **Sections 1.2 and 1.3**, and (iii) finally, as a payment by the Selling Members in cash or available funds to an account designated by the Buyer within five (5) Business Days of the final determination of such payment.


ARTICLE 8

DEFINITIONS

Section 8.1    Definitions.  For purposes of this Agreement, the following terms used in this Agreement shall have the meanings ascribed to them below:

"**409A Plan**" has the meaning ascribed to such term in **Section 3.10(a)(xv)**.

"**Cap**" means fifty percent of an amount equal to (i) all amounts paid by Buyer pursuant to **Article 1** less (ii) all amounts paid to Buyer by the Selling Members pursuant to **Article 1.**

"**CHT**" means Constellation Healthcare Technologies, Inc., a Delaware corporation.

"**Civil Monetary Penalty Law**" has the meaning ascribed to such term in the definition of "**Healthcare Laws**".

"**Closing**" has the meaning ascribed to such term in **Section 2.1.**

"**Closing Accounts Receivable**" has the meaning ascribed to such term in **Section 1.5(f)**.

"**Closing Balance Sheet**" has the meaning ascribed to such term in **Section 1.5(a).**

"**Closing Date**" has the meaning ascribed to such term in **Section 2.1.**

"**Closing Date Calculation**" has the meaning ascribed to such term in **Section 1.5(a).**

"**Closing Payment**" has the meaning ascribed to such term in **Section 1.2(a)**

"**Closing Payment Multiplier**" is 3.0.

"**Closing Working Capital**" has the meaning ascribed to such term in **Section 1.5(a).**

"**CMS**" means the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services.

"**Code**" means the Internal Revenue Code of 1986, as amended. All citations to the Code or to the regulations promulgated thereunder shall include any amendments or any substitute or successor provisions thereto.

"**Commercial Healthcare Plan**" means any plan or program established by a non-governmental third-party payor that pays for health care provided to individuals, including, without limitation, indemnity plans, health maintenance organizations, preferred provider organizations, and plans established under ERISA.

"**Company**" has the meaning ascribed to such term in the Preamble.

"**Company Group**" means the Company together with all of its Subsidiaries; each of the Company and its Subsidiaries is a member of the Company Group.

"**Company Leased Property**" has the meaning ascribed to such term in **Section 3.8.**

{00829079.DOCX;12 }

"**Environmental Law**" means any Law, permit, authorization, policy, opinion, common law or agency requirement applicable to one or more members of the Company Group relating to: (i) the protection, investigation or restoration of the environment, health and safety, or natural resources or exposure to any harmful or hazardous material, (ii) the handling, use, presence, disposal, release or threatened release of any chemical substance or waste water, or (iii) noise, odor, wetlands, pollution, contamination or any injury or threat of injury to persons or property, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, the Resource Conservation and Recovery Act, the Occupational and Safety and Health Act (solely to the extent related to Hazardous Substances), Clean Water Act and the Oil Pollution Act.

"**ERISA**" has the meaning ascribed to such term in **Section 3.12(b)**.

"**Escrow Agent**" has the meaning ascribed to such term in **Section 1.2(a)**.

"**Escrow Agreement**" has the meaning ascribed to such term in **Section 1.2(a)**.

"**Escrow Fund**" has the meaning ascribed to such term in **Section 1.2(b)**.

"**Escrow Payment**" has the meaning ascribed to such term in **Section 1.2(b)**.

"**Excessive Payment to a Client**" has the meaning ascribed to such term in **Section 1.6(a)**.

"**Excluded Earnings**" has the meaning ascribed to such term in **Section 1.6(a)**.

"**Excluded Liabilities**" means any and all of the debts, liabilities, claims and obligations of one or more members of the Company Group, whether fixed, contingent or otherwise, in each case to the extent existing or accrued or required to be accrued at or as of the Closing, or made, asserted or arising after the Closing but based upon or arising from any act, transaction, circumstance, sale or providing of goods or services, state of facts or other condition which occurred or existed on or prior to the Closing, whether or not then known, due or payable, including, without limitation, the following (but excluding the Qualified Accounts Payable):

(i)     any claims, liabilities or obligations against or of one or more members of the Company Group under or arising out of any actual or claimed equity option, equity purchase, equity-based incentive, profit-sharing or similar plan(s), program(s), agreement(s) or arrangement(s) and/or under any and all qualified or non-qualified equity options, grants or awards and/or any other agreement, arrangement or understanding to make a payment to any manager, officer or employee in connection with the sale of the Interests or any transaction described in this Agreement;

(ii)    any and all claims, liabilities and obligations against or of one or more members of the Company Group by, of or to any of its present or former direct or indirect shareholders, including any arising out of any action by one or more members of the Company Group in connection with any of the transactions described in this Agreement;

Law prior to the Closing Date, on, from, involving or by any of the Company Leased Property, one or more members of the Company Group or any of its Affiliates.

"**Exclusions Statute**" has the meaning ascribed to such term in the definition of "**Healthcare Laws**".

"**False Claims Act**" has the meaning ascribed to such term in the definition of "**Healthcare Laws**".

"**False Report**" has the meaning ascribed to such term in **Section 1.6(a)**.

"**Financial Statements**" has the meaning ascribed to such term in **Section 3.14(a)**.

"**GAAP**" means U.S. generally accepted accounting principles, consistently applied.

"**Governing Plan**" has the meaning ascribed to such term in **Section 1.3(f)**.

"**Government Bid**" has the meaning ascribed to such term in **Section 3.19(a)(iv)**.

"**Government Contract**" has the meaning ascribed to such term in **Section 3.19(a)(iv)**.

"**Government Healthcare Program**" means Medicare, Medicaid, TRICARE and any other program for the provision of health care established by the U.S. federal government or a state government.

"**Government Healthcare Program Contractor**" means a non-governmental entity that acts on behalf of a Government Healthcare Program to administer a Government Healthcare Program, process and audit claims, make eligibility determinations, enroll and dis-enroll providers and suppliers, or audit providers and suppliers, including, for example, any Medicare Administrative Contractor ("**MAC**"), Recovery Audit Contractor ("**RAC**"), Zone Program Integrity Contractor ("**ZPIC**").

"**Governmental Entity**" means (a) any supranational, federal, state, local, municipal, foreign or other government; (b) any governmental or quasi-governmental entity of any nature (including any governmental agency, branch, department, official or entity and any court or other tribunal); or (c) any body, authority or agency exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority, including any arbitral tribunal.

"**GPO**" has the meaning set forth in **Section 3.26(l)**.

"**Hazardous Discharge**" means the use, management, handling, transport, treatment, generation, storage, spill, escape, seepage, leakage, spillage, emission, release,

of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all indebtedness secured by a purchase money mortgage or other Lien to secure all or part of the purchase price of the property subject to such mortgage or Lien, (f) all obligations under leases which shall have been or must be, in accordance with GAAP, recorded as capital leases, (g) any credit extended in the nature of banker's acceptances or letters of credit, (h) any obligations (including, but not limited to, interest, fees, penalties and other expenses) under any interest rate swap agreements or instruments, (i) all interest, fees and other expenses owed with respect to the indebtedness referred to above, and (j) all indebtedness and liabilities referred to above which is directly or indirectly guaranteed, and, with respect to (a) to (j) above, all premiums, penalties, charges, fees, expenses and other amounts that are or would be due (including with respect to early termination) in connection with the payment and satisfaction in full of such obligations.

"**Indemnifiable Loss**" has the meaning ascribed to such term in **Section 7.1(c)(vi)**

"**Indemnified Party**" has the meaning ascribed to such term in **Section 7.1(e)(i)**.

"**Indemnifying Party**" has the meaning ascribed to such term in **Section 7.1(e)(i)**.

"**Indemnity Payment**" has the meaning ascribed to such term in **Section 7.1(c)(v)**.

"**Independent Auditor**" means a mutually agreeable independent nationally recognized accounting firm who has not then provided services to any Party in the previous two (2) years (a "**Neutral Firm**") that will agree to act as Independent Auditor. If: (i) Buyer and the Selling Member Representative are unable to agree on the selection of an Independent Auditor within fifteen (15) days of the conclusion of the period described above, then each of Buyer, on the one hand, and the Selling Member Representative, on the other hand, shall select one Neutral Firm and those two Neutral Firms together shall appoint a Neutral Firm as Independent Auditor hereunder, and such appointment shall be conclusive and binding on all of the Parties; or (ii) if any Party does not select a Neutral Firm within ten (10) days of written demand therefor by the other Party, then the Neutral Firm selected by the other Party shall act as the Independent Auditor.

"**Intellectual Property**" means any know-how, proprietary rights or other intellectual property, including without limitation, trade secrets, inventions, formulae, processes, patents (including all reissues, divisions, continuations and extensions thereof), patent applications, Trademarks, Trademark registrations, Trademark applications, service marks, service mark registrations, service mark applications, copyrights, copyright registrations, copyright applications, web sites and home pages, uniform resource locators, domain names, all rights to, and all intellectual property used or necessary to, create, publish, modify or maintain, any website or home page, customer and vendor information, lists and data bases, customer files, customer lists, mailing and subscription lists, supplier lists, information not known to the general public, literary works, whether or not copyrightable, ideas, concepts, designs, drawings, discoveries, product and service developments, inventions, improvements, processes, logos,

{00829079.DOCX;12 }

"**Medical Waste**" means any solid or liquid waste that is generated in the diagnosis, treatment, or immunization of human beings or animals, in research pertaining thereto, or in the production or testing of biologicals, including, without limitation, blood soaked bandages; culture dishes and other glassware; discarded surgical gloves; discarded surgical instruments; discarded syringes and needles used to give shots or draw blood; blood and blood products; cultures, stocks, swabs used to inoculate cultures; removed body organs or other body tissue; human body waste; and discarded lancets.

"**Medicare**" means the health care program for individuals sixty five (65) years of age and over, certain disabled individuals, and certain individuals with end-stage renal disease established under Title XVIII of the Social Security Act.

"**Medicare Advantage**" means the health insurance program for certain individuals sixty five (65) years of age and over established under Part C of Title XVIII of the Social Security Act usually in the form of a coordinated care program and generally administered by non-governmental entities.

"**Minimum Working Capital**" has the meaning ascribed to such term in **Section 1.4(c)**.

"**Net Revenue**" means, for any particular period, the sum of (i) the gross revenues generated by the members of the Company Group and their Subsidiaries for services rendered or products sold less (ii) amounts paid by the members of the Company Group and their Subsidiaries to physicians and other medical professionals and practices in connection with services that resulted in payments to the members of the Company Group and their Subsidiaries less (iii) amounts that the members of the Company Group and their Subsidiaries paid to any Person for payments of commissions and sharing of administrative fees in connection with services that resulted in payments to the members of the Company Group and their Subsidiaries.

"**Neutral Firm**" has the meaning ascribed to such term in the definition of "**Independent Auditor**".

"**New Baseline**" means the greater of $10,900,000 and the Year 1 Revenue.

"**Non-Escrowed Closing Payment**" has the meaning ascribed to such term in **Section 1.2(a)**.

"**Objection Notice**" has the meaning ascribed to such term in **Section 1.5(c)**.

"**OCR**" means the Office for Civil Rights of the United States Department of Health and Human Services.

"**OIG**" means the Office of the Inspector General of the United States Department of Health and Human Services.

"**Ordinary Course of Business**" means the ordinary course of business of the members of the Company Group consistent with past custom and practice (including with respect to frequency and amount).

{00829079.DOCX;12 }

"**Purchase Price**" has the meaning ascribed to such term in **Section 1.1**.

"**Purchase Price Allocation**" has the meaning ascribed to such term in **Section 6.3(i)**.

"**Qualified Accounts Payable**" has the meaning ascribed to such term in **Section 1.4(a)**.

"**RAC**" has the meaning ascribed to such term in the definition of "**Government Healthcare Program Contractor**".

"**Refundable Payment by a Client**" has the meaning ascribed to such term in **Section 1.6(a)**.

"**Reimbursable Expenses**" mean any and all expenses, including those related to automobiles, telephones, memberships, travel and entertainment, of managers, directors, officers, employees and consultants of one or more members of the Company Group that one or more members of the Company Group is obligated to reimburse or are of the type that members of the Company Group have generally reimbursed.

"**Replacement Costs**" means an amount equal to (i) the total compensation, including salary, bonus and benefits, attributable to Replacement Personnel for such applicable period, less (ii) an amount equal to the total compensation, including salary, bonus and benefits, that would have been attributable to Kelly had she been employed during such applicable period using the actual amounts attributable to Kelly for the last full month immediately prior to Kelly's termination of employment with the Company Group by Kelly without Good Reason or by the Company Group for Cause or upon death or disability (each as defined in the Kelly Employment Agreement).

"**Replacement Personnel**" mean any and all persons engaged by the Company Group upon the termination of Kelly's employment with the Company Group by Kelly without Good Reason or by the Company Group for Cause (each as defined in the Kelly Employment Agreement) to fulfill some or all of the functions provided by Kelly to the Company Group immediately prior to the Closing; provided, however that if the Buyer wishes to engage Replacement Personnel, the Buyer shall provide Kelly with prior written notice and, in the case of the first two candidates, Buyer shall not engage their services without Kelly's prior written consent, which consent may be denied for any reason or no reason at all (provided, however, that Kelly shall be deemed to have consented if she does not respond in writing within seven (7) days from her receipt of the notice).

"**Required Payment**" has the meaning ascribed to such term in **Section 1.6(a)**.

"**Resolution Period**" has the meaning ascribed to such term in **Section 1.5(d)**.

"**Restricted Period**" has the meaning ascribed to such term in **Section 6.4(a)**.

"**Second Escrow Agent**" has the meaning ascribed to such term in **Section 1.2(a)**.

"**Subsidiary**" or "**Subsidiaries**" of any Person means another Person, an amount of the voting securities, other voting rights or voting membership or partnership interests of which is sufficient to elect at least a majority of its board of directors or other governing body (or, if there are no such voting interests, fifty percent (50%) or more of any class or series of capital stock or other partnership, joint venture, membership or other equity interest of which) is owned directly or indirectly by such first Person.

"**Tax**" or "**Taxes**" means all taxes, including (i) all federal, state, local, provincial or foreign income or franchise taxes; (ii) all gross receipts, ad valorem, value-added, goods and services, excise, real property, personal property, sales, use, transfer, withholding, employment, unemployment, insurance, social security, business license, business organization, environmental (including Taxes under Code section 59A), workers compensation, profits, license, lease, service, service use, severance, stamp, occupation, windfall profits, customs, duties, franchise, net worth, commercial profits and other taxes imposed by any Governmental Entity; (iii) any interest, penalties, assessments or additions to tax resulting from, attributable to or incurred in connection with any items listed in clauses (i) or (ii) of this paragraph; and (iv) any liability in respect of any items described in clauses (i), (ii) and/or (iii) payable by reason of contract, assumption, transferee liability, operation of law or Treasury Regulations section 1.1502-6(a) (or any predecessor or successor thereof or any similar provision under law or otherwise).

"**Tax Benefit**" means any actual reduction in Taxes payable for any year (or period) or increase in Tax refunds received for any year (or other period).

"**Tax Contest**" has the meaning ascribed to such term in **Section 6.3(f)**.

"**Tax Return**" means any return, declaration, report, statement or information return required to be filed with any Governmental Entity with respect to Taxes, including all required Schedules and other attachments thereto, and any amendments thereof.

"**Trademarks**" means all trademarks and service marks (whether registered or unregistered), trade names and designs, together with all goodwill related to the foregoing owned by or licensed to one or more members of the Company Group.

"**Transaction Expenses**" means the sum of the fees and expenses of third parties (such as accountants, lawyers, consultants or other outside advisors) incurred by one or more members of the Company Group arising or resulting from the transactions described in this Agreement, which remain outstanding as of the Closing Date.

"**Transaction Regulations**" means 45 C.F.R. Parts 160 and 162.

"**Transaction Tax Items**" means any payments relating to (i) the repayment of Indebtedness, (ii) any Transaction Expenses, (iii) any Payables and (iv) any indemnification payments made by the Selling Members under this Agreement.

"**TRICARE**" means the health care program established by the Department of Defense under Title 10, Subtitle A, Part II, Chapter 55 (10 U.S.C. §1071 *et seq.*) for members of the military, military retirees, and their dependents.

forth hereafter or at such other address as to which such party may inform the other parties in writing in compliance with the terms of this Section:

| | |
|---|---|
| If to Selling Parties, then to: | Elizabeth Kelly<br>12 Annfield Court<br>Staten Island, NY 10304<br>Cliona Sotiropoulos<br>5203 Sandstone Court<br>Suffolk, VA 23435 |
| | Michaela Kircher<br>432 Temple Ave.<br>Woodbury Heights, NJ 08097 |
| with a copy (which shall not constitute notice) to: | Holland and Knight LLP<br>701 Brickell Avenue<br>Suite 3300<br>Miami, FL 33131<br>Attention: Alberto Hernandez, Esq. |
| (a)    If to Buyer, then to: | NYNM Acquisition, LLC<br>c/o Robinson Brog Leinwand et al.<br>875 Third Avenue<br>9th Floor<br>New York, New York 10022 |
| with a copy (which shall not constitute notice) to: | Robinson Brog Leinwand et al.<br>875 Third Avenue<br>9th Floor<br>New York, New York 10022<br>Attention: A. Mitchell Greene, Esq. |

Notices shall be deemed properly delivered and received (i) if personally delivered, upon receipt thereof, (ii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iii) if sent by a commercial overnight courier for delivery on the next Business Day, on the first Business Day after deposit with such courier for delivery. In this Section, "notice" includes any demand or request permitted or required under this Agreement.

Representative in reliance upon any notice, direction, instruction, consent, statement or other documents believed by it to be genuinely and duly authorized, nor for any other action or inaction with respect to the indemnification obligations of the parties under this Agreement, including the defense or settlement of any claims and the making of payments with respect thereto, except to the extent resulting from the Selling Member Representative's own willful misconduct or gross negligence. The Selling Member Representative may, in all questions arising under this Agreement and the Exhibits, rely on the advice of counsel, and for anything done, omitted or suffered in good faith by the Selling Member Representative, the Selling Member Representative shall not be liable to the Selling Members.

Section 9.4    Governing Law; Consent to Jurisdiction and Waiver of Jury Trial.

(a)    This Agreement shall be governed by and construed in accordance with the internal substantive laws, and not the choice of law rules, of the State of New York.

(b)    Each of the Parties irrevocably submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York located in New York County, State of New York, or if such court does not have jurisdiction, the state courts of the State of New York located in New York County for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby. Each of the Parties hereto irrevocably and fully waives the defense of an inconvenient forum to the maintenance of such suit, action or proceeding. Each of the Parties further agrees that service of any process, summons, notice or document to such Party's respective address listed above in one of the manners set forth in **Section 9.2** hereof shall be deemed in every respect effective service of process in any such suit, action or proceeding; provided that with respect to this **Section 9.4(b)** only, any such notice solely sent in accordance with **Section 9.2** shall be deemed given only if and when actually received by the other Party. Nothing herein shall affect the right of any Person to serve process in any other manner permitted by Law. Each of the Parties hereto irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in either of the courts named in this subsection and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. The Parties hereto hereby irrevocably and unconditionally waive trial by jury in any legal action or proceeding relating to this Agreement or any other agreement entered into in connection therewith and for any counterclaim with respect thereto. Notwithstanding the preceding, the Parties may subsequently agree in writing that any such proceeding may be brought and maintained in any other court sitting in the United States that has jurisdiction.

(c)    The Parties further agree that should any dispute arise between the parties pursuant to this Agreement, the losing party in any action shall be responsible for paying the winning party's reasonable attorney fees.

Section 9.5    Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Execution and delivery of this Agreement by delivery of a facsimile or electronically recorded copy in .pdf file or similar format bearing a copy of the

{00829079.DOCX;12 }

words of similar import when used in this Agreement will refer to this Agreement as a whole and not to any particular provision of this Agreement. All terms used herein with initial capital letters have the meanings ascribed to them herein and all terms defined in this Agreement will have such defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Unless otherwise indicated, any agreement, instrument or statute defined or referred to herein, or in any agreement or instrument that is referred to herein, means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. References to a Person are also to its successors and permitted assigns.

Section 9.13  Assignability.  This Agreement shall not be assignable by any Party hereto without the prior written consent of the other Parties; provided that Buyer (a) may grant a security interest in its rights under this Agreement to its lenders as security for Buyer's obligations to such lenders (and such lenders may exercise their rights and remedies with respect to such security interest), (b) may assign its rights under the Agreement to any Affiliate of Buyer and (c) may assign its rights to indemnity, in whole or in part, to any Person that acquires an interest in Buyer or a material portion of its assets or the Business. Notwithstanding any assignment by Buyer described in clauses (b) and (c) of the proviso in the previous sentence of this Section, Buyer shall remain liable under this Agreement jointly and severally with the assignee. No such assignment shall be a novation of Buyer's obligations under this Agreement.

Section 9.14  Attorneys' Fees.  If any Party hereto defaults in the performance of any of its obligations under this Agreement or if any dispute arises between Parties hereto concerning the meaning or interpretation of any provision of this Agreement, then the defaulting Party or the Party not prevailing in such dispute, as the case may be, shall pay any and all costs and expenses incurred by the other Party or Parties on account of such default and/or in enforcing or establishing its rights hereunder, including, without limitation, court costs (including costs of any trial or appeal therefrom), and reasonable attorneys' fees and disbursements.

Section 9.15  Specific Performance.  The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that each Party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement (without any obligation of such Party to post any bond or other surety in connection therewith) and to enforce specifically the terms and provisions of this Agreement in addition to any other remedy to which such Party may be entitled at law or in equity.

Section 9.16  Continuing Counsel.  The Buyer hereby acknowledges that Holland & Knight LLP has acted as counsel to the Company Group with respect to this Agreement and the transactions contemplated hereby. The following provisions apply to the attorney-client relationship between Holland & Knight LLP and the Company Group following the Closing. The Buyer hereby agrees that (a) it will not seek to disqualify Holland & Knight

{00829079.DOCX;12 }

73

IN WITNESS WHEREOF, the parties hereto have duly executed this Membership Interests Purchase Agreement as of the date first above written.

NYNM ACQUISITION, LLC

By: _____
    Name: Paul Parmar
    Title:  Manager

NEW YORK NETWORK MANAGEMENT, L.L.C.,

By: _____
    Name:
    Title:

_____
ELIZABETH KELLY

_____
MICHAELA KIRCHER

_____
CLIONA SOTIROPOULOS

[Signature Page to MIPA]

IN WITNESS WHEREOF, the parties hereto have duly executed this Membership Interests Purchase Agreement as of the date first above written.

NYNM ACQUISITION, LLC

By: _____
    Name:  Paul Parmar
    Title:  Manager

NEW YORK NETWORK MANAGEMENT, L.L.C.,

By: _____
    Name:
    Title:

_____
ELIZABETH KELLY

_____
MICHAELA KIRCHER

_____
CLIONA SOTIROPOULOS

[Signature Page to MIPA]

## ASSIGNMENT OF MEMBERSHIP INTEREST

FOR VALUE RECEIVED, the undersigned ("Assignor") hereby sells, assigns, transfers, grants and conveys unto NYNM ACQUISITION, LLC, all of Assignor's right, title and interest in NEW YORK NETWORK MANAGEMENT, L.L.C., a New York limited liability company (the "Company"), standing in her name on the books said Company, together with all of her rights, powers and obligations arising thereunder and does hereby irrevocably constitute and appoint the Secretary of the Company as attorney-in-fact to transfer said interest on the books of the Company with full power and substitution in the premises.

IN WITNESS WHEREOF, the undersigned has executed this instrument as of the 10th, day of March, 2017.

ELIZABETH KELLY

ASSIGNMENT OF MEMBERSHIP INTEREST

FOR VALUE RECEIVED, the undersigned ("Assignor") hereby sells, assigns, transfers, grants and conveys unto NYNM ACQUISITION, LLC, all of Assignor's right, title and interest in NEW YORK NETWORK MANAGEMENT, L.L.C., a New York limited liability company (the "Company"), standing in her name on the books said Company, together with all of her rights, powers and obligations arising thereunder and does hereby irrevocably constitute and appoint the Secretary of the Company as attorney-in-fact to transfer said interest on the books of the Company with full power and substitution in the premises.

IN WITNESS WHEREOF, the undersigned has executed this instrument as of the 10th, day of March, 2017.

CLIONA SOTIROPOULOS

## ESCROW AGREEMENT

**THIS ESCROW AGREEMENT** (this "**Agreement**"), dated as of March [   ], 2017, is by and between Elizabeth Kelly (the "**Selling Member Representative**"), and Robinson Brog Leinwand Greene Genovese & Gluck P.C. ("**Escrow Agent**").

## BACKGROUND:

Elizabeth Kelly, Michaela Kircher, Cliona Sotiropoulos (collectively, the "**Selling Members**"), New York Network Management, L.L.C., a New York limited liability company ("**Company**"), NYNM Acquisition, LLC, a Delaware limited liability company ("**Buyer**"), and Selling Member Representative are parties to that certain Membership Interests Purchase Agreement, dated as of the date hereof (the "**Purchase Agreement**[1]"), pursuant to which Buyer has agreed to acquire from the Selling Members their membership interest in the Company.

The Purchase Agreement provides for $2,000,000 (the "**Escrow Payment**") to be placed in escrow with the Escrow Agent to be disbursed in accordance with this Agreement.

The Selling Member Representative desires to appoint Escrow Agent as the escrow agent pursuant to this Agreement, and Escrow Agent is willing to act as escrow agent hereunder. Escrow Agent agrees to hold and distribute all funds deposited with Escrow Agent pursuant to this Agreement in accordance with the terms of this Agreement.

The Selling Member Representative acknowledges that the Escrow Agent is not a party to, is not bound by, and has no duties or obligations under the Purchase Agreement, that all references in this Agreement to the Purchase Agreement are for convenience, and that the Escrow Agent shall have no implied duties beyond the express duties set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing background and of the mutual covenants set forth herein, the Selling Member Representative, intending to be legally bound, hereby agrees as follows:

1.      _Appointment of Escrow Agent_. The Selling Member Representative hereby appoints and designates Escrow Agent as escrow agent for the purposes set forth herein, and Escrow Agent does hereby accept such appointment under the terms and conditions set forth herein.

2.      _Establishment of the Escrow_. In connection with the Purchase Agreement, Buyer has heretofore delivered to Escrow Agent the sum of $2,000,000 (together with all interest earned thereon, the "**Escrow Fund**").

3.      _Investment of Escrow Fund_. Subject to applicable rules of professional conduct, during the term of this Agreement, Escrow Agent shall deposit the Escrow Payment in a non-interest-bearing account.

---

[1] All terms not defined herein shall have the meaning ascribed to them in the Purchase Agreement.

pursuant to this Agreement; and (vii) in the event that it shall be uncertain as to its duties or rights hereunder, or shall receive instructions, claims or demands from any of the parties hereto with respect to the Escrow Fund, which, in its opinion, are in conflict with any provision of this Agreement, it shall be entitled to refrain from taking any action (other than to keep safely the Escrow Fund) until it shall be directed otherwise in writing by all the parties hereto or by a final order or judgment of a court of competent jurisdiction.

7.2     Escrow Agent shall not be liable to anyone for any action taken or omitted to be taken by it or any of its shareholders or employees hereunder except in the case of gross negligence, bad faith, fraud or willful misconduct. the Selling Member Representative covenants and agrees to indemnify Escrow Agent and hold it harmless from and against, without any limitation, any loss, liability or expense (including without limitation any legal expenses) of any nature incurred by Escrow Agent arising out of or in connection with this Agreement or with the administration of its duties hereunder including, without limitation, legal fees and any other costs and expenses of defending or preparing to defend against any claim or liability, unless such loss, liability or expense shall be caused by Escrow Agent's gross negligence, bad faith, fraud or willful misconduct as adjudicated by a court of competent jurisdiction. In no event shall Escrow Agent be liable for indirect, punitive, special or consequential damages.

8.     Dispute Resolution.

8.1     It is understood and agreed that should any dispute arise with respect to the delivery, ownership, right of possession, and/or disposition of the Escrow Fund or should any claim be made upon the Escrow Fund by a third-party, Escrow Agent, upon receipt of written notice of such dispute or claim by the Selling Member Representative or by a third-party, is authorized and directed to retain the Escrow Fund in its possession, without liability to anyone, to the extent subject to any dispute or claim, until such dispute or claim shall have been settled either by the mutual agreement of the parties involved or by a final order, decree or judgment of a court of competent jurisdiction, the time for perfection of an appeal of such order, decree or judgment having expired, or by arbitration award, if resolution of such dispute is subject to this Agreement, whereupon Escrow Agent shall disburse the Escrow Fund in accordance with such settlement or court order. Escrow Agent may, but shall be under no duty to, institute or defend any legal proceedings which relate to the Escrow Fund.

8.2     the Selling Member Representative acknowledges that Escrow Agent is acting as the escrow agent hereunder as an accommodation to the Selling Member Representative and nothing herein shall prevent Escrow Agent from representing the Buyer in connection with any matter, including without limitation, any dispute between Buyer and the Selling Members, or any matter arising under, in connection with or related to this Agreement, the Purchase Agreement, or any related agreement in connection therewith, and the Selling Member Representative by execution hereof waives and releases any claim asserting any theory that would interfere with or prevent designate Escrow Agent from so representing the Buyer. The Selling Member Representative on its own behalf and on behalf of the Selling Members specifically agrees they will not assert in any proceeding that Escrow Agent has or may have a conflict in representing the Buyer, nor shall the Selling Member Representative or the Selling Members seek to disqualify Escrow Agent from continued representation of the Buyer in any proceeding.

and any such notice or communication given in the manner specified in this Section 12 shall be deemed to have been given as of the date so delivered or sent if delivered personally or as of the next Business Day if sent by overnight courier, postage prepaid.

13.    Severability. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the Selling Member Representative hereto shall use its good faith, reasonable efforts to substitute one or more valid, legal and enforceable provisions in order to implement the purposes and intent hereof.

14.    Successors and Assigns; Assignment; No Third Party Rights. This Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the heirs, executors, administrators, personal representatives, successors and assigns of the Selling Member Representative; provided, however, that no party hereto shall assign this Agreement or any of its rights, interest or obligations hereunder without giving written notice thereof to Escrow Agent. No third party shall have any right, title or interest in or to any portion of the Escrow Fund.

15.    Modifications; Waiver. This Agreement may not be altered or modified without the express written consent of the party against whom enforcement is sought. No course of conduct shall constitute a waiver of any of the terms and conditions of this Agreement, unless such waiver is specified in writing, and then only to the extent so specified. A waiver of any of the terms and conditions of this Agreement on one occasion shall not constitute a waiver of the other terms and conditions of this Agreement, or of such terms and conditions on any other occasion.

16.    Governing Law. The terms of this Agreement shall be governed by the laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof. The Selling Member Representative irrevocably submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York located in New York County, State of New York, or if such court does not have jurisdiction, the state courts of the State of New York located in New York County for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby. The Selling Member Representative hereto irrevocably and fully waives the defense of an inconvenient forum to the maintenance of such suit, action or proceeding. The Selling Member Representative irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in either of the courts named in this subsection and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. The Selling Member Representative irrevocably and unconditionally waives trial by jury in any legal action or proceeding relating to this Agreement or any other agreement entered into in connection therewith and for any counterclaim with respect thereto. Notwithstanding the preceding, the Selling Member Representative may subsequently agree in writing that any such proceeding may be brought and maintained in any other court sitting in the United States that has jurisdiction.

**IN WITNESS WHEREOF**, the Parties hereto have executed, or have caused this Agreement to be executed, as an instrument under seal, intending this Agreement to be, to constitute and to have the effect of a sealed instrument according to law.

BUYER:

NYNM Acquisition, LLC

By: _____

Name: Paul Parmar

Title:  Manager


Selling Member Representative


By: _____
    Elizabeth Kelly

Escrow Agent:

Robinson Brog Leinwand Greene Genovese & Gluck P.C.

By: _____
Name: A. Mitchell Greene   .


[Signature Page to Escrow Agreement]

**EXHIBIT 2.2(a)(i)**

(attached)

immediately prior to the closing of the transactions contemplated by the Purchase Agreement or within 10 miles of such location.

2.    **Loyalty and Diligence**. Executive shall at all times exercise Executive's commercially reasonable best efforts to promote the success of the Company Group and to discharge Executive's duties and responsibilities in a commercially reasonable manner.

3.    **Base Salary**. During the Employment Term, subject to all of the terms and conditions of this Agreement, the Company shall pay the Executive a base yearly salary of $50,000.00 ("*Base Salary*"), payable in accordance with Company's usual payroll policies, but no less often than every other week and commencing no later than the first full payroll cycle after the date hereof, less such deductions or amounts to be withheld as shall be required by law.

4.    **Other Benefits**.

A.    During the Employment Term, Executive shall be entitled to participate in all of Company's benefit plans (if any), such as group life insurance, hospitalization, medical and disability plans, in accordance with their provisions, and other benefits extended by Company from time to time to its senior executives, such as vacations, holidays, sick leave, savings and retirement plans, and related programs, all to the same degree as other senior executives of the Company are entitled to participate. Company may, at any time, modify, amend and/or terminate any of these plans or benefits with respect to all of its senior executives, to the extent permitted by law, without obligation to Executive. Company shall reimburse Executive for all reasonable and necessary business and traveling expenses pursuant to the Company expense reimbursement policy, and other disbursements reasonably incurred by Executive for or on behalf of Company in the performance of Executive's duties hereunder ("*Reimbursable Expense(s)*"); provided, however, Executive shall obtain prior written consent from the CHT CEO before the incurrence of any Reimbursable Expenses in excess of **$200**, which consent shall not be unreasonably withheld, conditioned or delayed.

B.    In furtherance of the foregoing, Executive shall be entitled to paid vacation each calendar year during the Employment Term at the rate of no less than **four (4) weeks** per annum ("*PTO*"). The Executive shall be allowed to roll over three days of PTO per year into the next calendar year.  As of the date of this Agreement the Executive acknowledges that she is not owed any PTO.

5.    **Termination**.

A.    Notwithstanding the provisions of Section 1 hereof, or any other provision of the Agreement regarding termination or discharge, the Employment Term and Executive's employment with Company shall terminate upon the first to occur of any of the following:

a)    non-renewal and/or expiration of the Employment Term as provided in Section 1 hereof;

b)    the death of Executive;

{00846093.DOCX;7 }

3

Executive's employment is terminated for nonrenewal, death or disability pursuant to clauses (a), (b) or (c) of Section 5.A above, Company shall pay Executive the then current Base Salary and accrued but unused PTO paid through the effective date of termination, plus any incurred but outstanding Reimbursable Expenses and any accrued benefits under any Company benefit plans, which amount shall be due and payable within thirty (30) days after the termination date. Any termination of Executive by Company for Cause shall be deemed a material breach of this Agreement by Executive and shall be without prejudice to any other remedy Company may have at law or in equity. Executive's voluntary resignation, with or without Good Reason, shall not be a breach of this Agreement.

      E.     If Company terminates Executive's employment hereunder for any reason other than For Cause, or pursuant to clauses (a), (b) or (c) of Section A above, or Executive terminates Executive's employment hereunder for Good Reason, Company shall pay or provide the amounts and benefits described in Section 5.D above to Executive and, subject to Executive's execution and nonrevocation during the applicable revocation period of a release of claims in the form substantially similar to the **Exhibit B** (the "*Release*") attached hereto, Company shall pay Executive (i) an amount equal to the then current Base Salary (immediately prior to any unauthorized reduction thereof constituting Good Reason) for the period from the date of Executive's termination of employment through the last day of the Employment Term in effect immediately prior to such termination, or, if longer, for one year, which amount shall be due and payable in a lump sum within thirty (30) days after the termination date, and (ii) health insurance premiums (on an 'after-tax basis") for **[three (3) months]** following the date of Executive's termination of employment at the same level as if the Executive had continued to be employed by the Company; provided that the execution of the Release, if timely provided to Executive, and the expiration of any revocation period must occur within sixty (60) days following the termination of employment for Executive to be entitled to receive the amounts that are consideration for the Release described in this Section 5.E.

      F.     Notwithstanding anything herein to the contrary, if this Agreement is terminated by Company without Cause or by Executive for Good Reason, the restrictions set forth in Section 5 of the Confidentiality Agreement (as defined below) and Section 6.4(a)(i) of the Purchase Agreement shall terminate as of the last day of the Employment Term in effect immediate prior to such termination and thereafter shall have no further force or effect.

      G.     Notwithstanding anything contained herein to the contrary, during the first (24) months after the Effective Date, the Company shall not have the right to terminate Executive's employment except for in cases of Cause, or pursuant to 5(A)(a), or 5(A)(c).

      H.     In the event that the Company terminates Executive's employment without Cause in breach of this Agreement or Executive terminates its employment for Good Reason, then if the Buyer wishes to engage persons to fulfill some or all of the functions provided by Executive to the Company immediately prior to the termination, the Buyer shall provide Executive with prior written notice and, in the case of the first two candidates, Buyer shall not engage their services without Executive's prior written consent, which consent may be denied for any reason or no reason at all (provided, however, that Executive shall be deemed to

11.    **Governing Law Conflicts of Law**. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without reference to conflicts of laws.

12.    **Integration: Amendment of Agreement**. This Agreement together with the Confidentiality Agreement sets forth the entire agreement between Company and Executive relating to Executive's employment and engagement and supersedes all prior negotiations and written or oral agreements or understandings between Company and Executive relating to Executive's employment and engagement. This Agreement may be amended, supplemented, or modified only by a written instrument executed by or on behalf of each Party. Nothing herein contained is intended to, or shall be deemed to affect any rights to any payments under the Purchase Agreement or documents related thereto.

13.    **Headings/Recitals**. The headings used in this Agreement have been inserted for convenience of reference only and do not define or limit the provisions hereof. The Recitals are incorporated into and made part of this Agreement.

14.    **Severability**. The Parties intend all provisions of this Agreement to be enforced to the fullest extent permitted by law. Accordingly, if an arbitrator or court of competent jurisdiction determines that the scope and/or operation of any provision of this Agreement is too broad to be enforced as written, the Parties intend that the arbitrator or court should reform such provision to such narrower scope and/or operation as it determines to be enforceable. If, however, any provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future law, and not subject to reformation, then (a) such provision shall be fully severable, (b) this Agreement shall be construed and enforced as if such provision was never a part of this Agreement, and (c) the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by illegal, invalid, or unenforceable provisions or by their severance.

15.    **Waiver**. Any term or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof, but no such waiver shall be effective unless set forth in a written instrument duly executed by or on behalf of the Party waiving such term or condition. Any waiver by the Company shall require the consent of the CHT CEO. No waiver by any Party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion. All remedies, either under this Agreement or by law or otherwise afforded, will be cumulative and not alternative.

16.    **Survival**. The provisions of this Agreement containing covenants intended to survive the termination of this Agreement, shall survive such termination regardless of the reason for termination for the period necessary to give effect to such covenants.

17.    **Indemnification**. Company shall secure directors' and officers' liability insurance for the benefit of Executive on terms at least equal to those applicable to the other directors and officers of Company (which insurance, for Executive, shall provide for advancement of defense costs) and shall indemnify Executive to the maximum extent permitted under the New York Limited Liability Company Law.

{00846093.DOCX;7 }

7

reasonable actions which are necessary, appropriate or desirable to avoid imposition of any additional tax or income recognition prior to actual payment to Executive under Section 409A.

F.    For purposes of this Agreement, "*Section 409A Limit*" means the lesser of two (2) times: (i) Executive's annualized compensation based upon the annual rate of pay paid to Executive during Company's taxable year preceding Company's taxable year of Executive's separation from service as determined under Treasury Regulation 1.409A-1(b)(9)(iii)(A)(1) and any Internal Revenue Service guidance issued with respect thereto; or (ii) the maximum amount that may be taken into account under a qualified plan pursuant to Section 401(a)(17) of the Internal Revenue Code for the year in which Executive's employment is terminated.

[Signature Page Follows]

*IN WITNESS WHEREOF*, the Parties have executed this Agreement as of the Effective Date.

COMPANY:

By: _____ ███████████████

Name: Paul Parmar

Title: Manager

EXECUTIVE:

_____

[Signature Page to Employment Agreement – Elizabeth Kelly]

order and/or waive in writing compliance with the confidentiality provisions of this Confidentiality Agreement.

2. **Developments**.

(a) <u>Assignment of Developments</u>. I agree that I will, without additional compensation, promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title and interest throughout the world in and to any and all developments, original works of authorship, inventions, concepts, know-how, improvements or trade secrets, whether or not patentable or registrable under copyright or similar laws, which I may solely or jointly with others conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of my employment by any member of the Company Group (the "*Employment Period*")whether or not during regular working hours, provided they either (i) relate at the time of conception or development to the actual or demonstrably proposed business or research and development activities of the Company Group; (ii) result from or relate to any work performed for the Company Group; or (iii) are developed through the use of Confidential Information and/or resources of any member of the Company Group or in consultation with personnel of any member of the Company Group (collectively referred to as "*Developments*"). I further acknowledge that all Developments which are made by me (solely or jointly with others) within the scope of and during the Employment Period are "works made for hire" (to the greatest extent permitted by applicable law) for which I am, in part, compensated by my salary, and in the event any such Development is deemed not to be a work made for hire, I hereby assign all rights in such Development to the Company, or its or its designee.

(b) <u>Maintenance of Records</u>. I agree to keep and maintain adequate and current written records of all Developments made by me (solely or jointly with others) during my Employment Period. The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, and any other format. The records will be available to and remain the sole property of the Company at all times. I agree not to remove such records from the Company's place of business except as permitted by the Company Group's policy which may, from time to time, be revised at the sole election of the Company Group for the purpose of furthering the business of the Company Group.

(c) <u>Intellectual Property Rights</u>. I agree to reasonably assist the Company Group, or its designee, at the Company Group's expense, in every way to secure the rights of the Company Group or its assignee in the Developments and any copyrights, patents, trademarks, service marks, database rights, domain names, mask work rights, moral rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company Group of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments which the Company Group shall reasonably deem necessary in order to apply for, obtain, maintain and transfer such rights and in order to assign and convey to the Company Group the sole and exclusive right, title and interest in and to such Developments, and any intellectual property or other proprietary rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after

"*Territory*"); provided, however, that nothing in this Agreement shall preclude me from purchasing or owning up to five percent (5%) of the outstanding capital stock of a company which has a class of securities registered under Section 12 of the Securities Act of 1934, as amended, or trading on a national securities exchange or quoted in an over-the-counter market.

(b)    For the purposes of this Release, "Post-Termination Restricted Period" shall mean the period commencing on the date of the termination of the Employment Period for any reason and ending on the one (1) year anniversary of such date of said termination; provided, however, that the Post-Employment Restricted Period shall terminate immediately upon the termination of the Employment Period by the Company without "Cause" or my resignation for "Good Reason", as these terms are defined in my Employment Agreement with the Company dated the date hereof.

6.    **Reasonableness of Restrictions**.    I acknowledge and recognize the highly competitive nature of the Company Group's business, that access to Confidential Information renders me special and unique within the Company Group's industry, and that I will have the opportunity to develop substantial relationships with existing and prospective clients, accounts, customers, consultants and contractors, investors and strategic partners of the Company Group during the course of and as a result of my employment with the Company. In light of the foregoing, I recognize and acknowledge that the restrictions and limitations set forth in this Confidentiality Agreement are reasonable and valid in geographical and temporal scope and in all other respects, and are essential to protect the value of the business and assets of the Company Group. I further acknowledge that the restrictions and limitations set forth in this Confidentiality Agreement will not materially interfere with my ability to earn a living following the termination of my employment with the Company and that my ability to earn a livelihood without violating such restrictions is a material condition to my employment with the Company.

7.    **Independence; Severability**.

(a)    Each of the rights enumerated in this Confidentiality Agreement shall be independent of the others and shall be in addition to and not in lieu of any other rights and remedies available to the Company Group at law or in equity. If any of the provisions of this Confidentiality Agreement or any part of any of them is hereafter construed or adjudicated to be invalid or unenforceable, the same shall not affect the remainder of this Confidentiality Agreement, which shall be given full effect without regard to the invalid portions.

(b)    If any of the other covenants contained herein are held to be invalid or unenforceable because of the duration of such provisions or the area or scope covered thereby, I agree that the court making such determination shall have the power to reduce the duration, scope and/or area of such provision to the maximum and/or broadest duration, scope and/or area permissible by law and in its reduced form said provision shall then be enforceable.

8.    **Injunctive Relief**. I expressly acknowledge that any breach or threatened breach of any of the terms and/or conditions set forth in this Confidentiality Agreement may result in substantial, continuing and irreparable injury to the members of the Company Group. Therefore, I hereby agree that, in addition to any other remedy that may be available to the Company, any member of the Company Group shall be entitled to seek injunctive relief, specific performance

{00846093.DOCX;7 }

14

I, Elizabeth Kelly, and the Company have executed this Confidentiality, Non-Interference and Invention Assignment agreement on the respective dates set forth below:

Date: 3/10/17

_____
(Signature)

*ELIZABETH KELLY*
(Type/Print Name)

Date:_____

New   York   Network   Management,   L.L.C.


By:_____
Name: Paul Parmar
Title:  Manager

[Signature Page to Confidentiality Agreement – Elizabeth Kelly]

**EXHIBIT B**

**SEPARATION AGREEMENT AND GENERAL RELEASE**

This is a SEPARATION AGREEMENT ("**Agreement**") by and among New York Network Management, L.L.C., a New York limited liability company (together with its successors, "**Company**"), and Elizabeth Kelly ("**Employee**"), (collectively, the "**Parties**").

WHEREAS, Employee's employment with Company is ending or has ended; and in order to forever resolve and settle any and all disputes regarding Employee's employment with Company or any other disputes with Company Employee may have, the Parties agree as follows:

1.    *Separation.*    You will be terminated from your position as of _____ (the "**Separation Date**"). You are being notified that employment with Company will be terminated, together with all other positions which Employee may hold with Company, and its subsidiaries and affiliates..

2.    *Separation Payments and Benefits.* Subject to Employee's execution of the release set forth in Section 3 hereof and Employee's compliance with the provisions of this Agreement and the Confidentiality, Non-Interference and Invention Assignment Agreement as stated in your Employment Agreement dated March 1, 2017("Employment Agreement") between Employee and Company, Employee shall receive all of the benefits and payments specified in paragraphs 5.D and 5.E of the Employment Agreement, reduced by any required withholding of taxes.

3.    *Release Release.* Employee agrees to and does fully and completely release, discharge and waive any and all claims, complaints, causes of action or demands of whatever kind which Employee has or may have, whether known or unknown, against Company, its subsidiaries, stockholders, affiliates, predecessors and successors and all their officers, directors, and employees by reason of any event, matter, cause or thing which has occurred prior to the Separation Date, including but not limited to any event, matter cause or thing which has occurred in Employee's capacity as an employee or security holder of Company or its affiliates or otherwise ("**Claims**"). *This is a General Release.* Employee understands and accepts that this Agreement specifically covers, but is not limited to, any and all Claims which Employee has or may have against Company and its affiliates relating in any way to Employee's employment arrangements or to compensation, or to any other terms, conditions or circumstances of Employee's former employment with Company and its affiliates, and to the termination of such employment, whether for severance or based on statutory or common law claims for employment discrimination (including under the Age Discrimination in Employment Act (29 U.S.C. §621 et seq.) and Title VII of Civil Rights Act of 1964 (42 U.S.C. §2000e et seq.)), wrongful discharge, breach of contract or any other theory, whether legal or equitable. Employee acknowledges that this Release shall extend to unknown, as well as known claims, and hereby waives the application of any provision of law that purports to limit the scope of a general release. Notwithstanding the foregoing, Employee does not waive any rights which Employee may be entitled to seek to enforce this Agreement. The Parties agree that to the extent, if any, Employee may have a right to file or participate in a claim or charge against Company, which cannot be waived, the Agreement shall not be intended to waive such a right. However, even if Employee

{00846093.DOCX;7 }

17

(b)    In connection with the termination of Employee's employment hereunder, Employee shall cooperate with Company and its affiliates to ensure an orderly transition, in such a manner and at such times as Company shall reasonably request.

7.    *No Waiver.* The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver of such party's rights or deprive such party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

8.    *Severability.* In the event that any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions of this Agreement shall not be affected thereby.

9.    *Assignment.* This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective heirs, representatives, successors and assigns. This Agreement shall not be assignable by Employee and shall be assignable by Company only to an affiliate or successor of Company.

10.    *Acknowledgment.* Employee acknowledges that Employee has carefully read and fully understands this Agreement, fully understands and accepts all of its provisions, and signs it voluntarily of Employee's own free will. Employee acknowledges that some of the payments provided in this Agreement are payments to which Employee would not otherwise be entitled absent this Agreement. Employee further acknowledges that Employee has been provided a full opportunity to review and reflect on the terms of this Agreement and to seek the advice of legal counsel of his choice, and the Employee is hereby advised to seek advice of counsel prior to signing this Agreement.

11.    *Governing Law.* This Agreement shall be governed by and construed in accordance with the laws of the State of New York. Any dispute between the Parties shall be resolved in New York, New York pursuant to the expedited Commercial Arbitration Rules of the American Arbitration Association. Notwithstanding the foregoing, nothing herein shall prevent a Party from seeking equitable relief from any court of competent jurisdiction to enforce the provisions of the Non-Interference Agreement.

**SIGNATURES**

CONSULTING AGREEMENT

This Agreement ("*Agreement*"), dated as of March 10, 2017 (the "*Effective Date*"), is by and between New York Network Management, L.L.C., a New York limited liability company (the "*Company*") having an address at c/o Robinson Brog Leinwand Greene Genovese & Gluck PC 875 Third Avenue/9th Floor New York, NY 10022 and Premier Network Management LLC ("*Consultant*") having an address at 125 Annfield Ct Staten Island, NY 10304. Company and Consultant may hereinafter be collectively referred to as the "*Parties*" and each a "*Party*".

## RECITALS

WHEREAS, pursuant to a Membership Interest Purchase Agreement (the "*Purchase Agreement*") dated as of the date hereof, by and among the Company, Elizabeth Kelly ("*Kelly*"), Michaela Kircher, and Cliona Sotiropoulos, and NYNM Acquisition, LLC a Delaware limited liability company ("*Buyer*"), the Buyer is acquiring all of the outstanding membership interests of the Company; and

WHEREAS, the Company and the Consultant now desire to enter into this Agreement.

NOW, THEREFORE, Company and Consultant, each in consideration of the promises of the other hereafter contained, intending to be legally bound agree as follows:

1.      Services. Consultant agrees to perform services to effectuate the sales and growth strategy of the Company (the "*Services*") to the Company and its subsidiaries and affiliates (the "*Company Group*") as Paul Parmar or his successors as the Chief Executive Officer of Constellation Healthcare Technologies, Inc. (the "*CHT CEO*") may reasonably determine from time to time. The Parties understand and agree that the Company shall only have control over the results of the Consultant's Services. Consultant shall retain control over the means and methods by which such results are accomplished. Consultant shall have sole discretion and control to determine which of its agents, representatives, employees or other individuals will perform the Services hereunder (except as otherwise provided herein), provided that Kelly shall remain the Consultant's sole Managing Member and sole provider of services for the Consultant to the Company (the "*Managing Member*"), unless otherwise approved by the Company during the Term, unless such requirement is expressly waived in advance by the Company in writing. Consultant shall provide its own equipment, and supplies.

2.      Independent Contractor Status. Nothing herein shall be construed to create a joint venture or partnership between the Parties or an employee/employer relationship. Consultant understands and agrees that the manner in which Consultant, the Managing Member or any of Consultant's agents, representatives and employees performs the Services is in Consultant's discretion and control, and that the Company shall not supervise or direct Consultant's performance of those Services. Consultant understands and agrees that it is an independent contractor, and neither it nor its Managing Member nor any officer, other member, manager, employee, agent or representative of Consultant (individually, a "*Consultant Group Member*," and, collectively, the "*Consultant Group*") is entitled to or shall receive any of the rights, privileges and benefits that the Company extends to its employees, including, but not limited to, pension, retirement savings or welfare benefits, vacation, termination or severance

{00846220.DOCX;2 }{00846220.DOCX;2 }

2

5. **Other Benefits**. Company shall reimburse Consultant for all reasonable and necessary business and traveling expenses pursuant to the Company expense reimbursement policy, and other disbursements reasonably incurred by Consultant for or on behalf of Company in the performance of Consultant's duties hereunder ("*Reimbursable Expense(s)*"); provided, however, Consultant shall obtain prior written consent from the CHT CEO before the incurrence of any Reimbursable Expenses in excess of **$100,000**, which consent shall not be unreasonably withheld, conditioned or delayed.

6. **Termination**.

(a) Notwithstanding the provisions of Section 1 hereof, or any other provision of the Agreement regarding termination or discharge, the Service Term and Consultant's engagement with Company shall terminate upon the first to occur of any of the following:

(i) non-renewal and/or expiration of the Service Term as provided in Section 3 hereof;

(ii) the death of Kelly;

(iii) the physical or mental disability or incapacity of Kelly, as determined by an independent physician chosen by Company and reasonably acceptable to Kelly, whether total or partial, if Kelly is unable to substantially perform Kelly's duties hereunder: (i) for a period of six consecutive months, or (ii) shorter periods aggregating six months during any twelve (12) month period, such termination to be effective thirty (30) days after written notice of such decision has been delivered by Company to Kelly;

(iv) a termination of Consultant engagement by the Company, with or without Cause; and

(v) Consultant's resignation of its engagement with or without Good Reason.

(b) For purposes of this Agreement, "Cause" shall mean: (i) the gross neglect by Consultant of Consultant's duties hereunder, continuing for ten (10) business days after receipt of written notice by Consultant from Company setting forth the conduct constituting such gross neglect with reasonable specificity; (ii) the willful failure of Consultant to perform the duties and obligations of Consultant hereunder, provided that Consultant has been given written notice specifying in reasonable detail the nature of such failure to perform and Consultant fails to cure such failure to perform to the reasonable satisfaction of the CHT CEO within thirty (30) days after receipt of such notice; (iii) the conviction of Kelly or entering a plea of guilty or nolo contendere by Kelly to a crime that constitutes a felony; (iv) the commission by Kelly or any member of the Consulting Group of any material act of fraud against Company;(v) a proven material breach of any restrictive covenant or non-compete provisions in the Confidentiality

(g)    Notwithstanding anything contained herein to the contrary, during the first (24) months after the Effective Date, the Company shall not have the right to terminate Consultant except for in cases of Cause, or pursuant to 5.A(a), or 5.A(c)

7.    **Non-Interference Agreement.**  Consultant is required as a condition of, and prior to the commencement of, the Agreement with the Company to execute the Company's Confidentiality, Non-Interference and Invention Assignment Agreement (the *"Confidentiality Agreement"*), in the form attached hereto as **Exhibit B**.  The Confidentiality Agreement shall be executed concurrently with the execution of this Agreement and shall become effective on the Effective Date.

8.    **Review by Counsel: No Adverse Inference.**  Each Party acknowledges that it has consulted with its own legal counsel, who has participated in the drafting of this Agreement. In the event of any ambiguity(ies) in any provision hereof, there shall be no adverse inference drawn against either Party.

9.    **Notices.**  Any notice, request, demand, and other communication provided for by this Agreement shall be sufficient if in writing and if delivered personally by hand or sent by any commercially reasonable means of conveyance that provides proof of delivery to the address listed at the head of this Agreement. Any such notice, request, demand or other communication shall be deemed given when received, if delivered by hand, or when signed for by the addressee or Consultant's agent.  The Consultant shall have the obligation to notify the Company if Consultant's address changes.

10.    **Conflict Resolution Arbitration: Interim Awards.**

(a)    Should Consultant have any issue concerning the Consultant's engagement , Consultant's shall take the issue to the CHT CEO in writing. The CHT CEO within 10 business days of receipt of the writing shall issue a ruling stating its decision in detail.

(b)    If Consultant's or is not satisfied with the CHT CEO's ruling the Consultant's shall have the right to take the matter to arbitration which shall be resolved in New York, New York pursuant to the expedited Commercial Arbitration Rules of the American Arbitration Association.  Notwithstanding the foregoing, nothing herein shall prevent a Party from seeking equitable relief from any court of competent jurisdiction to enforce the provisions of the Non-Interference Agreement.

11.    **Assignment: Heirs and Successors Bound.**  This Agreement shall be binding on and inure to the benefit of the Parties and their respective heirs, administrators, personal representatives, successors and permitted assigns. Company may assign or delegate any of its rights or obligations hereunder to any "assignee" and any such assignee shall be deemed substituted for Company under the terms of this Agreement and all references to *"Company"* shall be deemed to mean such assignee.  Consultant may not assign this Agreement, but her rights under this Agreement may be assigned upon her death to her heirs or pursuant to the laws of descent and distribution.  As used in this Agreement, the term "assignee" shall mean any person which at any time, whether by merger, purchase or otherwise, acquires all of the equity or all or substantially all of the assets or business of Company.

*IN WITNESS WHEREOF*, the Parties have executed this Agreement as of the Effective Date.

**COMPANY:**

By: _____

Name: Paul Parmar

Title: Manager


**CONSULTANT:**

_____

[Signature Page to Consultant Agreement – Elizabeth Kelly]

EXHIBIT A

# CONFIDENTIALITY, NON-INTERFERENCE AND INVENTION ASSIGNMENT AGREEMENT

In consideration of the engagement of Premier Network Management LLC (the "Consultant") with New York Network Management, L.L.C., a New York limited liability company (the "*Company*") and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, I on behalf of the Consultant and myself agree to the following Confidentiality, Non-Interference and Invention Assignment Agreement ("*Confidentiality Agreement*") :

### 19.    **Confidential Information**.

I acknowledge that, during the course of the Consultant's engagement with the Company pursuant to the Consulting Agreement (the "*Consulting Agreement*") by and between the Company and the Consultant, I will have access to information about the Company, and that my consulting for the Company shall bring me into close contact with confidential and proprietary information of the Company. In recognition of the foregoing, I agree, at all times during the term of the Consulting Agreement with the Company and for the Post-Termination Restricted Period (hereinafter defined) thereafter, to hold in confidence, and not to use, except for the benefit of the Company and its direct and indirect subsidiaries and affiliates and those entities that own, directly or indirectly the Company, together with their direct and indirect subsidiaries and affiliates (collectively, the "*Company Group*"), or to disclose to any person, firm, corporation or other entity without written authorization of the Company's Manager or Board of Managers (the "*Board*") or in the good faith performance of my duties to the Company Group, any Confidential Information that I obtain or create. I further agree not to make copies of such Confidential Information except as authorized by the Board or in the good faith performance of my duties to the Company Group. I understand that "*Confidential Information*" means confidential or proprietary trade secrets, client lists, client identities and information, information regarding service providers, investment methodologies, marketing plans, sales plans, management organization information, operating policies or manuals, business plans or operations or techniques, financial records or data, source code, or other financial, commercial, business or technical information relating to the Company Group, or that the Company Group may receive belonging to clients, accounts, customers or others who do business with the Company Group. I understand that Confidential Information includes, but is not limited to, information pertaining to any aspect of the Company  Group's business which is either information not known by actual or potential competitors of the Company  Group or is confidential or proprietary information of the Company Group or its clients, accounts, customers or licensees, whether of a technical nature or otherwise.   Notwithstanding the foregoing, Confidential Information shall not include (i) any of the foregoing items which have become publicly and widely known through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved; (ii) information I disclose to my

{00846220.DOCX;2 }{00846220.DOCX;2 }

9

transfer such rights and in order to assign and convey to the Company Group the sole and exclusive right, title and interest in and to such Developments, and any intellectual property or other proprietary rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of the Consulting Period until the expiration of the last such intellectual property right to expire in any country of the world; provided, however, the Company Group shall reimburse me for my reasonable expenses, including my time and my legal expenses, incurred in connection with carrying out the foregoing obligation. If the Company Group is unable because of my mental or physical incapacity to secure my signature to apply for or to pursue any application for any United States, Canadian or foreign patents or copyright registrations covering Developments or original works of authorship assigned to the Company Group as above, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications or records and to do all other lawfully permitted acts to further the application for, prosecution, issuance, maintenance or transfer of letters patent or registrations thereon with the same legal force and effect as if originally executed by me. I hereby waive and irrevocably quitclaim to the Company Group any and all claims, of any nature whatsoever, which I now or hereafter have for past, present or future infringement of any and all proprietary rights assigned to the Company Group.

21.    **Returning Company Group Documents**. I agree that, at the time of termination of the Consulting Agreement with the Company for any reason, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all Confidential Information and all other documents, materials, information or property developed by me pursuant to the Consulting Agreement or otherwise and belonging to the Company Group. I further agree that any property situated on the Company premises and owned by the Company (or any other member of the Company Group), including disks and other storage media, filing cabinets or other work areas, is subject to inspection by personnel of any member of the Company Group at any time with or without notice.

22.    **Disclosure of Agreement**. As long as the Confidentiality Agreement remains in effect, I will disclose the existence of this Confidentiality Agreement to any prospective employer, partner, co-venturer, investor or lender prior to entering into an employment, partnership or other business relationship with such person or entity.

23.    **Restrictions on Interfering**.

(a)    During the Consulting Period and the Post-Termination Restricted Period (defined below), I shall not, directly or indirectly, individually or on behalf of any person, company, enterprise or entity, or as a sole proprietor, partner, stockholder, director, member, manager, officer, principal, agent, executive, or in any other capacity or relationship, participate or engage in or provide any services to, or have any direct or indirect interest in, any business carried on whose operations, in whole or in part, are the same as, similar to or are in competition with any of the business operations carried on by the Company or any of its direct or indirect

26.  **Injunctive Relief**. I expressly acknowledge that any breach or threatened breach of any of the terms and/or conditions set forth in this Confidentiality Agreement may result in substantial, continuing and irreparable injury to the members of the Company Group. Therefore, I hereby agree that, in addition to any other remedy that may be available to the Company, any member of the Company Group shall be entitled to seek injunctive relief, specific performance or other equitable relief by a court of appropriate jurisdiction in the event of any breach or threatened breach of the terms of this Confidentiality Agreement. Notwithstanding any other provision to the contrary, I acknowledge and agree that the Post-Termination Restricted Period, if applicable, shall be extended by the duration of any period of proven violation of any of the covenants in Section 5 hereof and during any other period required for litigation during which the Company or any other member of the Company Group seeks to enforce such covenants against me if it is ultimately determined that I was in breach of such covenants.

27.  **General Provisions**.

(a)  <u>Governing Law and Jurisdiction</u>. The validity, interpretation, construction and performance of this Confidentiality Agreement shall be governed by the laws of the State of New York, without giving effect to the principles of conflict of laws.

(b)  <u>Entire Agreement</u>. This Confidentiality Agreement sets forth the entire agreement and understanding between the Company Group and me relating to the subject matter herein and merges all prior discussions between us. No modification or amendment to this Confidentiality Agreement, nor any waiver of any rights under this Confidentiality Agreement, will be effective unless in writing signed by the party to be charged. Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Confidentiality Agreement.

(c)  <u>No Right of Continued Work</u>. I acknowledge and agree that nothing contained herein shall be construed as granting the consultant and thus me the right to continued work with the Company, and the right of the Company to terminate is specifically set forth in the Consulting Agreement.

(d)  <u>Successors and Assigns</u>. This Confidentiality Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns. I expressly acknowledge and agree that this Confidentiality Agreement may be assigned by the Company without my consent to any other member of the Company Group as well as any purchaser of all or substantially all of the assets or stock of the Company, whether by purchase, merger, or other similar corporate transaction.

(e)  <u>Survival</u>. The provisions of this Confidentiality Agreement shall survive the termination of the Consulting Agreement and/or the assignment of this Confidentiality Agreement by the Company to any successor in interest or other assignee for the time periods expressly set forth herein.

*      *      *

I, Elizabeth Kelly, and the Company have executed this Confidentiality, Non-Interference and Invention Assignment agreement on the respective dates set forth below:

Date:_____

_____
(Signature)

_____
(Type/Print Name)

Date:_____

New    York    Network    Management,    L.L.C.

By:_____

Name: Paul Parmar

Title:  Manager

[Signature Page to Confidentiality Agreement -- Consulting Agreement – Elizabeth Kelly]

officers, directors, and employees, from any and all causes of action, rights and claims, of any nature or type, known or unknown, which Company has had in the past, now have, or might now have, through the date of its signing of this Agreement, including, but not limited to, any such causes of action, rights or claims in any way resulting from, arising out of or connected with Consultant's engagement by Company or any of its affiliates or the termination of that engagement, pursuant to any federal, state or local law, regulation or other requirement; provided that nothing herein shall be a release of Company's rights to enforce any provision of the Agreement, as in effect from time to time. Notwithstanding the forgoing the releases contained in this Section 4 is not a release or waiver of any of the Company's or its parent's or their affiliates' rights pursuant to that certain MIPA.

5. *Confidentiality; No Disparagement.* Consultant agrees not to make negative statements or representations, or otherwise communicate negatively, directly or indirectly, in writing, orally, or otherwise, or take any action which may, directly or indirectly, disparage or be damaging to Company, its subsidiaries, affiliates, successors or their officers, directors, employees, business or reputation. Consultant agrees not to directly or indirectly participate in the publication of any information concerning the facts underlying the termination of Consultant's engagement and this Agreement, other than in cooperation with Company. Company agrees not to make negative statements or representations, or otherwise communicate negatively, directly or indirectly, in writing, orally, or otherwise, or take any action which may, directly or indirectly, disparage or be damaging to Consultant or its managing member. Company agrees not to participate in the publication of any information concerning the facts underlying the termination of Consultant and this Agreement, other than in cooperation with Consultant.

6. *Covenants.*

(a)    Consultant and its managing member acknowledge and agrees that Consultant and its managing member will continue to be bound by the Confidential Information, Non-Solicitation, Non-Competition, Conflict of Interest and Invention Assignment Agreement.

(b)    In connection with the termination of Consultant's services hereunder, Consultant shall cooperate with Company and its affiliates to ensure an orderly transition, in such a manner and at such times as Company shall reasonably request.

7. *No Waiver.* The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver of such party's rights or deprive such party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

8. *Severability.* In the event that any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions of this Agreement shall not be affected thereby.

9. *Assignment.* This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective heirs, representatives, successors and assigns.    This