# EXHIBIT 9

EMPLOYMENT AGREEMENT

This Agreement ("*Agreement*"), dated as of March 1, 2017 (the "*Effective Date*"), is by and between New York Network Management, L.L.C., a New York limited liability company (the "*Company*") having an address at c/o Robinson Brog Leinwand Greene Genovese & Gluck PC 875 Third Avenue/9th Floor New York, NY  10022 and Elizabeth Kelly ("*Executive*") having an address at _____. Company and Executive may hereinafter be collectively referred to as the "*Parties*" and each a "*Party*".

## RECITALS

WHEREAS, pursuant to a Membership Interest Purchase Agreement (the "*Purchase Agreement*") dated as of the date hereof, by and among the Company, Executive, Michaela Kircher, and Cliona Sotiropoulos, and NYNM Acquisition, LLC a Delaware limited liability company ("*Buyer*"),  the Buyer is acquiring all of the outstanding membership interests of the Company; and

WHEREAS, the Company and the Executive now desire to enter into this Agreement.

NOW, THEREFORE, Company and Executive, each in consideration of the promises of the other hereafter contained, intending to be legally bound agree as follows:

1. **Term, Position and Responsibilities**.

    A.  Executive agrees to serve as the Chief Executive Officer of the Company, for a term of employment commencing on the Effective Date and ending on the date that is the second anniversary of the Effective Date (the "*Employment Term*"), unless terminated or renewed in accordance with the provisions of this Agreement.

    B.  The Company and the Executive shall negotiate in good faith so that at least 90 days prior to the end of the Employment Term the Company and the Executive shall enter into a replacement employment agreement for a period commencing immediately following the end of the Employment Term and ending no earlier than one year following its commencement, which replacement employment agreement shall contain financial terms no less favorable to the Executive than those under this Agreement, including a mutually agreed upon bonus based upon the Company's attaining specified targets.  If the Parties are unable to agree upon such a replacement employment agreement at least 30 days prior to the second anniversary of the Effective Date, the Employment Term, and Executive's employment under this Agreement shall terminate on the second anniversary of the Effective Date.

    C.  The Executive shall provide such services to the Company and its subsidiaries and affiliates (the "*Company Group*") as Paul Parmar or his successors as the Chief Executive Officer of Constellation Healthcare Technologies, Inc. (the "*CHT CEO*") may reasonably determine from time to time.  The duties to be performed by the Executive shall be commensurate with Executive's position. Employee's responsibilities and duties hereunder shall be performed at the office of the Company that Executive primarily worked at as of the date

immediately prior to the closing of the transactions contemplated by the Purchase Agreement or within 10 miles of such location.

2. **Loyalty and Diligence**. Executive shall at all times exercise Executive's commercially reasonable best efforts to promote the success of the Company Group and to discharge Executive's duties and responsibilities in a commercially reasonable manner.

3. **Base Salary**. During the Employment Term, subject to all of the terms and conditions of this Agreement, the Company shall pay the Executive a base yearly salary of $50,000.00 ("***Base Salary***"), payable in accordance with Company's usual payroll policies, but no less often than every other week and commencing no later than the first full payroll cycle after the date hereof, less such deductions or amounts to be withheld as shall be required by law.

4. **Other Benefits**.

A. During the Employment Term, Executive shall be entitled to participate in all of Company's benefit plans (if any), such as group life insurance, hospitalization, medical and disability plans, in accordance with their provisions, and other benefits extended by Company from time to time to its senior executives, such as vacations, holidays, sick leave, savings and retirement plans, and related programs, all to the same degree as other senior executives of the Company are entitled to participate. Company may, at any time, modify, amend and/or terminate any of these plans or benefits with respect to all of its senior executives, to the extent permitted by law, without obligation to Executive. Company shall reimburse Executive for all reasonable and necessary business and traveling expenses pursuant to the Company expense reimbursement policy, and other disbursements reasonably incurred by Executive for or on behalf of Company in the performance of Executive's duties hereunder ("***Reimbursable Expense(s)***"); provided, however, Executive shall obtain prior written consent from the CHT CEO before the incurrence of any Reimbursable Expenses in excess of **$200**, which consent shall not be unreasonably withheld, conditioned or delayed.

B. In furtherance of the foregoing, Executive shall be entitled to paid vacation each calendar year during the Employment Term at the rate of no less than **four (4) weeks** per annum ("***PTO***"). The Executive shall be allowed to roll over three days of PTO per year into the next calendar year. As of the date of this Agreement the Executive acknowledges that she is not owed any PTO.

5. **Termination**.

A. Notwithstanding the provisions of Section 1 hereof, or any other provision of the Agreement regarding termination or discharge, the Employment Term and Executive's employment with Company shall terminate upon the first to occur of any of the following:

a) non-renewal and/or expiration of the Employment Term as provided in Section 1 hereof;

b) the death of Executive;

c) the physical or mental disability or incapacity of Executive, as determined by an independent physician chosen by Company and reasonably acceptable to Executive, whether total or partial, if Executive is unable to substantially perform Executive's duties hereunder: (i) for a period of six consecutive months, or (ii) shorter periods aggregating six months during any twelve (12) month period, such termination to be effective thirty (30) days after written notice of such decision has been delivered by Company to Executive;

d) a termination of Executive's employment by the Company, with or without Cause; and

e) Executive's resignation of her employment with or without Good Reason.

B. For purposes of this Agreement, "Cause" shall mean: (i) the gross neglect by Executive of Executive's duties hereunder, continuing for ten (10) business days after receipt of written notice by Executive from Company setting forth the conduct constituting such gross neglect with reasonable specificity; (ii) the willful failure of Executive to perform the duties and obligations of Executive hereunder, provided that Executive has been given written notice specifying in reasonable detail the nature of such failure to perform and Executive fails to cure such failure to perform to the reasonable satisfaction of the CHT CEO within thirty (30) days after receipt of such notice; (iii) the conviction of Executive or entering a plea of guilty or nolo contendere by Executive to a crime that constitutes a felony; (iv) the commission by Executive of any material act of fraud against Company; and (v) a proven material breach of any restrictive covenant or non-compete provisions in the Confidentiality Agreement (as defined below) annexed hereto as **Exhibit A** that is not cured by Executive within fifteen (15) days after notice of such breach.

C. For purposes of this Agreement, "Good Reason" shall mean the occurrence of any one of the following events without the prior written consent of Executive: (i) a reduction by Company in Executive's Base Salary; (ii) Company's failure to make any payment owed to Executive pursuant to this Agreement, including payment of Base Salary and benefits, other than Reimbursable Expenses, within ten (10) days of the date it was due; (iii) after written notice and a reasonable chance to cure, Company's ceasing to provide health insurance or any other material benefits to Executive on terms substantially similar to those provided on the Effective Date, if not cured within twenty (20) days after notice from Executive (iv) Company's failure to make any payment of Reimbursable Expenses owed to Executive pursuant to this Agreement, within a month of submission of a request in accordance with this Agreement, which is not cured within five (5) business days after Company's receipt of written notice of same; (v) Company's relocation of Executive's office to an address more than 10 miles from its current location; (vi) any material diminution in Executive's title, duties or authority or the assignment to Executive of duties that are materially inconsistent with her position as Chief Executive Officer of Company which is not cured by the Company within ten (10) business days after written notice and a chance to cure; and (vii) other than as set forth in (i) through (vi) above any willful material breach by Company of this Agreement which is not cured within fifteen (15) business days after Company's receipt of written notice of same.

D. If Company terminates Executive's employment hereunder For Cause, Executive voluntarily terminates Executive's employment by Company without Good Reason, or

Executive's employment is terminated for nonrenewal, death or disability pursuant to clauses (a), (b) or (c) of Section 5.A above, Company shall pay Executive the then current Base Salary and accrued but unused PTO paid through the effective date of termination, plus any incurred but outstanding Reimbursable Expenses and any accrued benefits under any Company benefit plans, which amount shall be due and payable within thirty (30) days after the termination date. Any termination of Executive by Company for Cause shall be deemed a material breach of this Agreement by Executive and shall be without prejudice to any other remedy Company may have at law or in equity. Executive's voluntary resignation, with or without Good Reason, shall not be a breach of this Agreement.

E.   If Company terminates Executive's employment hereunder for any reason other than For Cause, or pursuant to clauses (a), (b) or (c) of Section A above, or Executive terminates Executive's employment hereunder for Good Reason, Company shall pay or provide the amounts and benefits described in Section 5.D above to Executive and, subject to Executive's execution and nonrevocation during the applicable revocation period of a release of claims in the form substantially similar to the **Exhibit B** (the "*Release*") attached hereto, Company shall pay Executive (i) an amount equal to the then current Base Salary (immediately prior to any unauthorized reduction thereof constituting Good Reason) for the period from the date of Executive's termination of employment through the last day of the Employment Term in effect immediately prior to such termination, or, if longer, for one year, which amount shall be due and payable in a lump sum within thirty (30) days after the termination date, and (ii) health insurance premiums (on an 'after-tax basis") for **[three (3) months]** following the date of Executive's termination of employment at the same level as if the Executive had continued to be employed by the Company; provided that the execution of the Release, if timely provided to Executive, and the expiration of any revocation period must occur within sixty (60) days following the termination of employment for Executive to be entitled to receive the amounts that are consideration for the Release described in this Section 5.E.

F.   Notwithstanding anything herein to the contrary, if this Agreement is terminated by Company without Cause or by Executive for Good Reason, the restrictions set forth in Section 5 of the Confidentiality Agreement (as defined below) and Section 6.4(a)(i) of the Purchase Agreement shall terminate as of the last day of the Employment Term in effect immediate prior to such termination and thereafter shall have no further force or effect.

G.   Notwithstanding anything contained herein to the contrary, during the first (24) months after the Effective Date, the Company shall not have the right to terminate Executive's employment except for in cases of Cause, or pursuant to 5(A)(a), or 5(A)(c).

H.   In the event that the Company terminates Executive's employment without Cause in breach of this Agreement or Executive terminates its employment for Good Reason, then if the Buyer wishes to engage persons to fulfill some or all of the functions provided by Executive to the Company immediately prior to the termination, the Buyer shall provide Executive with prior written notice and, in the case of the first two candidates, Buyer shall not engage their services without Executive's prior written consent, which consent may be denied for any reason or no reason at all (provided, however, that Executive shall be deemed to

have consented if she does not respond in writing within seven (7) days from her receipt of the notice).

6. **Non-Interference Agreement**. Executive is required as a condition of, and prior to the commencement of, Executive's employment with the Company to execute the Company's Confidentiality, Non-Interference and Invention Assignment Agreement (the *"Confidentiality Agreement"*), in the form attached hereto as **Exhibit B**. The Confidentiality Agreement shall be executed concurrently with the execution of this Agreement and shall become effective on the Effective Date.

7. **Review by Counsel: No Adverse Inference**. Each Party acknowledges that it has consulted with its own legal counsel, who has participated in the drafting of this Agreement. In the event of any ambiguity(ies) in any provision hereof, there shall be no adverse inference drawn against either Party.

8. **Notices**. Any notice, request, demand, and other communication provided for by this Agreement shall be sufficient if in writing and if delivered personally by hand or sent by any commercially reasonable means of conveyance that provides proof of delivery to the address listed at the head of this Agreement. Any such notice, request, demand or other communication shall be deemed given when received, if delivered by hand, or when signed for by the addressee or Executive's agent. The Executive shall have the obligation to notify the Company if Executive's address changes.

9. **Conflict Resolution Arbitration: Interim Awards**.

   A. Should Executive have any issue concerning the Executive's employment, Executive shall take the issue to the CHT CEO in writing. The CHT CEO within 10 business days of receipt of the writing shall issue a ruling stating its decision in detail.

   B. If Executive or is not satisfied with the CHT CEO's ruling the Executive shall have the right to take the matter to arbitration which shall be resolved in New York, New York pursuant to the expedited Commercial Arbitration Rules of the American Arbitration Association. Notwithstanding the foregoing, nothing herein shall prevent a Party from seeking equitable relief from any court of competent jurisdiction to enforce the provisions of the Non-Interference Agreement.

10. **Assignment: Heirs and Successors Bound**. This Agreement shall be binding on and inure to the benefit of the Parties and their respective heirs, administrators, personal representatives, successors and permitted assigns. Company may assign or delegate any of its rights or obligations hereunder to any "assignee" and any such assignee shall be deemed substituted for Company under the terms of this Agreement and all references to *"Company"* shall be deemed to mean such assignee. Executive may not assign this Agreement, but her rights under this Agreement may be assigned upon her death to her heirs or pursuant to the laws of descent and distribution. As used in this Agreement, the term "assignee" shall mean any person which at any time, whether by merger, purchase or otherwise, acquires all of the equity or all or substantially all of the assets or business of Company.

11.     **Governing Law Conflicts of Law**. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without reference to conflicts of laws.

12.     **Integration: Amendment of Agreement**. This Agreement together with the Confidentiality Agreement sets forth the entire agreement between Company and Executive relating to Executive's employment and engagement and supersedes all prior negotiations and written or oral agreements or understandings between Company and Executive relating to Executive's employment and engagement. This Agreement may be amended, supplemented, or modified only by a written instrument executed by or on behalf of each Party. Nothing herein contained is intended to, or shall be deemed to affect any rights to any payments under the Purchase Agreement or documents related thereto.

13.     **Headings/Recitals**. The headings used in this Agreement have been inserted for convenience of reference only and do not define or limit the provisions hereof. The Recitals are incorporated into and made part of this Agreement.

14.     **Severability**. The Parties intend all provisions of this Agreement to be enforced to the fullest extent permitted by law. Accordingly, if an arbitrator or court of competent jurisdiction determines that the scope and/or operation of any provision of this Agreement is too broad to be enforced as written, the Parties intend that the arbitrator or court should reform such provision to such narrower scope and/or operation as it determines to be enforceable. If, however, any provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future law, and not subject to reformation, then (a) such provision shall be fully severable, (b) this Agreement shall be construed and enforced as if such provision was never a part of this Agreement, and (c) the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by illegal, invalid, or unenforceable provisions or by their severance.

15.     **Waiver**. Any term or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof, but no such waiver shall be effective unless set forth in a written instrument duly executed by or on behalf of the Party waiving such term or condition. Any waiver by the Company shall require the consent of the CHT CEO. No waiver by any Party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion. All remedies, either under this Agreement or by law or otherwise afforded, will be cumulative and not alternative.

16.     **Survival**. The provisions of this Agreement containing covenants intended to survive the termination of this Agreement, shall survive such termination regardless of the reason for termination for the period necessary to give effect to such covenants.

17.     **Indemnification**. Company shall secure directors' and officers' liability insurance for the benefit of Executive on terms at least equal to those applicable to the other directors and officers of Company (which insurance, for Executive, shall provide for advancement of defense costs) and shall indemnify Executive to the maximum extent permitted under the New York Limited Liability Company Law.

18.  **Counterparts**.  This Agreement may be executed in one or more counterparts, with the same effect as if the Parties had all signed the same document.  A facsimile, copy, or electronic copy shall be deemed an original for all purposes.

19.  **Section 409A**.

A.  Notwithstanding anything to the contrary in this Agreement, no severance pay or benefits payable upon separation that is payable to Executive, if any, pursuant to this Agreement, when considered together with any other severance payments or separation benefits that constitute deferred compensation (together, the "*Deferred Payments*") under Internal Revenue Code Section 409A and the final regulations and official guidance thereunder ("*Section 409A*") will be payable until Executive has a "separation from service" within the meaning of Section 409A.

B.  Notwithstanding anything to the contrary in this Agreement, if Executive is a "specified employee" within the meaning of Section 409A at the time of Executive's termination of employment, then, if required, the Deferred Payments, which are otherwise due to Executive on or within the six (6) month period following Executive's termination will accrue, to the extent required, during such six (6) month period and will become payable in a lump sum payment on the date six (6) months and one (1) day following the date of Executive's termination of employment or on the date of death, if earlier.  All subsequent Deferred Payments, if any, will be payable in accordance with the payment schedule applicable to each payment or benefit.  Each payment and benefit payable under the Agreement is intended to constitute a separate payment for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations.

C.  Any severance payment that satisfies the requirements of the "short-term deferral" rule set forth in Section 1.409A-1(b)(4) of the Treasury Regulations shall not constitute Deferred Payments for purposes herein.  Any amount paid under this Agreement that qualifies as a payment made as a result of an involuntary separation from service pursuant to Section 1.409A-1(b)(9)(iii) of the Treasury Regulations that does not exceed the Section 409A Limit (as defined below) will not constitute Deferred Payments for purposes herein.

D.  To the extent that reimbursements or other in-kind benefits under this Agreement constitute Deferred Payments, (A) all such expenses or other reimbursements hereunder shall be made on or prior to the last day of the taxable year following the taxable year in which such expenses were incurred by Executive, (B) any right to such reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit, and (C) no such reimbursement, expenses eligible for reimbursement, or in-kind benefits provided in any taxable year shall in any way affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other taxable year.

E.  The foregoing provisions and the terms of this Agreement are intended to comply with the requirements of Section 409A so that none of the severance payments and benefits to be provided hereunder will be subject to the additional tax imposed under Section 409A, and any ambiguities herein will be interpreted to so comply.  Executive and Company agree to work together in good faith to consider amendments to this Agreement and to take such

reasonable actions which are necessary, appropriate or desirable to avoid imposition of any additional tax or income recognition prior to actual payment to Executive under Section 409A.

        F.        For purposes of this Agreement, "*Section 409A Limit*" means the lesser of two (2) times: (i) Executive's annualized compensation based upon the annual rate of pay paid to Executive during Company's taxable year preceding Company's taxable year of Executive's separation from service as determined under Treasury Regulation 1.409A-1(b)(9)(iii)(A)(1) and any Internal Revenue Service guidance issued with respect thereto; or (ii) the maximum amount that may be taken into account under a qualified plan pursuant to Section 401(a)(17) of the Internal Revenue Code for the year in which Executive's employment is terminated.

[Signature Page Follows]

*IN WITNESS WHEREOF*, the Parties have executed this Agreement as of the Effective Date.

**COMPANY:**

By: _____

Name: Paul Parmar

Title: Manager

**EXECUTIVE:**

_____

[Signature Page to Employment Agreement – Elizabeth Kelly]

*IN WITNESS WHEREOF*, the Parties have executed this Agreement as of the Effective Date.

**COMPANY:**

By: _____

Name: Paul Parmar

Title: Manager

**EXECUTIVE:**

_____ *[signature redacted]*

[Signature Page to Employment Agreement – Elizabeth Kelly]