# EXHIBIT 10

CONSULTING AGREEMENT

This Agreement ("*Agreement*"), dated as of March 10, 2017 (the "*Effective Date*"), is by and between New York Network Management, L.L.C., a New York limited liability company (the "*Company*") having an address at c/o Robinson Brog Leinwand Greene Genovese & Gluck PC 875 Third Avenue/9th Floor New York, NY 10022 and Premier Network Management, LLC ("*Consultant*") having an address at 125 Annfield Ct Staten Island, NY 10304. Company and Consultant may hereinafter be collectively referred to as the "*Parties*" and each a "*Party*".

## RECITALS

WHEREAS, pursuant to a Membership Interest Purchase Agreement (the "*Purchase Agreement*") dated as of the date hereof, by and among the Company, Elizabeth Kelly ("*Kelly*"), Michaela Kircher, and Cliona Sotiropoulos, and NYNM Acquisition, LLC a Delaware limited liability company ("*Buyer*"), the Buyer is acquiring all of the outstanding membership interests of the Company; and

WHEREAS, the Company and the Consultant now desire to enter into this Agreement.

NOW, THEREFORE, Company and Consultant, each in consideration of the promises of the other hereafter contained, intending to be legally bound agree as follows:

1. Services. Consultant agrees to perform services to effectuate the sales and growth strategy of the Company (the "*Services*") to the Company and its subsidiaries and affiliates (the "*Company Group*") as Paul Parmar or his successors as the Chief Executive Officer of Constellation Healthcare Technologies, Inc. (the "*CHT CEO*") may reasonably determine from time to time. The Parties understand and agree that the Company shall only have control over the results of the Consultant's Services. Consultant shall retain control over the means and methods by which such results are accomplished. Consultant shall have sole discretion and control to determine which of its agents, representatives, employees or other individuals will perform the Services hereunder (except as otherwise provided herein), provided that Kelly shall remain the Consultant's sole Managing Member and sole provider of services for the Consultant to the Company (the "*Managing Member*"), unless otherwise approved by the Company during the Term, unless such requirement is expressly waived in advance by the Company in writing. Consultant shall provide its own equipment, and supplies.

2. Independent Contractor Status. Nothing herein shall be construed to create a joint venture or partnership between the Parties or an employee/employer relationship. Consultant understands and agrees that the manner in which Consultant, the Managing Member or any of Consultant's agents, representatives and employees performs the Services is in Consultant's discretion and control, and that the Company shall not supervise or direct Consultant's performance of those Services. Consultant understands and agrees that it is an independent contractor, and neither it nor its Managing Member nor any officer, other member, manager, employee, agent or representative of Consultant (individually, a "*Consultant Group Member*," and, collectively, the "*Consultant Group*") is entitled to or shall receive any of the rights, privileges and benefits that the Company extends to its employees, including, but not limited to, pension, retirement savings or welfare benefits, vacation, termination or severance

pay or other perquisites by virtue of this Consulting Agreement or by virtue of Consultant's provision of Services to the Company. Consultant hereby releases, on behalf of the Consultant Group, any and all right, claim, or interest to any privileges or to any benefit, welfare plan or other employee benefit plans or perquisites, including but not limited to pension, welfare benefits, vacation or termination pay, provided by, or on behalf of, the Company to its employees. The Company shall issue an IRS Form 1099 to Consultant in connection with the Consulting Fees in accordance with applicable law. Consultant is responsible for any and all employment related federal, state and local taxes, unemployment compensation coverage, workers' compensation insurance and social security payments relating to the Services. Neither Party hereto shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other Party or to bind the other Party to any contract, agreement or undertaking with any third party.

3. **Term, Position and Responsibilities**.

(a) Consultant agrees to serve as a consultant to the Company, for a term of service commencing on the Effective Date and ending on the date that is the second anniversary of the Effective Date (the "***Initial Service Term***"), unless terminated or renewed in accordance with the provisions of this Agreement. For purposes of this Agreement, the term "***Service Term***" means collectively the Initial Service Term and each applicable Renewal Service Term (as hereinafter defined). The Company and the Consultant shall negotiate in good faith so that at least 90 days prior to the end of the Initial Service Term the Company and the Consultant shall enter into a replacement agreement for a period commencing immediately following the end of the Initial Service Term and ending no earlier than one year following its commencement, which replacement agreement shall contain financial terms no less favorable to the Consultant than those under this Agreement ("***Renewal Service Term***"). If the Parties are unable to agree upon such a replacement consulting agreement at least 30 days prior to the second anniversary of the Effective Date, the Initial Service Term, this Agreement shall then terminate on the second anniversary of the Effective Date. The Consultant for the majority of its work shall work from an office located at or within ten miles of 9201 4th Avenue, Brooklyn, New York 11209. Consultant shall at all times exercise, and shall cause its members to use, commercially reasonable best efforts to promote the success of the Company Group and to discharge Consultant's duties and responsibilities in a commercially reasonable manner.

4. **Fee**. During the Service Term, subject to all of the terms and conditions of this Agreement, the Company shall compensate the Consultant at a yearly rate of $250,000 ("***Fee***"), payable monthly. Consultant's Fee shall be subject to annual review and potential increases effective as of the first day following each anniversary of the Effective Date, which increases (if any) shall be in the sole discretion of the CHT CEO and, the amount of any such increases shall be determined by the CHT CEO in its sole discretion. The Consultant shall maintain the sole responsibility to compensate the Consultant Group; under no circumstances shall the Company be called upon to, or required to, provide any additional compensation or benefits to the Consulting Group, except as otherwise set forth herein.

5.  **Other Benefits**. Company shall reimburse Consultant for all reasonable and necessary business and traveling expenses pursuant to the Company expense reimbursement policy, and other disbursements reasonably incurred by Consultant for or on behalf of Company in the performance of Consultant's duties hereunder ("*Reimbursable Expense(s)*"); provided, however, Consultant shall obtain prior written consent from the CHT CEO before the incurrence of any Reimbursable Expenses in excess of **$100,000**, which consent shall not be unreasonably withheld, conditioned or delayed.

6.  **Termination**.

(a)  Notwithstanding the provisions of Section 1 hereof, or any other provision of the Agreement regarding termination or discharge, the Service Term and Consultant's engagement with Company shall terminate upon the first to occur of any of the following:

(i)  non-renewal and/or expiration of the Service Term as provided in Section 3 hereof;

(ii)  the death of Kelly;

(iii)  the physical or mental disability or incapacity of Kelly, as determined by an independent physician chosen by Company and reasonably acceptable to Kelly, whether total or partial, if Kelly is unable to substantially perform Kelly's duties hereunder: (i) for a period of six consecutive months, or (ii) shorter periods aggregating six months during any twelve (12) month period, such termination to be effective thirty (30) days after written notice of such decision has been delivered by Company to Kelly;

(iv)  a termination of Consultant engagement by the Company, with or without Cause; and

(v)  Consultant's resignation of its engagement with or without Good Reason.

(b)  For purposes of this Agreement, "Cause" shall mean: (i) the gross neglect by Consultant of Consultant's duties hereunder, continuing for ten (10) business days after receipt of written notice by Consultant from Company setting forth the conduct constituting such gross neglect with reasonable specificity; (ii) the willful failure of Consultant to perform the duties and obligations of Consultant hereunder, provided that Consultant has been given written notice specifying in reasonable detail the nature of such failure to perform and Consultant fails to cure such failure to perform to the reasonable satisfaction of the CHT CEO within thirty (30) days after receipt of such notice; (iii) the conviction of Kelly or entering a plea of guilty or nolo contendere by Kelly to a crime that constitutes a felony; (iv) the commission by Kelly or any member of the Consulting Group of any material act of fraud against Company; (v) a proven material breach of any restrictive covenant or non-compete provisions in the Confidentiality

Agreement (as defined below) annexed hereto as **Exhibit A** that is not cured by Consultant within fifteen (15) days after notice of such breach and (vi) Kelly no longer being the Managing Member.

(c) For purposes of this Agreement, "Good Reason" shall mean the occurrence of any one of the following events without the prior written consent of Consultant: (i) a reduction by Company in Consultant's Fee; (ii) Company's failure to make any payment owed to Consultant pursuant to this Agreement, including payment of the Fee, other than Reimbursable Expenses, within ten (10) days of the date it was due; (iii) Company's failure to make any payment of Reimbursable Expenses owed to Consultant pursuant to this Agreement, within a month of submission of a request in accordance with this Agreement, which is not cured within five (5) business days after Company's receipt of written notice of same; (v) Company's relocation of Consultant's office to an address more than 10 miles from 9201 4th Avenue, Brooklyn, New York 11209; and (vi) other than as set forth in (i) through (v) above any willful material breach by Company of this Agreement which is not cured within fifteen (15) business days after Company's receipt of written notice of same from the Consultant.

(d) If Company terminates the Consulting Agreement For Cause, Consultant voluntarily terminates Consultant's engagement by Company without Good Reason, or Consultant's engagement is terminated for nonrenewal, death or disability pursuant to clauses (i), (ii) or (iii) of Section 6(a) above, Company shall pay Consultant the then current Fee through the effective date of termination, plus any incurred but outstanding Reimbursable Expenses, which amount shall be due and payable within thirty (30) days after the termination date. Any termination of Consultant by Company for Cause shall be deemed a material breach of this Agreement by Consultant and shall be without prejudice to any other remedy Company may have at law or in equity. Consultant's voluntary resignation, with or without Good Reason, shall not be a breach of this Agreement.

(e) If Company terminates Consultant's engagement hereunder for any reason other than For Cause, or pursuant to clauses (i), (ii) or (iii) of Section 6(a) above, or Consultant terminates its engagement hereunder for Good Reason, Company shall pay or provide the amounts described in Section 6(d) above to Consultant and, subject to Consultant's execution of a release of claims in the form substantially similar to the **Exhibit B** (the "*Release*") attached hereto, Company shall pay Consultant (i) an amount equal to the then current Fee (immediately prior to any unauthorized reduction thereof constituting Good Reason) for the period from the date of Consultant's termination through the last day of the Service Term in effect immediately prior to such termination, or, if longer, for one year, which amount shall be due and payable in a lump sum within thirty (30) days after the termination date.

(f) Notwithstanding anything herein to the contrary, if this Agreement is terminated by Company without Cause or by Consultant's for Good Reason, the restrictions set forth in Section 5 of the Confidentiality Agreement (as defined below) and Section 6.4(a)(i) of the Purchase Agreement shall terminate as of the last day of the Service Term in effect immediate prior to such termination and thereafter shall have no further force or effect.

{00846220.DOCX;2 }{00846220.DOCX;2 }

4

(g) Notwithstanding anything contained herein to the contrary, during the first (24) months after the Effective Date, the Company shall not have the right to terminate Consultant except for in cases of Cause, or pursuant to 6(a)(i), or 6(a)(iii).

7. **Non-Interference Agreement**. Consultant is required as a condition of, and prior to the commencement of, the Agreement with the Company to execute the Company's Confidentiality, Non-Interference and Invention Assignment Agreement (the *"Confidentiality Agreement"*), in the form attached hereto as **Exhibit B**. The Confidentiality Agreement shall be executed concurrently with the execution of this Agreement and shall become effective on the Effective Date.

8. **Review by Counsel: No Adverse Inference**. Each Party acknowledges that it has consulted with its own legal counsel, who has participated in the drafting of this Agreement. In the event of any ambiguity(ies) in any provision hereof, there shall be no adverse inference drawn against either Party.

9. **Notices**. Any notice, request, demand, and other communication provided for by this Agreement shall be sufficient if in writing and if delivered personally by hand or sent by any commercially reasonable means of conveyance that provides proof of delivery to the address listed at the head of this Agreement. Any such notice, request, demand or other communication shall be deemed given when received, if delivered by hand, or when signed for by the addressee or Consultant's agent. The Consultant shall have the obligation to notify the Company if Consultant's address changes.

10. **Conflict Resolution Arbitration: Interim Awards**.

(a) Should Consultant have any issue concerning the Consultant's engagement, Consultant shall take the issue to the CHT CEO in writing. The CHT CEO within 10 business days of receipt of the writing shall issue a ruling stating its decision in detail.

(b) If Consultant is not satisfied with the CHT CEO's ruling the Consultant's shall have the right to take the matter to arbitration which shall be resolved in New York, New York pursuant to the expedited Commercial Arbitration Rules of the American Arbitration Association. Notwithstanding the foregoing, nothing herein shall prevent a Party from seeking equitable relief from any court of competent jurisdiction to enforce the provisions of the Non-Interference Agreement.

11. **Assignment: Heirs and Successors Bound**. This Agreement shall be binding on and inure to the benefit of the Parties and their respective heirs, administrators, personal representatives, successors and permitted assigns. Company may assign or delegate any of its rights or obligations hereunder to any "assignee" and any such assignee shall be deemed substituted for Company under the terms of this Agreement and all references to *"Company"* shall be deemed to mean such assignee. Consultant may not assign this Agreement, but her rights under this Agreement may be assigned upon her death to her heirs or pursuant to the laws of descent and distribution. As used in this Agreement, the term "assignee" shall mean any person which at any time, whether by merger, purchase or otherwise, acquires all of the equity or all or substantially all of the assets or business of Company.

{00846220.DOCX;2 }{00846220.DOCX;2 }

12. **Governing Law Conflicts of Law**. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without reference to conflicts of laws.

13. **Integration: Amendment of Agreement**. This Agreement together with the Confidentiality Agreement sets forth the entire agreement between Company and Consultant relating to Consultant's engagement and supersedes all prior negotiations and written or oral agreements or understandings between Company and Consultant relating to Consultant's engagement. This Agreement may be amended, supplemented, or modified only by a written instrument executed by or on behalf of each Party. Nothing herein contained is intended to, or shall be deemed to affect any rights to any payments under the Purchase Agreement or documents related thereto.

14. **Headings/Recitals**. The headings used in this Agreement have been inserted for convenience of reference only and do not define or limit the provisions hereof. The Recitals are incorporated into and made part of this Agreement.

15. **Severability**. The Parties intend all provisions of this Agreement to be enforced to the fullest extent permitted by law. Accordingly, if an arbitrator or court of competent jurisdiction determines that the scope and/or operation of any provision of this Agreement is too broad to be enforced as written, the Parties intend that the arbitrator or court should reform such provision to such narrower scope and/or operation as it determines to be enforceable. If, however, any provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future law, and not subject to reformation, then (a) such provision shall be fully severable, (b) this Agreement shall be construed and enforced as if such provision was never a part of this Agreement, and (c) the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by illegal, invalid, or unenforceable provisions or by their severance.

16. **Waiver**. Any term or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof, but no such waiver shall be effective unless set forth in a written instrument duly executed by or on behalf of the Party waiving such term or condition. Any waiver by the Company shall require the consent of the CHT CEO. No waiver by any Party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion. All remedies, either under this Agreement or by law or otherwise afforded, will be cumulative and not alternative.

17. **Survival**. The provisions of this Agreement containing covenants intended to survive the termination of this Agreement, shall survive such termination regardless of the reason for termination for the period necessary to give effect to such covenants.

18. **Counterparts**. This Agreement may be executed in one or more counterparts, with the same effect as if the Parties had all signed the same document. A facsimile, copy, or electronic copy shall be deemed an original for all purposes.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

COMPANY:

By: ███████████████████

Name: Paul Parmar

Title: Manager


CONSULTANT: Premier Network Management, LLC

By: _____

Name: Elizabeth Kelly

Title: Member

*IN WITNESS WHEREOF*, the Parties have executed this Agreement as of the Effective Date.

COMPANY:

By: _____

Name: Paul Parmar

Title: Manager

CONSULTANT: Premier Network Management, LLC

By: ~~[redacted]~~

Name: Elizabeth Kelly

Title: Member

Premier Network Management, LLC

[Signature Page to Consultant Agreement – ~~Elizabeth Kelly~~]

EXHIBIT A

# CONFIDENTIALITY, NON-INTERFERENCE AND INVENTION ASSIGNMENT AGREEMENT

In consideration of the engagement of Premier Network Management, LLC (the "*Consultant*") with New York Network Management, L.L.C., a New York limited liability company (the "*Company*") and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, I on behalf of the Consultant and myself agree to the following Confidentiality, Non-Interference and Invention Assignment Agreement ("*Confidentiality Agreement*"):

19. **Confidential Information.**

I acknowledge that, during the course of the Consultant's engagement with the Company pursuant to the Consulting Agreement (the "*Consulting Agreement*") by and between the Company and the Consultant, I will have access to information about the Company, and that my consulting for the Company shall bring me into close contact with confidential and proprietary information of the Company. In recognition of the foregoing, I agree, at all times during the term of the Consulting Agreement with the Company and for the Post-Termination Restricted Period (hereinafter defined) thereafter, to hold in confidence, and not to use, except for the benefit of the Company and its direct and indirect subsidiaries and affiliates and those entities that own, directly or indirectly the Company, together with their direct and indirect subsidiaries and affiliates (collectively, the "*Company Group*"), or to disclose to any person, firm, corporation or other entity without written authorization of the Company's Manager or Board of Managers (the "*Board*") or in the good faith performance of my duties to the Company Group, any Confidential Information that I obtain or create. I further agree not to make copies of such Confidential Information except as authorized by the Board or in the good faith performance of my duties to the Company Group. I understand that "*Confidential Information*" means confidential or proprietary trade secrets, client lists, client identities and information, information regarding service providers, investment methodologies, marketing plans, sales plans, management organization information, operating policies or manuals, business plans or operations or techniques, financial records or data, source code, or other financial, commercial, business or technical information relating to the Company Group, or that the Company Group may receive belonging to clients, accounts, customers or others who do business with the Company Group. I understand that Confidential Information includes, but is not limited to, information pertaining to any aspect of the Company Group's business which is either information not known by actual or potential competitors of the Company Group or is confidential or proprietary information of the Company Group or its clients, accounts, customers or licensees, whether of a technical nature or otherwise. Notwithstanding the foregoing, Confidential Information shall not include (i) any of the foregoing items which have become publicly and widely known through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved; (ii) information I disclose to my

{00846220.DOCX;2 }{00846220.DOCX;2 }

attorneys or accountants; or (iii) any information that I am required to disclose to, or by, any governmental or judicial authority; provided, however, that in such event I will give the Board prompt written notice thereof so that the Company Group may seek an appropriate protective order and/or waive in writing compliance with the confidentiality provisions of this Confidentiality Agreement.

20. **Developments**.

(a) Assignment of Developments. I agree that I will, without additional compensation, promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title and interest throughout the world in and to any and all developments, original works of authorship, inventions, concepts, know-how, improvements or trade secrets, whether or not patentable or registrable under copyright or similar laws, which I may solely or jointly with others conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the term of the Consulting Agreement by any member of the Company Group (the "*Consulting Period*") whether or not during regular working hours, provided they either (i) relate at the time of conception or development to the actual or demonstrably proposed business or research and development activities of the Company Group; (ii) result from or relate to any work performed for the Company Group; or (iii) are developed through the use of Confidential Information and/or resources of any member of the Company Group or in consultation with personnel of any member of the Company Group (collectively referred to as "*Developments*"). I further acknowledge that all Developments which are made by me (solely or jointly with others) within the scope of and during the Consulting Period are "works made for hire" (to the greatest extent permitted by applicable law) for which I am, in part, compensated by my salary, and in the event any such Development is deemed not to be a work made for hire, I hereby assign all rights in such Development to the Company, or its or its designee.

(b) Maintenance of Records. I agree to keep and maintain adequate and current written records of all Developments made by me (solely or jointly with others) during the Consulting Period. The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, and any other format. The records will be available to and remain the sole property of the Company at all times. I agree not to remove such records from the Company's place of business except as permitted by the Company Group's policy which may, from time to time, be revised at the sole election of the Company Group for the purpose of furthering the business of the Company Group.

(c) Intellectual Property Rights. I agree to reasonably assist the Company Group, or its designee, at the Company Group's expense, in every way to secure the rights of the Company Group or its assignee in the Developments and any copyrights, patents, trademarks, service marks, database rights, domain names, mask work rights, moral rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company Group of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments which the Company Group shall reasonably deem necessary in order to apply for, obtain, maintain and

transfer such rights and in order to assign and convey to the Company Group the sole and exclusive right, title and interest in and to such Developments, and any intellectual property or other proprietary rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of the Consulting Period until the expiration of the last such intellectual property right to expire in any country of the world; provided, however, the Company Group shall reimburse me for my reasonable expenses, including my time and my legal expenses, incurred in connection with carrying out the foregoing obligation. If the Company Group is unable because of my mental or physical incapacity to secure my signature to apply for or to pursue any application for any United States, Canadian or foreign patents or copyright registrations covering Developments or original works of authorship assigned to the Company Group as above, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications or records and to do all other lawfully permitted acts to further the application for, prosecution, issuance, maintenance or transfer of letters patent or registrations thereon with the same legal force and effect as if originally executed by me. I hereby waive and irrevocably quitclaim to the Company Group any and all claims, of any nature whatsoever, which I now or hereafter have for past, present or future infringement of any and all proprietary rights assigned to the Company Group.

21. **Returning Company Group Documents**. I agree that, at the time of termination of the Consulting Agreement with the Company for any reason, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all Confidential Information and all other documents, materials, information or property developed by me pursuant to the Consulting Agreement or otherwise and belonging to the Company Group. I further agree that any property situated on the Company premises and owned by the Company (or any other member of the Company Group), including disks and other storage media, filing cabinets or other work areas, is subject to inspection by personnel of any member of the Company Group at any time with or without notice.

22. **Disclosure of Agreement**. As long as the Confidentiality Agreement remains in effect, I will disclose the existence of this Confidentiality Agreement to any prospective employer, partner, co-venturer, investor or lender prior to entering into an employment, partnership or other business relationship with such person or entity.

23. **Restrictions on Interfering**.

(a) During the Consulting Period and the Post-Termination Restricted Period (defined below), I shall not, directly or indirectly, individually or on behalf of any person, company, enterprise or entity, or as a sole proprietor, partner, stockholder, director, member, manager, officer, principal, agent, executive, or in any other capacity or relationship, participate or engage in or provide any services to, or have any direct or indirect interest in, any business carried on whose operations, in whole or in part, are the same as, similar to or are in competition with any of the business operations carried on by the Company or any of its direct or indirect

subsidiaries while consulting for the Company or that the Company or any of its direct or indirect subsidiaries contemplated (and which I should have known that the Company or any of its direct or indirect subsidiaries was contemplating) carrying on at the time of the termination of the Consulting Agreement by the Company in New York, New Jersey, Pennsylvania, or Connecticut (the "*Territory*"); provided, however, that nothing in this Agreement shall preclude me from purchasing or owning up to five percent (5%) of the outstanding capital stock of a company which has a class of securities registered under Section 12 of the Securities Act of 1934, as amended, or trading on a national securities exchange or quoted in an over-the-counter market.

(b) For the purposes of this Release, "Post-Termination Restricted Period" shall mean the period commencing on the date of the termination of the Service Term for any reason and ending on the one (1) year anniversary of such date of said termination; provided, however, that the Post-Termination Restricted Period shall terminate immediately upon the termination of the Consulting Period by the Company without "Cause" or the Consultant's resignation for "Good Reason", as these terms are defined in the Consulting Agreement with the Company dated the date hereof.

24. **Reasonableness of Restrictions**. I acknowledge and recognize the highly competitive nature of the Company Group's business, that access to Confidential Information renders me special and unique within the Company Group's industry, and that I will have the opportunity to develop substantial relationships with existing and prospective clients, accounts, customers, consultants and contractors, investors and strategic partners of the Company Group during the course of and as a result of the Consulting Agreement. In light of the foregoing, I recognize and acknowledge that the restrictions and limitations set forth in this Confidentiality Agreement are reasonable and valid in geographical and temporal scope and in all other respects, and are essential to protect the value of the business and assets of the Company Group. I further acknowledge that the restrictions and limitations set forth in this Confidentiality Agreement will not materially interfere with my ability to earn a living following the termination of the Consulting Agreement with the Company and that the restrictions are a material condition to the Company entering into the Consulting Agreement.

25. **Independence; Severability**.

(a) Each of the rights enumerated in this Confidentiality Agreement shall be independent of the others and shall be in addition to and not in lieu of any other rights and remedies available to the Company Group at law or in equity. If any of the provisions of this Confidentiality Agreement or any part of any of them is hereafter construed or adjudicated to be invalid or unenforceable, the same shall not affect the remainder of this Confidentiality Agreement, which shall be given full effect without regard to the invalid portions.

(b) If any of the other covenants contained herein are held to be invalid or unenforceable because of the duration of such provisions or the area or scope covered thereby, I agree that the court making such determination shall have the power to reduce the duration, scope and/or area of such provision to the maximum and/or broadest duration, scope and/or area permissible by law and in its reduced form said provision shall then be enforceable.

26. **Injunctive Relief**. I expressly acknowledge that any breach or threatened breach of any of the terms and/or conditions set forth in this Confidentiality Agreement may result in substantial, continuing and irreparable injury to the members of the Company Group. Therefore, I hereby agree that, in addition to any other remedy that may be available to the Company, any member of the Company Group shall be entitled to seek injunctive relief, specific performance or other equitable relief by a court of appropriate jurisdiction in the event of any breach or threatened breach of the terms of this Confidentiality Agreement. Notwithstanding any other provision to the contrary, I acknowledge and agree that the Post-Termination Restricted Period, if applicable, shall be extended by the duration of any period of proven violation of any of the covenants in Section 5 hereof and during any other period required for litigation during which the Company or any other member of the Company Group seeks to enforce such covenants against me if it is ultimately determined that I was in breach of such covenants.

27. **General Provisions**.

(a) Governing Law and Jurisdiction. The validity, interpretation, construction and performance of this Confidentiality Agreement shall be governed by the laws of the State of New York, without giving effect to the principles of conflict of laws.

(b) Entire Agreement. This Confidentiality Agreement sets forth the entire agreement and understanding between the Company Group and me relating to the subject matter herein and merges all prior discussions between us. No modification or amendment to this Confidentiality Agreement, nor any waiver of any rights under this Confidentiality Agreement, will be effective unless in writing signed by the party to be charged. Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Confidentiality Agreement.

(c) No Right of Continued Work. I acknowledge and agree that nothing contained herein shall be construed as granting the consultant and thus me the right to continued work with the Company, and the right of the Company to terminate is specifically set forth in the Consulting Agreement.

(d) Successors and Assigns. This Confidentiality Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns. I expressly acknowledge and agree that this Confidentiality Agreement may be assigned by the Company without my consent to any other member of the Company Group as well as any purchaser of all or substantially all of the assets or stock of the Company, whether by purchase, merger, or other similar corporate transaction.

(e) Survival. The provisions of this Confidentiality Agreement shall survive the termination of the Consulting Agreement and/or the assignment of this Confidentiality Agreement by the Company to any successor in interest or other assignee for the time periods expressly set forth herein.

\* \* \*

I, Elizabeth Kelly, on behalf of the Consultant and myself, and the Company have executed this Confidentiality, Non-Interference and Invention Assignment agreement on the respective dates set forth below:

Date:_____

_____
(Signature)

Elizabeth Kelly
(Type/Print Name)

Date:_____

Premier Network Management LLC

By:_____
Name:
Title:

Date:_____

New York Network Management, L.L.C.

By:_____
Name:
Title:

# EXHIBIT B

# AGREEMENT AND GENERAL RELEASE

This is an AGREEMENT AND GENERAL RELEASE ("**Agreement**") by and among New York Network Management, L.L.C., a New York limited liability company (together with its successors, "**Company**"), and Premier Network Management LLC ("**Consultant**"), (collectively, the "**Parties**").

WHEREAS, Consultant's engagement with Company is ending or has ended; and in order to forever resolve and settle any and all disputes regarding the engagement with Company or any other disputes with Company Consultant may have, the Parties agree as follows:

1. *Termination.* Your consultancy will be terminated as of _____ (the "**Termination Date**").

2. *Termination Payments and Benefits.* Subject to Consultant's execution of the release set forth in Section 3 hereof and Consultant and its member's compliance with the provisions of this Agreement and the Confidentiality, Non-Interference and Invention Assignment Agreement between Consultant, Consultant's member and the Company, each of which is referenced in the Consulting Agreement dated March 10, 2017 ("CA") between Consultant and Company, Consultant shall receive all of the payments specified in the CA.

3. *Release.* Consultant agrees to and does fully and completely release, discharge and waive any and all claims, complaints, causes of action or demands of whatever kind which Consultant has or may have, whether known or unknown, against Company, its subsidiaries, stockholders, affiliates, predecessors and successors and all their officers, directors, and employees by reason of any event, matter, cause or thing which has occurred prior to the Termination Date, ("Claims"). *This is a General Release.* Consultant understands and accepts that this Agreement specifically covers, but is not limited to, any and all Claims which Consultant has or may have against Company and its affiliates relating in any way to the services of the Consultant and its members. Consultant acknowledges that this Release shall extend to unknown, as well as known claims, and hereby waives the application of any provision of law that purports to limit the scope of a general release. Notwithstanding the foregoing, Consultant does not waive any rights which Consultant may be entitled to seek to enforce this Agreement. Notwithstanding the forgoing the releases contained in this Section 3 is not a release or waiver of any of Consultant's rights pursuant to that certain Membership Interest Purchase Agreement by and among Elizabeth Kelly, Michaela Kircher, and Cliona Sotiropoulos, and NYNM Acquisition LLC ("**MIPA**").

4. *Release.* Company, on its own behalf and on behalf of its parents, subsidiaries and other affiliates and all of their respective past and present officers, directors, shareholders, employees, agents, general and limited partners, members, managers, joint venturers, representatives, successors and assigns, and all others connected with any of them (hereafter collectively referred to in this Section as "Company"), hereby release and forever discharge Consultant, its subsidiaries, members, affiliates, predecessors and successors and all their

officers, directors, and employees, from any and all causes of action, rights and claims, of any nature or type, known or unknown, which Company has had in the past, now have, or might now have, through the date of its signing of this Agreement, including, but not limited to, any such causes of action, rights or claims in any way resulting from, arising out of or connected with Consultant's engagement by Company or any of its affiliates or the termination of that engagement, pursuant to any federal, state or local law, regulation or other requirement; provided that nothing herein shall be a release of Company's rights to enforce any provision of the Agreement, as in effect from time to time. Notwithstanding the forgoing the releases contained in this Section 4 is not a release or waiver of any of the Company's or its parent's or their affiliates' rights pursuant to that certain MIPA.

5. *Confidentiality; No Disparagement.* Consultant agrees not to make negative statements or representations, or otherwise communicate negatively, directly or indirectly, in writing, orally, or otherwise, or take any action which may, directly or indirectly, disparage or be damaging to Company, its subsidiaries, affiliates, successors or their officers, directors, employees, business or reputation. Consultant agrees not to directly or indirectly participate in the publication of any information concerning the facts underlying the termination of Consultant's engagement and this Agreement, other than in cooperation with Company. Company agrees not to make negative statements or representations, or otherwise communicate negatively, directly or indirectly, in writing, orally, or otherwise, or take any action which may, directly or indirectly, disparage or be damaging to Consultant or its managing member. Company agrees not to participate in the publication of any information concerning the facts underlying the termination of Consultant and this Agreement, other than in cooperation with Consultant.

6. *Covenants.*

(a) Consultant and its managing member acknowledge and agree that Consultant and its managing member will continue to be bound by the Confidential Information, Non-Solicitation, Non-Competition, Conflict of Interest and Invention Assignment Agreement.

(b) In connection with the termination of Consultant's services hereunder, Consultant shall cooperate with Company and its affiliates to ensure an orderly transition, in such a manner and at such times as Company shall reasonably request.

7. *No Waiver.* The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver of such party's rights or deprive such party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

8. *Severability.* In the event that any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions of this Agreement shall not be affected thereby.

9. *Assignment.* This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective heirs, representatives, successors and assigns. This

Agreement shall not be assignable by Consultant and shall be assignable by Company only to an affiliate or successor of Company.

10. *Acknowledgment.* Consultant acknowledges that Consultant has carefully read and fully understands this Agreement, fully understands and accepts all of its provisions, and signs it voluntarily of Consultant's own free will. Consultant acknowledges that some of the payments provided in this Agreement are payments to which Consultant would not otherwise be entitled absent this Agreement. Consultant further acknowledges that Consultant has been provided a full opportunity to review and reflect on the terms of this Agreement and to seek the advice of legal counsel of its choice, and the Consultant is hereby advised to seek advice of counsel prior to signing this Agreement.

11. *Governing Law.* This Agreement shall be governed by and construed in accordance with the laws of the State of New York. Any dispute between the Parties shall be resolved in New York, New York pursuant to the expedited Commercial Arbitration Rules of the American Arbitration Association. Notwithstanding the foregoing, nothing herein shall prevent a Party from seeking equitable relief from any court of competent jurisdiction to enforce the provisions of the Non-Interference Agreement.

**SIGNATURES**