**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| ORION HEALTHCORP, INC.[1] | : Case No. 18-71748 (AST) |
| | : |
| Debtors. | : (Jointly Administered) |

------------------------------------------

| | |
|---|---|
| HOWARD M. EHRENBERG IN HIS CAPACITY AS | : Adv. Pro. No. 20-08049 (AST) |
| LIQUIDATING TRUSTEE OF ORION | : |
| HEALTHCORP, INC., ET AL., | : Trial:   July 24, 2024 |
| | : Time:   9:30 a.m. |
| Plaintiff, | : Place:   Courtroom 960 |
| | :       U.S. Bankruptcy Court |
| | :       290 Federal Plaza |
| v. | :       Islip, NY |
| | : |
| ARVIND WALIA; NIKNIM MANAGEMENT, INC., | : PTC:   July 17, 2024 |
| | : Time:   1:30 p.m. |
| Defendants. | : |
| | : Judge:   Hon. Alan S. Trust |
| | : |
| | : |

------------------------------------------

**TRIAL BRIEF OF PLAINTIFF, HOWARD M. EHRENBERG IN HIS CAPACITY AS**
**LIQUIDATING TRUSTEE OF ORION HEALTHCORP, INC.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Orion Healthcorp, Inc. (7246); Constellation Healthcare Technologies, Inc. (0135); NEMS Acquisition, LLC (7378); Northeast Medical Solutions, LLC (2703); NEMS West Virginia, LLC (unknown); Physicians Practice Plus Holdings, LLC (6100); Physicians Practice Plus, LLC (4122); Medical Billing Services, Inc. (2971); Rand Medical Billing, Inc. (7887); RMI Physician Services Corporation (7239); Western Skies Practice Management, Inc. (1904); Integrated Physician Solutions, Inc. (0543); NYNM Acquisition, LLC (unknown) Northstar FHA, LLC (unknown); Northstar First Health, LLC (unknown); Vachette Business Services, Ltd. (4672); Phoenix Health, LLC (0856); MDRX Medical Billing, LLC (5410); VEGA Medical Professionals, LLC (1055); Allegiance Consulting Associates, LLC (7291); Allegiance Billing & Consulting, LLC (7141); New York Network Management, LLC (7168). The corporate headquarters and the mailing address for the Debtors listed above is 1715 Route 35 North, Suite 303, Middletown, NJ 07748.

## TABLE OF CONTENTS

I.  PROCEDURAL POSTURE ................................................................................... 2

II.  PRELIMINARY STATEMENT ......................................................................... 2

III.  FACTS ............................................................................................................... 3

   (i)  The First Transfer (April 15, 2016):  $2,500,000 ................................... 3

   (ii)  The Second Transfer (June 28, 2017): $1,520,000 ................................ 7

   (iii)  Defendant NIKNIM Management, Inc. and Its Operations.................... 8

IV.  BY DEFENDANT'S OWN ADMISSION THE FIRST TRANSFER IS AN
    INTENTIONALLY FRAUDULENT TRANSFER UNDER STATE AND
    FEDERAL LAW ................................................................................................ 8

V.  THE DIRECT EVIDENCE CLEARLY ESTABLISHES THE DUO OF PARMAR
    AND WALIA FALSIFYING THE APA TO DEFRAUD CREDITORS ...................... 10

   (i)  The Lack Or Inadequacy Of Consideration: .......................................... 12

   (ii)  The Family, Friendship Or Close Associate Relationship Between
        The Parties: ............................................................................................ 14

   (iii)  The Retention Of Possession, Benefit, Or Use Of The Property In Question:..... 14

   (iv)  The Secrecy, Haste, Or Unusualness Of The Transaction;  A Questionable
        Transfer Not In The Usual Course Of Business: .................................... 15

   (v)  The Financial Condition Of The Party Sought To Be Charged Both Before
        And After The Transaction In Question: ................................................ 16

   (vi)  The Existence Or Cumulative Effect Of A Pattern Or Series Of Transactions Or
        Course Of Conduct After The Incurring Of Debt, Onset Of Financial Difficulties,
        Or Pendency Or Threat Of Suits By Creditors: ..................................... 17

   (vii)  The General Chronology Of The Events And Transactions Under Inquiry:........ 17

VI.  THE FIRST TRANSFER WAS CONSTRUCTIVELY FRAUDLENT TO CREDITORS
    AS THE DEBTOR WAS INSOLVENT AND THE TRANSFER WAS NOT MADE
    FOR FAIR CONSIDERATION ........................................................................... 18

VII.  DEFENDANT WALIA PARTICIPATED IN THE FRAUDULENT TRANSFER........ 21

VIII.  DEFENDANTS WALIA AND NIKNIM ARE THE ALTER EGO OF ONE ANOTHER AND EQUITY DEMANDS THEY BE HELD JOINTLY AND SEVERALLY RESPONSIBLE FOR ANY JUDGMENT ........................................... 22

    (i)  NIKNIM's Lack of Business Purpose ................................................. 23

    (ii)  Commingling of Funds ......................................................... 23

    (iii)  NIKNIM's Deposits To Pay Walia's Personal Expenses: .................................. 23

    (iv)  The Failure To Maintain Adequate Corporate Minutes Or Records ................... 24

    (v)  Domination Or Control Of The Corporation By The Stockholder ...................... 24

    (vi)  Capitalization .......................................................... 24

    (vii)  Use Of A Single Address ...................................................... 25

    (viii)  Inequitable Result ......................................................... 25

Comes now Plaintiff, Howard M. Ehrenberg in his capacity as Liquidating Trustee of Orion Healthcorp, Inc., and submits his Trial Brief pursuant to the Adversary Pretrial Scheduling Order.

## I.
## PROCEDURAL POSTURE

1.      On April 10, 2024, the Court issued extensive findings of fact pursuant to Fed. R. Proc. 56(g) , incorporated by Rule 7056, which became the law of the case.  (See Notice of Ruling ("NOR"), p. 8, lns. 10-17, attached hereto as **Exhibit A**.)

2.      Two Transfers are at issue in the Complaint.  The First in the amount of $2,500,000 ("First Transfer" and the Second Transfer in the amount of $1,520,000 ("Second Transfer").  The Second Transfer has already been adjudicated as an intentional and constructively fraudulent transfer; the only remaining question being the liability of the Defendant Arvind Walia. It is an established fact at trial that the Transfers constituted the Debtors property and both Transfers were made within two years  before the date of the filing of the Petition.

## II.
## PRELIMINARY STATEMENT

3.      The undisputed facts leave no doubt.  The Transfers were an orchestrated fraud on creditors perpetrated by Paul Parmar and Arvind Walia.  Defendant, Arvind Walia was either his partner in crime or his enabler, as neither Transfer could have occurred but for Defendant Walia's involvement.  Both Transfers orchestrated a fraud on all creditors.  $4,020,000 exited the estate for no consideration.

4.      The Trustee will submit evidence that the Transfers between insiders were not arm's-length transactions made in the usual course of business, but hastily conceived, in secret where the two executives talked in riddles in order to cover their true intentions. The APA and the alleged escrow which Walia claims as the source of the "fair consideration" stems from a transaction which is admittedly fraudulent on its face.  If the agreement is viewed as being

conceived with the intent to deceive, it cannot be the source of a valid debt enforceable under New York law. But even more to the point, the only admissible evidence introduced at trial will satisfy the badges of fraud. Defendants' will introduce no credible evidence of value, a burden they shoulder. Instead, Defendants' will offer explanations that are not credible. Whether partner or participant, the admissible evidence submitted by the Trustee documents no consideration, let alone "reasonably equivalent value," received for the First Transfer. As the facts make clear, Defendant NIKNIM was purposely inserted by Walia only a day or two before the executives diverted the Debtor's monies. Walia then personally drained the NIKNIM bank account within 3 days which monies he used to pay he and his family's personal expenses. Walia followed no corporate formalities for NIKNIM abusing the corporate privilege. Creditors deserve the opportunity to purse both Defendants for the wrongs perpetrated.

### III.
### FACTS

5.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O)

6.      Venue of this adversary proceeding in this district is proper pursuant to 28 U.S.C. § 1409.

7.      The First Amended Complaint seeks the return of $4,020,000. It is undisputed that the transfers at issue involved an interest of the Debtor in property, that was made on or within two years before the date of the filing of the petition in bankruptcy.

8.      Parmar and Defendant Walia were both high level officers of the debtors Orion and CHT at the time of each transfer and Defendant Walia was an insider. (NOR, p. 39, lns. 3-6)

**(i)      The First Transfer (April 15, 2016):  $2,500,000**

9.      The Debtors were an enterprise of several companies aggregated through a series of acquisitions which operated in the healthcare sector primarily in revenue and practice management for physician practices.  (NOR, p. 26, lns. 6-10)

10.    In 2015, Paul Parmar was the Chief Executive officer of CHT and looking to acquire a medical billing company. He became interested in purchasing Porteck Corporation. (NOR, p. 26, lns. 6-18)

11.    Porteck Corporation ("Porteck") was a technology services company in the healthcare industry incorporated, owned and controlled by Defendant Walia who acted as its CEO. (NOR, p. 26, lns. 2-23)

12.    At the time, Porteck consisted of two business lines: AHMS and PC Advantage ("PCA") which were both medical billing companies. (NOR, pp. 26-27, lns. 24-1)

13.    In March 2015, the debtor entity Physicians Practice Plus acquired the assets of Porteck pursuant to an Asset Purchase Agreement ("APA"). The Sellers were Walia, Porteck, and the Janaminder Trust. (NOR, p. 26, lns. 6-18) Mr. Walia executed the APA on behalf of himself, Porteck and the Janaminder Trust. The Walia Trust never signed the APA. Mr. Parmar executed the APA on behalf of the Debtor, Physicians Practice. (NOR, p. 27, lns. 10-18)

14.    The APA, reflects a purchase price of $12.8 million for the sale of Porteck even though Mr. Walia had agreed in writing to sell the Porteck assets for $10.8 million. The purchase price was "juiced upwards" because Mr. Parmar told Walia he needed to add an additional $2M to the APA as "deal fees". (NOR, p. 27, lns. 18-24)

15.    Mr. Walia was unconcerned about the deal price being juiced up. Mr Walia testified that he paid no attention to what Mr. Parmar was doing when the APA purchase price was set at $2 million more than the agreed purchase price. Per his testimony, "as long as Walia's share did not change, it did not concern me." As established by the record, the actual deal fees paid to the broker, Abstract business advisors, was $192,500, or one-tenth or so of the nearly $2 million by which the purchase price was juiced up. (NOR, pp. 27-28, lns. 25-18)

16.    In terms of the value of the assets acquired by the debtor entity, the net asset value of AHMS in 2015 was $1.35 million. The assets were valued at $2,350,000 less a $1M liability, a promissory note paid off by the Debtor at acquisition. (NOR, p. 28, lns. 19-22)

17.    The assets of PCA were valued at $2,546,246 but there was 1.9 M in loans outstanding. The net asset value of PCA recorded at time of purchase by the Debtor was $474,000. The actual value of the assets acquired from Porteck at the time they were acquired was $1.824 million, being the net asset value of AHMS and the net asset value of PCA. (NOR, pp. 28-29, lns. 23-3)

18.    Despite the written record of the asset valuation, Mr. Parmar and Mr. Walia agreed to the value of the assets being $10.8 million and apparently was five times the 2014 [sic] EBITDA of $2.2 million. And again, that five times multiple is before the $2 million was added into the transaction. (NOR, p. 29, lns. 4-8)

19.    Bank records provided evidence memorializing a wire of $9.8 million from the debtor Constellation Healthcare Technologies to the IOLTA account at Robinson Brog, which was used to close the Porteck sale. (NOR, p. 29, lns. 9-13)

20.    Of the $9.8 million, $6.8 million was wired on to Mr. Walia and $3 million went sideways in the vernacular to another non-debtor entity controlled by Mr. Parmar called First United Health. (NOR, p. 29, lns. 14-17)

21.    Once the Porteck deal closed shortly thereafter in June of 2015, Mr. Walia was installed as the chief executive officer of the Debtor's main operating company, Orion Health Co., and became the chief technology officer of Constellation Healthcare Technologies. He continued to serve in those capacities through the fall of 2018. (NOR, pp. 29-30, lns. 25-5)

22.    While Mr. Walia was CEO of Orion and CTO of Constellation Healthcare Technologies, on or about April 15 of 2016, the debtor, Constellation Healthcare Technologies, transferred $2.5 million from its JP Morgan account to NIKNIM. (NOR, p. 30, lns. 6-10)

23.    Mr. Walia testifies that the stated purpose of the escrow arrangement was to protect the rights of Physicians Practice, the actual acquirer, as purchaser under the Porteck APA to receive $2.5 million to the extent such funds were required to indemnify Physicians Practice though as a practical matter, the arrangement was not necessary to protect the buyer because it simply withheld payment of the $2.5 million. (NOR, p. 30, lns. 16-24)

24.    The written agreement in Section 1.6 of the APA provides that for purposes of partially-securing the seller's obligations, the amount of $2,500,000 shall be delivered by the buyers at closing to the escrow agent by wire transfer of immediately available funds pursuant to an escrow agreement substantially in the form attached as Exhibit A to the APA. (NOR, pp. 30-31, lns. 25-6) [Emphasis added]

25.    Section 1.6 clearly required certain conditions of the escrow including that it be established and that it be funded upon occurrence of certain events. However, no escrow agreement was ever executed and no escrow account was ever established. Despite Walia's assertion that the $2.5 million was owed to him or his company, the books and records of the Debtor reflect no antecedent debt at the year ending December. There is no antecedent debt reflected reflected on the books and records as being owed to Walia or NIKNIM. (NOR, p. 31, lns. 9-19)

26.    The Debtor's books and records reflect no debt being owed as a result of the Porteck transaction as of the end of 2015. (NOR, p. 31, 19-21)

27.    The Debtor's 2016 books and records did not evidence the satisfaction of any antecedent debt of $2.5 million or any increase in the net assets of the Debtors as a result of that $2.5 million transfer. (NOR, p. 31, lns. 22-25)

28.    The Trustee asserts that the $2.5 million transfer was fraudulent based in part on an email that Mr. Parmar sent to Mr. Walia on the date of the transfer, stating, "I am willing to give you $3.5 million in return for you to allow me to structure it properly internally, which requires I close the file with the $2 million payment." (NOR, p. 32, lns. 1-6)

29.    On the same day as that email, the Debtor transferred $2.5 million from its M&T account, the M&T account of CHT to the JP Morgan account of NIKNIM. (NOR, p. 32, lns. 7-9)

### (ii)   The Second Transfer (June 28, 2017): $1,520,000

30.   The second transfer at issue involves a 2017 transaction and agreement under which Mr. Walia agreed to sell to Mr. Parmar or a designated entity a software company that Mr. Walia indirectly owned called AllRad Direct LLC.  Object Tech Holding LLC was a shell company that Allrad owned. (NOR, p. 32, lns. 13-19)

31.   The sale was memorialized by a membership interest purchase agreement, or "MIPA", dated June 2017 between Object Tech as seller and Physicians Healthcare Network Management Solutions as buyer.  Physicians Network Solutions, is not and was not one of the Debtors, but was again a third party entity owned or controlled by Mr. Parmar.  (NOR, pp. 32-33, lns. 20-1)

32.   The MIPA required a due diligence report and the negotiations required the diligence report to be prepared in connection with the sale, but the due diligence report was never completed. (NOR, p. 33, lns. 2-5)

33.   The MIPA required various schedules to be provided.  Those schedules were never completed, such as 1.3, earnout payments; 1.4, discharge of debts and liabilities, maintenance of working capital. The MIPA also called for certain revenue projections, balance sheets or statements of assets and liabilities to be provided.  Those were never provided. State and federal tax returns that were called for under the MIPA from the sellers were never provided. And the Debtor's board of directors never approved the purchase.  (NOR, p. 33, lns. 2-16)

34.   Despite these deficiencies, the MIPA sale closed in June of 2017 and Debtor's funds, $1,520,000, was wired out of the Robinson Brog IOLTA account to the NIKNIM bank account at JP Morgan Chase. Correspondingly, all of the shares of AllRad were transferred, but transferred to the non-debtor entity, Physicians Network Solutions.  No assets were ever transferred in connection with the AllRad Object Tech transaction to any of the Debtors. (NOR, p. 33, lns. 17-24)

35.   At no point during 2017 did any of the debtors' books and records evidence an antecedent debt of $1,520,000 or any other debt owed to either of the defendants in connection with Object Tech or AllRad. In fact, the debtors' books and records do not evidence

the satisfaction of any antecedent debt or increase in net assets of the debtors through the acquisition of the interest in Object Tech or AllRad. The second transfer occurred within eight months prior to the petition date, well within the two- year period.  (NOR, pp. 33-34, lns. 25-4)

### (iii)    Defendant NIKNIM Management, Inc. and Its Operations

36.    Defendant NIKNIM is a corporation formed under the laws of the State of New York with its principle place of business at Walia's residence at 27 Kettlepond Road, Jericho, New York.  (NOR, p. 27, lns. 2-5)

37.    NIKNIM was incorporated in 2015, and at all times Walia owned and managed NIKNIM as the sole employee, officer, and shareholder.  NIKNIM is an S corp. formed by Walia to manage his consulting work, personal investments, and that of his family trust.  NIKNIM followed and observed no corporate formalities and maintained no resolutions of shareholders or minutes.  (NOR, p. 27, lns. 5-9)

38.    NIKNIM was paid by the Debtor as a personal accommodation to Mr. Walia for tax purposes.  (NOR, p. 41, lns. 15-16).  NIKNIM was originally capitalized one or two thousand dollars. (NOR, p. 42, lns. 3-5)  Walia was receiving monies from Orion in 2017 which he would deposit at his convenience into either the NIKNIM or his personal checking account.  In 2016-2017, Walia would deposit monies from his other investments, family trust, and his wife's accounts into the NIKNIM bank account.  Walia used the NIKNIM account to pay personal expenses of his such as pool maintenance, purchasing suits, salon treatments, voice lessons, homeowner dues, and car payments. (NOR, p. 41,lns. 17-25)

39.    Walia personally directed that the Transfers identified in the Complaint be deposited into the NIKNIM bank account at JP Morgan Chase.  (NOR, p. 41, lns. 17-19)

### IV.
### BY DEFENDANT'S OWN ADMISSION THE FIRST TRANSFER IS AN INTENTIONALLY FRAUDULENT TRANSFER UNDER STATE AND FEDERAL LAW

40.    In its First Claim for Relief, the Plaintiff  seeks: to avoid the intentionally fraudulent transfer of the Debtors' funds pursuant to 11 U.S.C. §§ 544, 548 and 550 and NY

Debt & Cred L ("NYDCL") §276, *et seq.*, or recover the value thereof, and preserve the Transfer for the benefit of the Debtors' estate pursuant to 11 U.S.C. § 551. The standard set forth in New York state law regarding actual fraudulent conveyances essentially overlaps with the Bankruptcy Code. *Barnard v Albert (In re Janitorial Close-Out City Corp.)*, 2013 Bankr LEXIS 523, at *14 (Bankr. E.D.N.Y. Feb. 8, 2013). Unlike NYDCL Sections 273 and 275, under NYDCL Section 276, a transferor does not need to receive fair consideration for a conveyance to be fraudulent ("where actual intent to defraud is proven, the conveyance will be set aside regardless of the adequacy of the consideration given.") *MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 934 (S.D.N.Y. 1995) (citing *to HBE Leasing,* 48 F.3d. at 639); *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2nd Cir. 2005). Actual fraudulent intent under NYDCL §278(2) has been construed such that it is satisfied if a "transferee participated or acquiesced in the transferor's fraudulent design. 13 Romualdo P. Eclavea, Carmody-Wait 2d New York Practice with Forms §§85-29 & 85-30 (2002) (emphasis added); *Berlenbach v. Bischoff,* 137 Misc. 719, 244 N.Y.S. 369, 371 (N.Y.Sup.Ct. Spec. Term 1930). "When considering whether a debtor had an actual intent to hinder, delay, or defraud its creditors, courts focus on the intent of the transferor not on the intent of the transferee." *45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC)*, 650 B.R. 602, 611-612 (Bankr. S.D.N.Y. 2023) . A court will look at the intent of corporate actors and individuals in instances where a debtor is not an individual. *Id.* at *17 (citing *In re Roco Corp.,* 701 F.2d 978, 984-85 (1st. Cir. 1983))

41.     Circumstantial evidence may be used to demonstrate actual fraud. "Due to the difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on 'badges of fraud' to support his case, i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *Sharp Int'l Corp. v. State St. Bank & Tr. Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005) (citing *Wall St. Assocs. v. Brodsky*, 257 A.D.2d 526, 684 N.Y.S.2d 244, 247 (App. Div. 1st Dep't 1999)). Courts frequently look to "badges of fraud" to establish an inference of fraudulent intent in cases

brought under an actual intent theory. Such badges of fraud include: 1) the lack or inadequacy of consideration; 2) the family, friendship or close associate relationship between the parties; 3) the retention of possession, benefit, or use of the property in question; 4) the financial condition of the party sought to be charged both before and after the transaction in question; 5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; 6) the general chronology of the events and transactions under inquiry; 7) a questionable transfer not in the usual course of business; and 8) the secrecy, haste, or unusualness of the transaction. *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.)*, 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005). The presence or absence of any single badge of fraud is not conclusive; rather, the inquiry focuses on what factors are present, as well as the context for the badges of fraud. *Halperin v. Morgan Stanley Inv. Mgmt., Inc. (In re Tops Holding II Corp.)*, 646 B.R. 617, 675 (Bankr. S.D.N.Y. 2022), leave to appeal denied, 2023 U.S. Dist. LEXIS 2749, 2023 WL 119445 (S.D.N.Y. Jan. 6, 2023).  Although "badges of fraud" are not conclusive and are more or less strong or weak according to their nature and the number occurring in the same case, "**'a concurrence of several badges will always make out a strong case'**". *Gafco, Inc. v. H. D. S. Mercantile Corp.*, 47 Misc. 2d 666, 665 (1965). (Emphasis Added)

## V.
## THE DIRECT EVIDENCE CLEARLY ESTABLISHES THE DUO OF PARMAR AND WALIA FALSIFYING THE APA TO DEFRAUD CREDITORS

42.    Parmar and Walia had both the motive and opportunity to defraud the Debtors' creditors.  *45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC)*, 650 B.R. 602, 613 (Bankr. S.D.N.Y. 2023) Motive "entail[s] concrete benefits that could be realized by one or more" of the actions alleged, and opportunity "entails the means and likely prospect of achieving concrete benefits by the means alleged." *Id.*

43.    There is direct evidence of fraud by the Transferor, Paul Parmar, even before examining the circumstantial evidence  surrounding the "badges of fraud".  Walia admits the APA was intentionally misstated by Parmar to add millions of dollars in "deal fees". (NOR, pp.

27-28, lns. 17-18) Walia knew the "deal fees" were bogus  since he received the statement of the deal fees.  (Pl **Trial Ex. 1**) The Trustee has proven the deal fees were yet another kickback scheme by Parmar taking $3 million off the top. (NOR, p. 29, lns. 14-17)   It is also an established fact, Walia knew about and participated in juicing up the purchase price. (NOR, 28, lns. 2-18)  Actual fraudulent intent under NYDCL §278(2) has been construed such that it is satisfied if a "transferee participated or acquiesced in the transferor's fraudulent design". 13 Romualdo P. Eclavea, Carmody-Wait 2d New York Practice with Forms §§85-29 & 85-30 (2002) (emphasis added); *Berlenbach v. Bischoff*, 137 Misc. 719, 244 N.Y.S. 369, 371 (N.Y.Sup.Ct. Spec. Term 1930).  False statements, misrepresentations and backdating documents is evidence of intent to defraud as an effort to make an illegitimate transaction appear legitimate. See *United States v. Maciejewski*, 70 F. Supp. 2d 129, 134 (Bankr. N.D.N.Y. 1999)

44.      Where there is such overwhelming evidence of fraud or deception in a contract, the Trustee submits the Court should not accept Walia's explanation that the contract could provide consideration as to do so is against public policy. See *Chia Huey Chou v. Remington Tai Che*, 2010 U.S. Dist. LEXIS 142766, *9 (E.D.N.Y. 2010), citing to *Contemporary Mission, Inc. v. Bonded Mailings, Inc.*, 671 F.2d 81, 86 (2d Cir. 1982) (A contract is void in New York and unenforceable as a matter of public policy when its performance would practice fraud or deception on a third party).  *Id.* citing to *McConnell v. Commonwealth Pictures Corp.*, 7 N.Y.S.2d 465, 471, 166 N.E.2d 494, 199 N.Y.S.2d 483 (1960) (As a matter of public policy, fraud and deception practiced on a third party . . . will invalidate a New York contract, at least where there is a 'direct connection between the illegal transaction . . . and the obligation sued upon). A court may interfere and prevent the arrangement being further consummated in case of partial performance) *Di Tomasso*, 250 A.D. 206, 209, 293 N.Y.S. 912, 916 (App. Div. 2nd Dept. 1937).[2] See *AQ Asset Mgt. LLC v. Levine*, 2013 N.Y. Misc. LEXIS 2054, *28 (N.Y. Sup. Ct., Mar. 28, 2013) (If it was agreed that the funds would be deposited with Levine under false

_____

[2] As set forth in *Chia Huey Chou, supra*, (the Second Circuit has instructed "courts [to] not be timid in voiding agreements which tend to injure the public good or contravene some established interest of society." *Chia Huey Chou v. Remington Tai Che*, 2010 U.S. Dist. LEXIS 142766, *10 (E.D.N.Y. 2010) citing to *Stamford Bd. of Educ. v. Stamford Educ. Ass'n.*, 697 F.2d 70, 73 (2d Cir. 1982).

pretenses, to not pay federal taxes, the agreement between sellers and Levine would be unenforceable. No cause of action can arise from an agreement which has been documented falsely for an illegal purpose regardless of degree of complicity in scheme).

45.    The APA was deceptive and fraudulent on its face and there is a direct connection between it and Defendants' attempt to use the APA as a shield. A contract against public policy cannot be the source of a defense especially where it simply seeks to perpetrate a further fraud. Addressing the circumstantial evidence, the Trustee submits all the badges of fraud are implicated.

### (i)    The Lack Or Inadequacy Of Consideration:

46.    The term "reasonably equivalent value" in 11 U.S.C. § 548(a)(1)(B) and the term "fair consideration" in New York's Debtor & Creditor Law have the same fundamental meaning and are interpreted similarly by the courts. *Pryor v. Tiffen (In re TC Liquidations LLC)*, 463 B.R. 257, 268 (E.D.N.Y. 2011) "Whether a debtor received a reasonably equivalent value is analyzed from the point of view of the debtor's creditors, because the function of this element is to allow avoidance of only those transfers that result in a diminution of a debtor's prepetition assets." *Mendelsohn v. Kovalchuk (In re APCO Merch. Servs.)*, 585 B.R. 306 (Bankr. E.D.N.Y. 2018); *Jordan v. Kroneberger (In re Jordan)*, 392 B.R. 428, 441 (Bankr. D. Idaho 2008); *see also Frontier Bank v. Brown (In re N. Merch., Inc.)*, 371 F.3d 1056, 1059 (9th Cir. 2004) ("the primary focus . . . is on the net effect of the transaction on the debtor's estate and the funds available to the unsecured creditors."). "The touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred." *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991).

47.    The Debtor's books and records evidence no antecedent debt owed to the Defendants, Walia or NIKNIM related to the First Transfer. (NOR, 31, lns. 22-25). As such, no argument can be made for the satisfaction of an antecedent debt. Rather, Defendants claim that 2.5M was set aside in an escrow. Just like the "deal fees", the escrow was <u>more</u> fiction.

However, if the Court did entertain the argument, it is clear the Debtor received nothing in exchange for the $2.5M First Transfer.

48.     First, the Trustee established that what the Debtor purchased for 12.8M had an net asset value of $1.824 million. (NOR, p. 29, lns. 19-3) . In reality, what the Debtor received was <u>far less</u> than what the financial documents evidence on the face of the deal.  AHMS  had loss of revenue in 2015/16 of (-1,776,862). (Pl **Trial Ex 2**) (See **Trial Aff'd of F. Lazzara**, ¶11) What the Debtor purchased had a net asset value of $1.824 million and an agreed-upon formulaic reduction in value due to "AHMS Revenue loss adjustment to purchase Price" of (-1,776,862. (Pl Trial Ex 3). If you further remove the Bad AR of AHMS from the asset value per the APA, the net value of the assets sold to the Debtor was only $47,128. ($1,824,000- $1,776,872) versus the $12.8M the Debtor paid.  (See **Trial Aff'd of F. Lazzara**, ¶11)

49.     Second, the Trustee retained an expert in the area of working capital adjustment and related escrow provisions to examine the APA to determine if, <u>assuming arguendo,</u> there was an escrow, would any amounts be due Walia or the Debtor?  Mr. Mitchell works for Grant Thorton, and advises buyers and sellers on the accounting and financial aspects of purchase agreements and many of the metrics involved therein such as price adjustments, working capital adjustments, cash, indebtedness, escrows and earn-outs. (See **Trial Affidavit of Maxwell G. Mitchell**, ¶¶2, 3) He is a Chartered Accountant (Scotland) and serves as both as an accountant and business advisor in mergers and acquisitions. (See **Trial Affidavit Maxwell G. Mitchell**, ¶3) He examined Section 1.6(e) of the APA and noted it was incomplete and contains non-standard language.  However, if you applied standard industry norms,  the working capital adjustment in a purchase agreement is used to adjust the purchase price for any excess or deficit of working capital acquired, compared to a target (or 'normal') level of working capital, which is the amount required to operate the acquired business in the ordinary course. Such deficit, if any, is typically applied against any amount held in escrow.  (See **Trial Affidavit of Maxwell G. Mitchell**, ¶¶ 5, 6, 7) His conclusion, as part of any escrow true-up in the present case there was a working capital deficiency of ($1,924,837), which sum was owed to the Buyer, Debtor, as part of

any reconciliation. (See **Trial Affidavit of Maxwell G. Mitchell**, ¶8).  Based on his M&A experience, the use of escrow is as a vehicle to true-up the purchase price, post-closing and simply taking the claimed full escrow monies is improper. (See **Trial Affidavit of Maxwell G. Mitchell**, ¶10).

50.     The admissible evidence establishes nothing of any value was exchanged for the First Transfer.  This factor is a badge of fraud as the transaction went to personally benefit the two insiders.  *See Est. of Tawil v. Sutton*, 2024 N.Y. Misc. LEXIS 839, Kings County Supreme Court (2024) (citing to *Axginc Corporation v. Plaza Automall Ltd.*, 2022 U.S. Dist. LEXIS 90477, 2022 WL 2135474 (E.D.N.Y, 2022)) (Inadequacy of the consideration is considered a "particularly important" badge establishing a fraudulent conveyance).  The further payment of $2.5M to Walia conferred no realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred." *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991).  The first badge is established.

### (ii)     The Family, Friendship Or Close Associate Relationship Between The Parties:

51.     Walia was introduced to Parmar in 2009, and visited his home at the Colts Neck, NJ property. (Depo. Walia, p. 50, lns. 13-25, lns. 2-17)  Parmar was the CEO of the Debtor, CHT, and Walia the CEO of the Debtor Orion and the Chief Technology Officer of CHT after February 2015, the year predating the Transfer.  They were both insiders at the time of the Transfer.  (NOR, p. 39, lns. 5-6)  The evidence supports the establishment of the second badge.

### (iii)     The Retention Of Possession, Benefit, Or Use Of The Property In Question:

52.     The evidence at trial establishes that the First Transfer was sent by Parmar to Walia on April 15, 2016. The monies then were taken by Defendants NIKNIM and Walia.  There is no evidence to indicate Parmar retained control or possession of the First Transfer, especially since the evidence indicated Parmar paid the CEO of Orion to "in return allow me to structure it properly", i.e. look the other way as he did with the deal fees. (Pl **Trial Ex 9,** April 15, 2016 email at 12:37 p.m.) Parmar did not retain possession of the money, but he did receive a benefit.

It is a different scenario than usual, but the intent is clear. "Fraudulent acts are as varied as the fish in the sea." *In re Kaiser*, 722 F.2d 1574, 1583(2nd Cir. 1983) The third badge is established by the parties own communications.

### (iv)    The Secrecy, Haste, Or Unusualness Of The Transaction;  A Questionable Transfer Not In The Usual Course Of Business:

53.    The facts and circumstances surrounding the First Transfer and the explanation provided by the Defendants clearly demonstrate  the First Transfer was made in haste, concealed, and not an ordinary or usual business transaction. Though the Porteck deal closed no later than March 3, 2015 (Pl **Trial Ex. 4**), the Defendant and the executives do not even mention the issue of a closing payment until 5:19 pm on April 7, 2016. (Pl **Trial Ex. 10**).  There was no discussion in 2015 of a legitimate escrow, executing an escrow agreement, or funding an escrow. As a matter of established fact, no escrow was funded or created. (NOR, p. 31, lns. 11-13)  The next afternoon on April 8, Walia responds:

> "Paul, I will (sic) like to meet this Monday to resolve the post-closing calculations.  Please let me know if you are available to meet this Monday".
> (Pl **Trial Ex. 10, email dated April 8, 2016**).

54.    One week later, on April 15, 2016, with Parmar using his pegasusbluestar email address, there is a flurry of  emails where Walia says at 11:21 am, here is my wire instructions, "wire this money today". (Pl **Trial Ex. 9**).  Parmar's response does not reference an escrow, but a wire of $2M and $1M for "India".  (Pl **Trial Ex. 9**).  45 minutes later, Walia responds, give me $2.5M and $1M for India.  The entire email chain is suspect , but what is clear is that 9 minutes later Parmar responds;

> "I cannot wire more than 2.5m if you remember I told you yesterday….I will let you have 3.5m which is almost 1.5m more than I really think if we calculate the numbers per contract will come around to 2m but I am willing to give you 3.5m **in return for you to allow me to structure it properly internally** which requires I close the file with 2m payment." (Pl **Trial Ex. 9**) (Emphasis Added)

Less than an hour later Parmar states:

> "I will give you 2.5m today but I want you to understand I am looking at the bigger picture and trying to make this work…" (Pl **Trial Ex. 9**).

55.      There was <u>nothing usual</u> about the emails.  Send me money "today", exchanged within "minutes", wildly divergent topics or the simple fact no one else is included in the discussions on Friday April 15, 2016, but for Parmar and Walia.  Minutes later, same day, 2.5M is transferred from one insider to the other. (NOR, p. 30, lns. 6-11)  The transaction and/or the First Transfer does not show up on the Debtor's books and records.  (NOR, p. 31, lns. 14-25).  These two badges of fraud, haste/secrecy and unusual transaction are satisfied and extremely relevant as it clearly shows insiders at work diverting millions outside the prying eyes of creditors.

### (v)      The Financial Condition Of The Party Sought To Be Charged Both Before And After The Transaction In Question:

56.      The First Transfer occurred on April 15, 2016.  Prior to this time, the Debtor was insolvent.  (See **Trial Affidavit of Craig Jacobson**, ¶11).  Prior to this time, judgment creditors existed who had obtained judgments that went unsatisfied. (See Plaintiff's Req. for Judicial Notice, Claim No. 1000) On March 9, 2016, the debtors Physicians Practice Plus and CHT were sued by a plaintiff, Criterions. LLC. (See Plaintiff's Req. for Judicial Notice, Criterions, LLC) The executive team was not paying legitimate creditors.  Rather, the executive team which included Walia were devising schemes to divert millions of dollars to one another. Between 2015 and 2016, the net  loss of the Debtor  blossomed from net losses of (-$11,917,826) for 2015 to (-$46,742,748) for 2016. (See **Trial Affidavit of Craig Jacobson**, ¶11).  From 2016 to 2017, Walia and Parmar diverted not less than $4M to Walia alone.  On the Petition Date, the Debtors are liable on $158 million in secured debt to a lender consortium headed by BOFA who allege they were defrauded as part of the Go-Private transaction . (See **Trial Aff'd of Lazzara**, ¶12) *See Messer v. Wei Chu (In re Xiang Yong Gao)*, 560 B.R. 50, 64 (Bankr. E.D.N.Y. 2016) (the Debtor appears to have endeavored to render himself "judgment proof" by divesting himself of any assets and compiling liabilities).  Parmar accumulated massive liabilities while he diverted assets into the name of others.

57.      The Trustee has submitted credible evidence to satisfy this badge of fraud.

    **(vi)**    **The Existence Or Cumulative Effect Of A Pattern Or Series Of Transactions Or Course Of Conduct After The Incurring Of Debt, Onset Of Financial Difficulties, Or Pendency Or Threat Of Suits By Creditors:**

58.    Between 2016 to when the First Transfer was consummated to June 23, 2017, when the Second Transfer was consummated, the time frame was marked by crisis and a series of sham transactions orchestrated by Parmar with the assistance of his executive team and friends.

59.    Parmar's house was in foreclosure. Only weeks before the First Transfer, Parmar asked a fellow investor, John Petrozza to incorporate Aquila Alpha to purchase the first trust deed for his Colts Neck property. (See **Trial Aff'd of F. Lazzara**, ¶13) Parmar deposited $3.5M from the CHT bank account into the company Aquila Alpha, and pretending to be a third party disinterested buyer, purchased the $24M Note for $4M at a 75% discount from Deutche Bank. (See **Trial Aff'd of F. Lazzara**, ¶13). The transaction was a fraud.

60.    On January 30, 2017, the Go-Private transaction orchestrated by Parmar and company was effectuated. (See **Trial Aff'd of F. Lazzara**, ¶12) However, it did not go as planned as the FBI stepped in and seized $20M of the proceeds in the Robinson Brog IOLA account from the Go-Private transaction as it suspected the transaction was effectuated by fraud. (See **Trial Aff'd of F. Lazzara**, ¶¶12, 14) Various assets on the Debtor's balance sheet such as MDRX, Phoenix Health, LLC and Northstar, disappeared and the Debtors were forced to amend their tax returns. (See **Trial Affidavit of Craig Jacobson**, ¶9).

61.    The pattern of fraud is significant and credible.

    **(vii)**    **The General Chronology Of The Events And Transactions Under Inquiry:**

62.    The undisputed facts are that no legitimate business purpose exists for the First Transfer. (Pl **Trial Ex. 8**) Walia's attempt to justify why Parmar was going to divert $2.5M to him on April 8, 2016, is entertaining but more evidence of fraud. (Pl **Trial Ex. 5**) The deal fees siphoned off to Parmar were $3M, not $2M as Walia claimed. (Pl **Trial Ex. 5**; NOR, p. 29, lns. 14-17) There was no escrow, so the Court has evidence of Parmar and Walia covering their

tracks. Even if you ignore the fact no escrow was established or funded, an objective examination of the  financial documents associated with the APA at the time of the deal in February 2015 clearly indicates there was a working capital deficiency of (-$1,924,837), which sum was owed to the Buyer. (See **Trial Affidavit of Maxwell G. Mitchell**, ¶8).  Just because Walia issues an email 14 months after the closing asserting there is an escrow <u>and</u> he is entitled to all of it, does not make it so.  The First Transfer was invisible to creditors.  It was instead created only due to a series of emails between two men who were insiders. The Transfer was made in haste, concealed and clearly not in the ordinary course of the Debtor's business.

63.    Plaintiff submits that each and every badge of fraud is documented.  Defendants will submit no admissible evidence to rebut the evidence other than unsupported claims of the participant in the fraud, Arvind Walia:

**VI.**
**THE FIRST TRANSFER WAS CONTRUCTIVELY FRAUDULENT TO
CREDITORS AS THE DEBTOR WAS INSOLVENT AND
THE TRANSFER WAS NOT MADE FOR FAIR CONSIDERATION**

64.    Plaintiff submits the expert report of Craig Jacobson, a Managing Director at GlassRatner Advisory Capital Group who's credentials have been accepted in other similar cases involving solvency or valuation within Federal and State Courts. (see **Trial Affidavit of Craig Jacobson, ¶¶**1,2,3, filed concurrently herewith) Mr. Jacobson reviewed financial documents, bankruptcy documents and interviewed individuals with back ground on the Debtors and its operations.  He prepared a solvency/insolvency analysis based on the traditional methods of analyzing insolvency in a fraudulent conveyance case.  (see **Trial Affidavit of Craig Jacobson, ¶**7)  The Expert Report focused and analyzed the history of the business, a financial analysis of Orion including CHT, the industry and the economy as of the various measurement dates, the value of the business enterprise which was used to perform a balance sheet test, a forecast of the company's operations and debt obligations to perform a cash flow test, and an analysis of the company and other industry companies to perform a capital adequacy test, an analysis of the company's contingent liability, and examined other evidence of insolvency. (see **Trial Affidavit**

**of Craig Jacobson, ¶8)** Mr. Jacobson was aware of the alleged sham transactions perpetrated from the Orion and CHT accounts which he did not accept or dismiss but looked for objective evidence of it impacting the financial condition of the Debtors. (See **Trial Affidavit of Craig Jacobson, ¶9**) In summary, the entities Orion and CHT failed the Balance Sheet Test, the Cash Flow Test, and the Capital Adequacy Test as of the measure dates of April 15, 2016, June 23, 2017 and June 28, 2017, and were insolvent. (see **Trial Affidavit of Craig Jacobson, ¶11**)

65.    Defendant did not retain and designate their own expert to render an opinion on solvency. Rather, they waited until 6 months after the designation date and gave their expert Plaintiff and Defendants' mediation briefs. The analysis to rebut Mr. Jacobson's opinion of insolvency is flawed as it is based on an assumption that is improper and not the facts in the case. Plaintiff filed a Motion in Limine #1 to strike the report and Mr. Lunden's testimony.

66.    NYDCL §273 defines "fair consideration" for purposes of §273-a, and provides that Fair consideration is given for property, or obligation,

> a.  When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

> b.  When such property, or obligation, is *received in good faith* to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

*Lyman Commerce Solutions, Inc. v. Lung,* 2015 U.S. Dist. LEXIS 51447, 21(S.D.N.Y, 2015)[3]; *See also Kittay v. Flutie N.Y. Corp. (In re Flutie N.Y. Corp.),* 310 B.R. 31, 53(Bankr. SDNY 2018).

67.    As set forth in the analysis of the "Intentional Fraud" Cause of action, at page 10 herein, Plaintiff has submitted admissible evidence to demonstrate the Debtor did not receive reasonably equivalent value, let alone any consideration. Defendant will submit no credible rebuttal evidence . *United States v. Alfano,* 34 F. Supp. 2d 82, 848 (E.D.N.Y. 1999). (Defendants who present no credible evidence to meet their burden of proving that the property

---

[3] Section 548(c) requires both value and good faith and in the absence of either, the defense fails. *Berman v. Pavano (In re Michael S. Goldberg, LLC),* 2020 Bankr. LEXIS 2314, 22 (Bankr. Conn. 2020).

was conveyed for "fair consideration" as defined under prevailing New York State law have not met their burden).

68.    Even if there is fair consideration, a transfer is still constructively fraudulent in the absence of good faith on the part "of both the transferor and the transferee." *Wimbledon Fin. Master Fund v. Wimbledon Fund, SPC*, 2016 N.Y. Misc. LEXIS 4805 (N.Y. Sup. Ct., Dec. 2016) (emphasis added), quoting *Berner Trucking, Inc. v. Brown*, 281 AD2d 924, 925, 722 N.Y.S.2d 656 (1st Dept. 2001); *see Sardis v. Frankel*, 113 A.D.3d 135, 142, 978 N.Y.S.2d 135 (1st Dept. 2014) ("'Fair consideration' ... is not only a matter of whether the amount given for the transferred property was a 'fair equivalent' or 'not disproportionately small,' but whether the transaction is made 'in good faith,' an obligation that is imposed on both the transferor and the transferee.").

69.    The evidence at Trial will demonstrate both (i) that the Transfer was not exchanged for a fair equivalent or made to secure an advance or antecedent debt; and (ii) that the First Transfer was not made in good faith. A transferee's good faith is lacking if the transferee acted with either actual or constructive knowledge of the fraudulent scheme." *See HBE Leasing Corp.*, 48 F.3d 623, 636 (2nd Cir. 1995); *see* NYDCL §278(1). *See also In re Skalski*, 257 B.R. at 711 ("fair value is not sufficient if bad faith taints the transaction"). *Geltzer v. Artists Mktg. Corp. (In re Cassandra Group)*, 338 B.R. 583, 594 (Bankr S.D.N.Y. 2006) The evidence overwhelmingly supports that Walia participated in the fraudulent scheme.

70.    As significant, "**[a]n insider** payment is not in good faith, regardless of whether or not it was paid on account of an antecedent debt." (Emphasis added) *Am. Media, Inc. v. Bainbridge & Knight Labs., LLC*, 135 A.D.3d 477, 478, 22 N.Y.S.3d 437 (1st Dept. 2016), citing *EAC of N.Y., Inc. v. Capri 400, Inc.*, 49 A.D.3d 1006, 1007, 853 N.Y.S.2d 419 (3d Dept. 2008) Here, it is an undisputed fact that Walia was an insider at the time of both Transfers. (NOR, p. 39, lns. 5-6) New York courts have recognized that where the transferee is an officer, director, or major shareholder of the transferor, good faith is lacking as a matter of law. See *Sharp Int'l Corp. v. State St. Bank & Trust Co.*, 403 F.3d 43, 54 (2d Cir. 2005); *Farm Stores, Inc. v. Sch.*

*Feeding Corp.,* 102 A.D.2d 249, 477 N.Y.S.2d 374 (2d Dept. 1984). When preferences are given

to a debtor corporation's shareholders, officers, or directors, such transfers are *per se* violations

of the good faith requirement. *Id.* (citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir.

1995)). The Transfers are a *per se* violation of the good faith requirement.

71.    The Trustee submits that simply because Walia instructed Parmar to pay

Defendant NIKNIM, does not change the fact the First Transfer was between "insiders". (Pl Trial

Ex. 9, April 15, 2016 email) *See Schnelling v. Crawford (In re James River Coal Co.)*, 360 B.R.

139, 161 (Bankr. D. Va. 2007) (A corporation, being an entity created by law, is incapable of

formulating or acting with intent and the intent of the officers and directors may be imputed to

the corporation). NIKNIM played no role in the transaction. NIMNIM appeared on the scene

less than one (1) hour before the First Transfer and was sent the funds only due to Walia's

request. (**Pl Trial Ex. 9**)

## VII.
## DEFENDANT WALIA PARTICIPATED IN THE FRAUDULENT TRANSFER

72.    Under New York law, a creditor may recover money damages against a transferee

who received assets via a fraudulent transfer. *See Cadle Co. v. Newhouse*, 74 F. App'x 152, 153

(2d Cir. 2003) (summary order) ("A creditor may recover money damages against parties who

participate in the fraudulent transfer and are either transferees of the assets or beneficiaries of the

conveyance." (quoting *RTC Mort. Trust 1995-S/N1 v. Sopher*, 171 F. Supp. 2d 192, 201

(S.D.N.Y. 2001)). Under federal law, one "participates" in a fiduciary's breach if he or she

affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables it

to proceed. *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43,

51(2nd Cir. 2005) (citing to *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 284 (2d

Cir. 1992) (2d Cir. 2003). Masterminding the fraudulent transfers, using some of the transferred

assets to pay personal expenses, and diverting funds to cheat creditors is sufficient to support a

finding of personal involvement in a fraudulent conveyance. *Stochastic Decisions, Inc. v.

DiDomenico*, 995 F.2d 1158, 1172 (2d Cir. 1993) An officer acting as a signatory on its

corporate bank accounts and who authorizes expenditures to benefit himself and his family members, benefits both directly and indirectly and is liable for the entire amount of the fraudulent transfers. *Fannie Mae v. Olympia Mortg. Corp.*, 2014 U.S. Dist. LEXIS 79479, *19 (E.D.N.Y. June 10, 2014)  The owner of the transferee corporation, the individual and the defendant was, "[b]y any meaning of the word" a "beneficiary" of the corporations' fraudulent transfers and thus liable for the fraudulent conveyance. *U.S. v. Lax,* 414 F. Supp. 3d 359, 366-367 (E.D.N.Y. 2019)

73.     The trial record will support that Walia masterminded the fraudulent APA and it could not have occurred but for his participation.  Walia assisted Parmar to breach his fiduciary duty which is "participation" under federal law.  Walia assisted Parmar to breach his fiduciary as to the First Transfer.  Parmar said it best, "I am willing to give you 3.5 in return for you to allow me to structure it properly".  (Pl **Trial Ex. 9**) The trial record will support that Walia was the only signatory to  the NIKNIM bank account and utilized the account to benefit himself and his family members.  Walia is the undisputed owner of the transferee NIKNIM and he personally benefitted and is liable.

## VIII.
## DEFENDANTS WALIA AND NIKNIM ARE THE ALTER EGO OF ONE ANOTHER AND EQUITY DEMANDS THEY BE HELD JOINTLY AND SEVERALLY RESPONSIBLE FOR ANY JUDGMENT

74.     Alter ego liability exists under New York law "when a parent or owner uses the corporate form to achieve fraud, or when the corporation has been so dominated by an individual or another corporation . . . that its separate identity so disregarded that it primarily transacted the dominator's business rather than its own." *City of Almaty v. Ablyazov*, 2019 U.S. Dist. LEXIS 55183, *14 (Bankr. S.D.N.Y. 2019); *Kiobel v. Royal Dutch Petroleum*, 621 F.3d 111, 195 (2d Cir. 2010) (internal quotation marks and citation omitted).  "Factors to be considered in determining whether the owner has 'abused the privilege of doing business in the corporate form' include whether there was a 'failure to adhere to corporate formalities, inadequate capitalization, commingling of assets, and use of corporate funds for personal use'." (*East Hampton Union Free*

*School Dist. v Sandpebble Bldrs., Inc.*, 66 AD3d 122, 127, 884 NYS2d 94 (2009),

quoting *Millennium Constr., LLC v Loupolover*, 44 AD3d 1016, 1016-1017, 845 NYS2d 110

(2007))[4]. The undisputed facts evidence the factors outlined above warrant that any finding of

liability for receipt of the Transfers by NIKNIM is similarly extended to Walia since he

personally executed the operative documents, made the representations and engineered the

Transfers with Parmar. The Second Transfer for the purchase of a shell company with no

earnings or financial documents is nothing short of ourtrageous.

### (i)    NIKNIM's Lack of Business Purpose

75.    NIKNIM was incorporated in 2015 and at all times had a single employee,

officer, and shareholder who was Walia. NIKNIM was formed to manage Walia's consulting

work, take care of his personal investments, and that of his family trust. (NOR, 27, lns. 6-9)

NIKNIM was paid by the Debtor as a personal accommodation to Walia for tax purposes. (NOR,

p. 41, lns. 15-16)

### (ii)    Commingling of Funds

76.    Walia was receiving monies from Orion in 2017 which he would deposit as a

personal accommodation into either his personal checking account or that of NIKNIM. (NOR,

41, lns. 17-19) In 2016-2017, Walia would deposit monies from his other investments, family

trust, and his wife's accounts into the NIKNIM bank account as well. (NOR, p. 40, lns. 20-22)

### (iii)    NIKNIM's Deposits To Pay Walia's Personal Expenses:

77.    Use of a corporation's bank account for personal use is evidence of a lack of

separation between the individual and the corporation. See *First Horizon Bank v. Moriarty-*

*Gentile*, 2015 U.S. Dist. LEXIS 165695, *20 (Bankr. E.D.N.Y. 2015) (The evidence shows that

defendant treated the HPLP bank account as her own, diverted funds to pay her personal bills,

---

[4] Because a decision to pierce the corporate veil in any given instance will necessarily depend on the attendant facts
and equities, there are no definitive rules governing the varying circumstances when this power may be exercised.
*Baby Phat Holding Co., LLC v. Kellwood Co.*, 123 AD3d 405, 407, 997 N.Y.S.2d 67, citing to (*Matter of Morris v
New York State Dept. of Taxation & Fin.*, 82 NY2d 135, 141, 623 NE2d 1157, 603 NYS2d 807 [1993]).

commingled and failed to segregate funds, used HPLP as a conduit for defendant's acting business, and failed to maintain arm's-length transactions with HPLP by making continuous and frequent transfers between the HPLP bank account and her personal account.)  Here, it is not disputed that Walia used the NIKNIM account to pay his personal expenses such as pool maintenance, purchase of suits, salon treatments, voice lessons, homeowner's dues, automobile payments for he and his wife as well as large withdrawals of cash. (NOR, 41, lns. 20-25)  The bank account of NIKNIM was utilized by Walia for his personal use.

### (iv)    The Failure To Maintain Adequate Corporate Minutes Or Records

78.    NIKNIM followed no corporate formalities and maintained no resolutions of shareholders or minutes. (NOR, pp. 41-42, lns. 25-2)

### (v)    Domination Or Control Of The Corporation By The Stockholder

79.    Domination, especially with respect to the transaction attacked, and such domination used to commit the fraud or wrong against a plaintiff is the essence of the inquiry. *Gardiners Bay Landscape v. Postiglione (In re Postiglione)* 2019 Bankr. LEXIS 1887, *10 (Bankr. E.D.N.Y 2019) citing to *Baby Phat Holding Co. LLC v. Kellwood Co.*, 123 AD3d 405, 407, 997 N.Y.S.2d 67 (App. Div.1st Dept.).  A key factor in any decision to disregard the separate corporate entity is the element of control or influence exercised by the individual sought to be held liable over corporate affairs." *Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc.,* 187 Conn. 544, 556-57, 447 A.2d 406 (1982) Both transactions and related Transfers were dominated by Walia who orchestrated and directed the flow of funds.  Walia even filed a proof of claim listing himself as the creditor for alleged monies owed under the Porteck sale.

### (vi)    Capitalization

80.    NIKNIM was capitalized with a small sum of one or two thousand dollars. (NOR, p. 42, lns. 2-3)  The sum in dispute is in excess of 4M, evidencing the amount of capitalization of NIKNIM was entirely inadequate.  Further, as evidenced by Pl **Trial Exhibit 16**, anytime there were deposits in excess of one million dollars ($1,000,000) to NIKNIM, Walia drained the

money within days out of the NIKNIM account leaving an ending monthly balance of less than $50,000 in that same month.  (See **Trial Aff'd of F. Lazzara**, ¶8)

### (vii)    Use Of A Single Address

81.    Defendant NIKNIM is a corporation formed under the laws of the State of New York with its principle place of business <u>at Walia's house</u>. (NOR, 27, lns. 2-9)

### (viii)    Inequitable Result

82.    A plaintiff may be considered "injured" by the defendant's actions when "a company is rendered unable to pay the claims pending against it by third parties because of another company or individual's domination of the business." *See Balmer v. 1716 Realty LLC*, No. 05 CV 839 (NG)(MDG), 2008 U.S. Dist. LEXIS 38113, 2008 WL 2047888, at *6 (E.D.N.Y. May 9, 2008) (citing *Austin Powder Co. v. McCullough*, 216 A.D.2d 825, 827, 628 N.Y.S.2d 855 (App. Div. 3d Dept. 1995)). Actual or common law fraud need not be proven. See *DER Travel Servs. v. Dream Tours & Adventures*, No. 99 Civ. 2231 (HBP), 2005 U.S. Dist. LEXIS 25861, 2005 WL 2848939, at *9 (S.D.N.Y. Oct. 28, 2005).

83.    In the present case, the undisputed facts evidence Parmar, with Walia's active participation created fictitious acquisitions, Objecttech and Allrad, a fictitious due diligence report, a fictitious purchase price in the APA agreement for Porteck, and directed the diversion of Debtor funds, all the while acting as the CEO of Orion and an officer of CHT.  Legitimate creditors  did not stand a chance and had to sue, just like the Trustee had to step in and sue in the present adversary.  Under the circumstances, it would be inequitable for the Trustee and creditors to be forced to expend further legal fees to pursue only one Defendant.  Judgment is proper against both Defendants, and each of them, and Plaintiff reserves its right to seek fees and costs due to the significant expenditure of time and costs to creditors.

84.     By separate cover, Plaintiff respectfully submits his Conclusions of Law.

Dated:  July 10, 2024                   Respectfully submitted,

                                        PACHULSKI STANG ZIEHL & JONES LLP


                                        /s/ *Jeffrey P. Nolan*
                                        Ilan D. Scharf, Esq.
                                        Jeffrey P. Nolan, Esq. *(admitted pro hac vice)*
                                        PACHULSKI STANG ZIEHL & JONES LLP
                                        780 Third Avenue, 34th Floor
                                        New York, New York 10017
                                        Telephone:     (212) 561-7700
                                        Facsimile:     (212) 561-7777

                                        *Counsel for Plaintiff, the Liquidating Trustee*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document has been served via U.S. Mail and the Court's Electronic Filing System to:

# EXHIBIT A

1    UNITED STATES BANKRUPTCY COURT

2    EASTERN DISTRICT OF NEW YORK

3    Case No. 18-71748-ast

4    - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6    ORION HEALTHCORP, INC., et al.,

7             Debtor.

8    - - - - - - - - - - - - - - - - - - - - - - - - - x

9    Adv. Case No. 20-08049-ast

10   - - - - - - - - - - - - - - - - - - - - - - - - - x

11   HOWARD M. EHRENBERG, in his capacity as liquidating trustee

12   of Orion HealthCorp, Inc., et al.,

13                  Plaintiffs,

14            v.

15   ARVIND WALIA; NIKNIM MANAGEMENT, INC.,

16                  Defendants.

17   - - - - - - - - - - - - - - - - - - - - - - - - - x

18   Adv. Case No. 8-20-08052-ast

19   - - - - - - - - - - - - - - - - - - - - - - - - - x

20   HOWARD M. EHRENBERG in his capacity as LIQUIDATING TRUSTEE

21   OF ORION HEALTHCORP, INC., et al.,

22                  Plaintiffs,

23            v.

24   ABRUZZI INVESTMENTS, LLC,

25                  Defendants.

1    - - - - - - - - - - - - - - - - - - - - - - - - - x

2                    United States Bankruptcy Court

3                    290 Federal Plaza

4                    Central Islip, New York 11722

5

6                    April 10, 2024

7                    11:29 AM

8

9

10

11

12

13

14

15

16

17

18

19

20

21    B E F O R E :

22    HON ALAN S. TRUST

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO:   UNKNOWN

1    HEARING re Recovery Of Certain Transfers

2

3    HEARING re Summary Judgment

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Rita Weltsch

1    A P P E A R A N C E S :

2

3    PACHULSKI STANG ZIEHL & JONES LLP

4        Attorneys for Trustee Howard Ehrenberg

5        780 Third Avenue, 34th Floor

6        New York, NY 10017

7

8    BY:  JEFFREY P. NOLAN

9

10   ROSEN & ASSOCIATES

11       Attorneys for Arvind Walia

12       747 Third Avenue

13       New York, NY 10017

14

15   BY:  SANFORD P. ROSEN

16

17   THE LAW OFFICE OF EUGENE R. SCHEIMAN, PLLC

18       Attorneys for Niknim Management Inc.

19       570 Lexington Ave, Suite 1600

20       New York, NY 10022

21

22   BY:  EUGENE R. SCHEIMAN

23

24

25

```
1    GIULIANO LAW, P.C.

2         Attorney for the Counter-Claimant Abruzzi Investments

3         445 Broadhollow Road, Suite 25

4         Melville, NY 11754

5

6    BY:  ANTHONY F. GIULIANO

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2              MR. ROSEN:  Good morning, Judge.

 3              THE COURT:  Good morning.

 4              MR. ROSEN:  You're muted, Judge.

 5              THE COURT:  That will make for a short ruling

 6    conference.

 7              MR. ROSEN:  Sorry.  That's better.  We can hear

 8    you now.

 9              THE COURT:  I've been ruling for the last hour-

10    and-a-half.  You guys didn't hear it?

11              MR. ROSEN:  I'm so sorry.  Can you do it again?

12              THE COURT:  Sorry, my throat is sore now.

13              CLERK:  Good morning.  I am Alexis -- excuse me.

14              THE COURT:  It's contagious.

15              CLERK:  Good morning.  I am Alexis Hennigan,

16    backup courtroom deputy for Chief Judge Alan S. Trust

17    presiding.  These hearings are being recorded.  Please speak

18    clearly.  Once you hear your case called, please give your

19    appearance.  And remember, before speaking please state your

20    name so we can get a clear record of who is appearing.  All

21    parties not speaking, please put your phone on mute.

22              Case Number 20-08049, Howard M. Ehrenberg v.

23    Arvind Walia, et al, and Case Number 20-08052, Howard M.

24    Ehrenberg v. Abruzzi Investments LLC, et al.

25              THE COURT:  Let's take appearances please.  First
```

1    in Walia.

2          MR. ROSEN:  Good morning, Judge.  Sanford Rosen,

3    Rosen & Associates.  And we are counsel for the Defendants.

4          MR. SCHEIMAN:  Good morning, Your Honor.  Eugene

5    Sheiman with the Law Firm of Eugene Scheiman, co-counsel for

6    the Defendants.

7          MR. NOLAN:  Good morning, Your Honor.  Jeff Nolan

8    appearing on behalf of the Plaintiffs, Howard Ehrenberg, the

9    Trustee of the Orion Liquidating Trust.

10         MR. EHRENBERG:  Good morning, Your Honor.  I'm

11    Howard Ehrenberg, the liquidating trustee.

12         THE COURT:  All right.  Do we have counsel in

13    Abruzzi also?

14         MR. GIULIANO:  Yes, Your Honor.  Good morning.

15    Good morning, Your Honor.  Anthony Giuliano for the

16    defendants in the Abruzzi matter.

17         THE COURT:  All right.  And Mr. Nolan, you're

18    still representing Mr. Ehrenberg in Abruzzi?

19         MR. NOLAN:  Yes, Your Honor.  Jeff Nolan appearing

20    on behalf of the plaintiff in the 08052 Abruzzi adversary on

21    behalf of the plaintiff.

22         THE COURT:  All right.  I'm going to start with

23    the ruling conference in 20-08052, Ehrenberg v. Abruzzi

24    Investments and John Petrozza.

25         This is the Court's ruling made in narrative form

1    under Rule 7052 and will include the Court's findings of

2    undisputed facts and conclusions of law.  This is a core

3    proceeding under Title 28, Section 157(b)(2)(H).  The venue

4    is proper in this court.  Due and proper notice of the

5    various motions have been provided to the parties.  The

6    Court has before it Plaintiff-Trustee's motion for summary

7    judgment, the Defendant's cross-motion for summary judgment,

8    and motion to strike, which raises various evidentiary

9    issues.

10           The Court has determined that the following facts

11    are not subject to a genuine dispute and are therefore

12    established in this case pursuant to Rule 56(g) of the

13    Federal Rules of Civil Procedure as incorporated by Rule

14    7056.  The Court will also address the myriad evidentiary

15    objections raised by the Defendants to the extent that they

16    relate to the determination that this Court has made as to

17    what facts are not in genuine dispute.

18           This adversary proceeding revolves around one

19    payment, a $250,000 transfer made to one or more of the

20    defendants.  That transfer came prepetition from funds that

21    belonged to one or more of the debtors.  Those funds of

22    $250,000 were ultimately repaid, but repaid to a non-debtor

23    entity.  However, for purposes of this summary judgment

24    motion, the only issue before the Court is the transfer that

25    was made of the $250,000.

1      The Court has determined for the reasons that

2  follow to deny both parties' cross-motions for summary

3  judgment and will issue a trial scheduling order on the

4  pending claims.

5      The Debtors are the various multiple entities that

6  are listed in the adversary proceeding.  I won't recite all

7  18 or so of them in the record, but they are apparent on the

8  face of the adversary.

9      Those entities prepetition operated a consolidated

10  enterprise of companies which were aggregated through a

11  series of acquisitions and operated in the healthcare sector

12  space, primarily in revenue and practice management.

13      At all times relevant, John Petrozza, who I will

14  refer to as Petrozza, has been a resident of the State of

15  Florida who did business in New York.  His entity, Abruzzi

16  Investments, is a Limited Liability Company that had no

17  employees, no officers, and no directors but was managed by

18  Mr. Petrozza.  I'll refer to them collectively as

19  Defendants.  The only activity undertaken by Abruzzi was to

20  invest money on Mr. Petrozza's behalf.

21      Between 2015 and 2016, Mr. Petrozza considered

22  Paul Parmar, who was the primary principal of the Debtors,

23  as a close friend.  Mr. Parmar was at all relevant times the

24  primary operating person, officer, and controlling

25  shareholder behind the Debtors.

1          In June of 2013, Mr. Petrozza commenced his

2     business relationship with the Debtors when he was

3     approached by Mr. Parmar and asked to invest $4 million in

4     Constellation Healthcare Investment, which I'll refer to as

5     CHI, which is a non-debtor entity.  CHI allegedly held an

6     ownership interest in the Debtor entity, Orion HealthCorp

7     Inc., which I will refer to as Orion.  According to the

8     Defendants, their purpose in investing $4 million in CHI was

9     to acquire 100 percent ownership interest in Orion.  Mr.

10    Petrozza subsequently made the $4 million investment in what

11    he believed was CHI.  Additionally, he paid approximately

12    $300,000 to Orion to cover IPO and expenses associated with

13    his investment.  The money paid by Mr. Petrozza was sent to

14    Parmar and subsequently deposited into an IOLTA account held

15    at Robinson Brog Leinwald Greene Genovese & Gluck, referred

16    to as Robinson Brog, in the name of the non-debtor entity,

17    Constellation Health LLC.

18          In December of 2015, the United States District

19    Court for the Southern District of Texas entered a judgment

20    against Orion in the amount of $194,185.  That Southern

21    District of Texas judgement ultimately resulted in a proof

22    of claim being filed in the bankruptcy case and assigned as

23    Claim Number 1000.  That judgment remained outstanding at

24    the time the Debtors filed for bankruptcy relief.

25          On March 9th of 2016, a lawsuit was filed against

1   the debtor entities Physician Practice Plus and CHT by a

2   plaintiff called Criterions LLC.  On November 30th of 2017,

3   an adverse judgement was entered against those debtors,

4   Physician Practice and CHT, for some $77,000.  That

5   judgement also remained outstanding at the petition date.

6           In November of 2016 as part of a large-scale

7   private transaction involving taking CHT private, Mr.

8   Petrozza met with Mr. Parmar and the board of directors who

9   approved to go-private transaction so they could all make "a

10  gazillion dollars".  Petrozza asserted he was an investor in

11  one or more of the debtors at the time of the go-private

12  transaction and wanted to receive a multiple on his $4

13  million investment.

14          Along the way, several fictitious entities have

15  been created to represent ownership of the equity of CHT.

16  One of those entities was Lexington Landmark Services, Inc.,

17  which as far as Mr. Parmar knew, did not exist as a

18  legitimate business.  While his name was signed on certain

19  documents, he claimed his signature was forged and that he

20  never gave Robinson Brog authority to receive monies on

21  behalf of Landmark Services.

22          Mr. Petrozza testified that on May 24th of 2017,

23  he asked Mr. Parmar for a personal loan of $200,000.  He

24  testified that he wanted the money in order to acquire a

25  lease to a certain property in Florida.  The Court has not

1    been provided with any specifics concerning what property or

2    what lease.

3         In any event, on that same day, on May 24th, 2017,

4    Mr. Parmar directed partner Mitchell Greene at Robinson Brog

5    to wire $250,000 from the Debtor's IOLTA account to Mr.

6    Abruzzi.  Later that same day at 8:39 p.m., Parmar emailed

7    Mr. Greene to wire the $250,000 and he did not care which

8    account the funds were taken out of.

9         The next day, May 25, Robinson Brog confirmed to

10   Mr. Parmar that the $250,000 wire was in fact sent from the

11   Debtor's IOLTA account to Abruzzi.  The funds were sent from

12   an account held in the name of Constellation Health/CHT

13   Closing.  That transaction is what the pleadings refer to

14   and what the Court will refer to as the Transfer.

15        The Debtor's books and records evidence no

16   antecedent debt owed to the Defendants at any time during

17   the calendar year 2017.  Mr. Petrozza could not explain why

18   he asked for $200,000 but received $250,000.

19        Mr. Petrozza further testified that shortly after

20   receiving the wire, the deal for the property that he was

21   working on in Florida fell through and he no longer needed

22   the money.  He then advised his assistant, Lisa Basich, to

23   return the money to Mr. Parmar.  Mr. Parmar then provided

24   wiring instructions to Ms. Basich, who then directed that

25   the funds be wired back as directed by Mr. Parmar.

1          On June 28th of 2017, $250,000 was liquidated from

2     an investment account of Abruzzi and forwarded to Mr.

3     Petrozza's checking account.  The next day, Mr. Abruzzi

4     wired $250,000 to an entity called Sunshine Star LLC.

5     Sunshine Star was a newly-created entity, not a debtor

6     entity, but was created by or for the benefit of Mr. Parmar

7     and his at that time girlfriend, Elena Sartison.  The

8     Debtor's books and records reflect no antecedent debt owed

9     to Sunshine Star during 2017.

10          In October of 2017, Sunshine Star closed the bank

11    account into which the $250,000 had been wired.  Defendants

12    admit that the transfer to Sunshine did not benefit any of

13    the Debtors and that the Defendants had provided no services

14    for the debtors.

15          The multiple entities which ended up filing for

16    bankruptcy on March 16, 2018 include the entities the Court

17    has described thus far.  The Debtor's cases had been jointly

18    administered.

19          In July of 2018, Defendant Abruzzi Investment,

20    filed Claim Number 10062, identifying itself as a

21    shareholder of CHT.  That day Defendant also filed Claim

22    10063, asserting it held a 49 percent member interest in

23    CHT.

24          This adversary proceeding was commenced in March

25    of 2020.  The only transaction at issue for summary judgment

1    purposes, as I said, is the $250,000 wire transfer sent to

2    Abruzzi on May 25, 2017.  That transfer was from the funds

3    that belonged to one or more of the Debtors.

4            The parties have filed various pleadings

5    throughout this case, including and answer and counterclaim,

6    a plaintiff's motion for summary judgment, defendant's

7    cross-motion for summary judgment, and motions to strike

8    various of the evidentiary affidavits submitted by the

9    trustee.  The various motions have been on submission with

10   the Court since May of 2022.

11           I will let the parties know it is not this Court's

12   practice to hold matters on submission for nearly that

13   length of time.  So the Court's apologies to the parties for

14   the length of time it's taken to get to today's rulings.

15           Standards for summary judgement are well known by

16   the parties.  The Court won't recite them.  The central

17   issue is whether or not there exists genuine issues of

18   material fact -- whether or not there are genuine issues of

19   material fact that are in dispute such that judgment as a

20   matter of law can or cannot be awarded to either party.

21           Where cross-motions for summary judgment are

22   pending, the Court must make an independent valuation of

23   each motion separately.

24           Even though the Court is denying both summary

25   judgement motions because the matter will ultimately be

1  tried, I'm going to go ahead and give you my evidentiary

2  rulings on the affidavits that were presented to the Court

3  because the Court anticipates those affidavits will appear

4  again at the time of trial and there is no reason to redo

5  these objections.

6         With respect to the affidavit of Edith Wong and

7  the declaration of Frank Lazzara, Defendants have objected

8  under Rule 901 of the Federal Rules of Evidence, which is an

9  authentication requirement.  The caselaw that addresses Rule

10 901 is fairly replete that the burden of authentication is

11 not particularly high.  The Defendant objects to the Wong

12 affidavit and Lazzar declarations, including emails and

13 other business records that are identified in those

14 declarations because Ms. Wong and Mr. Lazzar did not

15 constitute witnesses with knowledge of the items that are

16 par of what they are claimed to be.

17        However, in a related adversary proceeding arising

18 out of the same Orion case, the same evidentiary objections

19 were raised by the same counsel as here.  Anecdotally, the

20 district court in that action determined that personal

21 knowledge is not a requirement for the authentication of

22 written documents in the Second Circuit.  See Aquila Alpha

23 v. Ehrenberg, 2023 WL 2164268 *4 (E.D.N.Y. Feb. 22, 2023),

24 affirmed by the Second Circuit, 95 F.4th 98.

25        The evidentiary objections to the Wong affidavit

1   and Lazzar affidavit for 901 purposes are overruled.

2   There's an adequate basis for the Court to accept those

3   documents as part of the summary judgment record, which

4   means that they can then become part of the trial record.

5           As to Ms. Sartison, the Debtor also -- the

6   Defendants also objected to her declaration which contained

7   the opening and closing bank statement of M&T for Sunshine

8   Star, again, based on authentication.  Again, there is an

9   adequate basis that's set out in the Sartison affidavit to

10  authenticate those documents, including the Ms. Sartison's

11  declaration that "At the request and direction of Mr.

12  Parmar, I opened an account at M&T Bank for Sunshine Star

13  LLC."

14          As the creator of the bank account for Sunshine,

15  there is clearly enough circumstantial evidence to

16  authenticate the opening and closing statements of that very

17  same bank account.  Refer you all back again to Acquila

18  Alpha.  Both the District Court's opinion and the Second

19  Circuits affirmed this.

20          The Defendants also object to the Wong and Lazzar

21  declarations as inadmissible expert testimony.  However,

22  there is no specific statement contained in either

23  declaration which should be stricken because it is providing

24  an opinion.  Both of those declarations were offering fact

25  testimony and aren't proffered as expert testimony, so 703

1   is irrelevant.

2         As far as the Defendant's hearsay objection, that

3   too is overruled obviously under the well-known hearsay

4   exception for business records under 803(6).  The records

5   attached are business records and the objection is

6   overruled.  Hearsay objections and business records

7   exceptions have been routinely construed in favor of

8   admissibility due to the general trustworthiness of

9   regularly-kept records and the need for this type of

10  evidence in many cases, particularly cases which an

11  independent trustee is appointed to oversee the

12  administration of a case and/or litigation arising

13  therefrom.  I'll refer the party to Arista Records v. Lime

14  Group, 784 F.Supp.2d 398, 421 and Chevron Corp. v. Donziger,

15  974 F.Supp.2d 362, 691-692.

16        With respect to the question of whether or not the

17  $250,000 was property of the estate, the Court has

18  determined that as a matter of law, the funds transferred

19  were property of the bankruptcy estate -- would have been

20  property of the bankruptcy estate had the bankruptcy estate

21  had the bankruptcy case existed at the time that the

22  transfer occurred.  The record is undisputed that the

23  Debtors utilized the IOLTA account at Robinson Brog to hold

24  large amounts of funds and for multiple transactions.  Just

25  because the fund were held in an IOLTA account does not make

1    them not funds of the Debtors.  New York Fiduciary Law

2    Section 4971 is clear that monies that are held by an

3    attorney or held in a fiduciary capacity from a client for a

4    client and/or for a designated beneficial owner.  The

5    Debtors had control and custody over the funds while they

6    sat in the Robinson Brog account and had the power to direct

7    their disposition.

8            The  Court finds no genuine dispute as to whether

9    or not the funds transferred to the Defendants are

10   recoverable as property of the estate.

11           In terms then of the substantive legal theory,

12   trustee moves forward first on Bankruptcy Code Section

13   548(a)(a), which allows the recovery of any property that

14   was transferred with actual intent to hinder, delay, or

15   defraud any entity to which the Debtor was or became liable,

16   as well as New York DCL Section 276, which provides that

17   every conveyance made and every obligation incurred with

18   actual intent to hinder, delay, or defraud present or future

19   creditors is fraudulent.  The two statutes are adequately

20   identical for the Court to conduct one analysis of both.

21   See Janitorial Close-out City Corp., 2013 WL 492375 *5

22   (Bankr. E.D.N.Y. 2013).

23           Transfer may be avoided either under 548(a) of the

24   Bankruptcy Code or New York DCL 276.  If the Debtor had an

25   interest in the property transferred, which is undisputed

1    here -- as to which there is no genuine dispute here.  The

2    transfer occurred within two years of the petition date.

3    That is undisputed here.  And the transfer was made with

4    actual intent to hinder, delay, or defraud a creditor.

5    That's where the factual dispute arises.

6            The trustee has the burden of establishing the

7    actual intent of the transfer or debtor by clear and

8    convincing evidence.  See In re Jacobs, 394 B.R. 646, 658

9    (Bankr. E.D.N.Y. 2008).

10           Because it is difficult to find direct evidence of

11   actual fraudulent intent, courts in this circuit look to

12   certain badges of fraud which can constitute circumstantial

13   evidence of fraudulent intent.  See In re Kaiser, 722 F.2d

14   1574, 1582-1583 (2d. Cir. 1983).  The parties generally

15   agree on what those badges of fraud can include.  Lack of

16   consideration, close association between the parties, the

17   financial condition of the transferor, chronology of events

18   and transactions under inquiry.

19           The Court has determined that a genuine issue of

20   fact disputes as to whether or not there was adequate

21   consideration for the transfer of the $250,000.  In the

22   shortest way to state it, Plaintiff asserts that it was

23   simply a transfer for no consideration.  The Defendant

24   asserted it was a loan, and a loan supported by a promise to

25   repay.

1      The Defendants rely on certain text messages to or

2  from Mr. Petrozza where he requests the $200,000 in exchange

3  for a promise to repay it.  The record is clear though that

4  there is no signed promissory note.  There doesn't appear to

5  be any interest charged for the loan or any collateral

6  provided.

7      Based upon the entire record before the Court,

8  there is a genuine dispute of material fact as to whether or

9  not there was consideration for the transfer at the time the

10  transfer was made and whether or not that consideration is

11  adequate.

12      On the close relationship, there is a close

13  relationship in this record between Petrozza and Mr. Parmar

14  for the reasons that I've already outlined.  There doesn't

15  appear to be any retention of possession or benefit of the

16  property by the Debtor once transferred.  Funds went to

17  Petrozza.  Petrozza then paid the funds back in the

18  equivalent amount that he received, although he didn't pay

19  it into the right entity.

20      As far as the financial condition of the Debtor

21  before or at the time of the transfer, the undisputed

22  evidence before the Court based upon an expert opinion from

23  B. Reily is that the Debtors were insolvent on the measuring

24  date, the probative date, the date of the transfer.  So

25  insolvency condition here exists.

1           In addition, the record is clear that there was

2      the Southern District of Texas judgement outstanding at the

3      time -- prior to the time that the transfer was made and the

4      FBI had seized over $20 million from the IOLTA account prior

5      to the time of the transfer.

6           Questions certainly do exist concerning the

7      overall chronology of events and whether or not the

8      transaction should have been considered legitimate at the

9      time that it was made, but that is a fact issue for the

10     court to determine after trial.

11          With respect to the Trustee's cause of action for

12     a constructively fraudulent transfer and New York DCL 273-a,

13     New York law is clear that any conveyance made without fair

14     consideration when debtor is a defendant in action for money

15     judgement and a judgement has been docketed against him can

16     be set aside as a constructively fraudulent transfer.  To

17     prevail, the Plaintiff must establish that the conveyance

18     was made without fair consideration and for the same reasons

19     that I discussed in connection with the actual fraudulent

20     transfer claim.  The Court has found a question of fact as

21     to whether or not there was fair consideration for the

22     transfer at the time it was made.  The other elements under

23     273-a have been satisfied as a matter of law by the trustee.

24          Again, as I've noted, the expert insolvency report

25     of Craig Jacobson from B. Reily is unrebutted in the summary

1    judgement record.  So Orion was insolvent on May 25, 2017.

2         The fair consideration under Section 272 of DCL,

3    the Court has also found a question of fact as to whether or

4    not the consideration -- whether consideration was provided

5    and whether that consideration was fair for 272 purposes.

6    The Court has also found a question of fact as to whether or

7    not the defendants were operating in good faith at the time

8    that the transfer was made.  See Sardis v. Frankel, 113

9    A.D.3d 135, 141-142.

10        So for all of those reasons, both motions for

11   summary judgement have been denied.  And again, the motion

12   to strike as to the evidence, the Court has already ruled on

13   that.

14        The Court has also noted in the pleadings that the

15   parties have a serious disagreement about the impact of

16   Section 550 of the Bankruptcy Code.  550 is only triggered

17   once a transfer has been avoided.  I won't spend any time

18   talking about 550 because to this point no transfer has been

19   avoided so there is no reason to talk about who might

20   ultimately have liability for the transfer if it were set

21   aside.

22        I'm going to set a trial on the claim in the

23   adversary proceeding.  As I said, for Rule 56(g) purposes,

24   the facts that I've identified as undisputed are undisputed

25   for trial purposes.  The trial will be limited to the

1    matters on which the Court stated there to be genuine issues

2    of material fact.  The Court's intention is to set the

3    matter for trial on July 24th of this year so that the

4    matter can be tried this summer.  The Court will issue a

5    trial scheduling order consistent therewith.

6        Mr. Nolan, I'm going to ask you and Mr. Giuliano

7    to work on a short form of order denying both summary

8    judgment motions.  You don't need to repeat all of the

9    evidentiary rulings that I've made on the record, but they

10   will -- as I said, those evidentiary rulings will stand

11   should the same declarations and affidavits be submitted at

12   the time of trial, which I suspect they might well be.

13        All right?

14        MR. NOLAN:  Yes, Your Honor.  Thank you.

15        MR. GIULIANO:  Thank you, Your Honor.

16        THE COURT:  Thank you both.

17        THE COURT:  All right.  I'm going to turn now back

18   to 20-08049, Trustee v. Walia.  This too is an adversary

19   proceeding seeking recovery of certain transfers.  The

20   causes of action set out in the adversary proceeding are

21   core proceedings, which this Court may hear and determine

22   under Title 28, Section 157(b)(2) and the orders of

23   reference in effect in the Eastern District of New York and

24   is proper before this Court.

25        As with the prior adversary proceeding, these

# EXHIBIT B

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   EASTERN DISTRICT OF NEW YORK

3   Case No. 18-71748-ast

4   Adv. Case No. 20-08042-ast

5   - - - - - - - - - - - - - - - - - - - - - - - - - x

6   In the Matter of:

7

8   ORION HEALTHCORP, INC.,

9

10          Debtor.

11  - - - - - - - - - - - - - - - - - - - - - - - - - x

12  HOWARD M. EHRENBERG, IN HIS CAPACITY AS LIQUIDATING TRUSTEE

13  OF ORION HEALTHCORP, INC., et al.,

14              Plaintiffs,

15          v.

16  HOWARD SCHOOR,

17              Defendants.

18  - - - - - - - - - - - - - - - - - - - - - - - - - x

19

20

21

22

23

24

25

1          United States Bankruptcy Court

2          290 Federal Plaza

3          Central Islip, New York 11722

4

5          June 3, 2021

6          10:11 AM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   B E F O R E :

22   HON ALAN S. TRUST

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   UNKNOWN

Page 3

1    HEARING re 43 Amended Notice of Motion/Presentment Filed by

2    Plaintiff Howard M Ehrenberg);

3

4    HEARING re 27 Motion for Summary Judgment Filed by Plaintiff

5    Howard M Ehrenberg)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:    Sonya Ledanski Hyde

Page 4

1    A P P E A R A N C E S :

2

3    PACHULSKI STANG ZIEHL & JONES LLP

4         Attorneys for the Trustee

5         780 Third Avenue, 34th Floor

6         New York, NY 10017

7

8    BY:  JEFF NOLAN

9         ILAN SCHART

10

11   PARLATORE LAW GROUP

12        Attorneys for 2 River Terrace

13        One World Trade Center, Suite 8500

14        New York, NY 10007

15

16   BY:  MARYANN HADDEN

17

18   ROSEBURG & PITTINSKY, LLP

19        Attorneys for Residential Board of Managers of

20        Riverhouse One Rockefeller Park Condominium

21        232 Madison Avenue, Suite 906

22        New York, NY 10016

23

24   BY:  LAWRENCE PIITTINSKY

25

Page 5

1    GIORDANO HALLERAN & CIESLA, P.C.

2         Attorneys for Howard Schoor

3         125 Half Mile Road, Suite 300

4         Red Bank, NJ 07701

5

6    BY:  DONALD CAMPBELL

7

8    ROSEN & ASSOCIATES, LLP

9         Attorneys for Arvind Walia

10        747 Third avenue, 20th Floor

11        New York, NY 10017

12

13   BY:  SANFORD ROSEN

14        PARIS GYPARAKIS

15

16   ALSO PRESENT TELEPHONICALLY:

17

18   JOSEPH ORBACH

19

20

21

22

23

24

25

Page 6

1                    P R O C E E D I N G S

2              CLERK:  Good morning.  I am Amy Tenorello, the

3     courtroom deputy for the Honorable Chief Judge Alan S.

4     Trust.  This hearing is being recorded.

5              THE COURT:  All right.  We'll take up.  Ms.

6     Tenorello, if you want to call the first two matters?

7              CLERK:  Oh, I'm sorry, Judge.  The first matter is

8     18-71748 Orion Healthcorp, Inc.

9              THE COURT:  I'm going to take appearances in the

10    main case on the sale motion as well as in adversary

11    proceeding 20-8051 which is on for status today, Ehrenburg

12    v. Sartison, et al., so who's appearing on those matters?

13             MR. SCHARF:  Sorry, I was on mute.  Good morning,

14    Your Honor.  It's Ilan Scharf and Jeff Nolan of Pachulski

15    Stang Ziehl and Jones on behalf of the Trustee.

16             MR. PITTINSKY:  Good morning, Judge.  Lawrence D.

17    Pattinsky, Roseburg and Pittinsky on behalf of non-party

18    board of managers of the Riverhouse Condominium.

19             MS. HADDEN:  Good morning, Your Honor.  Maryam

20    Hadden from Parlatore Law Group on behalf of 2 River Terrace

21    Apartment 12J LLC, one of the defendants in the adversary

22    and an interested party in the main case.

23             MR. LEV:  Good morning, Your Honor.  Daniel Lev,

24    Sulmeyer Kupetz.  I am general bankruptcy counsel for Howard

25    Ehrenburg, a liquidating trustee.  I will just be monitoring

Page 7

1    today and Mr. Nolan and Mr. Scharf will be handling the

2    hearing.

3            THE COURT:  All right.  Very well.  Anyone else?

4    All right.  So, before I take your arguments or positions on

5    the motion, let me outline some of the questions that the

6    Court has for the parties based upon the pleadings, based

7    upon some prior hearings on this matter.

8            My first question is always the optimistic

9    question, which is have you all reached either an overall

10   settlement of the adversary or at least a protocol

11   concerning the sale of the 2 River Terrace apartment?

12           MR. SCHARF:  No, Your Honor.

13           THE COURT:  Ms. Hadden?

14           MS. HADDEN:  We have not, Your Honor.  We are

15   still working on getting all of the personal property of the

16   manager of the LLC out of the apartment and we're in the

17   midst of selecting a second date for that.

18           But in terms of the sale of the apartment, no,

19   we're still on opposing ends.

20           THE COURT:  All right.  And so then, here are the

21   questions that the Court has, the other questions I suppose.

22           First, it does appear as raised by the 2 River

23   Terrace party in interest that as of right now there is a

24   non-final judgment that was entered in the adversary

25   proceeding which is now subject to what might be an

Page 8

1    interlocutory appeal to the district court.  It appears that

2    whoever has indicated that it has sought a stay pending

3    appeal but I don't see that on the CMECF docket.

4           So, let me first raise this to Mr. Scharf or Mr.

5    Nolan.  What is the Trustee's position on whether or not the

6    Court's order and judgment from back in March is

7    interlocutory?

8           MR. SCHARF:  Our position, Your Honor, is that the

9    judgment is interlocutory.  We'll brief that in full in

10   front of the district court within the next 12 days or so.

11          THE COURT:  All right.  And so, from this Court's

12   understanding, the purpose of seeking to determine a

13   judgment on appeal to be interlocutory is to have the appeal

14   dismissed.

15          And so, if the appeal is dismissed, where does

16   that then leave 2 River Terrace on attempting to challenge

17   whether or not the property, which is currently subject of

18   an interlocutory partial judgment, should be sold or not

19   before there's at least a final judgment or a final

20   appealable judgment?

21          MR. SCHARF:  Your Honor, I -- well, if there's no

22   appeal -- if the appeal is mooted out, I think they would

23   have to come back before Your Honor and seek some further

24   injunctive relief that Your Honor may or may not grant based

25   on whatever facts they can adduce to prevent the sale of the

Page 9

1   property.

2           THE COURT:  Wouldn't that then speak in favor of

3   not going forward and allowing the trustee -- the

4   liquidating trustee to sell the property now?

5           MR. SCHARF:  Well, we don't think that that would

6   have any chance of -- a reasonable likelihood or chance of

7   success, Your Honor.  And in addition any relief granted to

8   Mr. Parmar, either with respect to a stay pending appeal or

9   future injunctive relief should absolutely be conditioned on

10  his first posting a bond in the -- in the full amount and

11  value of this property, and second paying the arrears and

12  ongoing expenses that are due to the condo board that caused

13  this to become essentially a wasting asset which is I know

14  unusual for real estate, but given the arrears and ongoing

15  losses and expenses associated with this apartment, it's

16  only appropriate that any relief granted to Mr. Parmar be

17  conditioned on at least -- at the very least a bond and

18  payment of the arrears.

19          THE COURT:  All right.  Thank you, Ms. Hadden,

20  what is 2 River Terrace's position on those issues?

21          MS. HADDEN:  Addressing first the question of

22  whether the judgment is interlocutory and what the effect of

23  that would be if the appeal is dismissed for that reason,

24  and it's in fact for that reason that we initially did not

25  file for stay under Rule 8007.

Page 10

1          We were aware of the Trustee's position that the

2     order -- that the Court's order granting -- or transferring

3     ownership of the apartment to the Trustee was an

4     interlocutory order.

5          Based on that, it was our position that it was

6     untimely for the Trustee to be attempting to sell it.  If

7     the Trustee doesn't finally, for lack of a better term, own

8     the apartment, the sale of the apartment would be

9     injudicious to say the least, and it certainly puts Mr.

10    Parmar and more essentially the LLC in a position where if

11    the apartment is sold, at that point obviously, as the Court

12    is well aware under the Bankruptcy Code, there would be no

13    possibility of appeal at that particular sale.  Once the

14    asset -- once the real estate is sold, the real estate is

15    gone.  There's no appellate remedy.

16         So, we're in a situation where we have appealed

17    what we believed to be a final order, the Trustee believed

18    not to be a final order and it to be a interlocutory order,

19    and I think at this point it's premature to attempt to sell

20    the apartment when that issue is still outstanding.

21         If the order is final, then it is appealable and

22    at that point the appeal can go forward and either we

23    prevail or we don't.  If it's not final, then we're in a

24    scenario where we would be asking for some form of stay or

25    relief to protect the asset, because it is, as the Court is

Page 11

1    aware, a unique piece of property.

2            Every piece of property is unique, and you know,

3    finding another apartment or another premises that meets

4    these same specifications is not something that's either

5    easily done or even possibly done under the law.

6            So, in that scenario, I'm, you know, not taking a

7    position one way or the other as to the Trustee's

8    application that Mr. Parmar set forth a bond.  I honestly

9    don't know what his financial ability to do that is or what

10   the bond amount that the Court would set would be, but that

11   certainly is something that we would endeavor to do if the

12   Court were to require it of us.

13           And in that case, presuming that we were able to

14   do it, we would be doing it to attempt to protect the LLC's

15   sole asset from what at this point is at least arguably not

16   a final determination.

17           THE COURT:  And what about the issue that, one, it

18   is in a sense a wasting asset, more because there are costs

19   and expenses of upkeep, maintenance, board fees, etcetera,

20   being incurred that no one is paying, which Mr. Pittinsky

21   has been both quite vocal and quite temperate about on

22   behalf of his client in these proceedings, and it appears

23   that since an agreement was reached to move out the personal

24   property, nobody is living there?

25           MS. HADDEN:  It's correct that nobody is living

Page 12

1   there, and in fact no one has been able to live there over

2   the last couple of years because -- and Mr. Pittinsky and I

3   are on opposite sides about this issue as well, but it has

4   been our client's position and experience that whenever he

5   would attempt to go to the building, he was refused access

6   to the building.

7           Obviously at this point I'm speaking before the

8   Court's transfer of ownership to the Trustee.  For that

9   reason -- and I see Mr. Pittinsky shaking his head, I'm well

10  aware and I will certainly put on the record that he has

11  informed me that that is not the case.

12          Again, it's yet another thing that we can work oit

13  in mitigation I suppose.  But Mr. Parmar has, because of the

14  denial of access, been unable to use the apartment himself

15  over the last couple of years, since 2018, and it was for

16  that reason that the charges were not being paid initially.

17          It has been his position, and it was the position

18  of a case that we filed in state court and have suspended

19  while all of these other proceedings are being worked out,

20  that the denial of access by the board was depriving him of

21  his real property, and it was his position that the amount

22  of deprivation, the cost of that deprivation, actually

23  outweighed the cost of the fees and charges owed to the

24  board and he was seeking an offset in that state court

25  proceeding.

Page 13

1        Again, that proceeding has been completely put on

2   hold while all of these other matters are ongoing.

3        THE COURT:  And on the subject of things that are

4   on hold, and again this has been discussed at several

5   hearings, all other things be equal, the condo board has had

6   a judgment that they've been very politely holding off on

7   executing on which where they -- did they go forward on that

8   sale, then that property is going to be lost to the estate.

9        I don't think that issue has been lost on any of -

10  - any of the parties.  I doubt that 2 River Terrace's

11  position is that execution on the state court judgment and

12  whatever value that would bring would be higher or better

13  than at least the current $4.8 million offer in front of

14  this Court.

15       MS. HADDEN:  No, that's certainly not anything

16  that I think anybody could contend.  Although the judgment

17  on behalf of the board is substantial, it's certainly

18  significantly less than the 4.8 million.

19       THE COURT:  So, putting procedure aside for a

20  moment, I'm not shelving it because it is one of the things

21  that we do as trial court judges, but putting procedure

22  aside for the moment, has 2 River Terrace made a decision as

23  to whether or not monetizing these assets and paying the

24  judgment that exists and avoiding continued accrual of costs

25  and expenses of maintenance and upkeep, etcetera, is just

Page 14

1    better than continuing to fight about maintaining the

2    property as opposed to monetizing it and fighting over who

3    gets the money.

4            MS. HADDEN:  At this point, my client's -- I

5    apologize -- my client's manager is still seeking to

6    preserve the asset itself as opposed to monetizing the

7    asset.

8            Can I say that that will always be the case?  No,

9    I can't, but that's still his current position.

10           THE COURT:  All right.  Mr. Pittinsky, I know

11   you're here because you're here and don't necessarily have a

12   direct dog in the hut, but do you want to weigh in on either

13   the sale issue -- well, on the main case sale issue or

14   anything about the adversary on status?

15           MR. PITTINSKY:  Your Honor, not too much to say

16   other than, yes, the board is now getting extremely antsy as

17   the arrears continue to build.  We do have the sheriff on

18   hold.

19           We obviously deny any claim of lack of access to

20   the LLC.  I just want to point out to the Court and Ms.

21   Hadden whatever Mr. Parmar may think, this unit is owned by

22   a limited liability company.  Nobody from that company has

23   been denied access.  No one who was authorized on behalf of

24   that company has ever been denied access, and she can speak

25   to her partner about that.

1          We support monetizing this, sell it, fight about

2     the money, pay us, we get a new owner in so we have our

3     common charges being paid going forward.  They defaulted

4     after knowing about the supreme court action.  This is all

5     after-the-fact arguments on the apartment.

6          We strongly request the Court permit the sale to

7     go forward, and yes, I could say that if it was sold at the

8     sheriff's sale, the sale price is going to be substantially

9     less.  Even if it's bid over the judgment amount, it's not

10    going to reach the amount that the Trustee has been able to

11    secure on a private sale.

12              THE COURT:  Thank you.

13              MR. SCHARF:  Your Honor, if I may respond to a

14    couple of the points here?

15              THE COURT:  Sure.

16              MR. SCHARF:  The notion that mister -- that the

17    defendant -- that the LLC did not seek a stay pending appeal

18    because the appeal might be interlocutory based on our

19    contention is frankly absurd.

20          They knew this apartment was going to be sold

21    weeks ago.  It's self-evident that a Trustee who's charged

22    with selling an apart -- with liquidating an estate is not

23    going to let an apartment lie fallow, and we filed the sale

24    motion well before there was a request for a stay.

25              I would have expected a request for a stay pending

Page 16

1    appeal on the judgment, not the underlying sale but on the

2    judgment being enforced to be filed within -- at the same

3    time the appeal was filed or before the appeal was filed and

4    certainly to see one filed if that was their position as of

5    the -- as of the filing of the sale motion.

6          I expect, and this is my conjecture, that they

7    didn't do so because the conditions that would be associated

8    with such a stay would be something like posting a bond or -

9    - and paying arrears so that there is no further

10   depreciation to the asset.

11         I'll also note, Your Honor, when we do talk about

12   depreciation -- or sorry the losses incurred in the asset on

13   the ongoing arrears, the Trustee is making current payments

14   of the ongoing charges.  So, there is that loss.  It's a

15   direct expense being covered by the Trustee since the

16   Trustee took possession of the apartment.

17         And in addition, Your Honor, we have risk here.

18   It's an unoccupied apartment.  There was some minor damage,

19   scratches, holes, things like that, missing knobs from -- or

20   handles from a refrigerator, minor damage.

21         There's a risk there could be further damage.  We

22   could have a flood in that apartment.  We could all be

23   talking about an insurance claim (indiscernible) somebody

24   liable for fixing an apartment rather than monetizing an

25   apartment down the road.

1          So, it's not just the risk of ongoing expenses.

2     There's a risk of something catastrophic happening, and

3     frankly that's all on the Trustee given where we sit with

4     the judgment, Your Honor.

5          THE COURT:  All right.  Thank you.  The sale

6     motion itself, the -- I want to know who the witnesses would

7     be because the Court's -- what the Court's contemplating is

8     I -- I hate to put the practical ahead of the metaphysical

9     but it would seem from a practical standpoint that it would

10    be in everybody's best interest to monetize the asset and

11    fight over the proceeds; 2 River Terrace disagrees, and

12    that's fine.  They're certainly entitled to do so.

13          If I held an evidentiary hearing on the sale

14    motion, I presume the Trustee's witnesses would be Mr.

15    Stanton, the broker who's provided a declaration, and Mr.

16    Ehrenburg, the Trustee?

17          MR. SCHARF:  I believe that would be correct, Your

18    Honor.

19          THE COURT:  All right.  Ms. Hadden, I didn't

20    notice --

21          MR. SCHARF:  And Your Honor, potentially Mr.

22    Pittinsky's client on the losses and ongoing expenses in the

23    apartment, and any issues raised by Ms. Hadden.  I'm not

24    putting your client on the spot, Mr. Pittinsky, but those

25    were issues that were raised.

1    THE COURT:  Ms. Hadden, I didn't notice any

2 affirmative witness declarations in the opposition.  Is 2

3 River Terrace contemplating putting on any witnesses in an

4 evidentiary hearing on a sale?

5    MS. HADDEN:  In the event of an evidentiary

6 hearing, Your Honor, I'd have to discuss it with my co-

7 counsel on the criminal matter, but I would anticipate at

8 least the possibility of calling Mr. Parmar for at least

9 limited testimonial purposes.

10    THE COURT:  What about on the not enough money

11 aspect?  What I'm also trying to figure out is, is 2 River

12 Terrace contending that the purchase price is not fair

13 consideration?

14    MS. HADDEN:  Yes.

15    THE COURT:  All right.  Do you all have an expert

16 lined up to testify about the value of the unit or to

17 challenge whether or not the sale and marketing process was

18 adequate?

19    MS. HADDEN:  I do not, but we would retain one.

20    THE COURT:  All right.  Mr. Pittinsky, this is the

21 part where you again get to talk on behalf of your own

22 client.  Do you -- would the board contemplate putting on

23 evidence at a hearing on whether or not the sale

24 consideration is adequate and the process and procedures

25 that the Trustee -- liquidating Trustee went through were

1    appropriate for a sale of this type?

2              MR. PITTINSKY:  Your Honor, we would not really

3    take a position, I believe.  I would have to double check

4    with the board itself.  I don't have a client; I have a

5    board.

6              From my point of view, the price is not something

7    we would object to and the procedure is not something the

8    condominium board would object to.  If we were to do

9    objections, we would've put in papers on the motion itself.

10             THE COURT:  All right.  I'm not sure that whether

11   or not some person was told you can't go in there two years

12   ago or 17 months ago is really probative on whether or not -

13   - what the Court would be looking at, which is whether or

14   not the process the Trustee -- liquidating Trustee has gone

15   through in setting up a private sale process, whether or not

16   the property's been adequately marketed, your typical 363

17   type of issues.

18             Again, if 2 River Terrace wants to bring those in,

19   I take evidentiary objections as the question is asked

20   before the answer is given, but I don't really know that

21   that -- who shot John is particularly probative for me at

22   this -- at this stage.  From the Court's vantage point it's

23   really more of was the sale process -- was the sale process

24   appropriate and is the amount obtained as a result a fair

25   sales price.

Page 20

1           On the procedural side of it, it seems to the

2    Court in managing my docket that the best way to go about

3    this is if -- if the liquidating Trustee wants the partial

4    judgment to be rendered a final judgement under Rule 54,

5    then the trustee can file papers and ask the Court to do

6    that.

7           That takes this dance over whether it's an

8    interlocutory appeal out if the Court were to grant it.  It

9    would again seem -- I'm not ruling on a motion that's not in

10   front of me, but since 2 River Terrace would like the

11   opportunity to challenge this Court's ruling on appeal, and

12   they're more than welcome to do so, it would seem

13   procedurally the only way to actually do that is to render

14   that judgment final, which I can do under Rule 54 but won't

15   do until somebody actually asks me to do so.

16          If 2 River Terrace wants a stay pending appeal,

17   which they're certainly entitled to ask for, that should be

18   before me and then as you all know the trial court makes the

19   first determination on whether and under what circumstances

20   to grant a stay pending appeal, and then that can be taken

21   to the district court.  There's a certain synchronicity

22   between the two of those as they then tie into whether or

23   not the Court would approve the sale and approve the sale at

24   the price which has been advanced by the Trustee.  I don't

25   see that -- I'm not a wine connoisseur, but like -- but what

Page 21

1    I'm told about bottles of wine is some get better with age,

2    but litigation generally does not.

3            I don't -- I don't see that there is a need --

4    because these issues have been percolating for some time, I

5    don't see the reason to put any significant delay on these

6    issues, because I think the parties are fairly well-informed

7    and advised of what the disputes will be.

8            I'm prepared to give you all both an evidentiary

9    hearing on the sale motion as well as procedural hearings on

10   a 54B motion as well as a stay pending appeal motion on June

11   14th.  That's about 10 days from now.  And again, the issues

12   have been fairly well known and laid out.  I don't see a

13   reason to further delay this, and I have a standing protocol

14   and -- both a virtual platform standing protocol for how I

15   take witness testimony and the who can be in the room when

16   it happens kind of things.

17           As I think you all know from other practice before

18   me, I take all of my direct testimony from party-controlled

19   witnesses by affidavits exchanged in advance and then the

20   parties present here virtually for cross-examination.

21           That's how I'll run this trial.  I typically

22   require those affidavits to be exchanged seven days in

23   advance and then the supporting exhibits provided to the

24   Court in a format that my order will set out.

25           I would anticipate following essentially that

Page 22

1    program.  I'll probably give you a little flex on the

2    affidavits seven days ahead of time, because there is no --

3    the only affidavit that I think the Court has is Mr.

4    Stanton's.

5            But then have you all, you know, ready to try

6    these issues or argue these issues on June 14th at 2:00

7    Eastern Standard Time.  Mr. Scharf, will the Trustee be

8    ready?

9            MR. SCHARF:  The Trustee can be ready.  He is not

10   in the courtroom right now.  Mr. Lev may know his schedule

11   better.

12           MR. LEV:  Your Honor, I've been texting Mr.

13   Ehrenburg, who unfortunately has another conflict and he

14   said he is available on June 14th.

15           THE COURT:  All right.  Ms. Hadden, will 2 River

16   Terrace be ready?

17           MR. LEV:  Ms. Hadden's on mute.

18           THE COURT:  Oh, Ms. Hadden.

19           MS. HADDEN:  Sorry about that.  I actually have a

20   conflict the afternoon of the 14th.  Is it possible to do

21   the 15th or the 16th?  Almost any other day that week I can

22   do.  Just the 14th I'm already in another courtroom at that

23   time.

24           THE COURT:  Mr. Lev, will you check with Mr.

25   Ehrenburg on June 16th?

Page 23

1          MR. LEV:  What time, Your Honor?

2          THE COURT:  2:00 Eastern.

3          MS. HADDEN:  Thank you, Your Honor.

4          THE COURT:  All right.  Ms. Hadden, was -- didn't

5    2 River file a stay pending appeal with the district court?

6          MS. HADDEN:  No, Your Honor.  I had actually filed

7    somewhat informally in the course of my opposition to the

8    motion to sell.  I had added an application for a stay

9    within there, but I do need to file a separate application

10   for a stay to fully meet the Court's procedures.

11         THE COURT:  All right.

12         MS. HADDEN:  And obviously, I will file that

13   before Your Honor rather than in the district court.  I'm

14   aware it needs to be in the bankruptcy court first.

15         THE COURT:  All right.  Mr. Scharf, does the

16   liquidating trustee want to ask to sever the judgment -- the

17   partial judgement and render it final for appeal purposes?

18         MR. SCHARF:  I think I'm going to have to have a

19   substantive conversation with the Trustee about that but I

20   suspect we can -- I believe we can get an answer to that

21   tonight or tomorrow morning.

22         THE COURT:  All right.

23         MR. LEV:  Your Honor, Mr. Ehrenburg is available

24   June 16th, 2 p.m. Eastern time.

25         THE COURT:  Great.  So, we'll proceed --

1          MR. PITTINSKY:  Your Honor, part of the -- one --

2     some of the factors for a stay pending appeal include

3     showings of hardship.  We would ask that Mr. Parmar be

4     present to be cross-examined or to be examined by us on

5     those factors at the hearing rather than, you know, rather

6     than skate around whether or not he's relying on comments

7     made by counsel who's not put in an affidavit in connection

8     with that.

9          And or -- or Your Honor can direct if he does not

10    put an affidavit in that there's no -- that he doesn't get

11    another chance for an evidentiary hearing (indiscernible).

12         THE COURT:  Well, I'm going to go with the I'll

13    know what you all are asking me to do when I see it

14    approach.  So, rather than contemplate what's going to come

15    in, I'll decide based on what's actually in front of me.

16         I'll set the June 9th for -- to file whatever --

17    to file the motion seeking whatever relief the parties are

18    going to ask the Court to determine on June 16th at 2:00.

19    Those should be filed in the adversary proceeding.

20         Again, if it's a Rule 54B motion, if it's a stay

21    pending appeal, whatever it's going to be, file those by 5

22    p.m. on June the 9th and then any responses will be due by

23    noon on June the 14th.

24         I don't need replies on those types of issues.

25    There's -- I don't think there's going to be any Supreme

Page 25

1    Court setting presidential issues for me to decide on those

2    types of issues.  So, June 9th at 5 p.m. for the motions,

3    June 14th at noon, and I'll know what you all are asking me

4    to do once it's been filed.

5            On the evidentiary portion of the hearing, I'm not

6    precluding taking evidence on a motion for a stay pending

7    appeal.  I don't know that I typically do, but whatever you

8    all are going to ask me to do, the standing rule still

9    remains, if there are -- if there are specific facts that

10   are in controversy the parties want me to consider, then I

11   need to have a sponsoring witness who would testify to those

12   facts.  That's the general rule for the motion practice as

13   well.

14           Any affidavits that the parties want the Court to

15   consider at the evidentiary hearing on the sale motions,

16   those affidavits also need to be filed and exchanged by June

17   9th at 5 p.m.

18           Mr. Stanton's is already there.  It doesn't need

19   to be refiled, but any other testifying witness whether for

20   the liquidating Trustee or for 2 River Terrace or should the

21   board decide to weigh in from an evidentiary standpoint,

22   those witness affidavits have to be filed and exchanged by

23   June 9th at 5 p.m. along with any exhibits, documents --

24   documentary evidence that the parties wish to rely on.  And

25   then objections to the affidavits and the documents also due

Page 26

1    by June 14th at noon.

2           So, we'll have our full package from the court's

3    standpoint by June 14th at noon so that we can then do our

4    prep for the June 16 at 2:00 evidentiary hearing.  Again,

5    the witness affidavits constitute the direct testimony of

6    the witnesses and then I take live cross-examination of them

7    at the evidentiary.

8           In the event that there are evidentiary objections

9    to portions of the affidavits, I rule on those at the

10   beginning of that witness's testimony.  I don't expect any

11   motions in limine, but again, if you're going to object to

12   the other party's witness testimony or the other party's

13   exhibits, those will be due June 14th at noon.

14          This will all be laid out in the control order

15   that the Court will be issuing, but because the timeline is

16   a little bit tight, I wanted you to know today what those

17   issues are because it could be Monday before that order is

18   entered.

19          And then there'll be the protocol for how you

20   deliver the exhibits to each other and to the Court, and

21   again a -- I need to know who's in the room, anybody with

22   the witness, and from where the witness is testifying.  And

23   again, I have a protocol laid out for that that you'll see

24   in the order.

25          Anything else that you all want to address today

Page 27

1    on the sale motion or the status in the Ehrenberg v.

2    Sartison adversary?

3              All right.

4              MR. NOLAN:  Your Honor?

5              THE COURT:  Yes.

6              MR. NOLAN:  Jeff Nolan on behalf of the plaintiff.

7    To the extent at the -- that a party submits an affidavit

8    and it is not objected to, would -- does the Court need to

9    have that witness present or is the affidavit sufficient for

10   the hearing?

11             THE COURT:  The affidavit is the direct testimony,

12   so the affiant is still subject to cross-examination.  If

13   you all work out an agreement that I'm not going to

14   challenge the affidavit of X and I waive cross-examination,

15   then I'll take the affidavit at face value, but the

16   affidavit is only the direct testimony.  It doesn't waive

17   the other side's right to cross-examine.

18             MR. NOLAN:  All right.  Thank you, Your Honor.

19             MS. HADDEN:  Thank you, Your Honor.

20             THE COURT:  All right.  So, then those of you who

21   are logged in for the sale motion or the Sartison adversary,

22   if you all -- you're all welcome to stay but you're also

23   free to go before we go to our other matter.

24             MS. HADDEN:  Thank you, Your Honor.

25             CLERK:  The next matter on the calendar is case

Page 28

1    number -- adversary case number 20-8042, Howard Ehrenberg v.

2    Howard Schoor.

3            THE COURT:  All right.  And so, who is appearing

4    in that adversary proceeding?

5            MR. NOLAN:  Jeff Nolan appearing on behalf of the

6    plaintiff liquidating Trustee.

7            MR. CAMPBELL:  Good morning, Your Honor.  Don

8    Campbell from the law firm of Giordano Halleran & Ciesla on

9    behalf of Howard Schoor.

10           THE COURT:  All right.  Anyone else?

11           All right.  Bear with me, then, for one minute.

12   Have you all settled?

13           MR. CAMPBELL:  Unfortunately, no, Your Honor.

14           THE COURT:  All right.  So, then the Court has on

15   for today the ruling conference on the liquidating Trustee's

16   motion for summary judgment.  The Court will now render its

17   ruling.

18           The procedural history is as follows.  In this

19   adversary proceeding, 20-8042, the Trustee, Mr. Ehrenberg,

20   filed a complaint in March of 2020.  That complaint

21   essentially seeks to recover $160,000 that was paid to the

22   defendant, Mr. Schoor, in January of 2017.

23           The Trustee then moved for summary judgment on the

24   causes of actions set forth in the complaint and supported

25   that summary judgment motion with affidavits from Mr. Nolan

Page 29

1   and Ms. Edith Wong, which are at docket items 29 and 30

2   along with numerous exhibits.

3           The parties under the Court's instructions had

4   also prepared and filed a joint statement of stipulated

5   facts as well as additional facts upon which the Trustee

6   relies.  That document is at docket 28.  The defendant, Mr.

7   Schoor, filed an objection to the summary judgment motion at

8   docket 33 but did not provide any summary judgment evidence

9   of his own.

10          The Court held a hearing on March 16th of this

11  year on the motion for summary judgment, which I'll just

12  refer to as the motion or the MSJ.  The Court allowed the

13  defendant additional time to seek and submit evidence in

14  opposition to the summary judgment and specifically allowed

15  the defendant to submit affidavits from either Mr. Parmar or

16  Mr. Zaharis, who we'll talk further about.

17          The Court did subsequently receive an affidavit of

18  the defendant, Mr. Schoor, at docket 41, that affidavit

19  details a conversation that Mr. Schoor says he had with Mr.

20  Parmar in April of 2021, but the defendant did not provide

21  any direct affidavit from Mr. Parmar, Mr. Zaharis, or any

22  person who worked for any of the Debtors with knowledge of

23  the facts relevant to the pending motion.

24          The Trustee then moved to strike the predominant

25  portions of the Schoor affidavit that are the objection and

1    the motion to strike is at docket 42.  The Court had set

2    today for a ruling conference, and for the reasons to

3    follow, the summary judgment motion will be granted.

4              The Court will detail now on the record a number

5    of facts relevant to the Court's determination.  There are

6    no genuine -- there is no genuine dispute as to any of these

7    facts.  In fact, the predominance of these facts have been

8    stipulated to by the parties.  Other of these facts are

9    drawn from the defendant's own deposition made a part of the

10   summary judgment record as well as the uncontroverted

11   evidence before the Court.

12             Starting back to 2001, between the years 2001 and

13   2006, Mr. Schoor was a neighbor and at least social

14   acquaintance or friend of Paul Parmar.  In June of 2009, at

15   Mr. Parmar's request, Mr. Schoor loaned him $600,000.  That

16   loan is evidenced by a promissory note executed by Mr.

17   Parmar in favor of Mr. Schoor.

18             At that time in 2009 Mr. Parmar was a

19   businessperson interested in a variety of ventures, but

20   relevant here he later became a principal of one or more of

21   the entities that are now Debtors before this Court or were

22   acquired by or merged into one or more of the Debtors before

23   this Court.  That list of Debtors is detailed in the

24   complaint and the summary judgment motion is uncontroverted.

25             In August of 2009, on August 31st, Mr. Schoor sent

1    a letter to Mr. Parmar advising that the repayment of the

2    $600,000 loan was late, and Mr. Schoor stated, quote, "You

3    clearly indicated your need was for a few weeks of payroll

4    while you resolved an IRS lien placed on multiple accounts

5    and freed up other assets.  Your request and my reply was

6    based on," quote, "'our friendship,'" close quote, "and not

7    a business deal."  That's stipulation 7 at docket 28.

8              In August of 2010, Mr. Schoor sent a follow-up e-

9    mail stating, "I would greatly appreciate payment on the

10   balance of your personal loan.  Again, I repeat, this loan

11   was done on the basis of our friendship, not as a business

12   investment."

13             Fast forwarding several years now to 2017, Mr.

14   Parmar on January 4, 2017 directed an e-mail to Mr. Zaharis

15   who at that time was a high-ranking officer of one or more

16   of the Debtors.  Mr. Parmar directed that the balance of his

17   loan owed to Mr. Schoor be repaid and be paid with money of

18   one or more of the Debtors.

19             The next day, on January 5, 2017, one or more of

20   the Debtors transferred $100,000 to Mr. Schoor to a Debtor

21   bank account.  The next day, January 6th, Mr. Schoor was

22   sent another $60,000 from a bank account owned by one or

23   more of the Debtors.  Those two payments, the $100,000 and

24   the $60,000, are the transfers at issue in this adversary

25   proceeding.

Page 32

1          Questions were then raised internally at the

2    Debtors' specifically by an accounting manager as to why

3    these payments were made to Mr. Schoor from the Debtors.  In

4    response on May 20, 2017, Mr. Zaharis e-mailed Mr. Parmar

5    stating, "We need to come up with an invoice for a reason

6    for the payments made to Mr. Schoor."  That e-mail is part

7    of the summary judgment record attached to the affidavit of

8    Ms. Wong.

9          The next day on a Sunday, May 21, Mr. Zaharis

10   prepared a service and retainer agreement which identified

11   Mr. Schoor as a consultant of the Debtor and then told Mr.

12   Parmar that he, quote, "needed to beef up the deliverables

13   for the Howard Schoor agreement."  That e-mail is also

14   before the Court.

15         The next morning on May 22, 2017, Mr. Zaharis

16   forwarded a consulting agreement to Mr. Schoor.  That

17   consulting agreement was backdated to August 1, 2016 and

18   identified Mr. Schoor as a consultant for the Debtor.  That

19   e-mail is also before the Court as well as the document.

20   That document was never signed or authorized by Mr. Schoor.

21         It's undisputed that Mr. Schoor was never a vendor

22   of any of the Debtors.  He never sold product to Debtors.

23   He never performed services for any of the Debtors.  He

24   simply made a personal loan to Mr. Parmar in 2019.  When

25   that personal loan had been repaid in partial payments prior

Page 33

1   to 2017, Mr. Schoor was paid personally by Mr. Parmar.

2           In December of 2019, the liquidated Trustee, Mr.

3   Ehrenberg, sent a letter to Mr. Schoor asking that he return

4   the $160,000.  Shortly thereafter in February of 2020, Mr.

5   Schoor e-mailed Mr. Parmar advising him of the Trustee's

6   demand letter and requested that Mr. Parmar, quote, "review

7   and advise of your thoughts about my/our defense," close

8   quote.

9           In addition, Mr. Schoor asked Mr. Parmar to

10  provide any details as to what companies or what operations

11  he had used the loan proceeds for back in 2009.  Mr. Parmar

12  never responded.

13          From this Court's review of the uncontroverted

14  evidence, there is no genuine issue of material fact as to

15  any of the allegations raised by the Trustee which are

16  necessary for the Court to determine in order to grant

17  summary judgment and therefore the Trustee is entitled to

18  judgment as a matter of law.

19          The competent summary judgment before the Court

20  demonstrates that the two payments made in January of 2017

21  were made with actual fraudulent intent by the Debtors.  The

22  standard is not what intent did Mr. Schoor have when he

23  received the payments.  The standard is what was the intent

24  -- what was the reason behind the Debtors, one or more of

25  the Debtors, making the payments at the time they were made.

Case 8-20-08049-ast   Doc 131   Filed 07/10/24   Entered 07/10/24 23:26:16
Case 8-20-08042-ast   Doc 48-1   Filed 06/17/21   Entered 06/17/21 19:50:10

Page 34

1          The Court -- because the Court has concluded that

2     they were -- there is adequate evidence for the Court to

3     determine that they were made with actual fraudulent intent,

4     both transfers may be avoided under the Bankruptcy Code

5     under Section 548(a)(1)(A) and under New York Debtor &

6     Creditor Law, Section 276.

7          In reaching these determinations, the Court is

8     relying only on the competent summary judgment effort --

9     evidence in the record.  As has been long clear, and this

10    was noted by the 2nd Circuit almost 50 years ago in Dressler

11    v. MV Sandpiper, 331 F.2d 130 (2d Cir. 1964), it is

12    necessary that the Court only rely on competent evidence to

13    reach its determinations because only in this way may the

14    underlying objective of the summary judgment procedure to

15    determine whether one side has no real support for its

16    versions of the facts can be satisfied.

17         Here, the plaintiff has well documented the

18    evidence in support of his motion through the affidavits and

19    the declarations and the exhibits provided, particularly

20    those of Mr. Nolan and its attachments and Ms. Wong and hers

21    as well as the stipulated facts submitted by the parties.

22         When a party such as the defendant offers facts to

23    support his contention that there are genuine issues of

24    material fact, it must company with Rule 56C which requires

25    that an affidavit or a declaration be used to oppose a

Page 35

1    summary judgment motion as well as to support such a motion

2    be made on personal knowledge and set out facts that would

3    be admissible in evidence and show that the declarant is

4    competent to testify on the matters stated.

5         The only evidence submitted by the defendant, his

6    affidavit relating a conversation that he says he had with

7    Mr. Parmar in April of 2021, is classic hearsay.  Mr. Schoor

8    is attempting to provide testimony not based on what he

9    knows or could prove at trial but what -- but on what he

10   says Mr. Parmar would say if called to testify at trial.

11        That affidavit attempts to prove that the original

12   loan he made in 2009 was to be used to pay certain business

13   debts, but again, it's a hearsay statement and it fails to

14   provide any specificity as to what purported business debts

15   it would have been paying and is also in opposition to the

16   history of the e-mails and communications between Mr. Schoor

17   and Mr. Parmar.

18        For those reasons, the statements contained within

19   paragraph 7 through 14 of the -- of the Schoor affidavit are

20   stricken as not in compliance with Rule 56 and are

21   inadmissible.

22        Turning then specifically to Section 548(a)(1)(A)

23   of the Bankruptcy Code, in order to prevail on such a

24   fraudulent transfer claim, three elements must be

25   established.  The property at issue must have been property

1    in which the Debtor had an interest at the time transferred.

2    There's no controversy on that issue.

3         The transfer must have occurred within two years

4    prior to the petition date.  There's no controversy on that

5    issue, either.  And the third element that the transfer must

6    have been made with actual intent to hinder, delay, or

7    defraud a creditor.  See In Re: Bruno MacHinery Corp., 435

8    B.R. 819 (N.D.N.Y. 2010) and In Re: Bayou Group, 396 B.R.

9    810 (S.D.N.Y. Bankr. 2008).

10        Here, it's clear from the uncontroverted evidence

11   before the Court that Mr. Parmar and Mr. Zaharis attempted

12   to create a sham to disguise the reason why the Debtors made

13   the payments to Mr. Schoor on Mr. Parmar's personal debt.

14        This includes the e-mail string that the Court has

15   already referred to including specifically the May 20, 2017

16   statement of Mr. Zaharis to Mr. Parmar, "We need to come up

17   with an invoice for a reason to pay Schoor," and then the

18   creation of the back-dated consulting agreement, which

19   there's no evidence in the record to support there was any

20   business reason nor any evidence that it actually existed at

21   any time on or near 2016.

22        The fact that Mr. Zaharis and Mr. Parmar went to

23   lengths to fabricate a reason why the Debtors paid Mr.

24   Schoor is clear, convincing, and uncontroverted evidence

25   that the payments themselves were made with intent to

1    defraud creditors, one or more.

2         It's also uncontroverted that plaintiff has

3    provided evidence that there were creditors who existed in

4    January of 2017 when the payments were made who remained

5    unpaid at the time of the bankruptcy case and still remain

6    unpaid.

7         The Court has before it a judgment that was

8    entered in the Southern District of Texas for obligations

9    owing to Jack McBride and Alan Knottingham.  Those two

10   gentlemen also filed a claim in the case.  They claimed

11   10,000 and won.  That judgment and those -- that claim

12   remain unpaid.

13        The Court has determined that the liquidating

14   Trustee has also met his burden of proof under New York

15   Debtor & Creditor Law Section 276, which provides that every

16   conveyance made and every obligation incurred with actual

17   intent to hinder, delay, or defraud either present or future

18   creditors is fraudulent both as to present and future

19   creditors.  See In Re: MarketXT Holdings, 376 B.R. 390

20   (Bankr. S.D.N.Y.) as well as (indiscernible) Distributors.

21        The evidence again that this Court is relying on

22   are the fake consulting agreement which was attempted to be

23   backdated to create a business justification for one or more

24   of the Debtors having paid Mr. Parmar's personal obligation.

25   That document and the contemporaneous e-mails concerning the

Page 38

1    creation of that document and the fact that that document or

2    those e-mails were wrote after an internal accounting

3    manager of one or more of the Debtors questioned the

4    payments to Mr. Schoor constitute clear and convincing

5    evidence of an actual fraudulent intent to pay Mr. Schoor

6    and thereby place those funds beyond the reach of legitimate

7    creditors of the Debtors.

8            This Court has also reviewed the badges of fraud

9    that many courts often look at to determine whether or not

10   an actual fraud or fraudulent transfer can be found, and in

11   those badges of fraud, as an alternative basis, the Court

12   could find a violation of Section 276.

13           I'll briefly discuss each of the six badges of

14   fraud typically cited.  First is gross inadequacy of

15   consideration.  Again, here the Debtors didn't owe any Mr.

16   Schoor any money yet the Debtors made the payments.  That

17   evidence is grossly inadequate consideration.

18           As far as a close relationship between the

19   transferor and transferee, certainly Mr. Schoor and Mr.

20   Parmar were neighbors and friends, at least in 2016 -- 2009

21   when the loan was made and apparently had an adequate

22   relationship in 2017 that Mr. Parmar set upon a course to

23   have one or more of the Debtors repay the balance of their

24   loan which was a personal loan and never a business loan.

25           As far as the third badge in solvency, the

1    evidence is not as strong on whether or not the Debtors were

2    or were rendered insolvent at the time of the transfers.

3    There's evidence before the Court that in January just

4    before the payments were made in 2017 the Debtors were

5    juggling their financial commitments and funds available and

6    had to, quote, "short pay" certain other creditors in order

7    to pay Mr. Schoor.  Specifically, it was asked if the

8    Debtors can short pay India and use the $160,000 to pay Mr.

9    Schoor and then pay the India obligation later.

10           It's not clear from the summary judgment record,

11   though, whether or not the juggled payments due to the India

12   vendor were ultimately paid or not, but again, insolvency is

13   not necessary to be established in an actual

14   fraud/fraudulent transfer.

15           With respect to the badge of whether or not the

16   transfer was in the ordinary course of business, this was

17   clearly -- these were clearly payments made outside the

18   ordinary course of the business of the Debtors.

19           As far as the fifth and sixth badges, the secrecy

20   of the transfer, the transfers were not kept secret.  In

21   fact, they were discovered and questioned by an internal

22   accounting manager.  Then finally as far as retention of

23   control over the property that does not appear to be an

24   issue here.

25           On balance, the Court would find there was

1   adequate evidence under the badges of fraud to conclude as a

2   matter of law that these transfers were actual fraudulent

3   transfers.

4         Finally, as I've partly noted, in an actual fraud

5   transfer under the New York DCL, it is not necessary to

6   prove insolvency or even prove unfair consideration.  As the

7   first appellate department noted in Wallstreet Associates v.

8   Brodsky, DCL 276, until Sections 273 and 275, concerns

9   actual fraud as opposed to constructive fraud and does not

10   require proof of unfair consideration or insolvency, 257

11   A.D.2d 526 (1st Dept 1999.)  See also Korea Deposit

12   Insurance Corp. v. Young, 59 (indiscernible) 442, Superior

13   Court New York County -- Supreme Court New York County 2017.

14         Under DCL 276, a transfer made with actual intent

15   to hinder, delay, or defraud present or future creditors is

16   fraudulent (indiscernible) such creditors whether or not the

17   Debtor receives fair consideration.  See United States v.

18   McCombs, 30 F.3d 310 (2d Cir. 1994.)

19         Finally, the Court notes that Mr. Schoor attempted

20   to allege that the funds that he advanced Mr. Parmar were

21   somehow used on expenses of one or more businesses.  There's

22   simply no evidence in the record, no competent evidence in

23   the record, to support that.

24         For the reasons stated on the record, summary

25   judgment is granted in favor of the liquidating Trustee for

Page 41

1    recovery of the $160,000 plus post-judgment interest

2    thereon.

3         The Trustee in the motion had made a request but

4    did not brief or provide invoices on attorney's fees

5    incurred in connection with this litigation.  The Court will

6    use the following protocol to determine whether or not to

7    grant attorney's fees to the Trustee and if so in what

8    amount.

9         The Trustee has 14 days from today, so that's June

10   17th, to submit any invoices which can be redacted for

11   privilege or work product but should be submitted with a

12   summary attached concerning any legal fees or out-of-pocket

13   expenses incurred in connection with this litigation as well

14   as any case law or argument in support of the grant of

15   attorney's fees.

16        Mr. Schoor will then have 14 days thereafter to

17   file any response.  Again, on an issue of attorney's fees I

18   don't need a reply.  Because of the July 4th holiday, that

19   response will be due on January -- excuse me -- on July 7.

20        So, June 17 for any attorney's fee invoices and

21   summary as well as argument and support and then July 7 for

22   any response.  The Court is also awarding costs incurred in

23   connection with the litigation as provided under the rules.

24        Mr. Nolan, I'm going to -- I'm going to have your

25   office submit a form of judgment, but because I've taken the

Page 42

1    attorney's fees portion on submission on this protocol, I'm

2    simply going to wait and enter one final judgment at the

3    end.   There's nothing else in the litigation to be resolved

4    other than whether or not to award attorney's fees unless

5    there's something that we haven't addressed today.

6              MR. NOLAN:   That's correct, Your Honor.   This is

7    just the -- just the two parties to the litigation, to the

8    dispute, and I believe I submitted a proposed order to the

9    motion.   I'll look to make sure that that was in fact the

10   case and that's acceptable to the Trustee.

11             THE COURT:   All right.   So, again, I'll be

12   entering one order.   My protocol, as well as many other

13   trial courts, I'll enter one order granting the motion and

14   then one judgment in the amounts that the Court has

15   determined, but I'm not going to enter a partial judgment

16   now and then a final judgment after I resolve attorney's

17   fees.   I'm just going to enter one order and one judgment at

18   the end.

19             MR. NOLAN:   That's -- understood, Your Honor.

20             THE COURT:   All right.   All right.   Mr. Campbell?

21             MR. CAMPBELL:   Yes, Your Honor.

22             THE COURT:   I -- anything that you want to address

23   or any questions about the timing mechanics?

24             MR. CAMPBELL:   Not at this time, Your Honor.

25   Thank you, Your Honor.

Page 43

1          THE COURT:  All right.  All right, very well.  So,

2     then we'll be adjourned on 20-8042.  I'm not going to set a

3     further hearing because what remains to be resolved in the

4     adversary proceeding will be on submission as of July 7th.

5          MR. NOLAN:  Understood.

6          THE COURT:  All right.  Very well.

7          MR. CAMPBELL:  Thank you, Your Honor.

8          THE COURT:  Thank you both.

9          MR. NOLAN:  Thank you, Your Honor.

10          THE COURT:  So, that will conclude then the

11     Court's calendar for the morning of July the 3rd.  The Court

12     will be in recess and we'll go off the record.

13          (Whereupon these proceedings were concluded)

14

15

16

17

18

19

20

21

22

23

24

25

Page 44

1                          I N D E X

2

3                          RULINGS

4                                              Page      Line

5

6    Motion Granted                            14        32

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 45

1                     C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:    June 14, 2021

**[& - added]**                                                                 Page 1

| & |
|---|
| **&**   4:3,18 5:1,8 28:8 34:5 37:15 |

| 0 |
|---|
| **07701**   5:4 |

| 1 |
|---|
| **1**   32:17 34:5 35:22 |
| **10**   21:11 |
| **10,000**   37:11 |
| **100,000**   31:20,23 |
| **10007**   4:14 |
| **10016**   4:22 |
| **10017**   4:6 5:11 |
| **10:11**   2:6 |
| **11501**   45:23 |
| **11722**   2:3 |
| **12**   8:10 |
| **125**   5:3 |
| **12j**   6:21 |
| **130**   34:11 |
| **14**   35:19 41:9,16 44:6 45:25 |
| **14th**   21:11 22:6 22:14,20,22 24:23 25:3 26:1,3,13 |
| **15th**   22:21 |
| **16**   26:4 |
| **160,000**   28:21 33:4 39:8 41:1 |
| **16th**   22:21,25 23:24 24:18 29:10 |
| **17**   19:12 41:20 |
| **17th**   41:10 |
| **18-71748**   1:3 6:8 |
| **1964**   34:11 |
| **1994**   40:18 |
| **1999**   40:11 |
| **1st**   40:11 |

| 2 |
|---|
| **2**   4:12 6:20 7:11 7:22 8:16 9:20 13:10,22 17:11 |

| (col 2) |
|---|
| 18:2,11 19:18 20:10,16 22:15 23:5,24 25:20 |
| **20**   32:4 36:15 |
| **20-08042**   1:4 |
| **20-8042**   28:1,19 43:2 |
| **20-8051**   6:11 |
| **2001**   30:12,12 |
| **2006**   30:13 |
| **2008**   36:9 |
| **2009**   30:14,18,25 33:11 35:12 38:20 |
| **2010**   31:8 36:8 |
| **2016**   32:17 36:21 38:20 |
| **2017**   28:22 31:13 31:14,19 32:4,15 33:1,20 36:15 37:4 38:22 39:4 40:13 |
| **2018**   12:15 |
| **2019**   32:24 33:2 |
| **2020**   28:20 33:4 |
| **2021**   2:5 29:20 35:7 45:25 |
| **20th**   5:10 |
| **21**   32:9 |
| **22**   32:15 |
| **232**   4:21 |
| **257**   40:10 |
| **27**   3:4 |
| **273**   40:8 |
| **275**   40:8 |
| **276**   34:6 37:15 38:12 40:8,14 |
| **28**   29:6 31:7 |
| **29**   29:1 |
| **290**   2:2 |
| **2d**   34:11 40:18 |
| **2nd**   34:10 |

| 3 |
|---|
| **3**   2:5 |
| **30**   29:1 40:18 |
| **300**   5:3 45:22 |
| **310**   40:18 |
| **31st**   30:25 |
| **32**   44:6 |
| **33**   29:8 |
| **330**   45:21 |
| **331**   34:11 |
| **34th**   4:5 |
| **363**   19:16 |
| **376**   37:19 |
| **390**   37:19 |
| **396**   36:8 |
| **3rd**   43:11 |

| 4 |
|---|
| **4**   31:14 |
| **4.8**   13:13,18 |
| **41**   29:18 |
| **42**   30:1 |
| **43**   3:1 |
| **435**   36:7 |
| **442**   40:12 |
| **4th**   41:18 |

| 5 |
|---|
| **5**   24:21 25:2,17,23 31:19 |
| **50**   34:10 |
| **526**   40:11 |
| **54**   20:4,14 |
| **548**   34:5 35:22 |
| **54b**   21:10 24:20 |
| **56**   35:20 |
| **56c**   34:24 |
| **59**   40:12 |

| 6 |
|---|
| **60,000**   31:22,24 |
| **600,000**   30:15 31:2 |
| **6th**   31:21 |

| 7 |
|---|
| **7**   31:7 35:19 41:19 41:21 |
| **747**   5:10 |
| **780**   4:5 |
| **7th**   43:4 |

| 8 |
|---|
| **8007**   9:25 |
| **810**   36:9 |
| **819**   36:8 |
| **8500**   4:13 |

| 9 |
|---|
| **906**   4:21 |
| **9th**   24:16,22 25:2 25:17,23 |

| a |
|---|
| **a.d.2d**   40:11 |
| **ability**   11:9 |
| **able**   11:13 12:1 15:10 |
| **absolutely**   9:9 |
| **absurd**   15:19 |
| **acceptable**   42:10 |
| **access**   12:5,14,20 14:19,23,24 |
| **account**   31:21,22 |
| **accounting**   32:2 38:2 39:22 |
| **accounts**   31:4 |
| **accrual**   13:24 |
| **accurate**   45:4 |
| **acquaintance**   30:14 |
| **acquired**   30:22 |
| **action**   15:4 |
| **actions**   28:24 |
| **actual**   33:21 34:3 36:6 37:16 38:5 38:10 39:13 40:2 40:4,9,14 |
| **added**   23:8 |

Case 8-20-08049-ast    Doc 131    Filed 07/10/24    Entered 07/10/24 23:26:16
Case 8-20-08042-ast    Doc 48-1    Filed 06/17/21    Entered 06/17/21 19:50:10

[addition - balance]                                                    Page 2

**addition** 9:7 16:17
  33:9
**additional** 29:5,13
**address** 26:25
  42:22
**addressed** 42:5
**addressing** 9:21
**adduce** 8:25
**adequate** 18:18
  18:24 34:2 38:21
  40:1
**adequately** 19:16
**adjourned** 43:2
**admissible** 35:3
**adv** 1:4
**advance** 21:19,23
**advanced** 20:24
  40:20
**adversary** 6:10,21
  7:10,24 14:14
  24:19 27:2,21
  28:1,4,19 31:24
  43:4
**advise** 33:7
**advised** 21:7
**advising** 31:1 33:5
**affiant** 27:12
**affidavit** 22:3
  24:7,10 27:7,9,11
  27:14,15,16 29:17
  29:18,21,25 32:7
  34:25 35:6,11,19
**affidavits** 21:19
  21:22 22:2 25:14
  25:16,22,25 26:5
  26:9 28:25 29:15
  34:18
**affirmative** 18:2
**afternoon** 22:20
**age** 21:1
**ago** 15:21 19:12
  19:12 34:10

**agreement** 11:23
  27:13 32:10,13,16
  32:17 36:18 37:22
**ahead** 17:8 22:2
**al** 1:13 6:12
**alan** 2:22 6:3 37:9
**allegations** 33:15
**allege** 40:20
**allowed** 29:12,14
**allowing** 9:3
**alternative** 38:11
**amended** 3:1
**amount** 9:10
  11:10 12:21 15:9
  15:10 19:24 41:8
**amounts** 42:14
**amy** 6:2
**answer** 19:20
  23:20
**anticipate** 18:7
  21:25
**antsy** 14:16
**anybody** 13:16
  26:21
**apart** 15:22
**apartment** 6:21
  7:11,16,18 9:15
  10:3,8,8,11,20
  11:3 12:14 15:5
  15:20,23 16:16,18
  16:22,24,25 17:23
**apologize** 14:5
**apparently** 38:21
**appeal** 8:1,3,13,13
  8:15,22,22 9:8,23
  10:13,22 15:17,18
  16:1,3,3 20:8,11
  20:16,20 21:10
  23:5,17 24:2,21
  25:7
**appealable** 8:20
  10:21

**appealed** 10:16
**appear** 7:22 39:23
**appearances** 6:9
**appearing** 6:12
  28:3,5
**appears** 8:1 11:22
**appellate** 10:15
  40:7
**application** 11:8
  23:8,9
**appreciate** 31:9
**approach** 24:14
**appropriate** 9:16
  19:1,24
**approve** 20:23,23
**april** 29:20 35:7
**arguably** 11:15
**argue** 22:6
**argument** 41:14
  41:21
**arguments** 7:4
  15:5
**arrears** 9:11,14
  9:18 14:17 16:9
  16:13
**arvind** 5:9
**aside** 13:19,22
**asked** 19:19 33:9
  39:7
**asking** 10:24
  24:13 25:3 33:3
**asks** 20:15
**aspect** 18:11
**asset** 9:13 10:14
  10:25 11:15,18
  14:6,7 16:10,12
  17:10
**assets** 13:23 31:5
**associated** 9:15
  16:7
**associates** 5:8
  40:7

**ast** 1:3,4
**attached** 32:7
  41:12
**attachments**
  34:20
**attempt** 10:19
  11:14 12:5
**attempted** 36:11
  37:22 40:19
**attempting** 8:16
  10:6 35:8
**attempts** 35:11
**attorneys** 4:4,12
  4:19 5:2,9
**attorney's** 41:4,7
  41:15,17,20 42:1
  42:4,16
**august** 30:25,25
  31:8 32:17
**authorized** 14:23
  32:20
**available** 22:14
  23:23 39:5
**avenue** 4:5,21
  5:10
**avoided** 34:4
**avoiding** 13:24
**award** 42:4
**awarding** 41:22
**aware** 10:1,12
  11:1 12:10 23:14

|        **b**        |

**b** 2:21
**b.r.** 36:8,8 37:19
**back** 8:6,23 30:12
  33:11 36:18
**backdated** 32:17
  37:23
**badge** 38:25 39:15
**badges** 38:8,11,13
  39:19 40:1
**balance** 31:10,16
  38:23 39:25

Case 8-20-08049-ast Doc 131 Filed 07/10/24 Entered 07/10/24 23:26:16
Case 8-20-08042-ast Doc 48-1 Filed 06/17/21 Entered 06/17/21 19:50:10

[bank - contending] Page 3

**bank** 5:4 31:21,22
**bankr** 36:9 37:20
**bankruptcy** 1:1
2:1,23 6:24 10:12
23:14 34:4 35:23
37:5
**based** 7:6,6 8:24
10:5 15:18 24:15
31:6 35:8
**basis** 31:11 38:11
**bayou** 36:8
**bear** 28:11
**beef** 32:12
**beginning** 26:10
**behalf** 6:15,17,20
11:22 13:17 14:23
18:21 27:6 28:5,9
**believe** 17:17 19:3
23:20 42:8
**believed** 10:17,17
**best** 17:10 20:2
**better** 10:7 13:12
14:1 21:1 22:11
**beyond** 38:6
**bid** 15:9
**bit** 26:16
**board** 4:19 6:18
9:12 11:19 12:20
12:24 13:5,17
14:16 18:22 19:4
19:5,8 25:21
**bond** 9:10,17 11:8
11:10 16:8
**bottles** 21:1
**brief** 8:9 41:4
**briefly** 38:13
**bring** 13:12 19:18
**brodsky** 40:8
**broker** 17:15
**bruno** 36:7
**build** 14:17
**building** 12:5,6

**burden** 37:14
**business** 31:7,11
35:12,14 36:20
37:23 38:24 39:16
39:18
**businesses** 40:21
**businessperson**
30:19

c

**c** 4:1 6:1 45:1,1
**calendar** 27:25
43:11
**call** 6:6
**called** 35:10
**calling** 18:8
**campbell** 5:6 28:7
28:8,13 42:20,21
42:24 43:7
**capacity** 1:12
**case** 1:3,4 6:10,22
11:13 12:11,18
14:8,13 27:25
28:1 37:5,10
41:14 42:10
**catastrophic** 17:2
**caused** 9:12
**causes** 28:24
**center** 4:13
**central** 2:3
**certain** 20:21
35:12 39:6
**certainly** 10:9
11:11 12:10 13:15
13:17 16:4 17:12
20:17 38:19
**certified** 45:3
**challenge** 8:16
18:17 20:11 27:14
**chance** 9:6,6
24:11
**charged** 15:21
**charges** 12:16,23
15:3 16:14

**check** 19:3 22:24
**chief** 6:3
**ciesla** 5:1 28:8
**cir** 34:11 40:18
**circuit** 34:10
**circumstances**
20:19
**cited** 38:14
**claim** 14:19 16:23
35:24 37:10,11
**claimed** 37:10
**classic** 35:7
**clear** 34:9 36:10
36:24 38:4 39:10
**clearly** 31:3 39:17
39:17
**clerk** 6:2,7 27:25
**client** 11:22 17:22
17:24 18:22 19:4
**client's** 12:4 14:4
14:5
**close** 31:6 33:7
38:18
**cmecf** 8:3
**code** 10:12 34:4
35:23
**come** 8:23 24:14
32:5 36:16
**comments** 24:6
**commitments**
39:5
**common** 15:3
**communications**
35:16
**companies** 33:10
**company** 14:22
14:22,24 34:24
**competent** 33:19
34:8,12 35:4
40:22
**complaint** 28:20
28:20,24 30:24

**completely** 13:1
**compliance** 35:20
**concerning** 7:11
37:25 41:12
**concerns** 40:8
**conclude** 40:1
43:10
**concluded** 34:1
43:13
**conditioned** 9:9
9:17
**conditions** 16:7
**condo** 9:12 13:5
**condominium**
4:20 6:18 19:8
**conference** 28:15
30:2
**conflict** 22:13,20
**conjecture** 16:6
**connection** 24:7
41:5,13,23
**connoisseur** 20:25
**consider** 25:10,15
**consideration**
18:13,24 38:15,17
40:6,10,17
**constitute** 26:5
38:4
**constructive** 40:9
**consultant** 32:11
32:18
**consulting** 32:16
32:17 36:18 37:22
**contained** 35:18
**contemplate**
18:22 24:14
**contemplating**
17:7 18:3
**contemporaneous**
37:25
**contend** 13:16
**contending** 18:12

Case 8-20-08049-ast    Doc 131    Filed 07/10/24    Entered 07/10/24 23:26:16
Case 8-20-08042-ast    Doc 48-1    Filed 06/17/21    Entered 06/17/21 19:50:10

[contention - direct]                                                    Page 4

contention 15:19
  34:23
continue 14:17
continued 13:24
continuing 14:1
control 26:14
  39:23
controlled 21:18
controversy 25:10
  36:2,4
conversation
  23:19 29:19 35:6
conveyance 37:16
convincing 36:24
  38:4
corp 36:7 40:12
correct 11:25
  17:17 42:6
cost 12:22,23
costs 11:18 13:24
  41:22
counsel 6:24 18:7
  24:7
country 45:21
county 40:13,13
couple 12:2,15
  15:14
course 23:7 38:22
  39:16,18
court 1:1 2:1 6:5,9
  7:3,6,13,20,21 8:1
  8:10,11 9:2,19
  10:11,25 11:10,12
  11:17 12:18,24
  13:3,11,14,19,21
  14:10,20 15:4,6
  15:12,15 17:5,19
  18:1,10,15,20
  19:10,13 20:2,5,8
  20:18,21,23 21:24
  22:3,15,18,24
  23:2,4,5,11,13,14
  23:15,22,25 24:12

24:18 25:1,14
  26:15,20 27:5,8
  27:11,20 28:3,10
  28:14,14,16 29:10
  29:12,17 30:1,4
  30:11,21,23 32:14
  32:19 33:16,19
  34:1,1,2,7,12
  36:11,14 37:7,13
  37:21 38:8,11
  39:3,25 40:13,13
  40:19 41:5,22
  42:11,14,20,22
  43:1,6,8,10,11
court's 8:6,11
  10:2 12:8 17:7,7
  19:22 20:11 23:10
courtroom 6:3
  22:10,22
courts 38:9 42:13
court's 26:2 29:3
  30:5 33:13 43:11
covered 16:15
create 36:12
  37:23
creation 36:18
  38:1
creditor 34:6 36:7
  37:15
creditors 37:1,3
  37:18,19 38:7
  39:6 40:15,16
criminal 18:7
cross 21:20 24:4
  26:6 27:12,14,17
current 13:13
  14:9 16:13
currently 8:17

**d**

d 6:1,16 44:1
damage 16:18,20
  16:21

dance 20:7
daniel 6:23
date 7:17 36:4
  45:25
dated 36:18
day 22:21 31:19
  31:21 32:9
days 8:10 21:11
  21:22 22:2 41:9
  41:16
dcl 40:5,8,14
deal 31:7
debt 36:13
debtor 1:10 31:20
  32:11,18 34:5
  36:1 37:15 40:17
debtors 29:22
  30:21,22,23 31:16
  31:18,20,23 32:3
  32:22,22,23 33:21
  33:24,25 36:12,23
  37:24 38:3,7,15
  38:16,23 39:1,4,8
  39:18
debtors' 32:2
debts 35:13,14
december 33:2
decide 24:15 25:1
  25:21
decision 13:22
declarant 35:3
declaration 17:15
  34:25
declarations 18:2
  34:19
defaulted 15:3
defendant 15:17
  28:22 29:6,13,15
  29:18,20 34:22
  35:5
defendants 1:17
  6:21

defendant's 30:9
defense 33:7
defraud 36:7 37:1
  37:17 40:15
delay 21:5,13 36:6
  37:17 40:15
deliver 26:20
deliverables
  32:12
demand 33:6
demonstrates
  33:20
denial 12:14,20
denied 14:23,24
deny 14:19
department 40:7
deposit 40:11
deposition 30:9
depreciation
  16:10,12
deprivation 12:22
  12:22
depriving 12:20
dept 40:11
deputy 6:3
detail 30:4
detailed 30:23
details 29:19
  33:10
determination
  11:16 20:19 30:5
determinations
  34:7,13
determine 8:12
  24:18 33:16 34:3
  34:15 38:9 41:6
determined 37:13
  42:15
didn't 17:19 23:4
  38:15
direct 14:12 16:15
  21:18 24:9 26:5
  27:11,16 29:21

Case 8-20-08049-ast   Doc 131   Filed 07/10/24   Entered 07/10/24 23:26:16
Case 8-20-08042-ast   Doc 48-1   Filed 06/17/21   Entered 06/17/21 19:50:10

[directed - file]

Page 5

**directed** 31:14,16
**disagrees** 17:11
**discovered** 39:21
**discuss** 18:6 38:13
**discussed** 13:4
**disguise** 36:12
**dismissed** 8:14,15
9:23
**dispute** 30:6 42:8
**disputes** 21:7
**distributors** 37:20
**district** 1:2 8:1,10
20:21 23:5,13
37:8
**docket** 8:3 20:2
29:1,6,8,18 30:1
31:7
**document** 29:6
32:19,20 37:25
38:1,1
**documentary**
25:24
**documented**
34:17
**documents** 25:23
25:25
**doesn't** 27:16
**dog** 14:12
**doing** 11:14
**don** 28:7
**donald** 5:6
**don't** 21:3 26:10
41:18
**double** 19:3
**doubt** 13:10
**drawn** 30:9
**dressler** 34:10
**due** 9:12 24:22
25:25 26:13 39:11
41:19

**e**

**e** 2:21,21 4:1,1 6:1
6:1 31:8,14 32:4,6
32:13,19 33:5
35:16 36:14 37:25
38:2 44:1 45:1
**easily** 11:5
**eastern** 1:2 22:7
23:2,24
**ecro** 2:25
**edith** 29:1
**effect** 9:22
**effort** 34:8
**ehrenberg** 1:12
3:2,5 27:1 28:1,19
33:3
**ehrenburg** 6:11
6:25 17:16 22:13
22:25 23:23
**either** 7:9 9:8
10:22 11:4 14:12
29:15 36:5 37:17
**element** 36:5
**elements** 35:24
**endeavor** 11:11
**ends** 7:19
**enforced** 16:2
**enter** 42:2,13,15
42:17
**entered** 7:24
26:18 37:8
**entering** 42:12
**entities** 30:21
**entitled** 17:12
20:17 33:17
**equal** 13:5
**essentially** 9:13
10:10 21:25 28:21
**established** 35:25
39:13
**estate** 9:14 10:14
10:14 13:8 15:22

**et** 1:13 6:12
**etcetera** 11:19
13:25
**event** 18:5 26:8
**everybody's**
17:10
**evidence** 18:23
25:6,24 29:8,13
30:11 33:14 34:2
34:9,12,18 35:3,5
36:10,19,20,24
37:3,21 38:5,17
39:1,3 40:1,22,22
**evidenced** 30:16
**evident** 15:21
**evidentiary** 17:13
18:4,5 19:19 21:8
24:11 25:5,15,21
26:4,7,8
**examination**
21:20 26:6 27:12
27:14
**examine** 27:17
**examined** 24:4,4
**exchanged** 21:19
21:22 25:16,22
**excuse** 41:19
**executed** 30:16
**executing** 13:7
**execution** 13:11
**exhibits** 21:23
25:23 26:13,20
29:2 34:19
**existed** 36:20 37:3
**exists** 13:24
**expect** 16:6 26:10
**expected** 15:25
**expense** 16:15
**expenses** 9:12,15
11:19 13:25 17:1
17:22 40:21 41:13
**experience** 12:4

**expert** 18:15
**extent** 27:7
**extremely** 14:16

**f**

**f** 2:21 45:1
**f.2d** 34:11
**f.3d** 40:18
**fabricate** 36:23
**face** 27:15
**fact** 9:24 12:1
15:5 30:7 33:14
34:24 36:22 38:1
39:21 42:9
**factors** 24:2,5
**facts** 8:25 25:9,12
29:5,5,23 30:5,7,7
30:8 34:16,21,22
35:2
**fails** 35:13
**fair** 18:12 19:24
40:17
**fairly** 21:6,12
**fake** 37:22
**fallow** 15:23
**far** 38:18,25 39:19
39:22
**fast** 31:13
**favor** 9:2 30:17
40:25
**february** 33:4
**federal** 2:2
**fee** 41:20
**fees** 11:19 12:23
41:4,7,12,15,17
42:1,4,17
**fifth** 39:19
**fight** 14:1 15:1
17:11
**fighting** 14:2
**figure** 18:11
**file** 9:25 20:5 23:5
23:9,12 24:16,17
24:21 41:17

Case 8-20-08049-ast    Doc 131    Filed 07/10/24    Entered 07/10/24 23:26:16
Case 8-20-08042-ast    Doc 48-1    Filed 06/17/21    Entered 06/17/21 19:50:10

[filed - ilan]

Page 6

**filed** 3:1,4 12:18
15:23 16:2,3,3,4
23:6 24:19 25:4
25:16,22 28:20
29:4,7 37:10
**filing** 16:5
**final** 7:24 8:19,19
10:17,18,21,23
11:16 20:4,14
23:17 42:2,16
**finally** 10:7 39:22
40:4,19
**financial** 11:9
39:5
**find** 38:12 39:25
**finding** 11:3
**fine** 17:12
**firm** 28:8
**first** 6:6,7 7:8,22
8:4 9:10,21 20:19
23:14 38:14 40:7
**fixing** 16:24
**flex** 22:1
**flood** 16:22
**floor** 4:5 5:10
**follow** 30:3 31:8
**following** 21:25
41:6
**follows** 28:18
**foregoing** 45:3
**form** 10:24 41:25
**format** 21:24
**forth** 11:8 28:24
**forward** 9:3 10:22
13:7 15:3,7
**forwarded** 32:16
**forwarding** 31:13
**found** 38:10
**frankly** 15:19
17:3
**fraud** 38:8,10,11
38:14 39:14 40:1
40:4,9,9

**fraudulent** 33:21
34:3 35:24 37:18
38:5,10 39:14
40:2,16
**free** 27:23
**freed** 31:5
**friend** 30:14
**friends** 38:20
**friendship** 31:6
31:11
**front** 8:10 13:13
20:10 24:15
**full** 8:9 9:10 26:2
**fully** 23:10
**funds** 38:6 39:5
40:20
**further** 8:23 16:9
16:21 21:13 29:16
43:3
**future** 9:9 37:17
37:18 40:15

**g**

**g** 6:1
**general** 6:24
25:12
**generally** 21:2
**gentlemen** 37:10
**genuine** 30:6,6
33:14 34:23
**getting** 7:15 14:16
**giordano** 5:1 28:8
**give** 21:8 22:1
**given** 9:14 17:3
19:20
**go** 10:22 12:5 13:7
15:7 19:11 20:2
24:12 27:23,23
43:12
**going** 6:9 9:3 13:8
15:3,8,10,20,23
23:18 24:12,14,18
24:21,25 25:8
26:11 27:13 41:24

41:24 42:2,15,17
43:2
**good** 6:2,13,16,19
6:23 28:7
**grant** 8:24 20:8
20:20 33:16 41:7
41:14
**granted** 9:7,16
30:3 40:25 44:6
**granting** 10:2
42:13
**great** 23:25
**greatly** 31:9
**gross** 38:14
**grossly** 38:17
**group** 4:11 6:20
36:8
**gyparakis** 5:14

**h**

**hadden** 4:16 6:19
6:20 7:13,14 9:19
9:21 11:25 13:15
14:4,21 17:19,23
18:1,5,14,19
22:15,18,19 23:3
23:4,6,12 27:19
27:24
**hadden's** 22:17
**half** 5:3
**halleran** 5:1 28:8
**handles** 16:20
**handling** 7:1
**happening** 17:2
**happens** 21:16
**hardship** 24:3
**hate** 17:8
**haven't** 42:5
**head** 12:9
**healthcorp** 1:8,13
6:8
**hearing** 3:1,4 6:4
7:2 17:13 18:4,6
18:23 21:9 24:5

24:11 25:5,15
26:4 27:10 29:10
43:3
**hearings** 7:7 13:5
21:9
**hearsay** 35:7,13
**held** 17:13 29:10
**he's** 24:6
**high** 31:15
**higher** 13:12
**hinder** 36:6 37:17
40:15
**history** 28:18
35:16
**hold** 13:2,4 14:18
**holding** 13:6
**holdings** 37:19
**holes** 16:19
**holiday** 41:18
**hon** 2:22
**honestly** 11:8
**honor** 6:14,19,23
7:12,14 8:8,21,23
8:24 9:7 14:15
15:13 16:11,17
17:4,18,21 18:6
19:2 22:12 23:1,3
23:6,13,23 24:1,9
27:4,18,19,24
28:7,13 42:6,19
42:21,24,25 43:7
43:9
**honorable** 6:3
**howard** 1:12,16
3:2,5 5:2 6:24
28:1,2,9 32:13
**hut** 14:12
**hyde** 3:25 45:3,8

**i**

**identified** 32:10
32:18
**ilan** 4:9 6:14

Case 8-20-08049-ast    Doc 131    Filed 07/10/24    Entered 07/10/24 23:26:16
Case 8-20-08042-ast    Doc 48-1    Filed 06/17/21    Entered 06/17/21 19:50:10

[inadequacy - little]

Page 7

inadequacy 38:14
inadequate 38:17
inadmissible
  35:21
include 24:2
includes 36:14
including 36:15
incurred 11:20
  16:12 37:16 41:5
  41:13,22
india 39:8,9,11
indicated 8:2 31:3
indiscernible
  16:23 24:11 37:20
  40:12,16
informally 23:7
informed 12:11
  21:6
initially 9:24
  12:16
injudicious 10:9
injunctive 8:24
  9:9
insolvency 39:12
  40:6,10
insolvent 39:2
instructions 29:3
insurance 16:23
  40:12
intent 33:21,22,23
  34:3 36:6,25
  37:17 38:5 40:14
interest 7:23
  17:10 36:1 41:1
interested 6:22
  30:19
interlocutory 8:1
  8:7,9,13,18 9:22
  10:4,18 15:18
  20:8
internal 38:2
  39:21

internally 32:1
investment 31:12
invoice 32:5 36:17
invoices 41:4,10
  41:20
irs 31:4
islip 2:3
issue 10:20 11:17
  12:3 13:9 14:13
  14:13 31:24 33:14
  35:25 36:2,5
  39:24 41:17
issues 9:20 17:23
  17:25 19:17 21:4
  21:6,11 22:6,6
  24:24 25:1,2
  26:17 34:23
issuing 26:15
items 29:1
it's 9:24 35:13
  36:10 37:2
i'll 27:15 29:11
  38:13 42:9,11,13
i'm 27:13 41:24
  41:24 42:1,15,17
  43:2
i've 40:4 41:25

j

jack 37:9
january 28:22
  31:14,19,21 33:20
  37:4 39:3 41:19
jeff 4:8 6:14 27:6
  28:5
john 19:21
joint 29:4
jones 4:3 6:15
joseph 5:18
judge 2:23 6:3,7
  6:16
judgement 20:4
  23:17

judges 13:21
judgment 3:4
  7:24 8:6,9,13,18
  8:19,20 9:22 13:6
  13:11,16,24 15:9
  16:1,2 17:4 20:4
  20:14 23:16 28:16
  28:23,25 29:7,8
  29:11,14 30:3,10
  30:24 32:7 33:17
  33:18,19 34:8,14
  35:1 37:7,11
  39:10 40:25 41:1
  41:25 42:2,14,15
  42:16,17
juggled 39:11
juggling 39:5
july 41:18,19,21
  43:4,11
june 2:5 21:10
  22:6,14,25 23:24
  24:16,18,22,23
  25:2,3,16,23 26:1
  26:3,4,13 30:14
  41:9,20 45:25
justification
  37:23

k

kept 39:20
kind 21:16
knew 15:20
knobs 16:19
knottingham 37:9
know 9:13 11:2,6
  11:9 14:10 17:6
  19:20 20:18 21:17
  22:5,10 24:5,13
  25:3,7 26:16,21
knowing 15:4
knowledge 29:22
  35:2
known 21:12

knows 35:9
korea 40:11
kupetz 6:24

l

lack 10:7 14:19
laid 21:12 26:14
  26:23
late 31:2
law 4:11 6:20 11:5
  28:8 33:18 34:6
  37:15 40:2 41:14
lawrence 4:24
  6:16
leave 8:16
ledanski 3:25 45:3
  45:8
legal 41:12 45:20
legitimate 38:6
lengths 36:23
letter 31:1 33:3,6
lev 6:23,23 22:10
  22:12,17,24 23:1
  23:23
liability 14:22
liable 16:24
lie 15:23
lien 31:4
likelihood 9:6
limine 26:11
limited 14:22 18:9
line 44:4
lined 18:16
liquidated 33:2
liquidating 1:12
  6:25 9:4 15:22
  18:25 19:14 20:3
  23:16 25:20 28:6
  28:15 37:13 40:25
list 30:23
litigation 21:2
  41:5,13,23 42:3,7
little 22:1 26:16

**live** 12:1 26:6
**living** 11:24,25
**llc** 6:21 7:16 10:10
    14:20 15:17
**llc's** 11:14
**llp** 4:3,18 5:8
**loan** 30:16 31:2
    31:10,10,17 32:24
    32:25 33:11 35:12
    38:21,24,24,24
**loaned** 30:15
**logged** 27:21
**long** 34:9
**look** 38:9 42:9
**looking** 19:13
**loss** 16:14
**losses** 9:15 16:12
    17:22
**lost** 13:8,9

**m**

**m** 1:12 3:2,5
**machinery** 36:7
**madison** 4:21
**mail** 31:9,14 32:6
    32:13,19 36:14
**mailed** 32:4 33:5
**mails** 35:16 37:25
    38:2
**main** 6:10,22
    14:13
**maintaining** 14:1
**maintenance**
    11:19 13:25
**making** 16:13
    33:25
**manager** 7:16
    14:5 32:2 38:3
    39:22
**managers** 4:19
    6:18
**managing** 20:2
**march** 8:6 28:20
    29:10

**marketed** 19:16
**marketing** 18:17
**marketxt** 37:19
**maryam** 6:19
**maryann** 4:16
**material** 33:14
    34:24
**matter** 1:6 6:7 7:7
    18:7 27:23,25
    33:18 40:2
**matters** 6:6,12
    13:2 35:4
**mcbride** 37:9
**mccombs** 40:18
**mechanics** 42:23
**meet** 23:10
**meets** 11:3
**merged** 30:22
**met** 37:14
**metaphysical**
    17:8
**midst** 7:17
**mile** 5:3
**million** 13:13,18
**mineola** 45:23
**minor** 16:18,20
**minute** 28:11
**missing** 16:19
**mister** 15:16
**mitigation** 12:13
**moment** 13:20,22
**monday** 26:17
**monetize** 17:10
**monetizing** 13:23
    14:2,6 15:1 16:24
**money** 14:3 15:2
    18:10 31:17 38:16
**monitoring** 6:25
**months** 19:12
**mooted** 8:22
**morning** 6:2,13
    6:16,19,23 23:21
    28:7 32:15 43:11

**motion** 3:1,4 6:10
    7:5 15:24 16:5
    17:6,14 19:9 20:9
    21:9,10,10 23:8
    24:17,20 25:6,12
    27:1,21 28:16,25
    29:7,11,12,23
    30:1,3,24 34:18
    35:1,1 41:3 42:9
    42:13 44:6
**motions** 25:2,15
    26:11
**move** 11:23
**moved** 28:23
    29:24
**msj** 29:12
**multiple** 31:4
**mute** 6:13 22:17
**mv** 34:11

**n**

**n** 4:1 6:1 44:1
    45:1
**n.d.n.y.** 36:8
**near** 36:21
**necessarily** 14:11
**necessary** 33:16
    34:12 39:13 40:5
**need** 21:3 23:9
    24:24 25:11,16,18
    26:21 27:8 31:3
    32:5 36:16 41:18
**needed** 32:12
**needs** 23:14
**neighbor** 30:13
**neighbors** 38:20
**never** 32:20,21,22
    32:23 33:12 38:24
**new** 1:2 2:3 4:6,14
    4:22 5:11 15:2
    34:5 37:14 40:5
    40:13,13
**nj** 5:4

**nolan** 4:8 6:14 7:1
    8:5 27:4,6,6,18
    28:5,5,25 34:20
    41:24 42:6,19
    43:5,9
**non** 6:17 7:24
**noon** 24:23 25:3
    26:1,3,13
**note** 16:11 30:16
**noted** 34:10 40:4
    40:7
**notes** 40:19
**notice** 3:1 17:20
    18:1
**notion** 15:16
**number** 28:1,1
    30:4
**numerous** 29:2
**ny** 4:6,14,22 5:11
    45:23

**o**

**o** 2:21 6:1 45:1
**object** 19:7,8
    26:11
**objected** 27:8
**objection** 29:7,25
**objections** 19:9,19
    25:25 26:8
**objective** 34:14
**obligation** 37:16
    37:24 39:9
**obligations** 37:8
**obtained** 19:24
**obviously** 10:11
    12:7 14:19 23:12
**occurred** 36:3
**offer** 13:13
**offers** 34:22
**office** 41:25
**officer** 31:15
**offset** 12:24
**oh** 6:7 22:18

[oit - predominant]                                                                  Page 9

oit  12:12
old  45:21
once  10:13,14
  25:4
ongoing  9:12,14
  13:2 16:13,14
  17:1,22
operations  33:10
opportunity
  20:11
oppose  34:25
opposed  14:2,6
  40:9
opposing  7:19
opposite  12:3
opposition  18:2
  23:7 29:14 35:15
optimistic  7:8
orbach  5:18
order  8:6 10:2,2,4
  10:17,18,18,21
  21:24 26:14,17,24
  33:16 35:23 39:6
  42:8,12,13,17
ordinary  39:16,18
original  35:11
orion  1:8,13 6:8
outline  7:5
outside  39:17
outstanding  10:20
outweighed  12:23
overall  7:9
owe  38:15
owed  12:23 31:17
owing  37:9
owned  14:21
  31:22
owner  15:2
ownership  10:3
  12:8

**p**

p  4:1,1 6:1
p.c.  5:1
p.m.  23:24 24:22
  25:2,17,23
pachulski  4:3
  6:14
package  26:2
page  44:4
paid  12:16 15:3
  28:21 31:17 33:1
  36:23 37:24 39:12
papers  19:9 20:5
paragraph  35:19
paris  5:14
park  4:20
parlatore  4:11
  6:20
parmar  9:8,16
  10:10 11:8 12:13
  14:21 18:8 24:3
  29:15,20,21 30:14
  30:17,18 31:1,14
  31:16 32:4,12,24
  33:1,5,6,9,11 35:7
  35:10,17 36:11,16
  36:22 38:20,22
  40:20
parmar's  30:15
  36:13 37:24
part  18:21 24:1
  30:9 32:6
partial  8:18 20:3
  23:17 32:25 42:15
particular  10:13
particularly
  19:21 34:19
parties  7:6 13:10
  21:6,20 24:17
  25:10,14,24 29:3
  30:8 34:21 42:7
partly  40:4

partner  14:25
party  6:17,22
  7:23 21:18 27:7
  34:22
party's  26:12,12
pattinsky  6:17
paul  30:14
pay  15:2 35:12
  36:17 38:5 39:6,7
  39:8,8,9
paying  9:11 11:20
  13:23 16:9 35:15
payment  9:18
  31:9
payments  16:13
  31:23 32:3,6,25
  33:20,23,25 36:13
  36:25 37:4 38:4
  38:16 39:4,11,17
payroll  31:3
pending  8:2 9:8
  15:17,25 20:16,20
  21:10 23:5 24:2
  24:21 25:6 29:23
percolating  21:4
performed  32:23
permit  15:6
person  19:11
  29:22
personal  7:15
  11:23 31:10 32:24
  32:25 35:2 36:13
  37:24 38:24
personally  33:1
petition  36:4
piece  11:1,2
piittinsky  4:24
pittinsky  4:18
  6:16,17 11:20
  12:2,9 14:10,15
  17:24 18:20 19:2
  24:1

pittinsky's  17:22
place  38:6
placed  31:4
plaintiff  3:2,4
  27:6 28:6 34:17
  37:2
plaintiffs  1:14
platform  21:14
plaza  2:2
pleadings  7:6
plus  41:1
pocket  41:12
point  10:11,19,22
  11:15 12:7 14:4
  14:20 19:6,22
points  15:14
politely  13:6
portion  25:5 42:1
portions  26:9
  29:25
position  8:5,8
  9:20 10:1,5,10
  11:7 12:4,17,17
  12:21 13:11 14:9
  16:4 19:3
positions  7:4
possession  16:16
possibility  10:13
  18:8
possible  22:20
possibly  11:5
post  41:1
posting  9:10 16:8
potentially  17:21
practical  17:8,9
practice  21:17
  25:12
precluding  25:6
predominance
  30:7
predominant
  29:24

Case 8-20-08049-ast   Doc 131   Filed 07/10/24   Entered 07/10/24 23:26:16
Case 8-20-08042-ast   Doc 48-1   Filed 06/17/21   Entered 06/17/21 19:50:10

[premature - require]                                                    Page 10

premature 10:19
premises 11:3
prep 26:4
prepared 21:8
  29:4 32:10
present 5:16
  21:20 24:4 27:9
  37:17,18 40:15
presentment 3:1
preserve 14:6
presidential 25:1
presume 17:14
presuming 11:13
prevail 10:23
  35:23
prevent 8:25
price 15:8 18:12
  19:6,25 20:24
principal 30:20
prior 7:7 32:25
  36:4
private 15:11
  19:15
privilege 41:11
probably 22:1
probative 19:12
  19:21
procedural 20:1
  21:9 28:18
procedurally
  20:13
procedure 13:19
  13:21 19:7 34:11
procedures 18:24
  23:10
proceed 23:25
proceeding 6:11
  7:25 12:25 13:1
  24:19 28:4,19
  31:25 43:4
proceedings
  11:22 12:19 43:13
  45:4

proceeds 17:11
  33:11
process 18:17,24
  19:14,15,23,23
product 32:22
  41:11
program 22:1
promissory 30:16
proof 37:14 40:10
property 7:15
  8:17 9:1,4,11 11:1
  11:2,24 12:21
  13:8 14:2 35:25
  35:25 39:23
property's 19:16
proposed 42:8
protect 10:25
  11:14
protocol 7:10
  21:13,14 26:19,23
  41:6 42:1,12
prove 35:9,11
  40:6,6
provide 29:8,20
  33:10 35:8,14
  41:4
provided 17:15
  21:23 34:19 37:3
  41:23
provides 37:15
purchase 18:12
purported 35:14
purpose 8:12
purposes 18:9
  23:17
put 12:10 13:1
  17:8 19:9 21:5
  24:7,10
puts 10:9
putting 13:19,21
  17:24 18:3,22

q

question 7:8,9
  9:21 19:19
questioned 38:3
  39:21
questions 7:5,21
  7:21 32:1 42:23
quite 11:21,21
quote 31:2,6,6
  32:12 33:6,8 39:6

r

r 2:21 4:1 6:1 45:1
raise 8:4
raised 7:22 17:23
  17:25 32:1 33:15
ranking 31:15
reach 15:10 34:13
  38:6
reached 7:9 11:23
reaching 34:7
ready 22:5,8,9,16
real 9:14 10:14,14
  12:21 34:15
really 19:2,12,20
  19:23
reason 9:23,24
  12:9,16 21:5,13
  32:5 33:24 36:12
  36:17,20,23
reasonable 9:6
reasons 30:2
  35:18 40:24
receive 29:17
received 33:23
receives 40:17
recess 43:12
record 12:10 30:4
  30:10 32:7 34:9
  36:19 39:10 40:22
  40:23,24 43:12
  45:4
recorded 6:4

recover 28:21
recovery 41:1
red 5:4
redacted 41:10
refer 29:12
referred 36:15
refiled 25:19
refrigerator
  16:20
refused 12:5
relating 35:6
relationship
  38:18,22
relevant 29:23
  30:5,20
relief 8:24 9:7,9
  9:16 10:25 24:17
relies 29:6
rely 25:24 34:12
relying 24:6 34:8
  37:21
remain 37:5,12
remained 37:4
remains 25:9 43:3
remedy 10:15
render 20:13
  23:17 28:16
rendered 20:4
  39:2
repaid 31:17
  32:25
repay 38:23
repayment 31:1
repeat 31:10
replies 24:24
reply 31:5 41:18
request 15:6,24
  15:25 30:15 31:5
  41:3
requested 33:6
require 11:12
  21:22 40:10

Case 8-20-08049-ast    Doc 131    Filed 07/10/24    Entered 07/10/24 23:26:16
Case 8-20-08042-ast    Doc 48-1    Filed 06/17/21    Entered 06/17/21 19:50:10

[requires - specifically]                                                                 Page 11

**requires** 34:24
**residential** 4:19
**resolve** 42:16
**resolved** 31:4 42:3
  43:3
**respect** 9:8 39:15
**respond** 15:13
**responded** 33:12
**response** 32:4
  41:17,19,22
**responses** 24:22
**result** 19:24
**retain** 18:19
**retainer** 32:10
**retention** 39:22
**return** 33:3
**review** 33:6,13
**reviewed** 38:8
**right** 6:5 7:3,4,20
  7:23 8:11 9:19
  14:10 17:5,19
  18:15,20 19:10
  22:10,15 23:4,11
  23:15,22 27:3,17
  27:18,20 28:3,10
  28:11,14 42:11,20
  42:20 43:1,1,6
**risk** 16:17,21 17:1
  17:2
**river** 4:12 6:20
  7:11,22 8:16 9:20
  13:10,22 17:11
  18:3,11 19:18
  20:10,16 22:15
  23:5 25:20
**riverhouse** 4:20
  6:18
**road** 5:3 16:25
  45:21
**rockefeller** 4:20
**room** 21:15 26:21
**roseburg** 4:18
  6:17

**rosen** 5:8,13
**rule** 9:25 20:4,14
  24:20 25:8,12
  26:9 34:24 35:20
**rules** 41:23
**ruling** 20:9,11
  28:15,17 30:2
**rulings** 44:3
**run** 21:21

**s**

**s** 2:22 4:1 6:1,3
**s.d.n.y.** 36:9 37:20
**sale** 6:10 7:11,18
  8:25 10:8,13 13:8
  14:13,13 15:6,8,8
  15:11,23 16:1,5
  17:5,13 18:4,17
  18:23 19:1,15,23
  19:23 20:23,23
  21:9 25:15 27:1
  27:21
**sales** 19:25
**sandpiper** 34:11
**sanford** 5:13
**sartison** 6:12 27:2
  27:21
**satisfied** 34:16
**says** 29:19 35:6,10
**scenario** 10:24
  11:6
**scharf** 6:13,14 7:1
  7:12 8:4,8,21 9:5
  15:13,16 17:17,21
  22:7,9 23:15,18
**schart** 4:9
**schedule** 22:10
**schoor** 1:16 5:2
  28:2,9,22 29:7,18
  29:19,25 30:13,15
  30:17,25 31:2,8
  31:17,20,21 32:3
  32:6,11,13,16,18
  32:20,21 33:1,3,5

33:9,22 35:7,16
  35:19 36:13,17,24
  38:4,5,16,19 39:7
  39:9 40:19 41:16
**scratches** 16:19
**second** 7:17 9:11
**secrecy** 39:19
**secret** 39:20
**section** 34:5,6
  35:22 37:15 38:12
**sections** 40:8
**secure** 15:11
**see** 8:3 12:9 16:4
  20:25 21:3,5,12
  24:13 26:23 36:7
  37:19 40:11,17
**seek** 8:23 15:17
  29:13
**seeking** 8:12
  12:24 14:5 24:17
**seeks** 28:21
**selecting** 7:17
**self** 15:21
**sell** 9:4 10:6,19
  15:1 23:8
**selling** 15:22
**sense** 11:18
**sent** 30:25 31:8,22
  33:3
**separate** 23:9
**service** 32:10
**services** 32:23
**set** 11:8,10 21:24
  24:16 28:24 30:1
  35:2 38:22 43:2
**setting** 19:15 25:1
**settled** 28:12
**settlement** 7:10
**seven** 21:22 22:2
**sever** 23:16
**shaking** 12:9
**sham** 36:12

**shelving** 13:20
**sheriff** 14:17
**sheriff's** 15:8
**short** 39:6,8
**shortly** 33:4
**shot** 19:21
**show** 35:3
**showings** 24:3
**side** 20:1 34:15
**sides** 12:3
**side's** 27:17
**signed** 32:20
**significant** 21:5
**significantly**
  13:18
**simply** 32:24
  40:22 42:2
**sit** 17:3
**situation** 10:16
**six** 38:13
**sixth** 39:19
**skate** 24:6
**social** 30:13
**sold** 8:18 10:11,14
  15:7,20 32:22
**sole** 11:15
**solutions** 45:20
**solvency** 38:25
**somebody** 16:23
  20:15
**somewhat** 23:7
**sonya** 3:25 45:3,8
**sorry** 6:7,13 16:12
  22:19
**sought** 8:2
**southern** 37:8
**speak** 9:2 14:24
**speaking** 12:7
**specific** 25:9
**specifically** 29:14
  32:2 35:22 36:15
  39:7

[specifications - transferred]                                    Page 12

specifications
  11:4
specificity  35:14
sponsoring  25:11
spot  17:24
stage  19:22
standard  22:7
  33:22,23
standing  21:13,14
  25:8
standpoint  17:9
  25:21 26:3
stang  4:3 6:15
stanton  17:15
stanton's  22:4
  25:18
starting  30:12
state  12:18,24
  13:11
stated  31:2 35:4
  40:24
statement  29:4
  35:13 36:16
statements  35:18
states  1:1 2:1
  40:17
stating  31:9 32:5
status  6:11 14:14
  27:1
stay  8:2 9:8,25
  10:24 15:17,24,25
  16:8 20:16,20
  21:10 23:5,8,10
  24:2,20 25:6
  27:22
stipulated  29:4
  30:8 34:21
stipulation  31:7
stricken  35:20
strike  29:24 30:1
string  36:14
strong  39:1

strongly  15:6
subject  7:25 8:17
  13:3 27:12
submission  42:1
  43:4
submit  29:13,15
  41:10,25
submits  27:7
submitted  34:21
  35:5 41:11 42:8
subsequently
  29:17
substantial  13:17
substantially  15:8
substantive  23:19
success  9:7
sufficient  27:9
suite  4:13,21 5:3
  45:22
sulmeyer  6:24
summary  3:4
  28:16,23,25 29:7
  29:8,11,14 30:3
  30:10,24 32:7
  33:17,19 34:8,14
  35:1 39:10 40:24
  41:12,21
sunday  32:9
superior  40:12
support  15:1
  34:15,18,23 35:1
  36:19 40:23 41:14
  41:21
supported  28:24
supporting  21:23
suppose  7:21
  12:13
supreme  15:4
  24:25 40:13
sure  15:15 19:10
  42:9
suspect  23:20

suspended  12:18
synchronicity
  20:21

                t

t  45:1,1
take  6:5,9 7:4
  19:3,19 21:15,18
  26:6 27:15
taken  20:20 41:25
takes  20:7
talk  16:11 18:21
  29:16
talking  16:23
telephonically
  5:16
temperate  11:21
tenorello  6:2,6
term  10:7
terms  7:18
terrace  4:12 6:20
  7:11,23 8:16
  13:22 17:11 18:3
  18:12 19:18 20:10
  20:16 22:16 25:20
terrace's  9:20
  13:10
testify  18:16
  25:11 35:4,10
testifying  25:19
  26:22
testimonial  18:9
testimony  21:15
  21:18 26:5,10,12
  27:11,16 35:8
texas  37:8
texting  22:12
thank  9:19 15:12
  17:5 23:3 27:18
  27:19,24 42:25
  43:7,8,9
that's  11:4 14:9
  31:7 41:9 42:6,10
  42:19

thereon  41:2
there'll  26:19
there's  24:25 36:2
  36:4,19 39:3
  40:21 42:3,5
thing  12:12
things  13:3,5,20
  16:19 21:16
think  8:22 9:5
  10:19 13:9,16
  14:21 21:6,17
  22:3 23:18 24:25
third  4:5 5:10
  36:5 38:25
thoughts  33:7
three  35:24
tie  20:22
tight  26:16
time  16:3 21:4
  22:2,7,23 23:1,24
  29:13 30:18 31:15
  33:25 36:1,21
  37:5 39:2 42:24
timeline  26:15
timing  42:23
today  6:11 7:1
  26:16,25 28:15
  30:2 41:9 42:5
told  19:11 21:1
  32:11
tomorrow  23:21
tonight  23:21
trade  4:13
transcribed  3:25
transcript  45:4
transfer  12:8
  35:24 36:3,5
  38:10 39:14,16,20
  40:5,14
transferee  38:19
transferor  38:19
transferred  31:20
  36:1

Case 8-20-08049-ast    Doc 131    Filed 07/10/24    Entered 07/10/24 23:26:16
Case 8-20-08042-ast    Doc 48-1    Filed 06/17/21    Entered 06/17/21 19:50:10

[transferring - 'our]                                                    Page 13

transferring 10:2
transfers 31:24
  34:4 39:2,20 40:2
  40:3
trial 13:21 20:18
  21:21 35:9,10
  42:13
true 45:4
trust 2:22 6:4
trustee 1:12 4:4
  6:15,25 9:3,4 10:3
  10:6,7,17 12:8
  15:10,21 16:13,15
  16:16 17:3,16
  18:25,25 19:14,14
  20:3,5,24 22:7,9
  23:16,19 25:20
  28:6,19,23 29:5
  29:24 33:2,15,17
  37:14 40:25 41:3
  41:7,9 42:10
trustee's 8:5 10:1
  11:7 17:14
trustee' 28:15
  33:5
try 22:5
trying 18:11
turning 35:22
two 6:6 19:11
  20:22 31:23 33:20
  36:3 37:9 42:7
type 19:1,17
types 24:24 25:2
typical 19:16
typically 21:21
  25:7 38:14

u

u.s. 2:23
ultimately 39:12
unable 12:14
uncontroverted
  30:10,24 33:13
  36:10,24 37:2

underlying 16:1
  34:14
understanding
  8:12
understood 42:19
  43:5
undisputed 32:21
unfair 40:6,10
unfortunately
  22:13 28:13
unique 11:1,2
unit 14:21 18:16
united 1:1 2:1
  40:17
unknown 2:25
unoccupied 16:18
unpaid 37:5,6,12
untimely 10:6
unusual 9:14
upkeep 11:19
  13:25
use 12:14 39:8
  41:6

v

v 1:15 6:12 27:1
  28:1 34:11 40:7
  40:12,17
value 9:11 13:12
  18:16 27:15
vantage 19:22
variety 30:19
vendor 32:21
  39:12
ventures 30:19
veritext 45:20
versions 34:16
view 19:6
violation 38:12
virtual 21:14
virtually 21:20
vocal 11:21

w

wait 42:2
waive 27:14,16
walia 5:9
wallstreet 40:7
want 6:6 14:12,20
  17:6 23:16 25:10
  25:14 26:25 42:22
wanted 26:16
wants 19:18 20:3
  20:16
wasting 9:13
  11:18
way 11:7 20:2,13
  34:13
week 22:21
weeks 15:21 31:3
weigh 14:12 25:21
welcome 20:12
  27:22
went 18:25 36:22
we'll 26:2 29:16
  43:2,12
who's 26:21
wine 20:25 21:1
wish 25:24
witness 18:2
  21:15 25:11,19,22
  26:5,12,22,22
  27:9
witnesses 17:6,14
  18:3 21:19 26:6
witness's 26:10
won 37:11
wong 29:1 32:8
  34:20
work 12:12 27:13
  41:11
worked 12:19
  29:22
working 7:15
world 4:13

would've 19:9
wrote 38:2

x

x 1:5,11,18 27:14
  44:1

y

year 29:11
years 12:2,15
  19:11 30:12 31:13
  34:10 36:3
york 1:2 2:3 4:6
  4:14,22 5:11 34:5
  37:14 40:5,13,13
young 40:12
you'll 26:23
you're 26:11
  27:22,22

z

zaharis 29:16,21
  31:14 32:4,9,15
  36:11,16,22
ziehl 4:3 6:15

'

' 31:6
'our 31:6